**No. 2015-1944**

IN THE

# UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

WI-FI ONE, LLC,

*Appellant,*

v.

BROADCOM CORPORATION,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board in Case No. IPR2013-00601*

## NON-CONFIDENTIAL JOINT APPENDIX

G. Donald Puckett
NELSON BUMGARDNER PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
(817) 377-9111

Douglas A. Cawley
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4972

Peter J. Ayers
LEE & HAYES PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
(512) 605-0252

*Attorneys for Appellant*
*Wi-Fi One, LLC*

Dominic E. Massa
Katie M. Saxton
Kevin A. Goldman
Zachary P. Piccolomini
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Appellee*
*Broadcom Corporation*

## TABLE OF CONTENTS

| Document Title | Page Range |
| --- | --- |
| Final Written Decision (Paper No. 66) | A1–A28 |
| United States Patent No. 6,772,215 | A29–A39 |
| [REDACTED] Motion for Additional Discovery (Paper No. 14) | A44–A54 |
| [SEALED] Motion for Additional Discovery (Paper No. 12) **Pages A0046.1 and A0050.1 contain confidential material.** | A44.1–A54.1 |
| [REDACTED] Petitioner's Opposition to Motion for Additional Discovery (Paper No. 18) | A55–A64 |
| [SEALED] Petitioner's Opposition to Motion for Additional Discovery (Paper No. 19) **Pages A0069 and A0070 contain confidential information.** | A65–A74 |
| Decision on Motion for Discovery (Paper No. 23) | A75–A91 |
| Patent Owner's Request for Rehearing (Paper No. 27) | A92–A100 |
| Decision on Request for Rehearing (Paper No. 28) | A101–A106 |
| Decision on Institution of Inter Partes Review (Paper No. 29) | A107–A130 |
| Excerpts from [SEALED] Patent Owner Response (Paper No. 40) | A131 |
| [SEALED] Excepts from Patent Owner Response (Paper No. 40) **Page 0141 contains confidential information.** | A138–A150, A162, A173–177 |
| [REDACTED] Excepts from Patent Owner Response (Paper No. 41) | A188–A200, A212 |
| Excerpts from Petitioner's Reply to Patent Owner Response (Paper No. 49) | A231, A234–A243 |
| Patent Owner's Request for Rehearing of Final Written Decision (Paper No. 70) | A252–A269 |
| Decision on Request for Rehearing (Paper No. 71) | A270–A279 |
| Notice of Appeal (Paper No. 72) | A280–A286 |
| Certified List, Case No. IPR2013-00601 | A295–A299 |
| Excerpts from Petition for Inter Partes Review of U.S. Patent | A303–A306, |

| Document Title | Page Range |
|---|---|
| 6,772,215 (Paper No. 3) | A311–A312 |
| Excerpts from Notice of Oral Hearing (Paper No. 65) | A468 |
| Ex. 1002 - Seo, U.S. Patent No. 6,581,176 ("Seo") | A494–A505 |
| Excerpts from Ex. 1004 - Declaration of Harry Bims, Ph.D. | A521–A522, A526-A542 |
| Excerpts from Ex. 1005 - Memorandum Opinion And Order Construing Claim Terms of United States Patent Nos. 6,772,215, 6,330,435, 5,987,019, 6,466,568, and 5,790,516, Case 6:10-CV-473 (LED/KFG), March 8, 2013. | A591–A594 |
| Ex. 1007 - Declaration of David Djavaherian *Pages A0868-A0869 contain confidential information.* | A867–A869 |
| Excerpts from Ex. 1010 - 240US1 Exhibit 1010 Excerpts from TIA/EIA/IS-707-A | A879, A892 |
| Excerpts from Ex. 1012 - September 16, 2014 Deposition Transcript of Robert Akl | A1096, A1099–A1100 |
| Ex. 1013 - Reply Declaration of Harry Bims | A1109–A1112 |
| Excerpts from Ex. 1014 - February 20, 2014 Non-Confidential Brief for Plaintiffs-Appellees | A1125 |
| Ex. 2001 - PO's Request for Production | A1210–A1217 |
| Excerpts from Ex. 2005 - Form 10-Q SEC Filing | A1418 |
| Ex. 2007 - Email Stream 06-04-2010 | A1452–A1454 |
| Ex. 2009 - EC Complaint *Pages A1463-1496 contain confidential information.* | A1462–A1498 |
| Ex. 2016 – Order Denying Ericsson's Motion for Relief from Protective Order and Expedited Briefing | A1628–A1631 |
| Excerpts from Ex. 2018 - Final Judgment Pursuant to FRCP 54(b) | A1641 |
| Ex. 2020 - Declaration of Robert Akl, D.Sc. | A1645, A1651–A1652, A1654–A1658, A1663–A1667 |
| Excerpts from Ex. 2021 - Amendment and Reply to Office | A1698–A1703, |

| Document Title | Page Range |
|---|---|
| Action for Application No. 09/537,146 (January 7, 2004 | A1707–A1709 |
| Excerpts from Ex. 2022 - Notice of Allowability for Application No. 09/537,146 (February 24, 2004) | A1712 |

### Confidential Material Omitted

The material omitted on pages A59, A69 and A868-69 describes the commercial relationship between Broadcom and the Texas Defendants. The material omitted on pages A46, A46.1, A50, A50.1, A60, A70, A141, A191, and A1463-98 describes a non-public regulatory action.

Trials@uspto.gov
571-272-7822

Paper 66
Entered:  March 6, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

_____

Case IPR2013-00601
Patent 6,772,215 B1

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

**A0001**

IPR2013-00601
Patent 6,772,215 B1

## I.    INTRODUCTION

Broadcom Corporation ("Petitioner") filed a Petition requesting *inter partes* review of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 (the "challenged claims") of U.S. Patent No. 6,772,215 B1 (Ex. 1001, "the '215 patent").  Paper 3 ("Pet.").  Telefonaktiebolaget L. M. Ericsson[1] ("Patent Owner") filed an election to waive its Preliminary Response.  Paper 22.  On March 10, 2014, we instituted an *inter partes* review of all challenged claims on certain grounds of unpatentability alleged in the Petition.  Paper 29 ("Dec. to Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 40, "PO Resp.") to which Petitioner filed a Reply (Paper 49, "Pet. Reply").  Patent Owner filed a Motion to Exclude (Paper 53), which Petitioner opposed (Paper 58).  Patent Owner filed a Reply to Petitioner's Opposition to its Motion to Exclude.  Paper 59.  Oral hearing was held on December 8, 2014.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown, by a preponderance of the evidence, that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent are unpatentable.  Patent Owner's Motion to Exclude is denied.

---

[1] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice indicating that the '215 patent had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC were now the real parties-in-interest.  Paper 43.

[2] A transcript of the oral hearing is included in the record as Paper 65.

**A0002**

IPR2013-00601
Patent 6,772,215 B1

## A. Related Proceedings

Petitioner and Patent Owner indicate that the '215 patent is involved in a case captioned *Ericsson Inc. v. D-LINK Corp.*, Civil Action No. 6:10-cv-473 (E.D. Tex.) ("D-Link Lawsuit"), and in an investigation at the U.S. International Trade Commission captioned *In the Matter of Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Media Players and Televisions, and Components Thereof*, ITC Inv. No. 337-TA-862. Pet. 1–2; Paper 6, 1. Patent Owner also identifies an appeal at the Federal Circuit captioned *Ericsson Inc. v. D-LINK Corp.*, Case Nos. 2013-1625, -1631, -1632, and -1633. Paper 6, 1. Petitioner also filed two petitions for *inter partes* review of related patents: IPR2013-00602 (U.S. Patent No. 6,466,568) and IPR2013-00636 (U.S. Patent No. 6,424,625).

## B. The '215 Patent

The '215 patent relates to the telecommunications field and, in particular, to a method for minimizing feedback responses in Automatic Repeat Request (ARQ) protocols. Ex. 1001, 1:14–17. When data is conveyed between nodes in a network, certain algorithms are used to recover from the transmission of erroneous data and the loss of data between the nodes. *Id.* at 1:20–23. An algorithm commonly used is referred to as an ARQ protocol. *Id.* at 1:23–25. Each node, or peer entity, in a network includes a receiver and a sender. *Id.* at 1:26–29. The units of data conveyed between peer entities commonly are referred to as Protocol Data Units ("PDUs"). *Id.* at 1:29–30. The basic function of an ARQ protocol is to allow the receiver to request that the sender retransmit PDUs that were lost

3

**A0003**

IPR2013-00601
Patent 6,772,215 B1

during transmission or contained errors. *Id.* at 1:33–37. The receiver can inform the sender about which PDUs were received correctly and/or can inform the sender about which PDUs were *not* received correctly. *Id.* at 1:38–41. When the sender receives this information, it retransmits the "lost" PDUs. *Id.* at 1:41–42. Several ARQ protocols, such as Stop-and-Wait ARQ, Go-back-N ARQ, and Selective-Repeat ARQ, existed at the time that the '215 patent was filed and were well known. *Id.* at 2:17–21.

Figure 1 of the '215 patent is reproduced below.



Figure 1 illustrates the use of ARQ protocols. *Id.* at 2:22–23. A sequence of transmitted Data-PDUs ("D-PDUs") and Status-PDUs ("S-PDUs") is shown. *Id.* at 2:28–29. A D-PDU includes user data, a sequence number ("SN"), and possibly piggybacked error control information. *Id.* at 2:29–31. The sequence number ("SN") is associated with each D-PDU to identify that

4

**A0004**

IPR2013-00601
Patent 6,772,215 B1

specific D-PDU. *Id.* at 2:32–34. An S-PDU includes status information but no user information. *Id.* at 2:31–32.

According to the '626 patent, two main methods were used in the prior art for coding the SNs within S-PDUs: (1) a list of SNs to be retransmitted; and (2) a bitmap to represent the SNs to be retransmitted. *Id.* at 2:48–52. As such, known S-PDUs included a format identifier that could be used by a receiver to distinguish between the different PDU formats.

Figures 2 and 3 of the '215 patent are reproduced below:

FIG. 2
PRIOR ART

| PDU_format=S-PDU |
| Length=5 |
| SN=3 |
| SN=4 |
| SN=5 |
| SN=9 |
| SN=16 |

FIG.3
PRIOR ART

| PDU_format=S-PDU |
| SSN=2 |
| BITMAP=0100001111111000 |

Figure 2 shows an S-PDU that uses the list method to code SNs. *Id.* at 2:60–62. Figure 3 shows an S-PDU that uses the bitmap method to code SNs. *Id.* at 3:18–19. According to the '215 patent, a significant problem with existing ARQ protocols is that fixed length messages are used, which leads to a waste of bandwidth because unnecessary overhead information is transmitted. *Id.* at 3:46–50; *see also id.* at Table 1, 4:1–13. According to the '215 patent, a significant need existed for a method that can be used to minimize the size of S-PDUs in an ARQ protocol or, if it is not possible to fit all SNs into a single S-PDU, to maximize the number of SNs in an S-PDU with limited size. *Id.* at 4:33–38.

5

**A0005**

IPR2013-00601
Patent 6,772,215 B1

To address these issues, the '215 patent discloses a method whereby different mechanisms for indicating erroneous D-PDUs can be combined in a single S-PDU. *Id.* at 4:43–48. Each message includes three fields: type information, length information, and a value. *Id.* at 5:60–66. In a first embodiment of the invention, a bitmap message can be constructed using a number of methods to represent the length of the bitmap (i.e., the LENGTH field). *Id.* at 6:19–48. Likewise, a list message can list only erroneous SNs or can combine the prior art list method with the list of only erroneous SNs. *Id.* at 6:58 –7:51. In accordance with a second embodiment of the invention, a number of different message types can be combined to create an S-PDU. *Id.* at 7:52–54. Figure 8, reproduced below, illustrates how an S-PDU can be constructed in accordance with this embodiment:

| |
|---|
| Type=BITMAP' |
| FSN |
| LENGTH |
| Bitmap |
| Type=LIST' |
| LENGTH |
| $SN_1$ |
| $L_1$ |
| ... |
| $SN_{LENGTH}$ |
| $L_{LENGTH}$ |
| Type=BITMAP' |
| LENGTH |
| bitmap |
| Type=NO_MORE |

FIG. 8

As shown in Figure 8, the resulting S-PDU includes two BITMAP' messages and one LIST' message. *Id.* at 8:43–44. For comparison with the prior art techniques, Table 3 is reproduced below.

6

**A0006**

IPR2013-00601
Patent 6,772,215 B1

TABLE 3

| | Size of S-PDU (bits) | | |
| | State-of-the-art solutions | | Combination |
| | LIST | BITMAP | solution |
|---|---|---|---|
| 1 | 42 | 141 | 38 |
| 2 | 114 | 141 | 74 |
| 3 | 138 | 141 | 78 |
| 4 | 282 | 141 | 121 |
| 5 | 114 | 141 | 53 |

Table 3 shows the sizes of S-PDUs constructed in accordance with the prior art list and bitmap methods, and also with the combination method described in accordance with the second embodiment. *Id.* at 9:27–30. As illustrated by Table 3, the size of S-PDUs resulting from the combination method described in the '215 patent is significantly smaller than that of the S-PDUs resulting from the prior art methods. *Id.* at 9:32–35.

### C. Illustrative Claim

Of the challenged claims, claims 1, 15, 25, and 45 are independent. Claim 1 is reproduced below:

> 1.　A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:
>
> sending a plurality of first data units over a communication link;
>
> receiving said plurality of first data units; and
>
> responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.

7

**A0007**

IPR2013-00601
Patent 6,772,215 B1

*D. The Instituted Ground of Unpatentability*

We instituted *inter partes* review of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 under 35 U.S.C. § 102 as anticipated by Seo (US 6,581,176, issued June 17, 2003) (Ex. 1002).

II.    ANALYSIS

*A.  35 U.S.C. § 315(b)*

Patent Owner argues that "Petitioner is subject to the 35 U.S.C. § 315(b) bar as a privy to the D-Link Defendants, and because the D-Link Defendants are real parties-in-interest to this action, despite Petitioner's failure to designate them as such under 35 U.S.C. § 312(a)(2)." PO Resp. 8. According to Patent Owner, Petitioner is in privity with defendants named in the D-Link Lawsuit (*Ericsson Inc. v. D-Link Corp.*, 6:10-cv-473) because, *inter alia*, "[Petitioner] has an indemnity relationship with Dell and Toshiba." *Id.* at 8–12.  Patent Owner also argues that the defendants named in the D-Link Lawsuit (the "D-Link Defendants") are real parties-in-interest to this proceeding because Petitioner has a "substantive legal relationship with at least Dell and Toshiba," Petitioner used the same prior art references as the D-Link Defendants, and the Petition was filed after the D-Link Defendants abandoned their invalidity case regarding the '215 patent in the D-Link Lawsuit. *Id.* at 12–14.

Petitioner counters that "[Patent] Owner has raised this identical argument twice, and failed each time," and that "[t]his third attempt relies on *exactly the same arguments [Patent] Owner made to this Board and the Federal Circuit* and should be rejected for the same reasons." Pet. Reply 1. Petitioner continues that, "[Patent] Owner offers no new reason whatsoever

8

**A0008**

IPR2013-00601
Patent 6,772,215 B1

for this Board to reverse its prior decision that [Patent] Owner's preferred 'evidence' and legal authorities fail to amount to anything more than 'speculation' or 'a mere possibility' that [Petitioner] is in privity with the D-Link Defendants or that the D-Link Defendants are real parties-in-interest." *Id.* We find Petitioner's arguments persuasive.

Patent Owner's arguments and evidence are not different substantively from the arguments and evidence presented in its Motion for Additional Discovery (Paper 14). The arguments and evidence are unpersuasive for same reasons explained in our Decision on Patent Owner's Motion for Additional Discovery (Paper 23), which we adopt and incorporate by reference.

### B. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Technologies, LLC*, No. 2014-1301, 2015 WL 448667, at *5–*8 (Fed. Cir. Feb. 4, 2015) ("Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation"). Under the broadest reasonable interpretation standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). An inventor may rebut that presumption by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480

9

**A0009**

IPR2013-00601
Patent 6,772,215 B1

(Fed. Cir. 1994).  In the absence of such a definition, limitations are not to be read from the specification into the claims.  *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

1. *"responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field"*

Petitioner proposes that this phrase be construed as "responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types."  Pet. 5.  Petitioner states that this construction was proposed by Patent Owner and adopted by the Court in the D-Link Lawsuit.  Pet. 8 (citing Ex. 1005, 9).  Petitioner does not dispute this construction.  Pet. 8.  The proposed construction replaces "constructing" with "generating," and replaces "type identifier field" with "a field that identifies the message type of the feedback response message from a number of different message types."  Although this construction has been adopted in the D-Link Lawsuit, we are not persuaded that it is the broadest reasonable interpretation of this limitation.

For example, the antecedent basis for "*the* feedback response message" in the proposed construction is the "feedback responses" of the preamble.  "In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)).  "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or

10

**A0010**

IPR2013-00601
Patent 6,772,215 B1

intended use for the invention.'" *Id.* (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)).

If we were to adopt Petitioner's proposed construction, it would introduce a dependency upon the preamble, thereby causing the preamble to limit the invention.[3]  Accordingly, in the Decision to Institute, we explained that we were not persuaded that Petitioner's proposed construction would be the broadest reasonable interpretation of the claim because no term of the claim, as drafted, has its antecedent basis in the preamble.  Dec. to Inst. 10.

Patent Owner argues that we provided, in the Decision to Institute, "no case law for [the] proposition that introducing a dependency upon the preamble would cause the preamble to limit the invention," and that this proposition "appears to be focused on antecedent basis issue."  PO Resp. 26. As we explained in the Decision to Institute, Patent Owner's proposed construction uses the phrase "the feedback response," the antecedent basis for which is the "feedback response" of the preamble.  Dec. to Inst. 10.  We decline to construe claim 1 in a way that the preamble becomes "necessary to give life, meaning, and vitality" to the claim.  *Id.*  Moreover, the plain language of claim 1 requires the "type identifier field" be included in a "message field for *a second data unit*" (emphasis added).  It does not require that that "message field" be for a "feedback response."  By requiring the recited "type identifier field" to "identif[y] a message type of *a feedback response message*," Patent Owner's proposed construction implicitly limits

---

[3] This result would be contrary to Petitioner's proposed construction of the preambles as non-limiting.  Pet. 7, 8.

11

A0011

IPR2013-00601
Patent 6,772,215 B1

the recited "second data unit" to a feedback response message. Patent Owner provides no support for such a construction.

The '215 patent does not define explicitly the term "type identifier field," but does uses it several times to describe a field in an S-PDU that indicates whether that S-PDU includes a list or a bitmap. Ex. 1001, 6:20, 8:2, 8:16; *see also id.* at 7:58–61, 8:8–10, 8:55–57 (describing a "type identifier"). For example, Table 2 depicts a column labeled "Type Identifier," that includes NO_MORE, LIST', BITMAP', and ACK. *Id.* at 9:1–9. Accordingly, in the Decision to Institute, we construed "type identifier field" as "a field of a message that identifies the type of that message."

Patent Owner argues that our construction is overly broad because it "would cover a mere S-PDU as in the prior art . . . [b]ut the specification distinguishes 'the present invention' from the prior art S-PDU." PO Resp. 26 (citing Ex. 1001, 4:38–40, 4:43–63). Patent Owner does not elaborate. Petitioner counters that "[Patent] Owner concedes invalidity under the Board's construction based on the admitted prior art," and that "invalidity of the claims in light of the prior art is not grounds for rejecting this Board's well-reasoned claim construction." Pet. Reply 4.

We are not persuaded by Patent Owner's arguments. Patent Owner's proposed construction differs from ours in that it limits the message to "a feedback message" and states explicitly what is only implicit in our construction—i.e., "from a number of different message types." It is not evident which of those two additional limitations Patent Owner contends distinguish the prior art S-PDU. Indeed, the '215 patent describes the prior

12

**A0012**

IPR2013-00601
Patent 6,772,215 B1

art S-PDU as a "feedback response" (*See, e.g.,* Ex. 1001, 2:38–45) and describes how it may have a number of different message types (*See, e.g., id.* at 2:63–3:45, Figs. 2, 3). In any event, the '215 patent distinguishes "the present invention"—not the "type identifier field"—from the prior art. Even assuming that the patentee intended to draft the claims, as a whole, to distinguish a prior art S-PDU, Patent Owner identifies insufficient support in the claims or Specification for its proposed construction of the term "type identifier field."

Finally, in the Decision to Institute, we alternatively construed "type identifier field" as "any type of data." Dec. to Inst. 11–12. Patent Owner argues that "[b]ecause the type identifier field is not instructional or otherwise written material, the 'printed matter' doctrine does not apply." PO Resp. 27. According to Patent Owner, "the type identifier field in the challenged claims is not printed matter, and further, it defines functional characteristics of the claimed method and system." *Id.* at 31. We are persuaded that the recited "type identifier field" is not non-functional descriptive material.

Accordingly, we maintain our construction of "type identifier field" as "a field of a message that identifies the type of that message."

13

**A0013**

IPR2013-00601
Patent 6,772,215 B1

    2. *"means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields"*

Independent claim 45 recites a "means for receiving . . . ." Petitioner contends that this term is a means-plus-function element invoking 35 U.S.C. § 112, paragraph 6[4]. We agree because (1) the limitation uses the phrase "means for"; (2) the term "means for" is modified by functional language; and (3) the term "means for" is not modified by any structure recited in the claim to perform the claimed function. In the Decision to Institute, we determined that the function of the "means for receiving . . ." is

    *receiving* said plurality of first data units, *and constructing* one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length field.

Dec. to Inst. 12–15. We also construed the structure for performing the recited function to be the sender and receiver of a peer entity. *Id.* Neither party disputes our initial construction of this term, and Patent Owner agrees

---

[4] Section 4(c) of the AIA re-designated 35 U.S.C. § 112, ¶ 6, as 35 U.S.C. § 112(f). Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011). Because the '215 patent has a filing date before September 16, 2012 (effective date), we will refer to the pre-AIA version of 35 U.S.C. § 112, in this decision.

14

**A0014**

IPR2013-00601
Patent 6,772,215 B1

with our determination of the corresponding structure (PO Resp. 31).  We maintain our construction.

3.   *"for minimizing feedback responses in an ARQ protocol" (Preambles)*

The preamble of each independent claim recites "for minimizing feedback responses in an ARQ protocol."  In the Decision to Institute, we determined that the preambles do not limit the claims.  Dec. to Inst. 15.  Neither party disputes our initial construction of this term, and Patent Owner agrees with it (PO Resp. 32[5]).  We maintain our construction.

4.   *"means for sending a plurality of first data units over said communication link to said second peer entity"*

Independent claim 45 recites a "means for sending . . . ."  Petitioner contends that this term is a means-plus-function element invoking 35 U.S.C. § 112, paragraph 6.  We agree because (1) the limitation uses the phrase "means for"; (2) the term "means for" is modified by functional language; and (3) the term "means for" is not modified by any structure recited in the claim to perform the claimed function.  In the Decision to Institute, we determined that the function of the "means for sending a plurality of first data units over said communication link to said second peer entity" is "sending a plurality of first data units over said communication link to said second peer entity."  Dec. to Inst. 15–17.  We also construed the structure for performing the recited function to be the sender of a peer entity.  *Id.*

---

[5] Patent Owner's Response appears to have swapped headings IV.B.3 and IV.B.4 inadvertently, such that this claim term is argued under the heading "for minimizing feedback responses in an ARQ protocol," and that term is argued under the heading "means for sending."

15

**A0015**

IPR2013-00601
Patent 6,772,215 B1

Neither party disputes our initial construction of this term, and Patent Owner agrees with our determination of the corresponding structure (PO Resp. 31–32[6]).  We maintain our constructions.

*C. The Challenged Claims – Anticipated by Seo*

Petitioner argues that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Seo.  Pet. 21–45.  In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is disclosed by Seo, and relies upon the Declaration of Dr. Bims (Ex. 1004). *Id.* (citing Ex. 1004 ¶¶ 31–70).

Patent Owner counters that claim 1 is not anticipated by Seo because (1) Seo's NAK_TYPE does not "identif[y] the message type of a feedback response message from a number of different message types," as the parties' proposed construction of "type identifier field" requires, because Seo discloses only a single message type; and (2) Seo's NAK_TYPE field is not included in a "message field," as required by each of the challenged claims. PO Resp. 37–40.  Patent Owner also argues that Seo does not disclose a length field, as required by independent claim 15. *Id.* at 40–41.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are anticipated by Seo.

---

[6] *See* n.5 above.

16

IPR2013-00601
Patent 6,772,215 B1

*Seo (Exhibit 1002)*

Seo describes a method for transmitting control frames and user data frames in a mobile radio communications system.  Ex. 1002, 1:10–12.  Specifically, Seo discusses a modification of the Radio Link Protocol ("RLP") specified in international standard IS-707 for a Code Division Multiple Access ("CDMA") mobile radio communication system.  *Id.* at 1:14–19, 5:28–30.  According to the RLP retransmission procedure, a Negative Acknowledgement ("NAK") RLP control frame for a particular user data frame can be transmitted more than once at the same time to ensure reliability and, in response to receiving each NAK, the missing user data frame will be retransmitted.  According to the invention of Seo, rather than transmitting each NAK corresponding to each missed user data frame, a single NAK corresponding to *all* missed user data frames is transmitted to the sender.  *Id.* at 5:31–36.

Figure 4 of Seo is reproduced below:

| FIELD | LENGTH (BITS) |
|---|---|
| SEQ | 8 |
| CTL | 4 |
| RE_NUM | 2 |
| NAK_TYPE | 2 |
| NAK_SEQ | 4 |
| L_SEQ_HI | 4 |
|  |  |
| FIRST | 12 |
| LAST | 12 |
| FCS | 16 |
| PADDING | VARIABLE |
|  |  |
| NAK_Map_Count | 2 |
| NAK_Map |  |
| NAK_Map_SEQ | 12 |
| NAK_Map | 8 |

*FIG. 4*

17

**A0017**

IPR2013-00601
Patent 6,772,215 B1

Figure 4 shows the structure of a RLP NAK control frame according to the invention of Seo. *Id.* at 5:42–43. The NAK control frame of Seo includes a field NAK_TYPE with a length of 2 bits to indicate a NAK type. *Id.* at 5:53–54.

If the value of NAK_TYPE is "00," the receiver is requesting retransmission of a range of missed user data frames (*Id.* at 5:54–57), and the fields FIRST, LAST, FCS, and padding exist (*Id.* at 6:18–19). FIRST is the 12-bit sequence number of the first data frame for which retransmission is requested. *Id.* at 5:63–65. LAST is the 12-bit sequence number of the last data frame for which retransmission is requested. *Id.* at 5:65–67. SEQ, with a length of 8 bits, is a data frame sequence number. *Id.* at 5:57–58.

If the value of NAK_TYPE is "01," the receiver is requesting retransmission of missed user data frames using a bitmap, and the field NAK_MAP_COUNT exists. *Id.* at 6:8–21. If the value of the field NAK_MAP_COUNT+1 exists, then the fields NAK_MAP_SEQ and NAK_MAP exist. *Id.* at 6:21–22. NAK_MAP_SEQ is the 12-bit sequence number of the first data frame in the NAK Map for which retransmission is requested. *Id.* at 6:8–11. NAK_MAP is an 8-bit bitmap identifying the missing user data frames for which retransmission is requested, wherein the most significant bit corresponds to the user data frame identified by NAK_MAP_SEQ+1. *Id.* at 6:11–15.

> *Analysis*

In light of the arguments and evidence, Petitioner has demonstrated, by a preponderance of the evidence, that the challenged claims are unpatentable as anticipated by Seo.

**A0018**

IPR2013-00601
Patent 6,772,215 B1

For example, independent claim 1 recites "sending a plurality of first data units over a communication link."  Seo discloses a "transmitting station" that sends user data frames to a "receiving station" over a "radio section between a receiving station and the transmitting station."  Ex. 1002, 5: 28–41; *see also id.* at 8:24–27 ("transferring user data frames of a radio link protocol (RLP) from a transmitting station to a receiving station"), Fig. 6 ("Transmitting Station A").  The user data frames transport user traffic data.  *Id.* at 1:21–22.

Claim 1 also recites "receiving said plurality of first data units."  Seo discloses a "receiving station" that receives user data frames from the "transmitting station."  *Id.* at 1:21–22, 5:28–41, 8:24–27, Fig. 6 ("Receiving Station B").

Finally, claim 1 recites "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field."  Seo discloses an "RLP NAK" message that includes a field NAK_TYPE that identifies whether the message identifies a range of sequence numbers or uses a bitmap.  If the value of NAK_TYPE is "00," the RLP NAK message includes two fields—FIRST and LAST—with "the 12-bit sequence number of the first data frame for which a retransmission is required," and "the 12-bit number of the last data frame for which a retransmission is required," respectively.  Ex. 1002, 5:54–57, 5:63–67, 6:17–18.  If the value of NAK_TYPE is "01," the RLP NAK message includes a field NAK_MAP_SEQ with "the 12-bit sequence number of the first data frame in this NAK Map for which [] retransmission is requested."  *Id.* at

19

**A0019**

IPR2013-00601
Patent 6,772,215 B1

6:9–11.  On this record, we are persuaded that Seo's RLP NAK message includes a type identifier field (NAK_TYPE), and a sequence number field (FIRST, LAST, or NAK_MAP_SEQ).  We are persuaded that Seo discloses this limitation whether "type identifier field" is construed to mean "a field of a message that identifies the type of that message," or, in the alternative, to mean any type of data.

Claim 2 recites "wherein said message field comprises a bitmap message."  Claim 6 recites similarly "wherein said content field comprises a bitmap."  Seo discloses that, if the value of NAK_TYPE is "01," the RLP NAK message includes a field NAK_MAP "with a length of 8 bits [that] is a bit-map identifying the missing user data frames for which a retransmission is requested."  *Id.* at 6:11–13.  On this record, we are persuaded that Seo discloses claims 2 and 6.

Claim 4 recites "wherein said sequence number field includes any sequence number from said plurality of first data units."  Claim 8 recites similarly "wherein said second data unit comprises information about missing or erroneous said first data units."  As discussed above, the RLP NAK message includes fields with sequence numbers for which *re*transmission is requested—i.e., the sequence number of a data unit previously sent by the transmitting station but not missed by the receiving station.  *See, e.g., Id.* at 2:46–51 ("That is, the receiving station requests the transmitting station to retransmit the *missed* user data frames hereto.") (emphasis added).  On this record, we are persuaded that Seo discloses claims 4 and 8.

20

**A0020**

IPR2013-00601
Patent 6,772,215 B1

Petitioner also argues that claims 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are disclosed by Seo.  Pet. 23–33, 38–41.  We are persuaded that the evidence of record supports Petitioner's contentions.

Patent Owner presents several arguments as to how Petitioner has failed to provide an adequate reason to modify the references to reach the claimed invention and why Seo does not teach all of the limitations of the claims.  PO Resp. 32–42.  Petitioner responds to these arguments.  Pet. Reply 1–15.  We address each argument in turn below.

*Whether Seo discloses "a number of different message types"*

Patent Owner argues that, "the NAK_TYPE field in Seo does not 'identif[y] the message type of a feedback response message from a number of different message types' because Seo merely discloses a single message type."  PO Resp. 37.  According to Patent Owner, "Seo's NAK frame has a constant size and format, containing both a bitmap and a list, regardless of NAK_TYPE," and "the NAK frame . . . always contains the same fields whose content varies with the contents of the NAK_TYPE field."  *Id.* at 38.  Patent Owner continues that "Seo's NAK_TYPE field merely indicates which fields within the message field will contain zero values and which fields will contain non-zero values."  *Id*.  According to Patent Owner, "Figure 4 represents a single control frame that includes fields for both a list of first and last sequence numbers and bitmaps," and that the "only change is that certain fields contain non-zero values, depending on the value of the NAK_TYPE."  *Id.* at 39.

Petitioner counters that "Seo never limits the NAK message to a fixed length," and that "[e]ven if all the NAK messages in Seo had the same fixed

21

**A0021**

IPR2013-00601
Patent 6,772,215 B1

length, it would not prove that the NAK messages all have the same fields" because the length of a message does not necessarily determine its type. Pet. Reply 6. According to Petitioner, "Seo does not require that all fields shown in Figure 4 be used with all types of NAKs." *Id.* Petitioner continues that, "Seo describes how different fields 'exist' in different types of NAKs, as indicated by the value of NAK_TYPE." *Id.* at 6–7. We find Petitioner's arguments to be persuasive.

As an initial matter, Patent Owner's argument is based upon its proposed construction of "type identifier field," which we declined to adopt for the reasons above. In any event, we are not persuaded that Seo discloses only a single message type, as Patent Owner contends. Seo discloses explicitly that some fields in the RLP NAK control frame depicted in Figure 4 exist only if NAK_TYPE is "00," whereas other fields exist only if NAK_TYPE is "01." Ex. 1002, 6:18–22 ("[i]f a value of the field NAK_TYPE is '00', the fields FIRST, LAST, FCS, padding, exist. If a value of the 20 field NAK_TYPE is '01', the field NAK_MAP COUNT exi[st]. If a value of the field NAK_MAP COUNT+1 exists, there exist the fields NAK_MAP SEQ and NAK_MAP."); *see also id.* at claim 11. Patent Owner argues that Seo uses to the term "exist" to mean "contain non-zero values," and that those fields of Figure 4 which are not said to "exist" contain only zero values (PO Resp. 38–39), but cites nothing in Seo to support its interpretation. The only evidence Patent Owner offers is the testimony of its expert, Dr. Robert Akl, who merely repeats the language of the Patent Owner Response. Ex. 2020 ¶ 51.

22

**A0022**

IPR2013-00601
Patent 6,772,215 B1

In contrast, Petitioner's expert, Dr. Bims, testifies that Seo uses the common sense meaning of "exist," and testifies that "it would make sense to include unnecessary fields in a NAK message, such as FIRST and LAST fields in a NAK message of the bitmap NAK_TYPE, or bitmap fields in a First/Last type of NAK." Ex. 1013 ¶¶ 4–6. In this regard, we credit the testimony of Dr. Bims. We conclude that Seo discloses an RLP NAK control frame that includes certain fields only when NAK_TYPE is "00" and includes other fields only when NAK_TYPE is "01." Accordingly, we are not persuaded by Patent Owner's argument that NAK_TYPE is not a "type identifier field" because it does not identify the type of a message from a number of different message types.

### *Whether NAK_TYPE is included in a "message field"*

Patent Owner argues that, "NAK_TYPE is not part of the message, but rather part of the S-PDU header." PO Resp. 39. According to Patent Owner, "'the type identifier field' must be part of the 'said message field'" and distinguishes "fields that were included in the header of the PDU such as the PDU_format field shown in the admitted prior art." *Id.* at 39–40. Patent Owner argues that certain benefits of the invention are achieved because "the claimed 'type identifier field' [is] in the message body as opposed to the fixed length header." *Id.* at 40.

Petitioner counters that "neither the claims nor the specification of the '215 patent make a distinction between providing information in a 'header' versus in a 'payload' or in any other portion of a message." Pet. Reply 10. Petitioner continues that, "The '215 patent refers to its Figures 4-7 as 'messages' without differentiating any parts of those messages, such as those

23

**A0023**

IPR2013-00601
Patent 6,772,215 B1

fields that include control information (type) and those fields that contain data content." *Id.* at 11 (citing Ex. 1013 ¶ 10). Moreover, according to Petitioner, "[t]he amendment did not add any requirement that a type identifier field be in a particular portion of the message (header, payload, or elsewhere);" instead, "the type identifier field was *always* part of the 'message field' – the amendment just made clear that the type identifier field was a necessary element, and not just one of several optional fields within the message field." *Id.* at 12. We find Petitioner's arguments to be persuasive.

Patent Owner relies entirely on the testimony of its expert, Dr. Akl, to support its construction of "message" as excluding headers. PO Resp. 39–40 (citing Ex. 2020 ¶¶ 52, 53). However, neither the claims nor the Specification of the '215 patent distinguish a header from the recited "message." Indeed, the term "header" is not even used in the '215 patent. Moreover, Dr. Bims testifies that "the type field in Figures 4-7 of the '215 patent contain bits that tell a receiver how to process the substance of the data that follows, and therefore, would be considered part of a header as opposed to a "payload." Ex. 1013 ¶ 10. We, therefore, see no basis to construe the term "message" to exclude a header. Accordingly, we are not persuaded that Seo's NAK_TYPE is not included in a "message field."

*Dependent claim 15*

Patent Owner argues that claim 15 requires that each message field must include a "length field" because it requires

> at least one of (i) '*a length field*', (ii) 'a plurality of erroneous sequence number-fields . . . each of said plurality of erroneous sequence number fields associated with a respective one of said

24

**A0024**

IPR2013-00601
Patent 6,772,215 B1

> plurality of erroneous sequence number *length fields*,' and (iii)
> 'a plurality of erroneous sequence number *length fields*.'

PO Resp. 41. In other words, Patent Owner contends that the "each of" clause at the end of claim 15 should be read in conjunction with "a plurality of erroneous sequence number-fields," recited earlier in the claim. *Id.* According to Patent Owner, "Seo does not disclose a length field" because "[n]either the FIRST/LAST nor the BITMAP section of the NAK Control frame teaches or discloses a length field. *Id.*

Petitioner counters that the "each of" clause should be read in conjunction with the "plurality of erroneous sequence number length fields," that immediately precedes it in the claim. Pet. Reply 14. According to Petitioner, "[Patent] Owner's argument gives no meaning to the phrase "at least one of." *Id.* We find Petitioner's arguments to be persuasive.

The "each of" clause references both "said plurality of erroneous sequence number fields" and "said plurality of erroneous sequence number length fields." Nothing about the clause itself suggests that it should be read in conjunction with the "plurality of erroneous sequence number-fields, as opposed to with the "plurality of erroneous sequence number length fields." When a claim recites, "at least one of A, B, and C, each of said B associated with said C," the intuitive interpretation is to read the "each of" clause as part of C. Patent Owner points to nothing in the Specification of the '215 patent that supports its counter-intuitive interpretation. Accordingly, we are not persuaded that claim 15 requires a "length field" and, therefore, are not persuaded that Seo fails to disclose claim 15.

25

**A0025**

IPR2013-00601
Patent 6,772,215 B1

*Dependent claims*

Patent Owner argues that dependent claims 2, 4, 6, 8, 22, 26, 29, 32, 34, 46, 49, 42, and 54 are not anticipated by Seo because they depend from an independent claim that is not anticipated. PO Resp. 41–42. We are not persuaded by Patent Owner's arguments regarding the independent claims for the reasons discussed above.

*Conclusion*

We are persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are unpatentable as anticipated by Seo.

### D. Patent Owner's Motion to Exclude

Patent Owner's Motion to Exclude seeks to exclude (1) Exhibit 1010, entitled "TIA/EIA Interim Standard; Data Service Options for Wideband Spread Spectrum Systems," TIA/EIA/IS-707-A (Revision of TIA/EIA/IS-707); and (2) paragraph 7 of the Reply Declaration of Dr. Bims (Ex. 1013). Paper 53, 2–4. As movant, Patent Owner has the burden of proof to establish that it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(c). For the reasons stated below, Patent Owner's Motion to Exclude is *dismissed as moot*.

Patent Owner argues that Exhibit 1010 should be excluded because (1) it is irrelevant under Rule 403 because it is dated 4–8 months after Seo and is not, therefore, contemporaneous evidence of how a person of ordinary skill in the art would have interpreted Seo; (2) Petitioner has not shown why the exhibit could not have been included in the Petition; (3) it does not respond to any argument raised by Patent Owner in its response; (4) it is not

26

**A0026**

IPR2013-00601
Patent 6,772,215 B1

relevant to any issue in the case (Fed. R. Evid. 401, 403); (5) it has not been authenticated, and no evidence links it to the version of IS-707.2 referenced in Seo (Fed. R. Evid. 901); and (6) it is inadmissible hearsay because Broadcom is attempting to prove the truth of the matter asserted, including its alleged publication date (Fed. R. Evid. 801, 802). Paper 53, 2–3 (citing *Hilgraeve, Inc. v. Symantec Corp.*, 271 F. Supp. 2d 964, 974–75 (E.D. Mich. 2003)). Patent Owner argues that paragraph 7 of Dr. Bims' Declaration should be excluded because it "[f]or the same reasons above as to Exhibit 1010." *Id.* at 4.

Because we have not relied upon Exhibit 1010, the motion is *dismissed* as moot as to Exhibit 1010 and paragraph 7 of Exhibit 1013.

## III. CONCLUSION

Petitioner has shown, by a preponderance of the evidence, that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent are unpatentable.

## IV. ORDER

Accordingly, it is

ORDERED that pursuant claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent are held unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *dismissed as moot*; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

27

**A0027**

IPR2013-00601
Patent 6,772,215 B1

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
zachary.piccolomini@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
EricssonIPR2013-00601@leehayes.com
EricssonIPR2013-00602@leehayes.com

28

**A0028**

US006772215B1

(12) **United States Patent**

Rathonyi et al.

(10) **Patent No.:**     **US 6,772,215 B1**

(45) **Date of Patent:**       **Aug. 3, 2004**

(54) **METHOD FOR MINIMIZING FEEDBACK RESPONSES IN ARQ PROTOCOLS**

(75) Inventors: **Bela Rathonyi**, Malmö (SE); **Joachim Sachs**, Aachen (DE); **Michael Meyer**, Aachen (DE); **Per Beming**, Stockholm (SE); **Mathias Johansson**, Sollentuna (SE); **Christiaan Roobol**, Hässelby (SE); **Erik Schön**, Tokyo (JP); **Kazuhiko Inoue**, Tokyo (JP)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/537,146**

(22) Filed: **Mar. 29, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/128,517, filed on Apr. 9, 1999.

(51) **Int. Cl.**[7] ............................................... **G06F 15/16**

(52) **U.S. Cl.** ....................................... **709/230**; 370/229

(58) **Field of Search** ......................... 709/230; 370/229, 370/232, 394, 395.1, 349

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,439,859 A | | 3/1984 | Donnan ......................... 371/32 |
| 5,477,550 A | * | 12/1995 | Crisler et al. ................ 714/748 |
| 5,566,170 A | * | 10/1996 | Bakke et al. ................ 370/392 |
| 5,673,252 A | * | 9/1997 | Johnson et al. ............. 370/449 |
| 5,752,078 A | * | 5/1998 | Delp et al. ...................... 710/7 |
| 5,754,754 A | | 5/1998 | Dudley et al. ......... 395/182.16 |

| | | | | |
|---|---|---|---|---|
| 5,799,012 A | * | 8/1998 | Ayerst et al. ................ 370/336 |
| 5,968,197 A | * | 10/1999 | Doiron ........................ 714/748 |
| 5,991,299 A | * | 11/1999 | Radogna et al. ............. 370/392 |
| 6,034,963 A | * | 3/2000 | Minami et al. .............. 370/401 |
| 6,069,886 A | * | 5/2000 | Ayerst et al. ................ 370/336 |
| 6,317,430 B1 | * | 11/2001 | Knisely et al. .............. 370/394 |
| 6,359,877 B1 | * | 3/2002 | Rathonyi et al. ........... 370/349 |
| 6,473,399 B1 | * | 10/2002 | Johansson et al. .......... 370/229 |
| 6,542,490 B1 | * | 4/2003 | Ahmadvand et al. ....... 370/338 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 768806 A2 | 4/1997 |

OTHER PUBLICATIONS

Throughput analysis of some ARQ protocols in the presence of feedback errors by Cam et al.; IEEE; vol. 45 No. 1, Jan. 1997.*

Richard Cam and Cyril Leung; *Throughput Analysis of Some ARQ Protocols in the Presence of Feedback Errors;* IEEE Transactions on Communications; Jan. 1997; vol. 45, No. 1; pp. 35–44.

ISR, PCT/SE/ 00/00677, Completed Aug. 23, 2000.

* cited by examiner

*Primary Examiner*—Frantz B. Jean

(57) **ABSTRACT**

A method for minimizing feedback responses in an ARQ protocol is disclosed, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. The S-PDUs are constructed so as to optimize performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

**64 Claims, 3 Drawing Sheets**

| type=LIST |
|---|
| LENGTH=0 |
| LENGTH=4 |
| $SN_1$=1 |
| $SN_2$=25 |
| $SN_3$=50 |
| $SN_4$=95 |

A0029

**U.S. Patent**        Aug. 3, 2004        **Sheet 1 of 3**        **US 6,772,215 B1**



FIG.1
PRIOR ART

FIG. 2
PRIOR ART

| PDU_format=S-PDU |
|---|
| Length=5 |
| SN=3 |
| SN=4 |
| SN=5 |
| SN=9 |
| SN=16 |

FIG.3
PRIOR ART

| PDU_format=S-PDU |
|---|
| SSN=2 |
| BITMAP=0100001111111000 |

FIG.4

| Type=BITMAP' |
|---|
| FSN |
| LENGTH |
| Bitmap |

FIG. 5

| type=LIST |
|---|
| LENGTH=0 |
| LENGTH=4 |
| $SN_1$=1 |
| $SN_2$=25 |
| $SN_3$=50 |
| $SN_4$=95 |

FIG. 6

| Type=LIST' |
|---|
| LENGTH |
| $SN_1$ |
| $L_1$ |
| $SN_2$ |
| $L_2$ |
| ... |
| $^{SN}$LENGTH |
| $^{L}$LENGTH |

A0030

**U.S. Patent**     **Aug. 3, 2004**     **Sheet 2 of 3**     **US 6,772,215 B1**

| type=ACK |
|---|
| SN |

**FIG. 7**

| Type=BITMAP' |
|---|
| FSN |
| LENGTH |
| Bitmap |
| Type=LIST' |
| LENGTH |
| $SN_1$ |
| $L_1$ |
| ... |
| $SN_{LENGTH}$ |
| $L_{LENGTH}$ |
| Type=BITMAP' |
| LENGTH |
| bitmap |
| Type=NO_MORE |

**FIG. 8**

| Field | Field Value | | Field size |
|---|---|---|---|
| | Decimal | Bits | |
| LIST' | N/A' | 01 | 2 |
| LENGTH | 1 | 00001 | 5 |
| $SN_1$ | 51 | 000000110011 | 12 |
| $L_1$ | 27 | 11011 | 5 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

**FIG. 9**

| Field | Field Value | | Field size |
|---|---|---|---|
| | Decimal | Bits | |
| LIST' | N/A | 01 | 2 |
| LENGTH | 0 | 00000 | 5 |
| LENGTH | 4 | 00100 | 5 |
| $SN_1$ | 1 | 000000000001 | 12 |
| $SN_2$ | 25 | 000000011001 | 12 |
| $SN_3$ | 50 | 000001100100 | 12 |
| $SN_4$ | 95 | 000001011111 | 12 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

**FIG.10**

| Field | Field Value | | Field size |
|---|---|---|---|
| | decimal | Bits | |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 2 | 00010 | 5 |
| FSN | 27 | 000000011011 | 12 |
| Bitmap | 28-43 | 0001111011101011 | 16 |
| LIST' | N/A | 01 | 2 |
| LENGTH | 2 | 00010 | 5 |
| $SN_1$ | 91 | 000001011011 | 12 |
| $L_1$ | 3 | 00011 | 5 |
| $SN_1^2$ | 101 | 000001100101 | 12 |
| $L_2$ | 0 | 00000 | 5 |
| NO_MORE | N/A | 00 | 2 |

**FIG. 11**

| Field | Field Value | | Field size |
|---|---|---|---|
| | *decimal* | *Bits* | |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 11 | 01011 | 5 |
| FSN | 3 | 000000000011 | 12 |
| Bitmap | 4-10 | 1110111 | 88 |
| | 11-20 | 0111101111 | |
| | 21-30 | 1111111111 | |
| | 31-40 | 1101111111 | |
| | 41-50 | 1111011111 | |
| | 51-60 | 1111011111 | |
| | 61-70 | 1111101111 | |
| | 71-80 | 1111111011 | |
| | 81-90 | 1011111111 | |
| | 91 | 0 | |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

## FIG. 12

| Field | Field Value | | Field size |
|---|---|---|---|
| | *decimal* | *Bits* | |
| LIST' | N/A | 01 | 2 |
| LENGTH | 1 | 00001 | 5 |
| $SN_1$ | 10 | 000000001010 | 12 |
| $L_1$ | 20 | 10100 | 5 |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 1 | 00001 | 5 |
| Bitmap | 31-38 | 01011011 | 8 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

## FIG. 13

A0032

US 6,772,215 B1

# METHOD FOR MINIMIZING FEEDBACK RESPONSES IN ARQ PROTOCOLS

## CROSS-REFERENCES TO RELATED APPLICATIONS

This Application for Patent claims the benefit of priority from, and hereby incorporates by reference the entire disclosure of, co-pending U.S. Provisional Application for patent Ser. No. 60/128,517, filed Apr. 9, 1999.

## BACKGROUND OF THE INVENTION

1. Technical Field of the Invention

The present invention relates in general to the telecommunications field and, in particular, to a method for minimizing feedback responses in Automatic Repeat Request (ARQ) protocols, such as, for example, selective-repeat ARQ protocols.

2. Description of Related Art

When data is conveyed between nodes in a telecommunication network, certain algorithms are used to recover from the transmission of erroneous data and the loss of data on the transmission links between the nodes. An algorithm commonly used to recover from the transmission of erroneous data is referred to as an ARQ protocol.

The existing ARQ protocols (i.e., algorithms) include two peer entities that communicate with each other over transmission links. Each such entity includes a receiver and a sender. The units of data conveyed between the peer entities are commonly referred to as Protocol Data Units (PDUs). The ARQ protocols include certain rules for sending and receiving PDUs, as well as rules for the structure of the PDUs. As such, the name "Automatic Repeat Request" indicates the basic function of the protocol: the receiver requests the sender to retransmit those PDUs that were lost or contained errors during transmission.

The receiver can inform the sender about which PDUs were correctly received (i.e., receiver acknowledges correctly-received PDUs) and/or which PDUs were incorrectly received. When the sender receives this information, it retransmits the "lost" PDUs. In other words, an ARQ protocol is a set of rules that allow the use of efficient retransmission mechanisms between a sending side and receiving side in a communication system. These rules specify, for example, how and in what form the PDUs are to be constructed so that the receiving side can interpret the conveyed PDUs correctly and respond to them accordingly.

Three main types of information elements (PDUs) can be transferred between two ARQ peer entities: user data; error recovery control data; and common control data. These three types of PDUs can be found in all of the existing ARQ protocols. A user data PDU contains at least user data and a sequence number. An error recovery control data PDU contains various control information needed for error recovery and control functions such as positive and negative acknowledgments. A common control data PDU contains common control data.

In the known High Level Data Link Control (HDLC) protocol, which forms the basis for many existing ARQ protocols, the three types of PDUs are called, respectively, information frames (I-frames), supervisory frames (S-frames), and unnumbered frames (U-frames). Examples of HDLC-derived ARQ protocols are the Radio Link Protocol (RLP) used in the Global System for Mobile Communications (GSM), the Radio Link Control (RLC) and Logical Link Control (LLC) protocols used in the General Packet Radio Service (GPRS), the Infrared Link Access Protocol (IrLAP) used in IrDA systems, and the LAP-B protocol used in X.25 systems. Notably, PDUs that include user data and at least a sequence number are denoted herein as Data-PDUs (D-PDUs), and PDUs that include control data needed for error control/recovery are denoted herein as Status-PDUs (S-PDUs).

In most communication systems, user data information is conveyed in both directions between the peer entities. A common feature included in an ARQ protocol is the possibility of including error control information in the user data PDUs. This capability is known as "piggybacking". For example, an acknowledgment is included in all I-frames (i.e., D-PDUs) of HDLC-derived protocols. The acknowledgment informs the peer entity about the sequence number of the last (in-sequence) correctly received PDU.

The most common existing ARQ protocols implement one or more mechanisms to recover from errors on a transmission link, such as a Stop-and-Wait ARQ, Go-back-N ARQ, and Selective-Repeat ARQ. The use of these mechanisms and ARQs in general is well known.

FIG. 1 is a sequence diagram that illustrates the use of ARQ protocols. As shown, two ARQ peer entities 10, 12 are communicating with each other. The arrows in FIG. 1 indicate the transmission of PDUs between the two entities, and the content of each PDU is described directly above the respective arrow. Referring to FIG. 1, a sequence of transmitted D-PDUs and S-PDUs is shown. A D-PDU includes user data, a sequence number (SN), and possibly piggybacked error control information. An S-PDU includes status information but no user information. A sequence number (SN=x) is associated with a D-PDU to identify that specific D-PDU. An acknowledgment (ACK=x) is used to acknowledge any PDU with a SN<x. A negative acknowledgment (NAK=x) is used to acknowledge that a PDU (with an SN=x) has not been correctly received.

Two types of error control feedback responses are shown in FIG. 1. For one of the feedback responses (e.g., S-PDU, ACK=2) 14, the second ARQ peer entity 12 has acknowledged that it has received the PDUs with the SN=0 and SN=1. For the second type of feedback response (e.g., S-PDU, NAK=3) 16, the second peer entity 12 has indicated that the PDU with the SN=3 was corrupted and should be retransmitted by the first peer entity 10.

As discussed above, the S-PDUs are special PDUs which are transmitted between peer entities. An S-PDU includes information about the SNs of corrupted PDUS. Two main methods are currently used for coding the SNs within S-PDUs. One such method is to use a list of SNs to be retransmitted. The second method is to use a bitmap to represent the SNs to be retransmitted. As such, apart from representing SNs, an S-PDU also includes a format identifier which can be used by a receiver to distinguish between the different PDU formats (i.e., D-PDUs and S-PDUs).

The list method used for coding SNs includes the SNs of the erroneous PDUs in the S-PDU. If the length of the list is not predefined and thereby known, this length information is indicated in the S-PDU. For example, a length field can be included in the S-PDU. FIG. 2 shows such an S-PDU, which can be created by a receiver using a list method for coding SNs.

Referring to FIG. 2, a receiver can create an S-PDU with the contents shown, if the sender has transmitted a sequence of D-PDUs with SNs=0–15, and the PDUs with SNs=3, 5, 6, 7 and 8 have failed (not been correctly received). For example, the first two elements in the list (after the length

US 6,772,215 B1

3

field) indicate that the D-PDU with SN=3 was erroneous. The third and fourth elements in the list indicate that the D-PDUs with SNs=5–8 were erroneous. The final element is included to acknowledge the remaining PDUs (SNs up to 15).

The size of the S-PDU depends on the number of bits used to represent the PDU format identifier field, the length field and the SN field. As such, the size of an S-PDU can be calculated by the expression:

$$DU.SIZE_{LIST}=size(pdu.format.field)+size(length.field)+ \\ no.listelements*size(seq.no.field). \qquad (1)$$

For example, this list method is used in the SSCOP protocol, wherein two S-PDU formats exist and are denoted by the term "STAT" for a variable list length, and "USTAT" for a list with a limited number of elements (e.g., 2 elements).

FIG. 3 shows an S-PDU which can be created by a receiver using a bitmap method for coding SNs. When a bitmap is used to indicate SNs, the receiver creates the S-PDU from the SN of the last in-sequence correctly received D-PDU and a bitmap. This SN is referred to as a Start SN (SSN). Consequently, this S-PDU implicitly acknowledges all D-PDUs received up to the value of the SSN. Each location in the bitmap is used to address a specific S-PDU relative to the SSN. Typically, the size of the bitmap is fixed to the size of the ARQ receiver window and does not have to be explicitly indicated. If the bitmap is not fixed, the length has to be indicated.

The bitmap shown in FIG. 3 shows an S-PDU created from the example described above with respect to FIG. 2, and a window size of 16. As such, each location in the bitmap can have one of the two values, 0 or 1: A "1" means that SN=(SSN+bit_position) has been correctly received; and a "0" value means that SN=(SSN+bit_position) has not been correctly received. Of course, the meaning of the "0" and "1" values can be interchanged. The size of an S-PDU when using such a bitmap can be derived from the following expression:

$$PDU.SIZE_{BITMAP}=size(pdu.format.field)+size(SSN.field)+size(bit- \\ map.field). \qquad (2)$$

Both the RLC and LLC protocols in the GPRS system use such an expression and convey bitmaps between peer entities for error control purposes.

A significant problem with existing ARQ protocols is that they are static in construction (e.g., fixed length messages are used). In certain situations, this approach leads to a waste of bandwidth resources, because a great deal of overhead information is transmitted unnecessarily. For example, such situations can occur in systems having a large number of D-PDUs being transmitted between two ARQ peer entities, and these D-PDUs have to be acknowledged and selectively requested for retransmission. For some error control situations, the existing solutions introduce a significant amount of unnecessary overhead. The following example illustrates such a situation.

In the Wideband-Code Division Multiple Access (WCDMA) system currently being standardized for the so-called 3rd Generation Cellular Communication System, one ARQ protocol used is an RLC protocol. The,SN set includes the values 0–4095, which means that each SN is coded with 12 bits. An assumption can be made that for high data rates, a relatively large set of SNs will have to be addressed in some S-PDUs. Also, assume that the status of 100 D-PDUs (SN=1–100) needs to be communicated between the RLC peer entities in an S-PDU.

4

Table 1 below shows the number of bits needed to code an S-PDU using the list and bitmap methods described above. Different error circumstances are provided to highlight the large difference in the number of bits required for the two methods. Assume that the following element sizes are used: bitmap=128 bits; length=5 bits; and one PDU format identifier=1 bit (for distinguishing between a D-PDU and an S-PDU). As such, the different S-PDU sizes shown in Table 1 are calculated in accordance with Equations (1) and (2) above, respectively.

As illustrated by rows 2–5 in Table 1, both of the existing solutions have problems with efficiently building small S-PDUs for error circumstances shown. The length of the LIST does not depend so much on the number of erroneous D-PDUs, but rather on the distribution of the errors within the window used. This fact becomes evident by comparing rows 1 and 2 in Table 1.

TABLE 1

|  | Erroneous D-PDUs | # | Size of S-PDU (bits) | |
|  |  |  |  |  |
|  | (SN) | SN | LIST | BITMAP |
| 1 | 51–77 | 27 | 42 | 141 |
| 2 | 1, 25, 50, 95 | 4 | 114 | 141 |
| 3 | 27–30, 35, 39, 41, 91–93 | 10 | 138 | 141 |
| 4 | 3, 7, 11, 16, 33, 45, 55, 66, 78, 82, 91 | 11 | 282 | 141 |
| 5 | 10–29, 31, 33, 36 | 23 | 114 | 141 |

A general statement of the problem to be solved is to determine how to efficiently represent (encode) in a message the status of an arbitrary amount and distribution of n numbers from a set of m numbers. As such, a significant need exists for a method that can be used to minimize the size of S-PDUs in an ARQ protocol Also, a significant need exists for a method that can be used to maximize the number of SNs in an S-PDU with limited size, if it is not possible to fit all potential SNs into a single S-PDU. As described in detail below, the present invention successfully resolves the above-described problems and other related problems.

SUMMARY OF THE INVENTION

In accordance with an embodiment of the present invention, a method for minimizing feedback responses in an ARQ protocol is provided, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. In particular, these different mechanisms can be combined in a single S-PDU. The S-PDUs are constructed so as to optimize system performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

An important technical advantage of the present invention is that radio interface bandwidth resources can be saved.

Another important technical advantage of the present invention is that protocol overhead can be minimized.

Still another important technical advantage of the present invention is that system capacity can be increased.

Yet another important technical advantage of the present invention is that the number of feedback responses in a selective-repeat ARQ protocol can be minimized.

BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the method and apparatus of the present invention may be had by reference to the

US 6,772,215 B1

**5**

following detailed description when taken in conjunction with the accompanying drawings wherein:

FIG. **1** is a sequence diagram that illustrates the use of ARQ protocols;

FIG. **2** is a diagram that shows an S-PDU which can be created by a receiver using an existing list method for coding SNs;

FIG. **3** is a diagram that shows an S-PDU which can be created by a receiver using an existing bitmap method for coding SNs;

FIG. **4** is a bitmap message for use in an S-PDU, constructed in accordance with a first embodiment of the present invention;

FIG. **5** is a diagram of a message with the fields and contents of the LIST S-PDU for row 2 in Table 1, constructed in accordance with the first embodiment of the present invention;

FIG. **6** is a diagram of the fields of a LIST' message in an S-PDU, constructed in accordance with the first embodiment of the present invention;

FIG. **7** is a diagram that shows the contents of an "ACK" message constructed in accordance with the second embodiment of the present invention;

FIG. **8** is a diagram that illustrates how an S-PDU can be constructed in accordance with the combination method of the second embodiment;

FIG. **9** is a diagram that shows the contents of row 1 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. **10** is a diagram that shows the contents of row 2 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. **11** is a. diagram that shows the contents of row 3 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. **12** is a diagram that shows the contents of row 4 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention; and

FIG. **13** is a diagram that shows the contents of row 5 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention.

DETAILED DESCRIPTION OF THE DRAWINGS

The embodiments of the present invention and their advantages are best understood by referring to FIGS. **1–13** of the drawings, like numerals being used for like and corresponding parts of the various drawings.

Essentially, in accordance with a first embodiment of the present invention, a method for minimizing feedback responses in an ARQ protocol is provided, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. The S-PDUs are constructed so as to optimize performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

Specifically, hereinafter, the basic components being described are messages. For this embodiment, such a message can be described by using a Type, Length, Value (TLV) syntax. In other words, each message includes three fields. One field includes type information, the second field includes length information, and the third field includes a value. The size of the type field is preferably non-zero, while the sizes of the other two fields can be zero.

**6**

Notably, as mentioned earlier, all existing bitmap solutions include information about the sequence number (herein called the SSN) of the last received in-sequence D-PDU in a constructed S-PDU. The SSN indicates that no errors exist prior to that sequence number. In other words, the SSN is used to acknowledge all D-PDUs having SNs up to that of the SSN.

For this exemplary embodiment, a basic message to be used for minimizing feedback responses in an ARQ protocol can be constructed as follows. Using a BITMAP method for this embodiment, the SN included in a constructed S-PDU indicates the SN of any (not necessarily the first) erroneous D-PDU from the set of SNs. The status of the subsequent SNs are indicated in the bitmap. Although the SN of the first erroneous D-PDU is used in this exemplary embodiment, it should be understood that any D-PDU (from the SN set) can be used in the bitmap method instead. In that case, the bitmap also has to include the status (0 or 1) of the SN included in the constructed S-PDU. As such, a "BITMAP" message can be created with a type identifier field, a first SN (FSN) field, a bitmap length field, and a bitmap field. FIG. **4** illustrates a bitmap message with such fields for use in an S-PDU, in accordance with the first embodiment of the present invention.

Referring to the bitmap message shown in FIG. **4**, a number of methods can be used to represent the length of the bitmap (LENGTH field). For one method, a predefined number of bits can be used to represent the size of the bitmap in a basic data unit. Such a data unit can have any granularity and include, for example, one or more bits, bytes, words, etc. For example, if a byte is used as the basic data unit, the value, x, in the LENGTH field means that 8*x SNs are covered by the bitmap. This resulting value also represents the size of the bitmap in bits.

For a second method used to represent the length of the bitmap, a different SN can be used to indicate the last SN covered by the bitmap. The size of the LENGTH field is then equal to the size of the FSN field. As such, the size of the bitmap can be calculated by subtracting the FSN value from the LENGTH value.

A third method that can be used for representing the length of the bitmap is to fix the size of the bitmap so that no LENGTH field is required in the S-PDU. Alternatively, the size of the LENGTH field can be set to zero. Also, the size of the FSN field can also be set to zero if the SN that the bitmap covers is signalled remotely. Such a method is described in more detail below.

Notably, a conventional data compression method can be used to compress the information in the bitmap field. As such, both normal and compressed bitmaps can be included in one S-PDU. In this case, the value of the type field for the compressed bitmap would be different than that for a normal bitmap.

As mentioned earlier, a significant drawback of the existing LIST methods is that two SNs are required for each error group. An error group comprises a single error or several consecutive errors of D-PDUs. In order to resolve such a problem using a LIST method in accordance with this exemplary embodiment, only erroneous SNs are listed. In other words, a new LIST type can be defined wherein only single errors are listed. Consequently, the size of a resulting S-PDU can be significantly reduced for certain error situations, in comparison with the existing LIST solutions.

Another method that can be used to reduce the size of S-PDUs, in accordance with this embodiment, is to combine an existing LIST method (2 SNs per error group) with the

A0035

US 6,772,215 B1

| 7 | 8 |

above-described single error SN LIST method to create the list message. For example, the existing LIST method can be improved significantly by introducing the following rules for creating the LENGTH field value:

(1) A zero value means that a single error SN LIST method is applied. A second (new) length field is included directly after the original LENGTH field to indicate the number of single erroneous SNs that follow directly after the second field. All list elements represent single erroneous SNs, and no acknowledgment is provided while using this list method.

(2) An odd value implies that the last list element is an acknowledgment.

(3) An even value (excluding zero) implies that the last element is not an acknowledgment. Consequently, following the above-described rules in accordance with this embodiment, the (LIST) S-PDU for row 2 in Table 1 now contains the fields and contents shown in FIG. **5**. As such, if the field sizes shown in row 2 of the example illustrated by Table 1 were to be used with respect to the embodiment illustrated by FIG. **5**, then the total size of the S-PDU would be 59 bits. Consequently, in accordance with the present invention, the number of bits needed for the resulting S-PDU is significantly smaller than the number of bits (114) needed for the existing LIST solution.

FIG. **6** is a diagram that illustrates another method that can be used to reduce the size of an S-PDU using a LIST method. The method used in accordance with this embodiment is to include a field after each list element which determines the length of the error, instead of indicating the length of the error with an "ending" SN. In most systems, the size of the length field would then be substantially smaller than the size of the SN field. Furthermore, typically there is no need to represent very large consecutive, erroneous D-PDUs (i.e., a large error group) in an S-PDU.

Referring to FIG. **6**, the fields of a new message (denoted as LIST') in an S-PDU are shown. The new length field introduced after each $SN_i$ is denoted $L_i$ for $1 \leq I \leq LENGTH$. Notably, a value of zero can be used for $L_i$ to further improve the functionality of the resulting LIST' message. As such, the following alternatives can be used:

(1) A zero value for $L_i$ means that $SN_i$ is an acknowledgment (i.e., Li is not pointing out an error).

(2) A zero value represents the end of the LIST' message. The first LENGTH field can be omitted if the interpretation of the last SN has been predefined. For example, the last SN can be restricted so as to always be an acknowledgment (e.g., as in the first alternative), or the length can be predefined (e.g., so as to point out a single error).

In accordance with a second embodiment of the present invention, a number of different message types can be combined to create an S-PDU. These message types can be added in any arbitrary order in the S-PDU, and there is no rule on the number of messages or the type of message that can be included in the S-PDU. For this exemplary embodiment, each such message includes a type identifier, and the length is either fixed or indicated by a length field for each specific message. The first type identifier preferably has a predefined position in the resulting S-PDU. The rest of the type identifiers can be located at arbitrary locations depending on the sizes of the included messages. For example, the messages, LIST', BITMAP' and ACK can be included in the S-PDU.

The number of such messages that can possibly be included in an S-PDU determines the size (bits) of the type identifier field used in the S-PDU. For example, the size of such a type identifier field can be determined by the following expression:

$$\text{ize(type. field)} = \lfloor \log_2(\text{number of possible messages} + 1) \rfloor, \quad (3)$$

where the operator $\lfloor \ \rfloor$ rounds the argument off to the next highest integer value. The "+1" part of the argument is used so that a type identifier can be used to indicate that no other messages are included in an S-PDU. This special identifier is denoted herein as a "NO_MORE" message. As such, in accordance with Equation (3), the size of the type field is 2 bits for three different messages, because $\lfloor \log_2(4) \rfloor 2$.

The contents of an "ACK" message constructed in accordance with this embodiment are shown in FIG. **7**. The ACK message shown includes a type identifier field and SN. This ACK message marks the end of an S-PDU, and all prior D-PDUs not indicated to be erroneous within this S-PDU are acknowledged by the SN. Consequently, when such an ACK message is included in an S-PDU, there is no need to include a NO_MORE message to terminate the combined S-PDU.

Assume that a LIST' message with an acknowledgment feature (i.e., a zero value for $L_i$ means that $SN_i$ is an acknowledgment) is used (with a LENGTH field). When a BITMAP' message is included directly after a LIST' message, the size of the FSN field is zero. As such, the first SN which is represented in the bitmap is $SN_{LENGTH} +$ $L_{LENGTH}$. Furthermore, a zero in the LENGTH field of the LIST' message means that an additional LENGTH field is included, and the message is constructed as shown in FIG. **5** with no $L_{SNi}$ fields.

Another way to obtain the above-described LIST feature is to define a new type (denoted, for example, "LIST"). However, the size of the type field can be affected, which can result in a larger S-PDU. In any event, there is a trade-off (which is system dependent) to consider in selecting the exact rules to follow for the combination method described above.

FIG. **8** is a diagram that illustrates how an S-PDU can be constructed in accordance with the combination method described above. As shown, the resulting S-PDU includes two BITMAP' messages and one LIST' message. The second BITMAP' message does not include an FSN field (or, the size of the FSN field is zero). Consequently, the first element in the bitmap represents the SN having the value, $SN_{LENGTH} + L_{LENGTH}$.

In order to demonstrate the advantages of the above-described combination method, it can be applied to the example described above with respect to Table 1. As such, Table 2 shows different messages (along with their corresponding bit values) which can be combined in an S-PDU, in accordance with the second embodiment of the present invention. For this embodiment, each S-PDU starts with one of the type identifiers shown. Also, the sizes of the LENGTH and $L_{SNi}$ fields are fixed to 5 bits.

Consequently, these fields can each hold a value between $0-32(2^5)$ Notably, although the sizes of the fields are fixed, their sizes are not necessarily equal, as in this example (i.e., the size of the LENGTH field in the BITMAP' message can be different than the size of the LENGTH field in the LIST' message). The value of the LENGTH field in the BITMAP' message corresponds to the size of the bitmap in bytes (i.e., a maximum of 8*32=256 SNs can be addressed in a single S-PDU). All of the fields containing an SN value have a size of 12 bits (i.e., the FSN, SN and SSN fields).

US 6,772,215 B1

9

TABLE 2

| Type Identifier | Value |
|---|---|
| NO_MORE | 00 |
| LIST' | 01 |
| BITMAP' | 10 |
| ACK | 11 |

FIG. 9–13, respectively, are diagrams that show the contents of an S-PDU for each row shown in Table 1 for the above-described example. For this embodiment, the combination is selected so as to minimize the total size of the S-PDU.

As illustrated by the example described above with respect to Table 1, FIG. 9 shows the contents of row 1 in the resulting (combination) S-PDU, FIG. 10 shows the contents of row 2, and FIG. 11 shows the contents of row 3. Note that by including an ACK type instead of the list element $SN_i$ in FIG. 11, an additional 5 bits can be saved with respect to the total size of the S-PDU. FIG. 12 shows the contents of row 4 in the resulting S-PDU, and FIG. 13 shows the contents of row 5. As such, the contents of the entire coded S-PDU can be obtained by concatenating all values from the "bits" column. For example, the contents of row 1 of the S-PDU (FIG. 9) would appear as:

"010000100000011001111011111000001100101".

Table 3 shows the sizes of the S-PDUs constructed in accordance with the existing LIST and BITMAP methods, and also the combination method described above in accordance with the second embodiment. The sizes of the S-PDUs are calculated by adding the "Field size" columns in FIGS. 9–13. As illustrated by Table 3, the size of the S-PDU resulting from the combination method of the present invention is significantly smaller than the S-PDUs resulting from the existing solutions.

TABLE 3

| | Size of S-PDU (bits) | | |
|---|---|---|---|
| | State-of-the-art solutions | | Combination |
| | LIST | BITMAP | solution |
| 1 | 42 | 141 | 38 |
| 2 | 114 | 141 | 74 |
| 3 | 138 | 141 | 78 |
| 4 | 282 | 141 | 121 |
| 5 | 114 | 141 | 53 |

In many ARQ protocols, the size of the D-PDUs is predefined and can have limited set of different values. Padding can be used if the amount of user data provided to the sending ARQ entity is smaller than the size of the D-PDU. Padding is a technical whereby nonsensical data is used to fill up the remaining empty locations in the D-PDU. For example, if a D-PDU can be filled with 20 bytes of user data, and the sending ARQ entity has only 14 bytes of user data, the rest of the D-PDU can be filled or padded with 6 bytes of padding data. The length of the user data part is indicated in the D-PDU. The RLC protocol in the GPRS and W-CDMA systems use this type of padding function.

The combination method of the second embodiment can also be used efficiently with piggybacking. For example, an ARQ entity can piggyback status information after the end of the last user data byte, if enough space exists to fill the padding fields with a status message. A NO MORE type

10

identifier is used whenever there is no status information to be included in a D-PDU which contains padding bytes. This piggybacking scheme advantageously reduces the number of packets being exchanged between two ARQ entities and, consequently, saves system capacity. The cost for such a piggybacking scheme is relatively low, because no field is reserved in the D-PDU for the piggybacking scheme, which is the case for existing ARQ protocols that use piggybacking.

Although embodiments of the method and apparatus of the present invention have been illustrated in the accompanying Drawings and described in the foregoing Detailed Description, it will be understood that the invention is not limited to the embodiments disclosed, but is capable of numerous rearrangements, modifications and substitutions without departing from the spirit of the invention as set forth and defined by the following claims.

What is claimed is:

1. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.

2. The method of claim 1, wherein said message field comprises a bitmap message.

3. The method of claim 1, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

4. The method of claim 1, wherein said sequence number field includes any sequence number from said plurality of first data units.

5. The method of claim 1, wherein said length field comprises a length value for said content field.

6. The method of claim 1, wherein said content field comprises a bitmap.

7. The method of claim 1, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

8. The method of claim 1, wherein said second data unit comprises information about missing or erroneous said first data units.

9. The method of claim 1, wherein the size of said length field is zero and a predefined bitmap size is used.

10. The method of claim 1, wherein said length field indicates a final sequence number in a bitmap.

11. The method of claim 1, wherein said length field comprises a value of zero.

12. The method of claim 1, wherein a size of said sequence number field equals zero.

13. The method of claim 1, wherein at least one of said plurality of first data units is used to piggy-back said message field.

14. The method of claim 1, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

15. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of, a length field,

**A0037**

US 6,772,215 B1

11

a plurality of erroneous sequence number-fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

16. The method of claim 15, wherein said message field comprises a list message.

17. The method of claim 15, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

18. The method of claim 15, wherein said length field comprises a value of zero.

19. The method of claim 15, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

20. The method of claim 15, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

21. The method of claim 15, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

22. The method of claim 15, wherein said second data unit comprises information about missing or erroneous said first data units.

23. The method of claim 15, wherein at least one of said plurality of first data units is used to piggy-back said message field.

24. The method of claim 15, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

25. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing between one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

26. The method of claim 25, wherein said one to several message fields further comprise an acknowledgment message.

27. The method of claim 25, wherein the last of said one to several message fields includes an acknowledgment of all SNs not indicated erroneous by all other of said one to several message fields in said second data unit.

28. The method of claim 25, wherein said one to several message fields further comprise a no more message.

29. The method of claim 25, wherein said one to several message fields include a bitmap message.

30. The method of claim 25, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

31. The method of claim 25, wherein said length field comprises a length value for said content field.

32. The method of claim 25, wherein said content field comprises a bitmap.

33. The method of claim 25, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

34. The method of claim 25, wherein said second data unit comprises information about missing or erroneous said first data units.

12

35. The method of claim 25, wherein the size of said length field is zero and a predefined bitmap size is used.

36. The method of claim 25, wherein said length field indicates a final sequence number in a bitmap.

37. The method of claim 25, wherein said length field comprises a value of zero.

38. The method of claim 25, wherein a size of said sequence number field equals zero.

39. The method of claim 25, wherein said one to several message fields include a list message.

40. The method of claim 25, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

41. The method of claim 25, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

42. The method of claim 25, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

43. The method of claim 25, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

44. The method of claim 25, wherein at least one of said plurality of first data units is used to piggy-back said one to several message fields.

45. A system for minimizing feedback responses in an ARQ protocol, comprising:

a first peer entity;

a second peer entity; and

a communication link coupled between said first peer entity and said second peer entity for communicating data therebetween;

said first peer entity including means for sending a plurality of first data units over said communication link to said second peer entity;

said second peer entity including means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

46. The system of claim 45, wherein said one to several message fields further comprise an acknowledgment message.

47. The system of claim 45, wherein the last of said one to several message fields includes an acknowledgment of all SNs not indicated erroneous by all other of said one to several message fields in said second data unit.

48. The system of claim 45, wherein said one to several message fields further comprise a no more message.

49. The system of claim 45, wherein said one to several message fields include a bitmap message.

50. The system of claim 45, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

51. The system of claim 45, wherein said length field comprises a length value for said content field.

52. The system of claim 45, wherein said content field comprises a bitmap.

53. The system of claim 45, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

**A0038**

US 6,772,215 B1

13

**54**. The system of claim **45,** wherein said second data unit comprises information about missing or erroneous said first data units.

**55**. The system of claim **45,** wherein the size of said length field is zero and a predefined bitmap size is used.

**56**. The system of claim **45,** wherein said length field indicates a final sequence number in a bitmap.

**57**. The system of claim **45,** wherein said length field comprises a value of zero.

**58**. The system of claim **45,** wherein a size of said sequence number field equals zero.

**59**. The system of claim **45,** wherein said one to several message fields include a list message.

**60**. The system of claim **45,** wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

14

**61**. The system of claim **45,** wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

**62**. The system of claim **45,** wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

**63**. The system of claim **45,** wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

**64**. The system of claim **45,** wherein at least one of said plurality of first data units is used to piggy-back said one to several message fields.

* * * * *

Paper No. _____

Filed on behalf of: Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00601
U.S. Patent Nos. 6,772,215

_____

**PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

**A0044**

Patent Owner Ericsson ("Ericsson") respectfully submits this motion to take additional discovery of Petitioner Broadcom, Inc. ("Broadcom"). Ericsson submits seven narrowly tailored Requests for Production relevant to whether Broadcom's petitions are barred under 35 U.S.C. §315(b).  (Ex. 2001).

These Petitions for IPR were filed shortly after Ericsson obtained a judgment for infringement of the subject patents against several of Broadcom's customers in *Ericsson v. D-Link, el al* ("D-Link Lawsuit").  (Exs. 2002, 2003, 2004).  Broadcom clearly had a substantial interest in that case because its "BCM4313 and BCM4321" chips formed the basis for some of the infringement allegations, (Petition at 2), and as Broadcom admits in its SEC filings, it is not uncommon for Broadcom to be "required to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights." (Ex. 2005 at 46). To protect these interests, Broadcom "engage[s] in litigation to . . . determine the validity and scope of the proprietary rights of others, including [its] customers." *Id.* These IPRs are one example of Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligations.[1]

For years, Broadcom has been working behind the scenes to help defeat Ericsson's infringement claims against its customers.  Indeed, as far back as July 2010, Broadcom assisted Acer, Inc., a D-Link Lawsuit defendant, (Ex. 2002), in analyzing the very patents that are now the subject of Broadcom's petitions.  When

---

[1]   Another chip supplier, Intel, actually intervened in the case, stating it had a direct and substantial interest because of its indemnity agreements.  (Ex. 2006 at 3).

*CONFIDENTIAL MATERIAL REDACTED*

discussing an upcoming meeting, Acer noted, "Main purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros."  (Ex. 2007). More recently, Ericsson provided notice to Acer that it was seeking relief from the Protective Order in the D-Link Lawsuit to obtain the requested information by all other means. (Ex. 2008). In response, Acer admitted that such information was "privileged and [was] inadvertently produced." *Id.* This admission proves that a privilege exists that protects communications between Acer and Broadcom.

When its covert efforts failed to limit its indemnity obligations, Broadcom became more aggressive.

Broadcom now attacks Ericsson by petitioning for review of the same claims found to have been infringed by Broadcom's customers' use of its chips. Broadcom admits that it supplied the "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the defendants that were found to infringe. (Petition at 2). As Broadcom is now forced to indemnify its customers for damages and an ongoing activity, the timing and coordination of Broadcom's attacks is no coincidence. To be sure, Broadcom's petitions rely heavily on" (1) Ericsson's expert report on validity from the D-Link Lawsuit, a report that Broadcom could only have received from one

2

**A0046**

IPR2013-00601
Patent 6,772,215

of the defendants, (Pet. Ex. 1010); and (2) a majority of the same references that the defendants relied upon for their invalidity claims in the D-Link Lawsuit. This level of coordination raises serious questions about whether Broadcom is in privity with the defendants and is likewise time barred from filing these petitions by §315(b).

Because the certain facts as to Broadcom's standing are not publicly available and because Ericsson has exhausted all efforts to obtain them voluntarily, Ericsson submits this Motion. The requests are useful and relevant to Broadcom's standing, which the PTO has expressly identified as a basis for obtaining discovery. Ericsson worked diligently to obtain this evidence, and Broadcom faces no undue burden in responding. As such, Ericsson meets the interests of justice standard.

## I.    The Discovery Request Is Relevant to Broadcom's Standing.

If Broadcom is a privy to any of the D-Link Defendants, it is barred from obtaining *inter partes* review under 35 U.S.C. § 315(b) because Ericsson served the "D-Link Defendants"[2] more than one year before these petitions were filed. (Ex. 2004). The discovery sought goes directly to Section 315(b)'s application.

The PTO specifically identified standing as an issue that warrants additional discovery. *See* 77 Fed. Reg. 48680, 48689 (Aug. 14, 2012) ("additional discovery may be authorized where patent owner raises sufficient concerns regarding the petitioner's certification of standing."). The PTO also allows the Board to "permit new testimonial evidence where it addresses issues relating to the petitioner's

---

[2] The "D-Link Defendants" include, collectively, D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc.("Acer"), Acer America Corp. and Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. (Exs. B, C)

3

**A0047**

standing, or where . . . the evidence demonstrates that the trial may not be instituted." *Trial Practice Guide*, 77 Fed. Reg. 48756, 48764 (Aug. 14, 2012) ("TPG").  Thus, the PTO clearly intends to allow additional discovery for standing issues, like § 315.

Under § 315(b), IPR should be denied because Broadcom is in privity with at least one D-Link Defendant. The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," *Black's Law Dictionary*, 5th Ed. (1979), sufficient to justify applying principles of claim or issue preclusion to the nonparty, TPG at 48759. The PTO expanded the doctrine by noting its equitable and practical nature and stating it "should extend to parties to transactions and other activities relating to the property in question."  TPG at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)).

Under this expanded doctrine,[3] the Board must "evaluate what parties constitute 'privies' in a manner consistent with the flexible and equitable considerations established under federal caselaw."  TPG at 48759. For example, the TPG cites *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008), as support for its interpretation.  *Id.* In doing so, the Board must determine if the parties' relationship is "sufficiently close such that both should be bound by the trial outcome and related estoppels." *Id.*; *see* 154 Cong. Rec. S9987 (Sept. 27, 2008) (statement of Sen. Kyl). "A common consideration is whether the non-party exercised or could have exercised control over a party's participation in a proceeding." *Id.*

---

[3] Section 315(b) under the AIA also expanded on former 35 U.S.C. § 317(b) by precluding real parties in interest in addition to privies.  *See* former 35 U.S.C. § 317(b) (1999), *amended by* 35 U.S.C. § 317, Pub. L. No. 112-29, § 6(a), 125 Stat. 303 (2011).

4

**A0048**

Also, the Supreme Court set forth six categories for determining whether a nonparty to a suit is bound by its judgment in *Taylor,* and the PTO expressly validated them as guidelines for determining privity. *See* TPG at 48759. One category asks whether the nonparty maintains a "substantive legal relationship" with a party in suit. 553 U.S. at 894. This theory "originated 'as much from the needs of property law as from the values of preclusion by judgment.'" *Id.* (citations omitted).

Indemnity relationships satisfy *Taylor's* reasoning;[4] numerous federal courts agree and state that indemnity relationships justify third party preclusion. *See, F.T.C. v. Garvey*, 383 F.3d 891, 898 (9th Cir. 2004) ("To deny the right of indemnification would be to destroy the indemnitee's right by the result of an action . . . It is far better to preclude the third person . . . who often could have joined both adversaries in the first action."); *SCAC Transp. (USA) Inc. v. S.S. Danaos*, 845 F.2d 1157, 1162 (2d Cir. 1988) (indemnitor is precluded from disputing issues determined in the indemnitee's judgment); *Jennings v. U.S.*, 374 F.2d 983, 985 (4th Cir. 1967) ("where an indemnitor is notified and can take part in – indeed may control – the litigation, he is precluded from contesting the indemnitee's liability in the subsequent indemnity action.").

*Taylor* relies on the Restatement (second) of Judgments, 553 at 893 n. 6, which acknowledges that indemnity relationships justify privity preclusion. If an indemnitor has received "reasonable notice of the action" but declines to participate in the

---

[4] Broadcom relies on *Apple, Inc. v. Achates Ref. Publ'g, Inc.*, IPR2013-00080, Paper No. 18 (2013). However, Achates relied solely on an unsigned, public agreement with no evidence of concerted action. Here, evidence of Broadcom's past influence in negotiations, litigation history, corporate filings, contemporaneous attacks, *and* an indemnity agreement are evidence of control and a substantive legal relationship.

5

**A0049**

defense, absent a conflict of interest, it is "estopped from disputing the existence and extent of the indemnitee's liability" or "relitigating issues determined in the action" if the indemnitee reasonably defended the action.   Restatement (Second) of Judgments § 57(1) (1982). The weight of authority strongly supports that an indemnity agreement constitutes a substantive legal relationship sufficient to establish privity.

Here, evidence will prove that Broadcom has had the opportunity to control and maintains a substantive legal relationship with the D-Link Defendants sufficient to bind Broadcom to the District Court's judgment. Broadcom's corporate policy on litigation on behalf of its customers, its influence in Acer's discussions with Ericsson, and its collateral attacks on the Ericsson patents in ▬▬▬ the PTO contemporaneously with the D-Link Lawsuit demonstrate the nature of their relationship and actions thereon. Each of these attacks is based on the same BCM4313 and BCM4321 chips and the same patent claims. Rather than intervene in the D-Link Lawsuit like Intel, Broadcom launched collateral attacks ▬▬▬ ▬▬▬ Broadcom has yet to deny the existence of these contracts – further supporting this collusive attempt to undermine the award.

## II.    Discovery Request Should Be Granted in the Interest of Justice

The Board may grant additional discovery when it is "necessary in the interest of justice." *See* 37 C.F.R. § 42.51(b)(2).   Five factors control this standard. *See Garmin Int'l, Inc. v. Cuozzo Speed Tech., LLC*, IPR2012-00001, Notice 20 (2013). Given the length restrictions, Ericsson will concentrate on two factors, as the remaining factors can be proven by the Requests on their face.[5]

---

[5] Ericsson is not seeking Broadcom's litigation position, and the Requests' instructions are clear and concise.  Further, each of Ericsson's requests is sensible and

6

IPR2013-00601
Patent 6,772,215

A. <u>Useful information will be uncovered with additional discovery.</u>

Ericsson is already "in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered." *Garmin, supra,* at 7. "'Useful' means favorable in substantive value to a contention of the party moving for discovery." *Id.* Ericsson has come forward with considerable direct and circumstantial evidence that Broadcom colluded with the Defendants because of its indemnity obligations. (Exs. 2005, 2007, 2008, 2009, 2016). Ericsson has further evidence of the existence of the nature of this relationship but cannot submit this evidence because of confidentiality provisions that Broadcom and others refuse to waive. (Ex. 2012). Broadcom does not deny the existence of such indemnity agreements. *Id.* If produced, these contracts will be useful to reveal the full scope of these substantive legal relationships and Broadcom's participation in the D-Link Lawsuit so that the Board can sufficiently rule on Broadcom's standing.

B. <u>Equivalent information is not obtainable by any other means.</u>

Ericsson has actively pursued discovery from Broadcom and the defendants. First, Ericsson made limited requests from Broadcom related to the contractual relationships. (Ex. 2011). Broadcom did not, and still does not, deny the existence of the contracts, but instead relies on their confidentiality to avoid a 315(b) analysis. (Ex. 2012). Second, Ericsson asked the defendants to permit its IPR counsel to review any contracts relating to the "BCM4312 and BCM4321" chips without being subject

---

reasonably tailored to its genuine need to determine the relationship between Broadcom and the D-Link Defendants. Finally, the requests will not require a significant expenditure of human or financial resources, as they primarily relate to specific contracts and communications. *Garmin supra,* at 6-7.

to the "Prosecution Bar" in the Protective Order. (Ex. 2011). Broadcom's customers refused to waive that provision without Broadcom's consent. (Ex. 2013, 2014). Once again, Broadcom stonewalled Ericsson by hiding behind the protective order. [6]

Here, the parties to the relevant contracts and communications possess this evidence and it is amenable to concealment because all actions by the parties are taken behind closed doors, apparently locked by Confidentiality Agreements. Considering the nature and effect of this information, Ericsson has made all possible attempts to obtain it by other means. *Garmin*, *supra*, at 6. Thus, Ericsson has satisfied each factor; its limited requests should be granted in the interests of justice.

### C. Conclusion

If the Board denies Ericsson's request, it is difficult to conceive of a case in which discovery into standing will be permitted, despite the TPG's indication to the contrary. Patent owners will rarely if ever be in possession of indemnity agreements and, if they are, they will be unable to rely upon them because of a protection order. This will promote collusion among parties and thereby undermine the policy behind §315(b) that encourages litigates to bring their validity challenges to the Board in a timely manner. Without an order from the Board, this evidence will seldom be obtainable by any patent owner. Thus, as the PTO has declared, patent owners require the use of additional discovery; otherwise, § 315(b) will essentially be eviscerated.

---

[6] Ericsson has concurrently filed an Emergency Motion for Relief from the Protective Order in the district court. (*See* Ex. 2015). To the extent the Board is inclined to deny Ericsson's motion as "speculative" in the absence of the underlying indemnity agreements, despite the circumstantial evidence, Ericsson requests that the Board hold the present motion in abeyance until the district rules on Ericsson' motion.

Dated: December 11, 2013.

/Peter J. Ayers/
PETER AYERS
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefinakteibolaget
LM Ericsson

9

**A0053**

IPR2013-00601
Patent 6,772,215

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 11, 2013 the foregoing PATENT

OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. §

42.51(b) was served on Lead and Back-up Counsel for Broadcom Corporation by

sending the same via Federal Express to the service address provided in Broadcom's

Mandatory Notices:

Dominic E. Massa, Lead Counsel
Michael A. Diener, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109

LEE & HAYES PLLC

_/Peter J. Ayers/_
Peter J. Ayers, Reg. No. 38,374

10

**A0054**

Paper No. _____

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00601
U.S. Patent Nos. 6,772,215

_____

**PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37
C.F.R. § 42.51(b)**

**A0044.1**

IPR2013-00601
Patent 6,772,215

Patent Owner Ericsson ("Ericsson") respectfully submits this motion to take additional discovery of Petitioner Broadcom, Inc. ("Broadcom"). Ericsson submits seven narrowly tailored Requests for Production relevant to whether Broadcom's petitions are barred under 35 U.S.C. §315(b). (Ex. 2001).

These Petitions for IPR were filed shortly after Ericsson obtained a judgment for infringement of the subject patents against several of Broadcom's customers in *Ericsson v. D-Link, el al* ("D-Link Lawsuit"). (Exs. 2002, 2003, 2004). Broadcom clearly had a substantial interest in that case because its "BCM4313 and BCM4321" chips formed the basis for some of the infringement allegations, (Petition at 2), and as Broadcom admits in its SEC filings, it is not uncommon for Broadcom to be "required to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights." (Ex. 2005 at 46). To protect these interests, Broadcom "engage[s] in litigation to . . . determine the validity and scope of the proprietary rights of others, including [its] customers." *Id.* These IPRs are one example of Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligations.[1]

For years, Broadcom has been working behind the scenes to help defeat Ericsson's infringement claims against its customers. Indeed, as far back as July 2010, Broadcom assisted Acer, Inc., a D-Link Lawsuit defendant, (Ex. 2002), in analyzing the very patents that are now the subject of Broadcom's petitions. When

---

[1] Another chip supplier, Intel, actually intervened in the case, stating it had a direct and substantial interest because of its indemnity agreements. (Ex. 2006 at 3).

1

**A0045.1**

This page contains confidential information.

Please refer to A0046, which contains the redacted, public version of this page.

**A0046.1**

of the defendants, (Pet. Ex. 1010); and (2) a majority of the same references that the defendants relied upon for their invalidity claims in the D-Link Lawsuit. This level of coordination raises serious questions about whether Broadcom is in privity with the defendants and is likewise time barred from filing these petitions by §315(b).

Because the certain facts as to Broadcom's standing are not publicly available and because Ericsson has exhausted all efforts to obtain them voluntarily, Ericsson submits this Motion. The requests are useful and relevant to Broadcom's standing, which the PTO has expressly identified as a basis for obtaining discovery. Ericsson worked diligently to obtain this evidence, and Broadcom faces no undue burden in responding. As such, Ericsson meets the interests of justice standard.

## I.    The Discovery Request Is Relevant to Broadcom's Standing.

If Broadcom is a privy to any of the D-Link Defendants, it is barred from obtaining *inter partes* review under 35 U.S.C. § 315(b) because Ericsson served the "D-Link Defendants"[2] more than one year before these petitions were filed. (Ex. 2004). The discovery sought goes directly to Section 315(b)'s application.

The PTO specifically identified standing as an issue that warrants additional discovery. *See* 77 Fed. Reg. 48680, 48689 (Aug. 14, 2012) ("additional discovery may be authorized where patent owner raises sufficient concerns regarding the petitioner's certification of standing."). The PTO also allows the Board to "permit new testimonial evidence where it addresses issues relating to the petitioner's

---

[2] The "D-Link Defendants" include, collectively, D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc.("Acer"), Acer America Corp. and Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. (Exs. B, C)

3

**A0047.1**

standing, or where . . . the evidence demonstrates that the trial may not be instituted." *Trial Practice Guide*, 77 Fed. Reg. 48756, 48764 (Aug. 14, 2012) ("TPG"). Thus, the PTO clearly intends to allow additional discovery for standing issues, like § 315.

Under § 315(b), IPR should be denied because Broadcom is in privity with at least one D-Link Defendant. The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," *Black's Law Dictionary*, 5th Ed. (1979), sufficient to justify applying principles of claim or issue preclusion to the nonparty, TPG at 48759. The PTO expanded the doctrine by noting its equitable and practical nature and stating it "should extend to parties to transactions and other activities relating to the property in question." TPG at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)).

Under this expanded doctrine,[3] the Board must "evaluate what parties constitute 'privies' in a manner consistent with the flexible and equitable considerations established under federal caselaw." TPG at 48759. For example, the TPG cites *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008), as support for its interpretation. *Id.* In doing so, the Board must determine if the parties' relationship is "sufficiently close such that both should be bound by the trial outcome and related estoppels." *Id.*; *see* 154 Cong. Rec. S9987 (Sept. 27, 2008) (statement of Sen. Kyl). "A common consideration is whether the non-party exercised or could have exercised control over a party's participation in a proceeding." *Id.*

---

[3] Section 315(b) under the AIA also expanded on former 35 U.S.C. § 317(b) by precluding real parties in interest in addition to privies. *See* former 35 U.S.C. § 317(b) (1999), *amended by* 35 U.S.C. § 317, Pub. L. No. 112-29, § 6(a), 125 Stat. 303 (2011).

4

**A0048.1**

Also, the Supreme Court set forth six categories for determining whether a nonparty to a suit is bound by its judgment in *Taylor,* and the PTO expressly validated them as guidelines for determining privity. *See* TPG at 48759. One category asks whether the nonparty maintains a "substantive legal relationship" with a party in suit. 553 U.S. at 894. This theory "originated 'as much from the needs of property law as from the values of preclusion by judgment.'" *Id.* (citations omitted).

Indemnity relationships satisfy *Taylor's* reasoning;[4] numerous federal courts agree and state that indemnity relationships justify third party preclusion. *See, F.T.C. v. Garvey*, 383 F.3d 891, 898 (9th Cir. 2004) ("To deny the right of indemnification would be to destroy the indemnitee's right by the result of an action . . . It is far better to preclude the third person . . . who often could have joined both adversaries in the first action."); *SCAC Transp. (USA) Inc. v. S.S. Danaos*, 845 F.2d 1157, 1162 (2d Cir. 1988) (indemnitor is precluded from disputing issues determined in the indemnitee's judgment); *Jennings v. U.S.*, 374 F.2d 983, 985 (4th Cir. 1967) ("where an indemnitor is notified and can take part in – indeed may control –  the litigation, he is precluded from contesting the indemnitee's liability in the subsequent indemnity action.").

*Taylor* relies on the Restatement (second) of Judgments, 553 at 893 n. 6, which acknowledges that indemnity relationships justify privity preclusion. If an indemnitor has received "reasonable notice of the action" but declines to participate in the

---

[4] Broadcom relies on *Apple, Inc. v. Achates Ref. Publ'g, Inc.*, IPR2013-00080, Paper No. 18 (2013). However, Achates relied solely on an unsigned, public agreement with no evidence of concerted action.  Here, evidence of Broadcom's past influence in negotiations, litigation history, corporate filings, contemporaneous attacks, *and* an indemnity agreement are evidence of control and a substantive legal relationship.

5

**A0049.1**

This page contains confidential information.

Please refer to A0050, which contains the redacted, public version of this page.

**A0050.1**

IPR2013-00601
Patent 6,772,215

A. <u>Useful information will be uncovered with additional discovery.</u>

Ericsson is already "in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered." *Garmin, supra,* at 7. "'Useful' means favorable in substantive value to a contention of the party moving for discovery." *Id.* Ericsson has come forward with considerable direct and circumstantial evidence that Broadcom colluded with the Defendants because of its indemnity obligations. (Exs. 2005, 2007, 2008, 2009, 2016). Ericsson has further evidence of the existence of the nature of this relationship but cannot submit this evidence because of confidentiality provisions that Broadcom and others refuse to waive. (Ex. 2012). Broadcom does not deny the existence of such indemnity agreements. *Id.* If produced, these contracts will be useful to reveal the full scope of these substantive legal relationships and Broadcom's participation in the D-Link Lawsuit so that the Board can sufficiently rule on Broadcom's standing.

B. <u>Equivalent information is not obtainable by any other means.</u>

Ericsson has actively pursued discovery from Broadcom and the defendants. First, Ericsson made limited requests from Broadcom related to the contractual relationships. (Ex. 2011). Broadcom did not, and still does not, deny the existence of the contracts, but instead relies on their confidentiality to avoid a 315(b) analysis. (Ex. 2012). Second, Ericsson asked the defendants to permit its IPR counsel to review any contracts relating to the "BCM4312 and BCM4321" chips without being subject

---

reasonably tailored to its genuine need to determine the relationship between Broadcom and the D-Link Defendants. Finally, the requests will not require a significant expenditure of human or financial resources, as they primarily relate to specific contracts and communications. *Garmin supra,* at 6-7.

7

**A0051.1**

to the "Prosecution Bar" in the Protective Order. (Ex. 2011). Broadcom's customers refused to waive that provision without Broadcom's consent. (Ex. 2013, 2014). Once again, Broadcom stonewalled Ericsson by hiding behind the protective order. [6]

Here, the parties to the relevant contracts and communications possess this evidence and it is amenable to concealment because all actions by the parties are taken behind closed doors, apparently locked by Confidentiality Agreements. Considering the nature and effect of this information, Ericsson has made all possible attempts to obtain it by other means. *Garmin*, *supra*, at 6. Thus, Ericsson has satisfied each factor; its limited requests should be granted in the interests of justice.

## C. Conclusion

If the Board denies Ericsson's request, it is difficult to conceive of a case in which discovery into standing will be permitted, despite the TPG's indication to the contrary. Patent owners will rarely if ever be in possession of indemnity agreements and, if they are, they will be unable to rely upon them because of a protection order. This will promote collusion among parties and thereby undermine the policy behind §315(b) that encourages litigates to bring their validity challenges to the Board in a timely manner. Without an order from the Board, this evidence will seldom be obtainable by any patent owner. Thus, as the PTO has declared, patent owners require the use of additional discovery; otherwise, § 315(b) will essentially be eviscerated.

---

[6] Ericsson has concurrently filed an Emergency Motion for Relief from the Protective Order in the district court. (*See* Ex. 2015). To the extent the Board is inclined to deny Ericsson's motion as "speculative" in the absence of the underlying indemnity agreements, despite the circumstantial evidence, Ericsson requests that the Board hold the present motion in abeyance until the district rules on Ericsson' motion.

8

**A0052.1**

IPR2013-00601
Patent 6,772,215

Dated: December 11, 2013.

/Peter J. Ayers/
PETER AYERS
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefinakteibolaget
    LM Ericsson

9

**A0053.1**

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 11, 2013 the foregoing PATENT

OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. §

42.51(b) was served on Lead and Back-up Counsel for Broadcom Corporation by

sending the same via Federal Express to the service address provided in Broadcom's

Mandatory Notices:

    Dominic E. Massa, Lead Counsel
    Michael A. Diener, Back-up Counsel
    Wilmer Cutler Pickering Hale and Dorr, LLP
    60 State Street
    Boston, MA 02109

              LEE & HAYES PLLC


                /Peter J. Ayers/
              Peter J. Ayers, Reg. No. 38,374

10

**A0054.1**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

Case IPR2013-00601
U.S. Patent No. 6,772,215

**PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR
ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

ActiveUS 119712981v.1

**A0055**

Ericsson's ("Ericsson") Motion for Additional Discovery from Broadcom

Corporation ("Broadcom") (the "Motion") should be denied because Broadcom is

not in privity with the Texas Defendants[1] and because Ericsson has not

demonstrated that its requested additional discovery is "necessary in the interest of

justice." 35 U.S.C. § 316(a)(5); 37 C.F.R. § 42.51(b)(2)(i).

Discovery in *inter partes* review ("IPR") is "less than what is normally

available in district court patent litigation" because "Congress intended *inter partes*

review to be a quick and cost effective alternative to litigation." IPR2013-00080,

Paper 18 at 3. The Board must therefore be "conservative in authorizing additional

discovery." *Id.* Additional discovery–like that requested in Ericsson's Motion–

should only be permitted where such discovery is "necessary in the interest of

justice." *Id.*, at 4. And the requested discovery must be more than a speculation or

"mere possibility." *Id.* There must be "factual evidence or support" underlying a

request for additional discovery that demonstrate that "something useful [to the

proceeding] will be found." *Id.* Ericsson, despite all its colorful rhetoric about

Broadcom's "covert efforts" (Mot. at 2), and "attacks" on Ericsson and its patents

(*id.* at 2), has failed entirely to satisfy this standard.

---

[1] The "Texas Defendants" are the defendants in *Ericsson Inc. v. D-Link Corp. et al.*, Civil Action No. 10-cv-473 (E.D. Tex.) ("Texas Litigation"), namely D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc., Acer America Corp., Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. Broadcom is not a defendant.

1

Indeed, Ericsson's Motion, which by Ericsson's own admission is premised on "circumstantial evidence," (Mot. at 8, n.6) is precisely the type of "fishing expedition" the Board cautioned against during the December 6, 2013 conference call allowing Ericsson's Motion. In its Order Authorizing Motion for Additional Discovery, the Board required that Ericsson explain specifically why the discovery sought was "relevant to determining whether any of the [Texas Defendants] are real parties in interest or privies of Petitioner." *Id.* at 3. Ericsson failed to make such a showing. And any effort to do so is futile, because Broadcom is not in privity with the Texas Defendants, and no amount of discovery in this proceeding or in the Texas Litigation will prove otherwise.

Ericsson also unreasonably delayed in raising this issue with Broadcom and the Board. Ericsson has been aware of the facts upon which its Motion is based since Broadcom filed its Petitions in September. But Ericsson waited until November 15, 2013 to first approach Broadcom regarding this issue. Ex. 2010. Ericsson then delayed further in approaching the Board, waiting until December 6, 2013 to seek permission to file this Motion. Ericsson's behavior suggests that it is more interested in engaging in irrelevant discovery to delay the Board's processes than the central issue for this IPR – the invalidity of Ericsson's patents.

I.    **Ericsson's Requested Discovery Is Futile**

   A.    **Broadcom Is Not in Privity with the Texas Defendants**

2

Ericsson alleges that additional discovery is necessary to establish that Broadcom is in privity with one or more of the Texas Defendants and therefore barred under 35 U.S.C. § 315(b) from pursuing its IPR petitions.  Motion at 3. Ericsson's "evidence" of such purported privity consists of vague and speculative allegations regarding potential indemnity provisions in product purchase agreements between Broadcom and at least one Texas Defendant.  Motion at 4. But the existence of indemnity provisions alone is not, as Ericsson asserts, sufficient to establish privity.  *See* IPR2013-00175, Paper 20 (July 23, 2013) ("indemnification is not one of the "substantive legal relationships" cited in *Taylor* [] as binding a person not a party to a lawsuit to a judgment in that suit."); *see also* IPR2013-00080, Paper 18 at 6 ("Indemnification is not one of the 'substantive legal relationships' cited in *Taylor* [] and is significantly different from those relationships, which involve successive property interest.")[2]

Whether privity exists focuses on "how courts generally have used the terms to 'describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion.'"  IPR2013-000080, Paper 18 at 4.  The Board must evaluate "whether a non-party may be recognized as a 'real

---

[2] In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Supreme Court held that "non-party preclusion may be justified based on a variety of "substantive legal relationship[s]" between the person to be bound and a party to the judgment. Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* at 894.

3

ActiveUS 119712981v.1

**A0058**

party-in-interest' or 'privy'" and must do so "in a manner consistent with the flexible and equitable considerations established under federal caselaw." Fed. Reg. at 48759-60 (relevant factors for privity include whether the non-party funded or directed the proceedings or "exercised or could have exercised control over a party's participation in a proceeding.") Ultimately, the Board must determine whether the relationship between two parties is "sufficiently close that both should be bound by the trial outcome and related estoppels." 77 Fed. Reg. 48756, 48759.

Ericsson cannot offer evidence to the contrary. In addition to its assertions regarding Broadcom's purported indemnity obligations, Ericsson identifies Exhibits 2005, 2007, 2009 and 2016 as "evidence" in support of its Motion. (Mot.

4

ActiveUS 119712981v.1

**A0059**

*CONFIDENTIAL MATERIAL REDACTED*

at p. 7).[3] But Ericsson's allegations fail under even the most cursory review. For example, Exhibit 2005 is simply a general risk statement in Broadcom's SEC filings discussing the attendant risks for Broadcom of patent litigation brought against its customers. Ex. 2005 at p. 46. Exhibit 2007 is an email chain between Acer, Broadcom, Atheros, and Intel that merely states that Acer is going to discuss technical comments from Broadcom, one of its chipset suppliers, regarding Ericsson's infringement allegations. Ex. 2007 at p.1. Providing technical information to a customer does not establish "control" or "privity." ██████

██████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████[4]

---

[3] Although Ericsson refers to an "Exhibit 2016", no such Exhibit exists.

[4] Ericsson argues that Exhibit 2008 shows a common interest privilege between Acer and Broadcom because certain documents produced in the Texas Litigation "were inadvertently produced during email discovery," thus proving that "a privilege exists that protects communications between Acer and Broadcom." Mot.

5

## II.    Ericsson's Additional Discovery Is Not "Necessary in the Interests of Justice"

The Board may grant additional discovery in IPRs only where such discovery is necessary "in the interests of justice." 37 C.F.R. § 42.51(b)(2). The requested discovery must be "more than a possibility and mere allegation." IPR2012-00001, Paper No. 26 at 6. The Board has previously articulated five factors that are relevant to determining whether additional discovery is warranted in IPRs, only two of which are relevant to this Motion. *Id.,* at 6.[5] Ericsson's discovery requests fail under each of these two factors.

### 1.    Ericsson's Requested Discovery Will Not Yield "Useful Information"

To prevail in its request for additional discovery, Ericsson must demonstrate that it is "already be in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered." *See Id.,* at 7. "Useful" in this context means information that is not merely "relevant"

---

at p. 2. Ericsson's assertion is without merit. Existence of (or participation in) a joint defense group is not sufficient to establish privity. C.F.R. 48760 (party not a "'real party-in-interest' or a 'privy'" based on participation in a Joint Defense Group; *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001)).

[5] Although Ericsson fails to address the burden associated with responding to its discovery requests or whether the requests seek Broadcom's litigation positions, these factors weigh against the discovery Ericsson seeks. IPR2012-00001, Paper 26 at 6-7. Ericsson's request for "communications between Broadcom (or its counsel) and any of the D-Link Defendants (or their counsel) regarding validity" of the patents at issue in the Texas litigation is overly broad, and further evidence that Ericsson's discovery requests are nothing more than a fishing expedition.

6

ActiveUS 119712981v.1

**A0061**

or "admissible" but that which is "favorable in substantive value to a contention of the party moving for discovery." *See id.*, at 7.

Ericsson cannot satisfy this heightened burden. Ericsson asserts its requested additional discovery–which Ericsson concedes is premised on "circumstantial evidence" (Mot. at 8, n.6)–will establish that Broadcom is in privity with the Texas Defendants. But Broadcom is not in privity with the Texas Defendants, and no amount of discovery by Ericsson will establish that it is.

### 2. Ericsson Cannot Generate "Equivalent Information" Because No Such Information Exists

Ericsson complains that the Board must grant its request for "additional discovery" because it cannot "generate equivalent information by other means." Mot. at 7. This argument fails for, at least, three reasons. *First*, there is no "equivalent information" for Ericsson to generate because the information Ericsson seeks will not establish Broadcom is in privity with any of the Texas Defendants.

*Second*, according to Ericsson's own motion and its conduct in the Texas Litigation, Ericsson's additional discovery is not necessary because Ericsson has sought the same information through other means. On December 6, 2013–two and a half months after Broadcom's IPR filing–Ericsson filed an "emergency" motion in the Texas Litigation seeking production for use in this IPR certain categories of documents that it also seeks through this Motion. Ex. 1008. In its Texas motion, Ericsson requested that the Court order production of such documents in sufficient

7

ActiveUS 119712981v.1

**A0062**

time for Ericsson to submit those document as part of the Patent Owner's Statement. *Id*. at p. 1. Ericsson's motion in the Texas Litigation is fully briefed and pending before the Texas Court. Ex. 1009.[6]

*Finally*, Ericsson is incorrect that its additional discovery is warranted because Broadcom has "stonewalled Ericsson by hiding behind the [Texas] protective order" and by refusing to allow the Texas Defendants to produce Ericsson's requested information. *Id*. at 8. Broadcom is not a party to the Texas Litigation, and it does not control the conduct of the Texas Defendants. Broadcom therefore cannot require the Texas Defendants to waive the terms of a Protective Order that Broadcom did not negotiate. Ex. 2011 at p.1-2.

## III. CONCLUSION

For the reasons stated above, Broadcom respectfully requests that Ericsson's Motion be denied.

Dated: December 20, 2013.

Respectfully submitted,

/Dominic E. Massa/
Dominic E. Massa, Reg. No. 44,905
60 State St.
Boston, MA 02109

---

[6] The Board should reject Ericsson's request to "hold the present motion in abeyance until the district court rules on Ericsson's motion." Mot. at 8, n.6 As set forth above, even if Ericsson obtains the documents in its Texas motion, such documents will not establish Broadcom is in privity with the Texas Defendants.

8

ActiveUS 119712981v.1

**A0063**

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 20, 2013, I caused a true and correct copy

of the foregoing PETITIONER'S OPPOSITION TO PATENT OWNER'S

MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b) to be

served via email on the attorneys identified in Ericsson's Updated Mandatory

Notice (Paper 8), whom consented to electronic service:

| | |
|---|---|
| Lead Counsel: | Peter J. Ayers |
| Email Address: | peter@leehayes.com |
| Back-up Counsel: | J. Christopher Lynch |
| Email Address: | chris@leehayes.com |

/Dominic E. Massa/
Dominic E. Massa
Registration No. 44,905

9

**A0064**

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

---

Case IPR2013-00601
U.S. Patent No. 6,772,215

---

**PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR
ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

ActiveUS 119712981v.1

**A0065**

Ericsson's ("Ericsson") Motion for Additional Discovery from Broadcom Corporation ("Broadcom") (the "Motion") should be denied because Broadcom is not in privity with the Texas Defendants[1] and because Ericsson has not demonstrated that its requested additional discovery is "necessary in the interest of justice." 35 U.S.C. § 316(a)(5); 37 C.F.R. § 42.51(b)(2)(i).

Discovery in *inter partes* review ("IPR") is "less than what is normally available in district court patent litigation" because "Congress intended *inter partes* review to be a quick and cost effective alternative to litigation." IPR2013-00080, Paper 18 at 3. The Board must therefore be "conservative in authorizing additional discovery." *Id.* Additional discovery–like that requested in Ericsson's Motion–should only be permitted where such discovery is "necessary in the interest of justice." *Id*., at 4. And the requested discovery must be more than a speculation or "mere possibility." *Id.* There must be "factual evidence or support" underlying a request for additional discovery that demonstrate that "something useful [to the proceeding] will be found." *Id*. Ericsson, despite all its colorful rhetoric about Broadcom's "covert efforts" (Mot. at 2), and "attacks" on Ericsson and its patents (*id.* at 2), has failed entirely to satisfy this standard.

---

[1] The "Texas Defendants" are the defendants in *Ericsson Inc. v. D-Link Corp. et al.*, Civil Action No. 10-cv-473 (E.D. Tex.) ("Texas Litigation"), namely D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc., Acer America Corp., Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. Broadcom is not a defendant.

1

ActiveUS 119712981v.1

**A0066**

Indeed, Ericsson's Motion, which by Ericsson's own admission is premised on "circumstantial evidence," (Mot. at 8, n.6) is precisely the type of "fishing expedition" the Board cautioned against during the December 6, 2013 conference call allowing Ericsson's Motion. In its Order Authorizing Motion for Additional Discovery, the Board required that Ericsson explain specifically why the discovery sought was "relevant to determining whether any of the [Texas Defendants] are real parties in interest or privies of Petitioner." *Id.* at 3. Ericsson failed to make such a showing. And any effort to do so is futile, because Broadcom is not in privity with the Texas Defendants, and no amount of discovery in this proceeding or in the Texas Litigation will prove otherwise.

Ericsson also unreasonably delayed in raising this issue with Broadcom and the Board. Ericsson has been aware of the facts upon which its Motion is based since Broadcom filed its Petitions in September. But Ericsson waited until November 15, 2013 to first approach Broadcom regarding this issue. Ex. 2010. Ericsson then delayed further in approaching the Board, waiting until December 6, 2013 to seek permission to file this Motion. Ericsson's behavior suggests that it is more interested in engaging in irrelevant discovery to delay the Board's processes than the central issue for this IPR – the invalidity of Ericsson's patents.

## I.    Ericsson's Requested Discovery Is Futile

### A.    Broadcom Is Not in Privity with the Texas Defendants

2

ActiveUS 119712981v.1

Ericsson alleges that additional discovery is necessary to establish that Broadcom is in privity with one or more of the Texas Defendants and therefore barred under 35 U.S.C. § 315(b) from pursuing its IPR petitions. Motion at 3. Ericsson's "evidence" of such purported privity consists of vague and speculative allegations regarding potential indemnity provisions in product purchase agreements between Broadcom and at least one Texas Defendant. Motion at 4. But the existence of indemnity provisions alone is not, as Ericsson asserts, sufficient to establish privity. *See* IPR2013-00175, Paper 20 (July 23, 2013) ("indemnification is not one of the "substantive legal relationships" cited in *Taylor* [] as binding a person not a party to a lawsuit to a judgment in that suit."); *see also* IPR2013-00080, Paper 18 at 6 ("Indemnification is not one of the 'substantive legal relationships' cited in *Taylor* [] and is significantly different from those relationships, which involve successive property interest.")[2]

Whether privity exists focuses on "how courts generally have used the terms to 'describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion.'" IPR2013-000080, Paper 18 at 4. The Board must evaluate "whether a non-party may be recognized as a 'real

---

[2] In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Supreme Court held that "non-party preclusion may be justified based on a variety of "substantive legal relationship[s]" between the person to be bound and a party to the judgment. Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* at 894.

3

ActiveUS 119712981v.1

**A0068**

This page contains confidential information.

Please refer to A0059, which contains the redacted, public version of this page.

This page contains confidential information.

Please refer to A0060, which contains the redacted, public version of this page.

## II.    Ericsson's Additional Discovery Is Not "Necessary in the Interests of Justice"

The Board may grant additional discovery in IPRs only where such discovery is necessary "in the interests of justice."  37 C.F.R. § 42.51(b)(2).  The requested discovery must be "more than a possibility and mere allegation." IPR2012-00001, Paper No. 26 at 6.  The Board has previously articulated five factors that are relevant to determining whether additional discovery is warranted in IPRs, only two of which are relevant to this Motion.  *Id.*, at 6.[5]  Ericsson's discovery requests fail under each of these two factors.

### 1.    Ericsson's Requested Discovery Will Not Yield "Useful Information"

To prevail in its request for additional discovery, Ericsson must demonstrate that it is "already be in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered." *See Id.*, at 7.  "Useful" in this context means information that is not merely "relevant"

---

at p. 2.  Ericsson's assertion is without merit.  Existence of (or participation in) a joint defense group is not sufficient to establish privity.  C.F.R. 48760 (party not a "'real party-in-interest' or a 'privy'" based on participation in a Joint Defense Group; *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001)).
[5] Although Ericsson fails to address the burden associated with responding to its discovery requests or whether the requests seek Broadcom's litigation positions, these factors weigh against the discovery Ericsson seeks.  IPR2012-00001, Paper 26 at 6-7.  Ericsson's request for "communications between Broadcom (or its counsel) and any of the D-Link Defendants (or their counsel) regarding validity" of the patents at issue in the Texas litigation is overly broad, and further evidence that Ericsson's discovery requests are nothing more than a fishing expedition.

6

ActiveUS 119712981v.1

**A0071**

or "admissible" but that which is "favorable in substantive value to a contention of the party moving for discovery." *See id.*, at 7.

Ericsson cannot satisfy this heightened burden. Ericsson asserts its requested additional discovery–which Ericsson concedes is premised on "circumstantial evidence" (Mot. at 8, n.6)–will establish that Broadcom is in privity with the Texas Defendants. But Broadcom is not in privity with the Texas Defendants, and no amount of discovery by Ericsson will establish that it is.

### 2. Ericsson Cannot Generate "Equivalent Information" Because No Such Information Exists

Ericsson complains that the Board must grant its request for "additional discovery" because it cannot "generate equivalent information by other means." Mot. at 7. This argument fails for, at least, three reasons. *First*, there is no "equivalent information" for Ericsson to generate because the information Ericsson seeks will not establish Broadcom is in privity with any of the Texas Defendants.

*Second,* according to Ericsson's own motion and its conduct in the Texas Litigation, Ericsson's additional discovery is not necessary because Ericsson has sought the same information through other means. On December 6, 2013–two and a half months after Broadcom's IPR filing–Ericsson filed an "emergency" motion in the Texas Litigation seeking production for use in this IPR certain categories of documents that it also seeks through this Motion. Ex. 1008. In its Texas motion, Ericsson requested that the Court order production of such documents in sufficient

7

ActiveUS 119712981v.1

**A0072**

time for Ericsson to submit those document as part of the Patent Owner's Statement. *Id*. at p. 1. Ericsson's motion in the Texas Litigation is fully briefed and pending before the Texas Court. Ex. 1009.[6]

*Finally*, Ericsson is incorrect that its additional discovery is warranted because Broadcom has "stonewalled Ericsson by hiding behind the [Texas] protective order" and by refusing to allow the Texas Defendants to produce Ericsson's requested information. *Id*. at 8. Broadcom is not a party to the Texas Litigation, and it does not control the conduct of the Texas Defendants. Broadcom therefore cannot require the Texas Defendants to waive the terms of a Protective Order that Broadcom did not negotiate. Ex. 2011 at p.1-2.

## III.   CONCLUSION

For the reasons stated above, Broadcom respectfully requests that Ericsson's Motion be denied.

Dated: December 20, 2013.

Respectfully submitted,

/Dominic E. Massa/
Dominic E. Massa, Reg. No. 44,905
60 State St.
Boston, MA 02109

---

[6] The Board should reject Ericsson's request to "hold the present motion in abeyance until the district court rules on Ericsson's motion." Mot. at 8, n.6 As set forth above, even if Ericsson obtains the documents in its Texas motion, such documents will not establish Broadcom is in privity with the Texas Defendants.

ActiveUS 119712981v.1

## CERTIFICATE OF SERVICE

I hereby certify that, on December 20, 2013, I caused a true and correct copy of the foregoing PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b) to be served via email on the attorneys identified in Ericsson's Updated Mandatory Notice (Paper 8), whom consented to electronic service:

| | |
|---|---|
| Lead Counsel: | Peter J. Ayers |
| Email Address: | peter@leehayes.com |
| Back-up Counsel: | J. Christopher Lynch |
| Email Address: | chris@leehayes.com |

/Dominic E. Massa/
Dominic E. Massa
Registration No. 44,905

9

**A0074**

Trials@uspto.gov
Tel: 571-272-7822

Paper: 23
Entered: Jan 24, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)
Patent Owner
_____

Cases IPR2013-00601(Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,446,568 B1)
IPR2013-00636 (6,424,625 B1)[1]
_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

EASHTOM, *Administrative Patent Judge.*

DECISION
Ericsson's Motion for Additional Discovery
*37 C.F.R. § 42.51(b)(2)*

---

[1] The Board exercises its discretion to issue one Order to be filed in each case. The parties are not authorized to use this heading style.

**A0075**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

*Introduction*

Patent Owner ("Ericsson") filed a redacted motion for additional discovery in the instant proceedings (Paper 13, "Mot." or "Motion"), and Petitioner ("Broadcom") filed a redacted opposition (Paper 16 "Opp." or "Opposition").[2]  In its Motion, Ericsson requests discovery regarding indemnity agreements, defense agreements, payments, and email, or other communications, between Broadcom and defendants ("D-Link Defendants") in related litigation, *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) ("Texas Litigation").  *See* Mot.; Ex. 2001 ("Patent Owner's Requests for Production," hereinafter "Request").

In the Texas Litigation, a jury found Ericsson's challenged patents in the instant proceedings infringed by the D-Link Defendants due partly to their use of Broadcom's Wi-Fi compliant products.  *See* Pet. 1–2.  Broadcom was not a party to the Texas Litigation.  *Id*. at 1.  According to Broadcom, the jury did not address the issue of validity with respect to the patents challenged in IPR2013-00601 and IPR2013-00602.  *See* IPR2013-00601, Paper 3, 2; IPR2013-00602, Paper 2, 1-2.  Ericsson maintains that the requested discovery will show that "Broadcom is in privity with at least one D-Link Defendant" in the Texas Litigation.  Mot. 4.

For the reasons stated below, Ericsson's motion is *denied*.

*35 U.S.C. § 315(b)*

Under 35 U.S.C. § 315(b) , "[a]n inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year

---

[2] The parties also filed sealed redacted versions.  *See* note 3.  Unless otherwise noted, reference throughout is to redacted papers filed in IPR2013-00636.  The same or similar papers are filed in the other two cases, IPR2013-00601 and IPR2013-00602.

2

**A0076**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent." Broadcom does not dispute that one or more of the D-Link Defendants were served with a complaint more than one year prior to the filing of the Petition. Therefore, if Ericsson can show privity existed between the D-Link Defendants and Broadcom in the Texas Litigation, an *inter partes* review may not be instituted under 35 U.S.C. § 315(b). *See* Paper 9 (Order Authorizing Motion for Additional Discovery).

*Request*

Pursuant to its discovery Motion, Ericsson seeks the following discovery items:

1.  All executed contracts or agreements between Broadcom and any of the D-Link Defendants relating to Wi-Fi compliant products, such as the BCM4313 and BCM4321, that are used in any of the D-Link Defendants' products accused of infringement in the D-Link Litigation.

2. All executed contracts or agreements between Broadcom and any of the D-Link Defendants that include any indemnity or duty to defend provisions.

3.  All joint defense agreements, or other agreements addressing cooperation on the defense of the D-Link Litigation, between Broadcom and any of the D-Link Defendants relating to the D-Link Litigation.

4.  All invoices provided to or received from any of the D-Link Defendants, or their counsel, seeking reimbursement for any fees or expenses incurred in the D-Link Litigation.

5.  Records of any payments made by Broadcom to any of the D-Link Defendants, or their counsel, or to Ericsson, pursuant to any actual or alleged contractual duty to defend or

3

**A0077**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

indemnify any [of] the D-Link Defendants for any fees or expenses incurred in the D-Link Litigation.

6. All emails and written correspondence between any of the D-Link Defendants, or their counsel, and Broadcom, or its counsel, relating to any claimed duty of Broadcom to defend or indemnify any of the D-Link Defendants in the D-Link Litigation from January 1, 2010 to the present.

7. All emails and written correspondence between Broadcom, or its counsel, and any of the D-Link Defendants, or their counsel, from January 1, 2010 to the present relating to:
   A. The filing of IPR2013-00601, IPR2013-00602, and IPR2013-00636;
   B. Intervention by Broadcom in the D-Link Litigation;
   C. The claim construction or interpretation of any of the patents at issue in the D-Link Litigation, including, but not limited to, the '568 Patent, the '625 Patent, or the '215 Patent; and
   D. The validity or alleged invalidity of any of the patents at issue in the D-Link Litigation, including, but not limit[ed] to, the '568 Patent, the '625 Patent, or the '215 Patent.

Ex. 2001.

*Analysis*

To show privity, Ericsson relies, *inter alia*, on known indemnity agreements, wherein Broadcom agreed to indemnify certain D-Link Defendants. Ericsson also relies on allegations about litigation activity by Broadcom, filing of an amicus appeal brief by Broadcom in the Texas Litigation, SEC filings, communications with Acer, Inc., a D-Link Defendant, Broadcom's use of Ericsson's expert report in the filing of the Petition, timing of the filing of the IPRs, and email correspondence about indemnity and other matters. *See* Mot. 1-7 (citing Ex. 1010; Exs. 2002-

4

**A0078**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

2017).[3]  For its part, Broadcom asserts that "Broadcom is not in privity with the Texas Defendants, and no amount of discovery in this proceeding or in the Texas Litigation will prove otherwise."  Opp. 2.

Pursuant to the America Invents Act (AIA), certain discovery is available in *inter partes* review proceedings.  *See* 35 U.S.C. § 316(a)(5); 37 C.F.R. §§ 42.51-53.  Discovery in an *inter partes* review proceeding, however, is less than what is normally available in district court patent litigation, as Congress intended *inter partes* review to be a quick and cost effective alternative to litigation.  *See* H. Rep. No. 112-98 at 45-48 (2011). A party seeking discovery beyond what is expressly permitted by rule must do so by motion, and "must show that such additional discovery is in the interests of justice."  37 C.F.R. § 42.51(b)(2)(i); *accord* 35 U.S.C. § 316(a)(5) ("such discovery shall be limited to . . . what is otherwise necessary in the interest of justice").

The AIA legislative history makes clear that additional discovery

---

[3] As indicated above, note 2, in addition to the redacted papers, the parties filed un-redacted papers that remain under seal: Ericsson filed a protected motion, Paper 11, with protected exhibits that remain under seal.  Similarly, Broadcom filed a protected opposition, Paper 16, and a protected exhibit, Ex. 1017, that remain under seal.  (Broadcom should clarify if Exhibit 1018 is to be placed under seal. It appears, based on the face of the document and related characterizations, that it contains confidential information.  It is under seal at PTAB at this time.)  After review of the un-redacted materials, the Board determines that they do not alter the outcome.  In this Motion Decision, Broadcom's sealed opposition and exhibits are not addressed further, because they do not impact Ericsson's initial burden of showing that the requested discovery is necessary in the interests of justice.  Ericsson's sealed motion, Paper 11, additionally shows confidential litigation activity by Broadcom that fails to imply or show control by Broadcom over the Texas Litigation.

5

**A0079**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

should be confined to "particular limited situations, such as minor discovery that PTO finds to be routinely useful, or to discovery that is justified by the special circumstances of the case." 154 Cong. Rec. S9988-89 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl). In light of this, and given the statutory deadlines required by Congress for *inter partes* review proceedings, the Board must be conservative in authorizing additional discovery. *See id.*

An important factor in determining whether additional discovery is in the interests of justice is whether there exists more than a "mere possibility" or "mere allegation that something useful [to the proceeding] will be found." *Garmin International, Inc. et al. v. Cuozzo Speed Technologies LLC*, IPR2012-00001, Paper 20, 2–3, "Order—Authorizing Motion for Additional Discovery" (listing important factors to determine whether a discovery request meets the applicable standard) (hereinafter the "Garmin factors"); *accord Apple v. Achates Reference Publishing, Inc.*, IPR2013-00080, Paper 18, "Decision—Achates Motion for Additional Discovery" (applying the Garmin factors to indemnity agreements). The party seeking discovery must come forward with some factual evidence or support for its request. *See* IPR2012-00001, Paper 26 (decision addressing the Garmin discovery factors).

Whether a non-party is a "real party-in-interest" or "privy" for purposes of an *inter partes* review proceeding is a "highly fact-dependent question" that takes into account how courts generally have used the terms to "describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion." *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012) ("Trial

6

**A0080**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

Practice Guide" or "TPG"). Whether parties are in privity, for instance, depends on whether the relationship between a party and its alleged privy is "sufficiently close such that both should be bound by the trial outcome and related estoppels." *Id*. Depending on the circumstances, a number of factors may be relevant to the analysis, including whether the non-party "exercised or could have exercised control over a party's participation in a proceeding," and whether the non-party is responsible for funding and directing the proceeding. *Id*. at 48,759-60.

Ericsson's evidence does not amount to more than a "mere allegation that something useful will be found" to show privity, as is required by the first Garmin factor. To show privity requires a showing that Broadcom would be bound to the outcome of the Texas Litigation. To be bound, in normal situations, Broadcom must have had control over the Texas Litigation. According to long-standing precedent, *Bros, Inc. v. W.E. Grace Mfg. Co.*, 261 F.2d 428, 429 (5th Cir. 1958), when a patent holder sues a dealer, seller, or distributer of an accused product, as is the case at hand, indemnity payments and minor participation in a trial are not sufficient to establish privity between the non-party manufacturer of the accused device and the defendant parties:

> While the mere payment of counsel fees or participation in a trial by one not a named party to it would not alone be sufficient, *cf. I.T.S. Rubber Co. v. Essex Co.*, [] 272 U.S. 429 [(1926)]. . . Restatement, Judgment § 84, comment e (1942), the extent and nature of that participation may completely alter the consequences. This is particularly so in patent infringement cases in which, from tactical or strategic considerations relating to venue, desirability of a particular forum and the like, such cases are so often filed and tried against a dealer, a seller, a distributor, or a user of the accused device manufactured by

7

**A0081**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

> another. If the manufacturer stands aloof, he risks a judgment adverse to his interest resulting perhaps from inadequate or incompetent defense by one who has a secondary interest. *Such judgment, to be sure, would normall[y] not be binding by estoppel or res judicata,* but it would take its place in the jurisprudence where its practical effect as stare decisis might be as decisive. The alternative, of course, is to jump in and give the case full and active defense as though the manufacturer were the real named party. This assures that the issues will be presented and contested in a way deemed most effective by the nominally remote, but practically immediate, party at interest.

261 F.2d at 429 (emphases added); cited with approval by *Emerson Elec. Co. v. Black and Decker Mfg. Co.*, 606 F.2d 234, 242, n. 20 (8th Cir. 1979) ("If Emerson does control the Maryland suit, the outcome will be binding on, or inure to the benefit of, Emerson under principles of res judicata."); *see also United States v. Webber,* 396 F.2d 381, 387 (3d Cir.1968) (finding that appellants were "privies" because of their "control over and interest in the earlier litigation.")

*Bros, Inc.* relies on a long line of precedent to support the normal rule that privity requires a finding of active control of the trial:

> Where that course is followed and the non-party actively and avowedly conducts the defense, manages and directs the progress of the trial at its expense and under its supervision, the outcome, which if favorable would have redounded to his benefit, if adverse becomes sauce for goose and gander alike, and binding under principles of res judicata. *Minneapolis-Honeywell Regulator Co. v. Thermoco, Inc.*, 116 F.2d 845 (2d Cir. 1941); *Nash Motors Co. v. Swan Carburetor Co.*, 105 F.2d 305 (4th Cir. 1939); *Warford Corp. v. Bryan Screw Machine Products Co.*, 44 F.2d 713 (6th Cir. 1930); *N. O. Nelson Manufacturing Co. v. F. E. Myers & Bro. Co.*, 25 F.2d 659 (6th Cir. 1928); *Beyer Co. v. Fleischmann Co.*, 15 F.2d 465 (6th Cir. 1926); Restatement, Judgments 84, comment b, illustration 5 (1942).

8

**A0082**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

261 F.2d at 429 (citations reformatted).

Similarly, under *TRW Inc. V. Ellipse Corp.*, 495 F.2d 314, 318 (7th Cir. 1974), "the crucial distinction . . . is the extent of participation, for privity in the law of judicial finality usually connotes representation."  In *Dentsply Intern., Inc. v. Kerr Mfg. Co.*, 42 F.Supp.2d 385 (D.Del. 1999), the court characterized *TRW* as requiring control of the trial to show privity:

> In *TRW*, the Court of Appeals for the Seventh Circuit refused to apply the doctrine of res judicata to TRW, a nonparty, who agreed to indemnify a named party in a prior suit, but whose role in the prior suit was limited to observing the proceedings and filing amicus curiae briefs.  In reaching this conclusion, the court noted that *the crucial distinction* between *TRW* and other cases, in which nonparty indemnitors were found to have interests sufficiently close for establishing privity for res judicata purposes, was TRW's *limited extent of participation in the prior lawsuit*.  Indeed, *the court explicitly distinguished* TRW*'s situation from the situation in which a nonparty indemnitor retained the indemnitee-defendant's counsel and controlled the litigation.*

*Dentsply*, 42 F.Supp.2d at 398 (emphasis added).

Contrary to Ericsson's assertion that "[t]he weight of authority strongly supports that an indemnity agreement . . . establish[es] privity," Mot. 6, *Bros. Inc, TRW*, *Dentsplay* and other cases noted *supra* illustrate that more is required.  Control of the litigation, or some sort of representation, constitutes a "crucial" factor.  *Dentsply*, 42 F.Supp.2d at 398.

Ericsson relies, *inter alia*, on *Jennings v. U.S.*, 374 F.2d 983, 985 (4th Cir. 1967) for the following proposition: "where an indemnitor is notified and can take part in – indeed may control – the litigation, he is precluded from contesting the indemnitee's liability in the subsequent indemnity action."  Mot. 5.  Ericsson does not explain how this *dicta* in *Jennings*

9

**A0083**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

applies to the situation at hand or otherwise supports a departure from the long-standing rule that includes control or representation as a crucial factor that may bind a non-party to a trial outcome.

For example, in *Dentsplay*, the court found that "even if Centrix was ultimately relieved of its legal duty to defend and indemnify Kerr, as a factual matter, Centrix did defend Kerr for approximately two years, in a manner which was consistent with various terms of the agreement." 42 FSupp. 2d at 396, n. 4. Certain indemnity agreements involved in *Dentsply* corroborated control of the litigation, and the court found *extensive participation in the litigation* by indemnitor Centrix. *See id.* at 397-399. "Because of the contractual relationship between Centrix and Kerr, Centrix's extensive participation in the litigation and Centrix's knowledge of the injunction, the Court concludes that privity exists between Kerr and Centrix." *Id.* at 399.

Nevertheless, Ericsson seeks to discover indemnity agreements and asserts that certain SEC filings show that "it is not uncommon for Broadcom" to indemnify its customers. Mot. 1 (citing Ex. 2005, 46). Ericsson also asserts that "Broadcom does not deny the existence of such indemnity agreements." Mot. 7. Ericsson attaches an order from the Texas Litigation, Ex. 2016, in which the district court mentions two indemnity agreements and an e-mail communication about indemnity.[4]

---

[4] In the order, the court denied Ericsson's motion to release discovery of those items, partially because it was under a protective order there, and granting the motion would undermine the negotiations which produced the protective order and discovery items. *See* Ex. 2016, 3. The court noted that granting Ericsson's motion would allow Ericsson to employ the district

10

**A0084**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

Ericsson also attaches evidence of other litigation activity by Broadcom (which remains under a protective order in this proceeding), Ex. 2009, and attaches a "Motion of Amici Wi-Fi Chip Companies Broadcom Corporation . . . for Leave to File Amicus Brief" in the Court of Appeals for the Federal Circuit," Ex. 2017, as further evidence of collusion, litigation activity, or control by Broadcom.

The totality of this evidence fails to amount to more than a "mere possibility" that Broadcom controlled, or could have controlled, the Texas Litigation. Paying for trial expenses pursuant to indemnity normally does not establish privity or control. Therefore, the sought-after indemnity agreements, and the requested discovery items seeking evidence of payment pursuant to indemnity or other agreements, fail to amount to more than a "mere allegation that something useful will be found" to establish privity. *See* Ex. 2001 (discovery items 1–6, also listed *supra*).

Similarly, although filing an amicus brief shows interest in the outcome, it only shows some potential future control as a non-party over the appeal of an issue of damages. *See* Ex. 2017, 2 (motion by Broadcom to file amicus brief to address royalties and noting that the "award may also provoke indemnity issues"). Filing an amicus brief on appeal does not bind Broadcom to the trial below outcome or show that Broadcom exercised control over that outcome. *See Dentsplay*, 42 F.Supp.2d at 398 (quoted *supra*, discussing *TRW*—agreeing to indemnify a named party, but having a role limited to observing the proceedings and filing amicus curiae briefs, is insufficient to show privity). The other litigation activity by Broadcom in

---

court's broader "relevancy" standard and circumvent the PTO's narrower standard. *Id*.

11

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

another forum, Ex. 2009 (under seal), appears to have occurred during the Texas Litigation, prior to the court's entry of judgment. Nonetheless, it does not show control of the Texas Litigation or otherwise show that Broadcom would be bound by that outcome.

Ericsson also requests discovery of "emails and written correspondence," Ex. 2001 (discovery requests 6, 7), between Broadcom and the D-Link defendants relating to "[i]ntervention by Broadcom in the D-Link Litigation," *id.* (request 7), relating to a duty to defend or indemnify, *id.* (request 6) and also "agreements addressing cooperation on the defense of the D-Link Litigation," *id.* (request 3). Other than indemnity agreements, Ericsson does not provide sufficient evidence, if any, that any such other agreements exist or were discussed.

Ericsson also does not explain how a discovery request regarding intervention would show privity on the part of non-party Broadcom. For its part, Broadcom asserts that "Ericsson chose, for its own strategic reasons, not to sue [Broadcom] in this case." Opp. 1. The evidence also indicates that Ericsson partially opposed another manufacturer's motion to intervene. *See* Ex. 2006, 1. As Broadcom points out, participation in joint defense groups, even if such a group exists, also fails to show privity. *See* Opp. 5–6, n. 4; TPG 48,760 ("Joint Defense Group," by itself, insufficient to show privity).

Ericsson also asserts that filing a request for IPR (*inter partes* review) and the other noted litigation activity, Ex. 2009, constitutes evidence of "Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligation." *See* Mot. 1; Ex. 2001 (discovery request 7A, IPR filings). Ericsson's allegation amounts to conjecture because Ericsson does

12

**A0086**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

not show how IPR filings and other filings were pursuant to indemnity agreements, and even if they were, the IPR filings fail to show control over the Texas Litigation. The evidence does not amount to more than speculation that any of Broadcom's activity constitutes evidence of collusion with the D-Link defendants in the Texas Litigation in a manner that would bind Broadcom to the outcome thereof.

Ericsson also asserts that Broadcom's reliance, in its IPR filings, on "a majority of the same references that the defendants relied upon for their invalidity claims in the D-Link lawsuit" shows "coordination [that] raises serious questions about wither Broadcom is in privity with the defendants." Mot. 3. Ericsson also asserts that the IPR filings rely heavily on Ericsson's expert report from the Texas Litigation. *Id.* Again, these allegations of "serious questions" amount to just that, questions or speculation about collusion or control. Filing IPRs does not constitute evidence that shows control over prior litigation. Broadcom, as a manufacturer of accused products, had an interest in the trial; however, using some of the same trial evidence, including known prior art, in the IPR proceedings, and using an expert report, does not constitute evidence beyond mere speculation that Broadcom controlled, or should be bound by the outcome of, the Texas Litigation.

Ericsson's assertion that D-Link Defendant Acer sought "to discuss comments from Acer's vendors," including Broadcom, also fails to show control. *See* Mot. 2 (citing Ex. 2007). Even if the record shows that Acer sought to discuss the accused products with Broadcom, the manufacturer of the products, this implies control by Acer, not Broadcom. *See* Ex. 2007. As Broadcom also points out, providing technical information to customers

13

**A0087**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

does not establish control over the trial.  Opp. 5.

Ericsson also asserts that "Acer admitted" that some Texas Litigation discovery that Acer produced was "privileged" and shows that "a privilege exists that protects communications between Acer and Broadcom." Mot. 2 (discussing Ex. 2008).  The relevance of this assertion is not clear.  The emails show that Acer's counsel relies on the "Protective Order[, which] mandates that designated information may only be used for purposes of litigation between the parties," and that "fact discovery and trial in the Ericsson v. D-Link case concluded long ago."  Ex. 2008 (email dated Dec. 4, 2013 11:44AM; *accord* email Dec. 5, 2013 1:46PM and other emails attached).  Acer's counsel also stated that "as far as we understand it, the IPR is a proceeding initiated by Broadcom to which our clients are not parties" and "[w]e do not believe our clients are under any obligation to respond to your request." *Id.* (email dated Nov. 12, 2013 4:55 PM).  This email chain shows that Acer's counsel sought to abide by the trial court's protective order, and does not imply any control by Broadcom over Acer's actions in the Texas Litigation.

Ericsson's discovery request for correspondence between Broadcom and the D-Link Defendants regarding claim construction and invalidity positions "including, but not limited to, the '568 Patent, the '625 Patent, or the '215 Patent," Ex. 2001 (requests 7C, 7D), also amounts to a speculative request.  Ericsson does not point the Board to evidence that documents about some of these positions exist or that communication about them occurred.  Moreover, the request is overly broad because it is not limited to patents at issue here.  Ericsson fails to explain how discovering information about other patents bears on control over the Texas Litigation.

14

**A0088**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

The request for "all executed contracts or agreements between Broadcom and any of the D-Link Defendants relating to Wi-Fi compliant products," Ex. 2001 (request 1), seeks discovery that broadly embraces Broadcom's commercial activity including, for example, contracts regarding the sale of such products. Ericsson fails to explain how such broad information "relating" to selling accused products shows that Broadcom was in privy with the D-Link Defendants. The breadth and cost of searching for all potential agreements, which may include sales or other agreements, weighs against Ericsson's request.

The evidence and arguments fail to show that the sought-after discovery would have more than a mere possibility of producing useful privity information, i.e., that Broadcom controlled or could have controlled the Texas Litigation. This Garmin factor weighs heavily against Ericsson. The privity precedent outlined *supra* shows that determining whether privity exists, especially without some evidence of actual control of a trial, typically spirals into what amounts to a separate trial that involves a myriad of considerations. This impacts the PTAB's mandate to expedite the proceedings and provide limited discovery in the interests of justice. In the attached order denying Ericsson's request, the court in the Texas Litigation noted that "*[a]ccording to Ericsson*, the Indemnity documents show Broadcom is in privity with Dell and Toshiba, *or at least show additional discovery is warranted on the issue.*" Ex. 2016, 2 (emphasis added). The AIA discovery procedures do not contemplate allowing discovery on the basis that it may show that "additional discovery is warranted."

The Board agrees with Ericsson that the requests are simple to understand, and that this Garmin factor weighs in Ericsson's favor. *See* Mot.

15

**A0089**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

6–7, n. 5.  Nevertheless, that and other Garmin factors, including the ability to generate equivalent information, and seeking litigation positions by other means, do not outweigh the Garmin factor related to discovering useful information discussed above.

Other than the indemnity agreements, certain email correspondence, certain litigation activity, and other tangential items, Ericsson has not provided evidence to show that there is more than a mere possibility that the sought-after discovery even exists.  Ericsson has not shown that the sought-after discovery has more than a mere possibility of producing useful evidence on the crucial privity factor—control of the Texas Litigation by Broadcom in a sufficient manner to bind Broadcom through principles of res judicata or estoppel.  Notwithstanding that Ericsson argues that no other way exists to obtain the discovery because of the Protective Order, *see* Mot. 7-8 (citing Exs. 2011–2014), the Board cannot determine on this record, with more than conjecture, whether Ericsson otherwise would be able to obtain much of the sought-after discovery, because Ericsson has not shown beyond mere speculation that it exists.  For example, Ericsson has not shown that communication about any defense agreements, duty to defend agreements, agreements to intervene, invalidity positions, and claim interpretation, exist.

After weighing the factors surrounding the issue of privity as advanced by Ericsson, including the redacted information and arguments presented by Ericsson and Broadcom that remain under seal, the Board finds that Ericsson has not met its burden of demonstrating that additional discovery is in the interests of justice.

In consideration of the foregoing, it is hereby

ORDERED that Ericsson's motion for additional discovery is *denied*.

16

**A0090**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

Petitioner:

Dominic Massa
Michael Diener
michael.diener@wilmerhale.com
Dominic.massa@wilmerhale.com
Michael.diener@wilmerhale.com

Patent Owner:

Peter J. Ayers
J. Christopher Lynch
Lee & Hayes PLLC
Peter@leehayes.com
chris@leehayes.com

17

**A0091**

Paper No. _____

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00601
U.S. Patent Nos. 6,772,215

_____

**PATENT OWNER'S REQUEST FOR REHEARING**

**A0092**

IPR2013-00601
Patent 6,772,215

## I.    Introduction

Pursuant to 37 C.F.R. § 42.71, Patent Owner Telefonaktiebolaget LM Ericsson

("Ericsson") respectfully requests that the Board reconsider its denial of Ericsson's

Motion for Additional Discovery ("Decision") because Ericsson submits that the

Board overlooked certain critical legal authorities bearing on the Motion.

## II.    Argument

### A. Standard of Review

The Board will review requests for rehearing for an abuse of discretion.  37

C.F.R. 42.71(d).  The Board will grant requests for rehearing where a decision rests

on an erroneous application of the law.  *Schrader-Bridgeport Int'l, Inc. et al. v.*

*Cont'l Automotive Sys. US, Inc.*, IPR2013-00014 Paper No. 15 at 3; *Star Fruits*

*S.N.C. v. U.S.*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).  Ericsson respectfully submits

that the Board erred (a) in its holding that limitation of discovery holds a higher

statutory priority than limitation of duplicative proceedings; and (b) in its holding that

"Broadcom must have had control over the Texas Litigation" before 35 U.S.C. §

315(b) bar may be invoked, *See* Decision at 7.

**A0093**

B. The Board Overlooked that the Principal Purpose of the America Invents Act (AIA) is to Limit Multiple Proceedings, and that Limiting Discovery is a Subsidiary Purpose, and Erred by Elevating the Latter Over the Former.

A major goal of the AIA was "to limit unnecessary and counterproductive litigation costs." H. Rep. No. 112-98 at 40 (2011). The AIA limited litigation costs in two ways: (1) by enacting provisions intended to eliminate duplicative, wasteful and harassing proceedings; and (2) by limiting discovery costs.

The first goal of AIA, limiting and constraining repetitive litigation, was plainly a primary goal. Congress expressly condemned "repeated litigation and administrative attacks on the validity of a patent." H. Rep. No. 112-98 at 48. Toward that end, Congress enacted several measures so that AIA could not "be used as [a] tool[ ] for harassment" of patent owners. *Id.*

First, Congress expressly provided that the Board could *not take jurisdiction* of any *inter partes* review unless all real parties in interest were identified. *See* 35 U.S.C. § 312 ("A petition filed under section 311 may be considered *only if* . . . the petition identifies all real parties in interest") (emphasis added). The obvious purpose of this provision was to curtail the ability of related parties to use others as a shill for them while preserving the ability to repeat litigation in other fora. "Real parties in interest" is not a defined term, but Congress did not refer to a "privy", or to "control" anywhere in in Section 312.

IPR2013-00601
Patent 6,772,215

Congress further provided in 35 U.S.C. § 315(a)(1) that "*inter partes* review may not be instituted if . . . the petitioner or any real party in interest filed a civil action challenging the validity of a claim of the patent." In addition, it provided for an *automatic* stay of the civil action in the event that the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent. *Id.* at 315(a)(2). These clauses clearly preclude repetitive litigation.

Congress then barred institution of *inter partes* review for any "petitioner, real party in interest, or privy of the petitioner" if any are served with a complaint alleging infringement of the patent by the patent owner if the defendants were served more than one year before filing. *Id.* at 315(b). This clause furthers the statutory imperitive to prevent multiple actions. Congress also provided that multiple proceedings before the Board involving the same action may be consolidated. *Id.* at 315(d). Finally, Congress directed that any final written decision from the PTO shall bind the petitioner, real party in interest, and the privy of the petitioner and estop them from any subsequent attacks before the Office, any district court, or the International Trade Commission. *Id.* at 315(e). Thus, Congress enumerated *multiple* provisions to curb excessive litigation and repetitive attacks on patent owners.

The goal of limiting discovery was clearly a subsidiary method to control costs. Congress authorized discovery in one section, 35 U.S.C. § 316(5). Nevertheless, Congress permitted discovery as "necessary in the interest of justice." *Id.* Moreover,

REQUEST FOR REHEARING                    4                         IPR2013-00601

the PTO specifically stated that discovery can be utilized to resolve the primary goal of reducing repetitive litigation. *See* Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents, 77 Fed. Reg. 48680, 48689 (Aug. 14, 2012) ("additional discovery may be authorized where patent owner raises sufficient concerns regarding the petitioner's certification of standing.").

Ericsson respectfully submits that the Decision, which promoted the subsidiary goal – limitation of discovery costs – at the expense of the primary goal – elimination of repetitive and harassing proceedings – was erroneous as a matter of law, and as a matter of discretion because it was not "in the interests of justice." Limited discovery is necessary to determine the facts bearing on whether Broadcom was a real party in interest or privy of the defendants in *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF).

C. The Board Erred as a Matter of Law in its Holding that "Broadcom must have had control over the Texas Litigation."

Congress did not define "real party in interest" or "privy," but the text and structure of the AIA militate in favor of a broad and liberal construction to achieve the AIA's intended result of limiting repetitive litigation. Both Congress and the PTO stated that the term "privity" has acquired an "expanded meaning" and that it will give effect to judgments by extending the term "beyond its classical description."

*See* 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (citing

*Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal. App. 4th 1506 (Cal.

App. 2008)); *see also* Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14,

2012) ("Trial Practice Guide" or "TPG").

The PTO further acknowledged the broad aim of the AIA in the Trial Practice

Guide, which clearly states that the determination of who is a real party in interest or

privy must be made on the facts of each case. *See* TPG at 48,760. The PTO cited

*Cal. Physicians* with approval in its discussion regarding the expansion of the scope

of privity beyond the "control" test. *Cal. Physicians* held that "[t]he word 'privy' has

acquired expanded meaning. The courts, *in the interest of justice and to prevent*

*expensive litigation*, are striving to give effect to judgments by extending 'privies'

beyond the classical description. The emphasis is not on a concept of identity of

parties, but on the practical situation . . . The concept refers 'to a relationship between

the party to be estopped and the unsuccessful party in the prior litigation which is

'sufficiently close' so as to justify application of the doctrine of collateral estoppel.'"

163 Cal. App. 4th at 1521 (citations omitted) (emphasis added).

The court then declared that "[n]otions of privity have been expanded to the

limits of due process." *Id.* at 1522. The proper test for privity that satisfies due

process is to determine if the parties have "an identity or community of interests with,

and adequate representation by, the losing party in the first action as well as that the

**A0097**

IPR2013-00601
Patent 6,772,215

circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." *Id.* Further, when the appellant argued that it did not control the prior litigation, the court denied the contention and stated, "preclusion can apply even in the absence of such control." *Id.* at 1524.

The PTO adopted that exact language in the Trial Practice Guide, *see* TPG at 48,760; the Board's contrary holding, that "Broadcom must have had control over the Texas Litigation," was, respectfully, in error.

Where Ericsson' burden is to show an identity or community of interest sufficient to make Broadcom expect to be bound by the Texas Litigation, it was error to require a showing of control. The combination of Broadcom's indemnification agreements, ancillary legal actions, discussions with D-Link Defendants, amicus curiae brief, and its reliance on evidence from the Texas Litigation collectively indicate that Broadcom has an identity or community of interest that was served in the Texas Litigation. It was error to refuse to permit discovery sufficient to further show this community of interest.

IPR2013-00601
Patent 6,772,215

### III.    Conclusion

Ericsson respectfully requests that the Board reconsider its Decision.  Allowing limited discovery on the relationship between petitioner and the D-Link Defendants promotes Congress' principal purpose of the AIA – to prevent repeated litigation and multiple attacks on the validity of patents.  It also conforms to the broad doctrine of privity because denying privies the right to *inter partes* review is in the interest of justice, as provided by both Congress and the PTO.

Dated: February 7, 2014.

/Peter J. Ayers/
PETER AYERS
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefonaktiebolaget
    LM Ericsson

IPR2013-00601
Patent 6,772,215

CERTIFICATE OF SERVICE

The undersigned certifies that on February 7, 2014 the foregoing was served

via email on Lead and Back-up Counsel for Broadcom Corporation identified in

Broadcom's Mandatory Notices, whom consented to electronic service:

Dominic E. Massa, Lead Counsel
Michael A. Diener, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
WH-External-Broadcom-IPR2013-601@wilmerhale.com
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com

LEE & HAYES PLLC

/Peter J. Ayers/
Peter J. Ayers, Reg. No. 38,374

**A0100**

Trials@uspto.gov
Tel: 571-272-7822

Paper: 28
Entered: Feb. 20, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON and ERICSSON, INC.

Patent Owner
_____

Cases IPR2013-00601
Patent 6,772,215 B1
_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

EASHTOM, *Administrative Patent Judge.*

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

Patent Owner, "Ericsson," requests rehearing, Paper 27 ("Reh'g
Req."), of the Decision on Ericsson's Motion for Additional Discovery,
Paper 23 ("Dec. on Mot."), which denies additional discovery by Ericsson of

**A0101**

IPR2013-00601
Patents 6,772,215 B1

material possessed by Petitioner, "Broadcom." Ericsson requests that the Board reverse its decision and allow for limited discovery. Reh'g Req. 8. The request is *denied.*

Ericsson argues that the Board erred "(a) in its holding that limitation of discovery holds a higher statutory priority than limitation of duplicative proceedings; and (b) in its holding that 'Broadcom must have had control over the Texas Litigation' before [the] 35 U.S.C. § 315(b) bar may be invoked."[1] Reh'g Req. 2.

Ericsson's first argument is new. This new rehearing argument is improper. "The [rehearing] request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion . . . ." 37 C.F.R. § 42.71(d); *see also* 37 C.F.R. § 42.71(c) ("a panel will review the [rehearing] decision for an abuse of discretion.")[2]

The Board could not have misapprehended or overlooked an argument presented for the first time in Ericsson's Rehearing Request. Ericsson fails to point the Board to where it made the argument or where the Board made the alleged holding regarding "a higher statutory priority." The Board carefully balanced numerous factors and determined that Ericsson failed to meet the statutorily mandated "interests of justice" standard for additional discovery. *See* Dec. on Mot. 5 (citing 35 U.S.C. § 316(a)(5) ("such

---

[1] *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) ("Texas Litigation").
[2] An abuse of discretion may be determined if a decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if the decision represents an unreasonable judgment in weighing relevant factors. *Arnold Partnership v. Dudas*, 362 F3d 1338, 1340 (Fed. Cir. 2004).

2

**A0102**

IPR2013-00601
Patents 6,772,215 B1

discovery shall be limited to . . . what is otherwise necessary in the interest of justice")); *id.* at 4–16 (balancing factors, addressing precedent and legislative history).

Ericsson's second argument does not show that the Board erred in determining that the weight of authority requires some control over the Texas Litigation by Broadcom to show privity. *See* Dec. on Mot. 7 (citing and discussing "long-standing precedent"). Ericsson relies heavily on one of the cases cited in the Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759, 48,760 (Aug. 14, 2012)("TPG")—*Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.* 163 Cal. App. 4th 1506, 1524 (Cal. App. 2008). *See* Reh'g Req. 5–7. Ericsson ignores the weight of authority cited by the Board that shows control over prior litigation is a crucial factor normally required to bind a party to that prior litigation using collateral estoppel. *See* Dec. on Mot. 7-10; Reh'g Req. 5–7.

Immediately before citing *Aoki* as an example, the TPG qualifies *Aoki* as follows: "But whether something less than *complete funding and control* suffices to justify similarly treating the party requires consideration of the pertinent facts. *See e.g.*, *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.* 163 Cal. App. 4th 1506, 1524 (Cal. App. 2008) . . . ." (Emphasis added). In other words, although the TPG cites *Aoki*, it retains an emphasis on control. In other places, for example, the TPG states that "[a] common consideration is whether the non-party exercised control over a party's participation in a proceeding" and "the rules do not enumerate particular factors regarding a 'control' theory." TPG at 48,759.

Ericsson also quotes selectively from the Board's decision, ignoring the phrase "in normal situations" that qualifies the language it quotes. *See*

3

**A0103**

IPR2013-00601
Patents 6,772,215 B1

Reh'g Req. 7 (discussing the Board's rationale that "Broadcom must have had control over the Texas Litigation"); Dec. on Mot. 7. The Board's characterization of the law in the previous sentence, Dec. on Mot. 7 ("[t]o show privity requires a showing that Broadcom would be bound to the outcome of the Texas Litigation") is consistent with the characterization by the court in *Aoki*, 163 Cal. App. 4th at 1524 ("[t]he question is whether, under the circumstances as a whole, the party to be estopped should reasonably have expected to be bound by the prior adjudication.").

Ericsson is essentially correct in that *Aoki* held that "'preclusion can apply even in the absence of . . . control.'" Reh'g Req. 7 (quoting *Aoki*, 163 Cal. App. 4th at 1524). Nevertheless, *Aoki* also noted that "control over the prior action is commonly present" in collateral estoppel applications. *Id*. *Aoki* is also highly fact specific, as are typical cases involving collateral estoppel. *See* Dec. on Mot. 7-10.

*Aoki* begins its privity analysis by noting that "the doctrine [of collateral estoppel] applies 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding.'" *Id*. at 1520 (citation omitted). Departing from the normal privity rule that requires control, and delineating its finding of privity based on a community of interest theory, which included a finding of an identical issue to be precluded, *see id*. at 1521 (discussing exact same single issue of denial of coverage for an experimental procedure), the court cited as an important factor, "prevent[ing] the possibility of a dramatically inconsistent judgment," *id*. at 1524.

4

**A0104**

IPR2013-00601
Patents 6,772,215 B1

On its face, this important factor, preventing a "dramatically inconsistent judgment," underlies or coalesces with the fundamental threshold requirement enunciated by *Aoki*—precluding only the identical issue previously litigated—which issue, of course, is necessary to produce a (later) inconsistent judgment. That concern is not present in this proceeding. In general, as compared to district courts, different burdens of proof, different presumptions, different claim construction standards for unexpired patents, and different prior art, typically apply to PTAB proceedings. *See* 37 C.F.R. § 42.100(b); TPG at 48,766 (the broadest reasonable construction standard). Of course, Congress was aware of the differences between the two proceedings when it listed a "privy" as precluded from a time-barred *inter partes* proceeding under 35 U.S.C. 315(b). Therefore, although identical issues may not be required to establish privity through collateral estoppel at the PTAB, the TPG emphasizes control, which implies that control is an important factor to establish privity in the absence of identical issues and otherwise.

In other words, while the TPG and 35 U.S.C. 315(b) may indicate a relaxation, to a certain extent, of collateral estoppel principles, and *Aoki* generally may present guiding principles regarding privity, *Aoki* also recognizes that "[n]otions of privity have been expanded *to the limits of due process*." 163 Cal. App. 4th at 1522 (citation omitted) (emphasis added). In order to bind a non-party under collateral estoppel, this expansion cannot exceed the bounds of due process. Ultimately, Ericsson does not show that the Board overlooked a material consideration in determining that Ericsson failed to meet its burden of showing that additional discovery would have

5

**A0105**

IPR2013-00601
Patents 6,772,215 B1

more than a mere possibility of showing that Broadcom should be bound by the Texas Litigation. *See* Dec. on Mot. 11-13.

## DECISION on REHEARING

Ericsson's sought-after relief is DENIED.

PETITIONER:

Dominic Massa
Michael Diener
Dominic.massa@wilmerhale.com
Michael.diener@wilmerhale.com

PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Lee & Hayes PLLC
Peter@leehayes.com
chris@leehayes.com

6

**A0106**

Trials@uspto.gov
571-272-7822

Paper 29
Entered:  March 10, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET L. M. ERICSSON
Patent Owner

_____

Case IPR2013-00601
Patent 6,772,215

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00601
Patent 6,772,215

# I.     INTRODUCTION

Broadcom Corporation ("Petitioner") filed a petition requesting *inter partes* review of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 (the "challenged claims") of U.S. Patent No. 6,772,215 (Ex. 1001, "the '215 patent").  Paper 3 ("Pet.").  Telefonaktiebolaget L. M. Ericsson ("Patent Owner") filed an election to waive its preliminary response.  Paper 22.  We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides as follows:

> THRESHOLD.—The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Upon consideration of the petition, we determine that the information presented by Petitioner establishes that there is a reasonable likelihood that Petitioner would prevail in showing unpatentability of the challenged claims of the '215 patent.  Accordingly, pursuant to 35 U.S.C. § 314, we institute an *inter partes* review of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent.

## A.  Related Proceedings

Petitioner and Patent Owner indicate that the '215 patent is involved in a case captioned *Ericsson Inc., et al. v. D-LINK Corp., et al.,* Civil Action No. 6:10-cv-473 (E.D. Tex.) ("Texas Litigation"), and in an investigation

2

**A0108**

Case IPR2013-00601
Patent 6,772,215

captioned *In the Matter of Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Media Players and Televisions, and Components Thereof*, ITC Inv. No. 337-TA-862.  Pet. 1-2; Paper 6 at 1. Patent Owner also identifies an appeal at the Federal Circuit captioned *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Case Nos. 2013-1625, -1631, -1632, and -1633.  Paper 6 at 1.  Petitioner also has filed two petitions for *inter partes* review of related patents:  IPR2013-00602 (U.S. Patent No. 6,466,568), IPR2013-00636 (U.S. Patent No. 6,424,625).

### B.  The '215 Patent

The '215 patent relates to the telecommunications field and, in particular, to a method for minimizing feedback responses in Automatic Repeat Request (ARQ) protocols.  Ex. 1001, col. 1, ll. 14-17.  When data is conveyed between nodes in a network, certain algorithms are used to recover from the transmission of erroneous data and the loss of data between the nodes.  *Id.* at ll. 20-23.  An algorithm commonly used is referred to as an ARQ protocol.  *Id.* at ll. 23-25.  Each node, or peer entity, in a network includes a receiver and a sender.  *Id.* at ll. 26-29.  The units of data conveyed between peer entities are commonly referred to as Protocol Data Units ("PDUs").  *Id.* at ll. 29-30.  The basic function of an ARQ protocol is to allow the receiver to request that the sender retransmit PDUs that were lost during transmission or contained errors.  *Id.* at ll. 33-37.  The receiver can inform the sender about which PDUs were correctly received and/or can inform the sender about which PDUs were *not* correctly received.  *Id.* at

3

**A0109**

Case IPR2013-00601
Patent 6,772,215

ll. 38-41. When the sender receives this information, it retransmits the "lost" PDUs. *Id.* at ll. 41-42. Several ARQ protocols, such as Stop-and-Wait ARQ, Go-back-N ARQ, and Selective-Repeat ARQ, existed at the time that the '215 patent was filed and were well known. *Id.* at col. 2, ll. 17-21.

Figure 1 of the '215 patent is reproduced below.



Figure 1 illustrates the use of ARQ protocols. *Id.* at ll. 22-23. A sequence of transmitted Data-PDUs ("D-PDUs") and Status-PDUs ("S-PDUs") is shown. *Id.* at ll. 28-29. A D-PDU includes user data, a sequence number ("SN"), and possibly piggybacked error control information. *Id.* at ll. 29-31. The sequence number ("SN") associated with each D-PDU to identify that specific D-PDU. *Id.* at ll. 32-34. An S-PDU includes status information but no user information. *Id.* at ll. 31-32.

4

Case IPR2013-00601
Patent 6,772,215

Two main methods are currently used for coding the SNs within S-PDUs: (1) a list of SNs to be retransmitted; and (2) a bitmap to represent the SNs to be retransmitted. *Id.* at ll. 48-52. As such, an S-PDU includes a format identifier that can be used by a receiver to distinguish between the different PDU formats.

Figures 2 and 3 of the '215 patent are reproduced below:

FIG. 2
PRIOR ART

| PDU_format=S-PDU |
| Length=5 |
| SN=3 |
| SN=4 |
| SN=5 |
| SN=9 |
| SN=16 |

FIG.3
PRIOR ART

| PDU_format=S-PDU |
| SSN=2 |
| BITMAP=0100001111111000 |

Figure 2 shows an S-PDU that uses the list method to code SNs. *Id.* at ll. 60-62. Figure 3 shows an S-PDU that uses the bitmap method to code SNs. *Id.* at col. 3, ll. 18-19. According to the '215 patent, a significant problem with existing ARQ protocols is that fixed length messages are used, which leads to a waste of bandwidth because of the unnecessary overhead information that is transmitted. *Id.* at ll. 46-50.

Table 1 is reproduced below.

5

**A0111**

Case IPR2013-00601
Patent 6,772,215

TABLE 1

| Erroneous D-PDUs | # | Size of S-PDU (bits) | |
|---|---|---|---|
| (SN) | SN | LIST | BITMAP |
| 1 | 51–77 | 27 | 42 | 141 |
| 2 | 1, 25, 50, 95 | 4 | 114 | 141 |
| 3 | 27–30, 35, 39, 41, 91–93 | 10 | 138 | 141 |
| 4 | 3, 7, 11, 16, 33, 45, 55, 66, 78, 82, 91 | 11 | 282 | 141 |
| 5 | 10–29, 31, 33, 36 | 23 | 114 | 141 |

Table 1 shows different error circumstances in each row and, for each, the number of bits needed to code an S-PDU using the list and bitmap methods. *Id.* at col. 4, ll. 1-10. As illustrated by rows 2-5 of Table 1, both the list method and the bitmap method have problems with building efficiently small S-PDUs for the error circumstances shown. *Id.* at ll. 11-13. According to the '215 patent, a significant need existed for a method that can be used to minimize the size of S-PDUs in an ARQ protocol or, if it is not possible to fit all SNs into a single S-PDU, to maximize the number of SNs in an S-PDU with limited size. *Id.* at ll. 33-38.

To address these issues, the '215 patent discloses a method whereby different mechanisms for indicating erroneous D-PDUs can be combined in a single S-PDU. *Id.* at ll. 43-48. Each message includes three fields: type information, length information, and a value. *Id.* at col. 5, ll. 60-66. In accordance with a first embodiment of the invention, a bitmap message can be constructed using a number of methods can be used to represent the length of the bitmap fields. *Id.* at col. 6, ll. 19-48. Likewise, a list message can list only erroneous SNs or can combine the prior art list method with the list of only erroneous SNs. *Id.* at col. 6, l. 49 – col. 7, l. 51. In accordance

6

**A0112**

Case IPR2013-00601
Patent 6,772,215

with a second embodiment of the invention, a number of different message types can be combined to create an S-PDU.  *Id.* at col. 7, ll. 52-54.  Figure 8, reproduced below, illustrates how an S-PDU can be constructed in accordance with this embodiment:

FIG. 8

As shown in Figure 8, the resulting S-PDU includes two BITMAP' messages and one LIST' message.  *Id.* at col. 8, ll. 43-44.  For comparison with the prior art techniques, Table 3 is reproduced below.

TABLE 3

| | Size of S-PDU (bits) | | |
|---|---|---|---|
| | State-of-the-art solutions | | Combination |
| | LIST | BITMAP | solution |
| 1 | 42 | 141 | 38 |
| 2 | 114 | 141 | 74 |
| 3 | 138 | 141 | 78 |
| 4 | 282 | 141 | 121 |
| 5 | 114 | 141 | 53 |

Table 3 shows the sizes of S-PDUs constructed in accordance with the prior art list and bitmap methods, and also with the combination method described

7

**A0113**

Case IPR2013-00601
Patent 6,772,215

in accordance with the second embodiment. *Id.* at col. 9, ll. 27-30. As illustrated by Table 3, the size of S-PDUs resulting from the combination method of the present invention is significantly smaller than that of the S-PDUs resulting from the prior art methods. *Id.* at col. 9, ll. 32-35.

### C. Exemplary Claim

Of the challenged claims, claims 1, 15, 25, and 45 are independent. Claim 1 is reproduced below:

> 1.    A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:
>
>    sending a plurality of first data units over a communication link;
>
>    receiving said plurality of first data units; and
>
>    responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.

### D. References Relied Upon

Petitioner relies upon the following references:

| | | | |
|---|---|---|---|
| Seo | US 6,581,176 | June 17, 3003 | Ex. 1002 |
| Fengmin Gong, et al., "An Application-Oriented Error Control Scheme for High-Speed Networks," IEEE/ACM Transactions on Networking, Vol. 4, No. 5 (1996) ("Gong") | | | Ex. 1003 |

### E. The Asserted Grounds of Unpatentability

Petitioner argues that the challenged claims are unpatentable based upon the following grounds:

8

**A0114**

Case IPR2013-00601
Patent 6,772,215

| Reference | Basis | Claims challenged |
|-----------|-------|-------------------|
| Seo | § 102 | 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 |
| Gong | § 102 | 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 |

II.   ANALYSIS

*A. Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Also, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

1.  *"responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field"*

Petitioner proposes that this phrase be construed as "responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types."  Pet. 5.  Petitioner states that this construction was proposed by Patent Owner and adopted by the Court in the Texas Litigation.  Pet. 8 (citing Ex. 1005, 9).  Petitioner does not dispute this construction.  Pet. 8. The proposed construction replaces "constructing" with "generating," and replaces "type identifier field" with "a field that identifies the message type

9

**A0115**

Case IPR2013-00601
Patent 6,772,215

of the feedback response message from a number of different message types." Although this construction has been adopted in the Texas Litigation, we are not persuaded that it is the broadest reasonable interpretation of this limitation. For example, the antecedent basis for "*the* feedback response message" in the proposed construction is the "feedback responses" of the preamble.

"In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim. *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Id.* (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)).

If we were to adopt Petitioner's proposed construction, it would introduce a dependency upon the preamble, thereby causing the preamble to limit the invention.[1] We are not persuaded that Petitioner's proposed construction would be the broadest reasonable interpretation of the claim because no term of the claim, as drafted, has its antecedent basis in the preamble.

---

[1] This result would be contrary to Petitioner's proposed construction of the preambles as non-limiting. Pet. 7, 8.

10

**A0116**

Case IPR2013-00601
Patent 6,772,215

To the extent that Petitioner seeks to clarify the term "type identifier field," we note that the '215 patent does not define explicitly that term, but uses it several times to describe a field in an S-PDU that indicates whether that S-PDU includes a list or a bitmap. Ex. 1001, col. 6, l. 20; col. 8. ll. 2, 16; *see also id.* at col. 7, ll. 58, 60, 62 (describing a "type identifier"); col. 8, l. 9, 56 (describing a "type identifier"). For example, Table 2 depicts a column labeled "Type Identifier," that includes NO_MORE, LIST', BITMAP', and ACK. *Id.* at col. 9, ll. 1-9. On this record, we are persuaded that a "type identifier field" is a field of a message that identifies the type of that message, such as list or bitmap. Accordingly, we decline to construe "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field" as a phrase, but we construe "type identifier field" as "a field of a message that identifies the type of that message."

Alternatively, claim 1 recites no step that is functionally dependent upon the content of the recited message field or of the type identifier field. Thus, the recited "type identifier field" and other recited fields of the message field constitute non-functional descriptive material since the fields have no functional impact on the claimed method. "'Where the printed matter is not functionally related to the substrate, the printed matter will not distinguish the invention from the prior art in terms of patentability.'" *King Pharmaceuticals, Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1278-79 (Fed. Cir. 2010) (quoting *In re Gulack*, 703 F.2d 1381, 1385 (Fed. Cir. 1983) and extending the rationale behind *Gulack* and *In re Ngai*, 367 F.3d 1336 (Fed.

11

**A0117**

Case IPR2013-00601
Patent 6,772,215

Cir. 2004) to method claims citing informational instructions).
Nevertheless, for the sake of analyzing whether the prior art teaches or
suggests a "message field including a type identifier field," we consider
Petitioner's proposed construction.

Therefore, we construe "type identifier field" as "a field of a message
that identifies the type of that message" or alternatively, as any type of data,
because claim 1 does not alter the method according to the "type identifier
field" or otherwise operate on the "type identifier field" in a functional
manner.

2. *"means for receiving said plurality of first data units, and
constructing one to several message fields for a second data unit, said
one to several message fields including a type identifier field and at
least one of a sequence number field, a length field, a content field, a
plurality of erroneous sequence number fields, and a plurality of
erroneous sequence number length fields, each of said plurality of
erroneous sequence number fields associated with a respective one of
said plurality of erroneous sequence number length fields"*

| Petitioner's Proposal |
|---|
| Function: receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields. (Pet. 5-6)

Structure: the receiver of an entity capable of constructing |

12

**A0118**

Case IPR2013-00601
Patent 6,772,215

> one or more message fields including [a] a type identifier field
> and [b] at least one of [i] a sequence number field, [ii] a length
> field, [iii] a content field, [iv] a plurality of erroneous
> sequence number fields, and [v] a plurality of erroneous
> sequence number length fields, each of said plurality of
> erroneous sequence number fields associated with a respective
> one of said plurality of erroneous sequence number length
> fields. (*See* '215 Patent, FIG. 1 (ARQ Entity-2 12); 1:26-
> 29; 2:22-24; 2:63-3:16; 3:17-28; 6:8-48; Ex. 1001). (Pet. 6-7)

Petitioner contends that this term is a means-plus-function element invoking 35 U.S.C. § 112, paragraph 6 (now re-codified as 35 U.S.C. § 112(f)). We agree because (1) the limitation uses the phrase "means for"; (2) the term "means for" is modified by functional language; and (3) the term "means for" is not modified by any structure recited in the claim to perform the claimed function.

On this record, we determine that the function of the

> means for receiving said plurality of first data units, and
> constructing one to several message fields for a second data
> unit, said one to several message fields including a type
> identifier field and at least one of a sequence number field, a
> length field, a content field, a plurality of erroneous sequence
> number fields, and a plurality of erroneous sequence number
> length fields, each of said plurality of erroneous sequence
> number fields associated with a respective one of said plurality
> of erroneous sequence number length fields

is

> *receiving* said plurality of first data units, *and constructing* one
> to several message fields for a second data unit, said one to
> several message fields including a type identifier field and at
> least one of a sequence number field, a length field, a content

13

**A0119**

Case IPR2013-00601
Patent 6,772,215

field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length field.

Petitioner identifies as the structure for performing the function "the receiver of an entity." Pet. 6-7. Petitioner identifies specifically ARQ Entity-2 12 of Figure 1. Pet. 7. In Figure 1, ARQ Entity-2 12, or ARQ peer entity 12 as it is referred to in the '215 patent, is receiving the D-PDUs from ARQ Entity-1 10. Ex. 1001, col. 2, ll. 22-27. However, the '215 patent discloses that "[e]ach [peer] entity includes a receiver *and a sender*." Ex. 1001, col. 1, ll. 26-30 (emphasis added); col. 2, ll. 23-24. Thus, ARQ peer entity 12 includes both a sender and a receiver.[2] We agree with Petitioner that the receiver of a peer entity would perform the function of "receiving said plurality of first data units." However, Petitioner's construction would also require the "receiver" of a peer entity to perform the function of "constructing one to several message fields." The '215 patent suggests that the constructing of a message is performed by the sender of a peer entity. *See, e.g.,* Ex. 1001, col. 1, ll. 45-48 ("These rules specify, for example, how

---

[2] For clarity, we note that the '215 patent also refers to "a sending side" and "a receiving side" (col. 1, ll. 43-44), and abbreviates imprecisely the "sending side" as the "sender" and the "receiving side" as the "receiver" (*see, e.g.,* col. 1, ll. 35-37). In this usage, "sender" and "receiver" refer to respective peer entities communicating with one another—e.g., "The receiver can inform the sender about which PDUs were correctly received . . . ." (col. 1, ll. 38-39)—not to the "sender" and "receiver" *components* of a given peer entity, as referred to at col. 1, ll. 26-30.

14

**A0120**

Case IPR2013-00601
Patent 6,772,215

and in what form the PDUs are to be constructed so that the *receiving side* can interpret the conveyed PDUs correctly and *respond to them accordingly.*") (emphasis added). Based on our review of the '215 patent, the structure described as performing the function of "constructing one to several message fields for a second data unit" is the *sender* of the peer entity. On this record, therefore, we construe the structure for performing the recited function to be the sender and receiver of a peer entity.

3. *"for minimizing feedback responses in an ARQ protocol" (Preambles)*

The preamble of each independent claim recites "for minimizing feedback responses in an ARQ protocol." Petitioner proposes that the preambles of the independent claims be construed not to limit the claims. Pet. 7, 8-9 (citing Ex. 1005, 7-9; Ex. 1006, 245). None of the claim terms have their antecedent basis in the preamble. On this record, because the independent claims define a structurally complete invention in the claim body and use the preamble only to state a purpose or intended use for the invention, we are persuaded that the preambles do not limit the claims.

4. *"means for sending a plurality of first data units over said communication link to said second peer entity"*

| Petitioner's Proposal |
| --- |
| Function:   sending a plurality of first data units over said communication link to said second peer entity (Pet. 7) |
| Structure:   a transmitter of an entity capable of sending a plurality of first data units over a communication link to a peer entity. ('215 patent, FIG. 1 (ARQ Entity-1 10); 1:26-41; Ex. 1001). (Pet. 7) |

15

**A0121**

Case IPR2013-00601
Patent 6,772,215

Petitioner contends that this term is a means-plus-function element invoking 35 U.S.C. § 112, paragraph 6 (now re-codified as 35 U.S.C. § 112(f)). We agree because (1) the limitation uses the phrase "means for"; (2) the term "means for" is modified by functional language; and (3) the term "means for" is not modified by any structure recited in the claim to perform the claimed function.

On this record, we determine that the function of the "means for sending a plurality of first data units over said communication link to said second peer entity" is "sending a plurality of first data units over said communication link to said second peer entity."

Petitioner identifies as the structure for performing the function "a transmitter of an entity." Pet. 7. Petitioner identifies specifically ARQ Entity-1 10 of Figure 1. In Figure 1, ARQ Entity-1 10, or ARQ peer entity 10 as it is referred to in the '215 patent, is sending D-PDUs to ARQ Entity-2 12. Ex. 1001, col. 2, ll. 22-27. The '215 patent discloses that "[e]*ach* [peer] entity includes a receiver and a sender." Ex. 1001, col. 1, ll. 26-30 (emphasis added); col. 2, ll. 23-24. Thus, ARQ peer entity 10 includes both a sender and a receiver. The '215 patent suggests that the sending of a data unit, or PDU, is performed by the sender of a peer entity. *See, e.g.,* Ex. 1001, col. 1, ll. 45-48 ("These rules specify, for example, how and in what form the PDUs are to be constructed so that the *receiving* side can interpret the conveyed PDUs correctly and respond to them accordingly.") (emphasis added). Petitioner identifies the structure as a "transmitter," but the '215 patent does not disclose a "transmitter." On this record, therefore, we

16

**A0122**

Case IPR2013-00601
Patent 6,772,215

construe the structure for performing the recited function to be the sender of
a peer entity.

### B. The Challenged Claims – Anticipated by Seo

Petitioner argues that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34,
45, 46, 49, 52, and 54 are unpatentable under 35 U.S.C. § 102(b) as
anticipated by Seo.  Pet. 21-45.  In support of this ground of unpatentability,
Petitioner provides detailed explanations as to how each claim limitation is
disclosed by Seo, and relies upon the Declaration of Dr. Bims.  *Id.* (citing
Ex. 1004 ¶¶ 31-70).

#### Seo (Exhibit 1002)

Seo describes a method for transmitting control frames and user data
frames in a mobile radio communications system.  Ex. 1002, col. 1, ll. 10-
12.  Specifically, Seo discusses a modification of the Radio Link Protocol
("RLP") specified in international standard IS-707 for a Code Division
Multiple Access ("CDMA") mobile radio communication system.  *Id.* at
ll. 14-19; col. 5, ll. 28-30.  According to the RLP retransmission procedure, a
Negative Acknowledgement ("NAK") RLP control frame for a particular
user data frame can be transmitted more than once at the same time to ensure
reliability and, in response to receiving each NAK, the missing user data
frame will be retransmitted.  According to the invention of Seo, rather than
transmitting each NAK corresponding to each missed user data frame, a
single NAK corresponding to *all* missed user data frames is transmitted to
the sender.  *Id.* at col. 5, ll. 31-36.

17

**A0123**

Case IPR2013-00601
Patent 6,772,215

Figure 4 of Seo is reproduced below:

| FIELD | LENGTH (BITS) |
|---|---|
| SEQ | 8 |
| CTL | 4 |
| RE_NUM | 2 |
| NAK_TYPE | 2 |
| NAK_SEQ | 4 |
| L_SEQ_HI | 4 |
|  |  |
| FIRST | 12 |
| LAST | 12 |
| FCS | 16 |
| PADDING | VARIABLE |
|  |  |
| NAK_Map_Count | 2 |
| NAK_Map |  |
| NAK_Map_SEQ | 12 |
| NAK_Map | 8 |

## FIG. 4

Figure 4 shows the structure of a RLP NAK control frame according to the invention of Seo. *Id.* at ll. 42-43. The NAK control frame of Seo includes a field NAK_TYPE with a length of 2 bits to indicate a NAK type. *Id.* at ll. 53-54.

If the value of NAK_TYPE is "00," the receiver is requesting retransmission of a range of missed user data frames (*Id.* at ll. 54-57), and the fields FIRST, LAST, FCS, and padding exist (*Id.* at col. 6, ll. 18-19). FIRST is the 12-bit sequence number of the first data frame for which retransmission is requested. *Id.* at col. 5, ll. 63-65. LAST is the 12-bit

18

**A0124**

Case IPR2013-00601
Patent 6,772,215

sequence number of the last data frame for which retransmission is requested. *Id.* at ll. 65-67. SEQ, with a length of 8 bits, is a data frame sequence number. *Id.* at ll. 57-58.

If the value of NAK_TYPE is "01," the receiver is requesting retransmission of missed user data frames using a bitmap, and the field NAK_MAP_COUNT exists. *Id.* at col. 6, ll. 8-21. If the value of the field NAK_MAP_COUNT+1 exists, then the fields NAK_MAP_SEQ and NAK_MAP exist. *Id.* at ll. 21-22. NAK_MAP_SEQ is the 12-bit sequence number of the first data frame in the NAK Map for which retransmission is requested. *Id.* at ll. 8-11. NAK_MAP is an 8-bit bitmap identifying the missing user data frames for which retransmission is requested, wherein the most significant bit corresponds to the user data frame identified by NAK_MAP_SEQ+1. *Id.* at ll. 11-15.

*Analysis*

In light of the arguments and evidence, Petitioner has established a reasonable likelihood that the challenged claims are unpatentable as anticipated by Seo.

For example, independent claim 1 recites "sending a plurality of first data units over a communication link." Seo discloses a "transmitting station" that sends user data frames to a "receiving station" over a "radio section between a receiving station and the transmitting station." Ex. 1002, col. 5, ll. 28-41; *see also id.* at col. 8, ll. 24-27 ("transferring user data frames of a radio link protocol (RLP) from a transmitting station to a

19

**A0125**

Case IPR2013-00601
Patent 6,772,215

receiving station"), Fig. 6 ("Transmitting Station A"). The user data frames transport user traffic data. *Id.* at col. 1, ll. 21-22.

Claim 1 also recites "receiving said plurality of first data units." Seo discloses a "receiving station" that receives user data frames from the "transmitting station." *Id.* at col. 1, ll. 21-22, col. 5, ll. 28-41, col. 8, ll. 24-27, Fig. 6 ("Receiving Station B").

Finally, claim 1 recites "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field." Seo discloses an "RLP NAK" message that includes a field NAK_TYPE that identifies whether the message identifies a range of sequence numbers or uses a bitmap. If the value of NAK_TYPE is "00," the RLP NAK message includes two fields—FIRST and LAST—with "the 12-bit sequence number of the first data frame for which a retransmission is required," and "the 12-bit number of the last data frame for which a retransmission is required," respectively. Ex. 1002, col. 5, ll. 54-57, 63-67, col. 6, ll. 17-18. If the value of NAK_TYPE is "01," the RLP NAK message includes a field NAK_MAP_SEQ with "the 12-bit sequence number of the first data frame in this NAK Map for which [] retransmission is requested." *Id.* at col. 6, ll. 9-11. On this record, we are persuaded that Seo's RLP NAK message includes a type identifier field (NAK_TYPE), and a sequence number field (FIRST, LAST, or NAK_MAP_SEQ). We are persuaded that Seo discloses this limitation whether "type identifier field" is construed to

20

**A0126**

Case IPR2013-00601
Patent 6,772,215

mean "a field of a message that identifies the type of that message," or, in the alternative, to mean any type of data.

Claim 2 recites "wherein said message field comprises a bitmap message." Claim 6 recites similarly "wherein said content field comprises a bitmap." Seo discloses that, if the value of NAK_TYPE is "01," the RLP NAK message includes a field NAK_MAP "with a length of 8 bits [that] is a bit-map identifying the missing user data frames for which a retransmission is requested." *Id.* at col. 6, ll. 11-13. On this record, we are persuaded that Seo discloses claims 2 and 6.

Claim 4 recites "wherein said sequence number field includes any sequence number from said plurality of first data units." Claim 8 recites similarly "wherein said second data unit comprises information about missing or erroneous said first data units." As discussed above, the RLP NAK message includes fields with sequence numbers for which *re*transmission is requested—i.e., the sequence number of a data unit previously sent by the transmitting station but not missed by the receiving station. *See, e.g., Id.* at col. 2, ll. 46-51 ("That is, the receiving station requests the transmitting station to retransmit the *missed* user data frames hereto.") (emphasis added). On this record, we are persuaded that Seo discloses claims 4 and 8.

Petitioner also argues that claims 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are disclosed by Seo. Pet. 23-33, 38-41. On this record, Petitioner's showing is reasonable.

21

**A0127**

Case IPR2013-00601
Patent 6,772,215

*Conclusion*

We are persuaded that Petitioner has established a reasonable likelihood that it would prevail in showing that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are unpatentable as anticipated by Seo.

### C. Other Grounds

Petitioner also asserts that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are unpatentable under 35 U.S.C. § 102 as anticipated by Gong.  Pet. 41-55.  That asserted ground is redundant in light of the determination that there is a reasonable likelihood that the challenged claims are unpatentable based on the grounds of unpatentability on which we institute an *inter partes* review.  *See* 37 C.F.R. § 42.108(a).

### III.  CONCLUSION

For the foregoing reasons, we determine that the information presented in the petition establishes that there is a reasonable likelihood that Petitioner would prevail in establishing the unpatentability of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent.

The Board has not made a final determination on the patentability of any challenged claims.

22

**A0128**

Case IPR2013-00601
Patent 6,772,215

## IV.  ORDER

Accordingly, it is

ORDERED that pursuant to 35 U.S.C. § 314, an *inter partes* review is hereby instituted as to claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent as anticipated by Seo;

FURTHER ORDERED that all other grounds raised in Petitioner's petition are *denied* because they are deficient for the reasons discussed above;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(d) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial on the grounds of unpatentability authorized above; the trial commences on the entry date of this decision; and

FURTHER ORDERED that an initial conference call with the Board is scheduled for 2:00 PM Eastern Time on April 1, 2014; the parties are directed to the Office Patent Trial Practice Guide[3] for guidance in preparing for the conference call, and should be prepared to discuss any proposed changes to the Scheduling Order entered concurrently herewith and any motion the parties anticipate filing during the trial.

---

[3] Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,765-66 (Aug. 14, 2012).

23

**A0129**

Case IPR2013-00601
Patent 6,772,215

For PETITIONER:

Dominic E. Massa
Michael A. Diner
WILMER CUTLER PICKERING HALE AND DORR LLP
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com

**A0130**

**UNITED STATES PATENT AND TRADEMARK OFFICE**

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)
Patent Owner

_____

Case IPR2013-00601
Patent 6,772,215
Title: Method for Minimizing Feedback Responses in ARQ Protocols

**PATENT OWNER'S RESPONSE
BY ERICSSON UNDER 37 C.F.R. § 42.120**

**A0131**

Case IPR2013-00601

**PATENT OWNER RESPONSE TO PETITION**

**I.    Statement of Precise Relief Requested**

Pursuant to 35 U.S.C. § 316 and 37 C.F.R. § 42.120, Patent Owner requests that the Board confirm the validity of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 Patent.  Specifically Patent Owner requests that the Board find:

A.    Claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 Patent are not anticipated under 35 U.S.C. § 102 by Seo; and

B.    That this *inter partes* review is barred under 35 U.S.C. § 315(b).

**II.    Statement of Facts**

Over three years before Broadcom filed the present Petition, Ericsson served a complaint against D-Link Corporation and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer Inc. and Acer America Corporation ("Acer"), and Gateway Inc. ("Gateway") for infringement of its patents. *Ericsson Inc. v. D-Link Corp.*, No. 6:10-CV-473 (LED/KGF) ("D-Link Lawsuit"); (Ex. 2002).  Ericsson later amended its complaint and added Dell, Inc. ("Dell"), Toshiba Corporation, Toshiba America, Inc., Toshiba America Information Systems, Inc. and Toshiba

2

**A0138**

Case IPR2013-00601

America Consumer Products, LLC ("Toshiba"), and Belkin International, Inc. ("Belkin") as defendants.[1] (Ex. 2003).

The complaint alleged infringement of U.S. Patent Nos. 6,424,625, 6,519,215, and 6,466,568. (Ex. 2003). The D-Link Defendants challenged the validity of Ericsson's patents and denied infringement. With respect to validity, the D-Link Defendants served thousands of pages of invalidity contentions and expert reports, involving many of the same assertions that are now the basis for Broadcom's IPR petition. With respect to infringement, the Defendants' supplier, Broadcom, produced technical documents relating to the design and operation of its chips and agreed to voluntarily appear and testify at trial on behalf of the D-Link Defendants. (Exs. 2004, 2015). On the eve of trial, the D-Link Defendants abandoned their invalidity case regarding the '215 Patent and the '568 Patent, but continued challenging validity with respect to the '625 Patent. At the end of the trial, the jury found that the D-Link Defendants infringed three Ericsson patents based on their WLAN-compliant products. (Ex. 2018). The D-Link Defendants appealed to the Federal Circuit (where the appeal is now pending), D-Link Lawsuit, Nos. 2013-1625, -1631, -1632, -1633.

---

[1] The defendants listed in the Complaint and the Amended Complaint shall collectively be referred to as "D-Link Defendants."

3

**A0139**

Case IPR2013-00601

Broadcom has been working behind the scenes for years to help its customers defeat Ericsson's infringement claims. As far back as July 2010, Broadcom assisted Acer, during negotiations with Ericsson, in analyzing the very patents that are now the subject of Broadcom's petition. (Ex. 2007). Discussing an upcoming meeting on that topic, an Acer executive noted, "[The] [m]ain purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros." *Id*. As part of its effort to bring to the attention of the Board information bearing on the relationship among Broadcom and the D-Link Defendants, Ericsson provided notice to Acer that it was seeking relief from the Protective Order in the D-Link Lawsuit. (Ex. 2008). In response, Acer asserted that the information Ericsson sought to give the Board was "privileged and [was] inadvertently produced." *Id.* Acer obviously believes that its relationship with Broadcom is sufficiently close, and their interests are sufficiently aligned, to support a privilege covering relevant communications between the two.

Broadcom's SEC filings furnish additional evidence that it was a real party-in-interest in the D-Link Lawsuit, in privity with the D-Link Defendants, and that the D-Link Defendants are real parties in interest to its IPR petition. (Ex. 2005). Broadcom states in these filings that it is not uncommon for Broadcom "to indemnify some customers and strategic partners under our agreements if a third

4

**A0140**

This page contains confidential information.

Please refer to A0191, which contains the redacted, public version of this page.

A0141

Case IPR2013-00601

the rote assertion that there were no other real parties in interest, but in the body of its petition admitted that it supplied "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the D-Link Defendants that were found to infringe. Paper No. 3 at 1. It requires no logical leap to see first, that Broadcom has a duty to indemnify (and a community of interest with) some or all D-Link Defendants because its own products caused the D-Link Defendants to infringe Ericsson's patents, and second, that the coordination of Broadcom's successive attack on Ericsson's patents is no coincidence.

There is further evidence that the D-Link Defendants are real parties in interest to Broadcom's IPR proceeding. Broadcom filed a "Motion of Amici Wi-Fi Chip Companies" in this Court, in the pending appeal from the judgment in the D-Link Lawsuit. (Ex. 2017). In that motion, Broadcom specifically stated that the damages verdict "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (*Id.* at p. 4) (emphasis added). This demonstrates not only the effect of the relationship, but also Broadcom's willingness to take action in support of the D-Link Defendants.

---

("the '568 Patent") (IPR2013-00602), 6,424,625 ("the '625 Patent") (IPR2013-00636, and 6,772, 215 ("the '215 Patent") (IPR2013-00601).

6

**A0142**

Case IPR2013-00601

Broadcom cannot deny the existence of indemnity agreements and other evidence bearing on its community of interests with the D-Link Defendants, but Ericsson was prevented from bringing these to the attention of the Board because they are subject to a Protective Order. (Ex. 2016). The contents and scope of these documents continues to remain secret, but their existence is not: in its public order denying Ericsson Inc.'s Emergency Motion for Relief from the Protective Order, the district court recited that "[d]uring the course of the litigation, Ericsson discovered (1) an indemnity agreement between Toshiba and non-party Broadcom Corporation ('Broadcom'), (2) an indemnity agreement between Dell and Broadcom, and (3) an email between Dell and Broadcom discussing indemnification[.]" (Ex. 2016). There is no question an indemnity relationship exists between Broadcom and at least two of the D-Link Defendants and there was communication regarding the relationship during the pendency of the D-Link lawsuit.

The Board denied Ericsson's request for discovery that would have established the existence of the indemnity relationships, the substance of the conversation between Dell and Broadcom pertaining to Broadcom's indemnity obligation, and likely produced additional evidence establishing Broadcom's privity relationship with the defendants. Paper No. 20. Ericsson filed a Request

7

**A0143**

Case IPR2013-00601

for Rehearing that the Board denied.  Paper No. 24.  The Board issued its Decision

for Institution of *Inter Partes* Review on March 10, 2014, Paper No. 25, and

Ericsson now submits its Patent Owner's Response.

## III.    The Petition is Barred by 35 U.S.C. §315(b)

The D-Link Defendants were formally served with a complaint more than

one year before the filing date of the Petition; Petitioner is subject to the 35 U.S.C.

§ 315(b)[3] bar as a privy to the D-Link Defendants, and because the D-Link

Defendants are real parties-in-interest to this action, despite Petitioner's failure to

designate them as such under 35 U.S.C. § 312(a)(2).

### A.    Broadcom is in Privity with the D-Link Defendants

Broadcom has an indemnity relationship with Dell and Toshiba, and has

initiated multiple legal actions on behalf of the community of interest.  These

actions specifically relate to the '215 Patent and Broadcom's BCM4313 and

BCM4321 chips, the property in question here.  The result of these legal actions

---

[3] Under 35 U.S.C. § 315(b), "[a]n inter partes review may not be instituted if

the petition requesting the proceeding is filed more than 1 year after the date on

which the petitioner, real party in interest, or privy of the petitioner is served with a

complaint alleging infringement of the patent."

8

**A0144**

Case IPR2013-00601

will directly impact both Broadcom and these D-Link Defendants, demonstrating that their relationship is sufficiently close that both should be bound by the trial outcome and related estoppels.

The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," Ex. 2019 (*Black's Law Dictionary*, 9th Ed. (2009)), "sufficiently close such that both should be bound by the trial outcome and related estoppels," Office Patent Trial Practice Guide, 77 Fed. Reg. at 48759. Both Congress and the PTO expanded the meaning of privity for use in the AIA and acknowledged that the PTO will give effect to judgments by extending the term "beyond the classical description." 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (citing *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal. App. 4th 1506 (Cal. App. 2008)); *see also* Trial Practice Guide, 77 Fed. Reg. at 48,759. The PTO further noted that "privity is an equitable rule that takes into account the 'practical situation,' and should extend to parties to transactions and other activities relating to the property in question." Trial Practice Guide, 77 Fed. Reg. at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)). Thus, both Congress and the PTO specifically expanded the traditional notions of privity to cater the doctrine to the unique context of IPR proceedings.

9

**A0145**

Case IPR2013-00601

The PTO acknowledged the aim of the AIA in the Trial Practice Guide and stated that there are *multiple* factors relevant to the "real party-in-interest" and "privity" analysis, and it specifically cited both *Taylor v. Sturgell*, 553 U.S. 880 (2008) and *Aoki*, 163 Cal. App. 4th 1506. *Taylor* listed six distinct bases on which a party in a later case could be bound by the judgment in an earlier case to which he was not a party. 553 U.S. at 894–95. Two relevant factors listed in *Taylor* are whether the parties maintain a pre-existing "substantive legal relationship," or whether the later party had the *opportunity* to control the original party's participation in a proceeding. *Id.* Each of these factors is applicable here.

When discussing "substantive legal relationships," *Taylor* specifically stated that these relationships "are sometimes collectively referred to as 'privity.'" *Id.* at 894 n.8. The Court then cited to the Restatement:

> [A] person standing in one of a variety of pre-existing legal relationships with a party may be bound by a judgment affecting that party. These relationships are often referred to as involving "privity." The circumstances under which such relationships result in preclusion are the subject of specific rules such as those governing . . . *indemnitor and indemnitee*[.]

2 Restatement of Judgments § 62, Comment a (emphasis added); *see also Speedtrack, Inc. v. Office Depot, Inc.*, No. C 07-3602 PJH, 2014 WL 1813292, at *5-6 (N.D. Cal. May 6, 2014) (an indemnification agreement between the defendants and their software supplier established that the parties were in privity

10

**A0146**

Case IPR2013-00601

despite a lack of control over the suit, barring the infringement claims as res judicata).    The Supreme Court specifically relied on the Restatement, and explained that the term "privity" has "come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Taylor*, 553 U.S. at 894 n. 8 (citing 18A Wright & Miller § 4449, pp. 351-353, and n. 33).    Thus, the Court not only relied on authority that prescribes an indemnity relationship as a pre-existing substantive legal relationship, but also confirmed the broader interpretation of the term "privity."

The substantive legal relationship between Broadcom and the D-Link Defendants, specifically Dell and Toshiba, relates to the property in question. Ericsson's patents are the property in question both here and in the previous litigation—and, as Broadcom admits, both proceedings are closely related: "Patent Owner's infringement allegations were based in part on Defendants' use of Petitioner's WiFi compliant products, such as the BCM4313 and BCM4321." Paper No. 3 at 1. Ericsson proved the existence of Broadcom's indemnity relationships that dictate its contractual relationship to the property, and also that Broadcom has an express policy of initiating litigation to control the property, and did take several actions relating to the property in question during the D-Link Lawsuit.  (*See* Exs. 2005 at 53/65; 2009, 2015 at p. 3, 6, 2016, 2017).  Thus, not

11

**A0147**

Case IPR2013-00601

only does Broadcom maintain substantive legal relationships with the D-Link Defendants, but it has carried out multiple legal actions to control the property in question, and could have exercised control the D-Link Lawsuit. These substantive legal relationships and corresponding actions to control the '215 Patent prove that Broadcom is in privity with the Dell and Toshiba, among others, and therefore barred under Section 315(b).

### B. The D-Link Defendants are Real Parties-in-Interest.

The D-Link Defendants' substantive legal relationships with Broadcom and the parties' coordinated activity demonstrate that the D-Link Defendants are real parties in interest to this IPR. In IPR proceedings, "the 'real party-in-interest' is the party that desires review of the patent. Thus, the 'real party-in-interest' may be the petitioner itself, and/or it may be the party or parties at whose behest the petition has been filed." Trial Practice Guide, 77 Fed. Reg. at 48759. The same factors for determining privity apply to real parties in interest. *Id.* In addition, the PTO also relies on *In re Guan Inter Partes Reexamination* Proceeding, Control No. 95/001,045, Decision Vacating Filing Date, at 8 (Aug. 25, 2008), which states that the petitioner must identify another entity as the real party in interest if it "[a]llow[s] another entity to direct or control the content (e.g., *provide the prior patents/printed publication on which the reexam is to be based*) of the request

12

**A0148**

Case IPR2013-00601

whether such is termed 'technical review' or some other phrase." (emphasis added). Broadcom's substantive legal relationships with at least Dell and Toshiba, Broadcom's use of the same prior art references as the D-Link Defendants, and the timing of Broadcom's Petition for IPR confirm that both Broadcom and the D-Link Defendants are real parties in interest.

On August 8, 2013, Ericsson obtained a judgment of infringement against the D-Link Defendants for three patents. (Ex. 2018). Less than three months later, Broadcom filed its Petition for IPR of the same claims infringed by the D-Link Defendants' use of its chips, relying on the same reference the D-Link Defendants used in their invalidity case. For obvious reasons, Broadcom did not seek review of the claims the district court found to *not* be infringed. (*See* Ex. 2018).

Broadcom instead made the rote assertion that there were no other real parties in interest. However, Broadcom admitted that it supplied the property in question, namely the "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the D-Link Defendants. Paper No. 3 at 1. The only logical inference is that Broadcom's duty to indemnify some or all the D-Link Defendants triggered the successive attack on Ericsson's patents, and that the D-Link Defendants desire review of the '215 Patent.

13

**A0149**

Case IPR2013-00601

In addition, Broadcom made it clear that both itself and the D-Link Defendants desire review of the patent in its "Motion of Amici Wi-Fi Chip Companies." Broadcom specifically stated that the damages verdict in the D-Link Lawsuit "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (Ex. 2017 at p. 4) (emphasis added). This demonstrates that Broadcom and the D-Link Defendants have common interests in the '215 Patent, and that Broadcom is willing to take action on behalf of the D-Link Defendants. Broadcom cannot hide behind its rote assertions when it is clear that the D-Link Defendants "desire[ ] review of the patent" and, therefore, are real parties in interest.

The coordination between Broadcom and the D-Link Defendants and their indemnity agreements clearly demonstrate that the D-Link Defendants are real parties in interest. Broadcom failed to properly designate them as such under 35 U.S.C. § 312(a)(2), and because the D-Link Defendants were served with a complaint alleging infringement of the '215 Patent more than one year before Broadcom filed its Petition, Broadcom is barred from review under Section 315(b).

14

**A0150**

Case IPR2013-00601

(Order at 10.) Instead, the Board proposed that this term means "a field of a message that identifies the type of that message." (Order at 11.)

The Board's conclusion and proposed construction of this term is incorrect for several reasons. First, the Board provided no case law for its proposition that introducing a dependency upon the preamble would cause the preamble to limit the invention. (Paper No. 29 at 10.) Not only is this proposition unsupported by case law, it appears to be focused on the antecedent basis issue. (Akl Dec. ¶ 36.) Second, Board's proposed construction of this term would cover a mere S-PDU as in the prior art. But the specification distinguishes "the present invention" from the prior art S-PDU. ('215 Pat. At 4:38-40, 43-63). Therefore, the Patent Owner agrees with Broadcom that the district court's construction for this phrase represents the broadest reasonable construction that is consistent with the specification, with a slight modification, namely "responsive to the receiving step, generating a message field including a field that identifies **a** message type of a feedback response message from a number of different message types." (Ex. 1005 at 9.) And should the Board prefer to construe only the phrase "type identifier field," then the reasonable broadest construction for this term is "a field of a message that identifies the type of a feedback message from a number of different message types." (Akl Dec. ¶ 36.)

26

**A0162**

Case IPR2013-00601

the standard IS-707 header.  (Seo at 5:44-46, FIG. 4.)  The fixed-length message in the payload spans from the FIRST field to the NAK_MAP field.  (*See id.*; Akl Dec. ¶ 47.)  The blank row between the L_SEQ_HI field and the FIRST field delineates between the header and the payload, which includes the message.  (Seo at 5:44-46, FIG. 4; Akl Dec. ¶ 47.)

Broadcom contends Seo anticipates the challenged claims.  Specifically, Broadcom contends that the NAK_TYPE field anticipates the claimed "type identifier field."  (Pet. at 2.)  Broadcom is wrong.  First, unlike the broadest reasonable construction of this term, the NAK_TYPE field in Seo does not "identif[y] the message type of a feedback response message from a number of different message types" because Seo merely discloses **a single message type**. Second, the NAK_TYPE field is not included in the "message field" as required by all of the challenged claims.

**1.  The Seo NAK_TYPE field does not "identif[y] the message type of the feedback response from a number of different message types"**

The Seo NAK_TYPE field does not "identif[y] the message type of the feedback response message *from a number of different message types*," as required by the proper broadest reasonable construction of the term "type identifier field." Seo discloses only one message type, namely a redundant NAK control frame that

37

**A0173**

Case IPR2013-00601

contains both bitmaps and lists. (Seo at 5:28-30; Akl Dec. ¶ 49.) Seo's NAK frame has a constant size and format, containing both a bitmap and a list, regardless of the NAK_TYPE. (Seo at 5:28-30, FIG. 4, claim 10.) The NAK frame disclosed by Seo always contains the same fields whose content varies with the contents of the NAK_TYPE field. (*See id.*; Akl Dec. ¶ 49.)

Seo's NAK_TYPE field merely indicates which fields within the message field will contain zero values and which fields will contain non-zero values. (*See* Seo at 5:47-6:22; Akl. Dec. ¶ 50.) For example, "if NAK_TYPE is '00,'" the contents of the FIRST, LAST, and FCS fields are populated with non-zero values and the remainder of the message is padded with zeroes. (Seo at 5:63-6:6 ("the remainder of the frame of "variable length is padding bits and is required to fill the remainder of frames. These bits shall be set to '0.'").) Similarly, if the NAK_TYPE is "01" and NAK_MAP_Count has a non zero value, then the fields NAK-MAP_SEQ and NAK_MAP will also have non-zero values. (*Id.* at 6:19-22; Akl Dec. ¶ 50.) Because Seo does not disclose a field that identifies one of "a number of different messages types," Seo does not anticipate the challenged claims, each of which include that requirement. (Akl Dec. ¶ 50.)

Petitioner relies upon the claims in Seo to suggest that the message type changes from one NAK_TYPE to another. (Pet. at 35-36.) Petitioner's reliance is

38

**A0174**

Case IPR2013-00601

misplaced. Claim 10 recites "said NAK control frame further comprises: (d) a field with a length of 2 bits which indicates an NAK type," and claim 11 recites "said (g), (h), (i) and (j) fields exist when a value of said (d) field is '00', said (k) field exists when the value of said (d) field is '01'." Broadcom interprets this to mean that the fields relating to a list (*i.e.*, (g)-(j)) are overwritten by the fields relating to a bitmap (*i.e.*, (k)-(m)) and vice-versa, depending on the value of the NAK_TYPE. Such a reading belies FIG. 4, which shows "*the structure* of *a RLP NAK control frame* in accordance with the present invention." (Seo at 5:10-12. (emphasis added)). Seo makes clear that FIG. 4 represents a single control frame that includes fields for both a list of first and last sequence numbers and bitmaps. (Akl Dec. ¶ 51.) The only change is that certain fields contain non-zero values, depending on the value of the NAK_TYPE. (Akl Dec. ¶ 51.) Because Seo discloses only a single message type, Seo does not anticipate a "type identifier" that identifies "one of a number of different messages types." (Akl Dec. ¶ 51.)

**2. The Seo NAK_TYPE field does not teach or disclose a "message field including a type identifier field"**

Seo's NAK_TYPE also does not anticipate the claimed "type identifier field" because Seo's NAK_TYPE is not part of the message, but rather part of the S-PDU header. (Seo at FIG. 4; Akl Dec. ¶ 52.) In each of the challenged claims, the "type identifier field" must be part of the "said message field." ('215 Pat. at cl.

39

**A0175**

Case IPR2013-00601

1, 15, 25, and 45 ("said message field including a type identifier field").) This limitation was added by amendment during prosecution to distinguish, among other things, fields that were included in the header of the PDU such as the PDU_format field shown in the admitted prior art. (*Id*. at FIGs. 2-3.) By including the claimed "type identifier field" in the message body as opposed to the fixed length header, the invention permits any combination of feedback messages to be transmitted in the response, thereby reducing the size or the content of an S-PDU. (Akl Dec. ¶ 52.) For example, as shown in FIG. 8, the feedback response includes two bitmap message and one list message. ('215 Pat. at FIG. 8; Akl Dec. ¶ 52.)

Seo's NAK_TYPE field, on the other hand, is included in the header and not the message. (Akl Dec. ¶ 53.) This is clear from FIG. 4 of Seo (reproduced above), which shows a clear demarcation between the header and the message. (Akl Dec. ¶ 53.) As a result, Seo's NAK control frame can represent only a single request for a series of PDUs defined by the first and last sequence numbers or a bitmap response but not both at the same time. (Akl Dec. ¶ 53.) For these reasons, Seo fails to disclose a "message field including a type identifier field," as recited in independent claims 1, 15, 25, and 45 of the '215 Patent; (Akl Dec. ¶ 53.)

**3. Seo does not disclose a "length field" as required by independent claim 15**

Claim 15 of the '215 patent requires that each message field must include a

40

**A0176**

Case IPR2013-00601

"length field." Specifically, besides a "type identifier field," claim 15 requires the message field include at least one of (i) "*a length field*", (ii) "a plurality of erroneous sequence number-fields . . . each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number *length fields*," and (iii) "a plurality of erroneous sequence number *length fields*."    Regardless of the inclusion of at least one of (i)-(iiii) above, the language of claim 15 requires that each message field include one or more length fields. (Akl Dec. ¶ 54.) Any prior art reference that does not teach or disclose a message field having a length field cannot anticipate claim 15 of the '215 patent.

As discussed above, Seo does not disclose a length field as recited in claim 15 of the '215 patent. (Akl Dec. ¶ 55.) Neither the FIRST/LAST nor the BITMAP section of the NAK Control frame teaches or discloses a length field. (Akl Dec. ¶ 55.) Because Seo does not teach or suggest a message field having length field, Seo cannot anticipate claim 15 of the '215 patent. (Akl Dec. ¶ 55.)

**D.    The Challenged Dependent Claims Are Not Anticipated by Seo**

Claims 2, 4, 6, and 8 of the '215 patent depend from claim 1. Because Seo does not disclose, teach or suggest a "message field including a type identifier field" as recited by claim 1, Broadcom cannot show that claims 2, 4, 6, and 8 are

41

**A0177**

Case IPR2013-00601

## PATENT OWNER RESPONSE TO PETITION

### I.    Statement of Precise Relief Requested

Pursuant to 35 U.S.C. § 316 and 37 C.F.R. § 42.120, Patent Owner requests that the Board confirm the validity of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 Patent.  Specifically Patent Owner requests that the Board find:

A.    Claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 Patent are not anticipated under 35 U.S.C. § 102 by Seo; and

B.    That this *inter partes* review is barred under 35 U.S.C. § 315(b).

### II.    Statement of Facts

Over three years before Broadcom filed the present Petition, Ericsson served a complaint against D-Link Corporation and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer Inc. and Acer America Corporation ("Acer"), and Gateway Inc. ("Gateway") for infringement of its patents. *Ericsson Inc. v. D-Link Corp.*, No. 6:10-CV-473 (LED/KGF) ("D-Link Lawsuit"); (Ex. 2002).  Ericsson later amended its complaint and added Dell, Inc. ("Dell"), Toshiba Corporation, Toshiba America, Inc., Toshiba America Information Systems, Inc. and Toshiba

2

**A0188**

Case IPR2013-00601

America Consumer Products, LLC ("Toshiba"), and Belkin International, Inc.

("Belkin") as defendants.[1] (Ex. 2003).

The complaint alleged infringement of U.S. Patent Nos. 6,424,625, 6,519,215, and 6,466,568. (Ex. 2003). The D-Link Defendants challenged the validity of Ericsson's patents and denied infringement. With respect to validity, the D-Link Defendants served thousands of pages of invalidity contentions and expert reports, involving many of the same assertions that are now the basis for Broadcom's IPR petition. With respect to infringement, the Defendants' supplier, Broadcom, produced technical documents relating to the design and operation of its chips and agreed to voluntarily appear and testify at trial on behalf of the D-Link Defendants. (Exs. 2004, 2015). On the eve of trial, the D-Link Defendants abandoned their invalidity case regarding the '215 Patent and the '568 Patent, but continued challenging validity with respect to the '625 Patent. At the end of the trial, the jury found that the D-Link Defendants infringed three Ericsson patents based on their WLAN-compliant products. (Ex. 2018). The D-Link Defendants appealed to the Federal Circuit (where the appeal is now pending), D-Link Lawsuit, Nos. 2013-1625, -1631, -1632, -1633.

---

[1] The defendants listed in the Complaint and the Amended Complaint shall collectively be referred to as "D-Link Defendants."

3

**A0189**

Case IPR2013-00601

Broadcom has been working behind the scenes for years to help its customers defeat Ericsson's infringement claims. As far back as July 2010, Broadcom assisted Acer, during negotiations with Ericsson, in analyzing the very patents that are now the subject of Broadcom's petition. (Ex. 2007). Discussing an upcoming meeting on that topic, an Acer executive noted, "[The] [m]ain purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros." *Id.* As part of its effort to bring to the attention of the Board information bearing on the relationship among Broadcom and the D-Link Defendants, Ericsson provided notice to Acer that it was seeking relief from the Protective Order in the D-Link Lawsuit. (Ex. 2008). In response, Acer asserted that the information Ericsson sought to give the Board was "privileged and [was] inadvertently produced." *Id.* Acer obviously believes that its relationship with Broadcom is sufficiently close, and their interests are sufficiently aligned, to support a privilege covering relevant communications between the two.

Broadcom's SEC filings furnish additional evidence that it was a real party-in-interest in the D-Link Lawsuit, in privity with the D-Link Defendants, and that the D-Link Defendants are real parties in interest to its IPR petition. (Ex. 2005). Broadcom states in these filings that it is not uncommon for Broadcom "to indemnify some customers and strategic partners under our agreements if a third

4

**A0190**

Case IPR2013-00601

party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights." (*Id.* at 53/65). To protect these interests, Broadcom "engage[s] in litigation to . . . determine the validity and scope of the proprietary rights of others, including [its] customers." (*Id.*) This IPR is just another instance of Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligations.



(Ex. 2009).

(*Id.* at ¶101).

Less than three months after Ericsson obtained a judgment of infringement against the D-Link Defendants, Broadcom filed its petition for IPR of the same claims infringed by the D-Link Defendants' use of its chips, relying on the same references the D-Link Defendants used in their invalidity case.[2]  Broadcom made

---

[2] Broadcom immediately petitioned for *inter partes* review ("IPR") of the three patents the D-Link Defendants were found to infringe—U.S. Patent Nos. 6,466,568

5

**A0191**

Case IPR2013-00601

the rote assertion that there were no other real parties in interest, but in the body of its petition admitted that it supplied "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the D-Link Defendants that were found to infringe. Paper No. 3 at 1. It requires no logical leap to see first, that Broadcom has a duty to indemnify (and a community of interest with) some or all D-Link Defendants because its own products caused the D-Link Defendants to infringe Ericsson's patents, and second, that the coordination of Broadcom's successive attack on Ericsson's patents is no coincidence.

There is further evidence that the D-Link Defendants are real parties in interest to Broadcom's IPR proceeding. Broadcom filed a "Motion of Amici Wi-Fi Chip Companies" in this Court, in the pending appeal from the judgment in the D-Link Lawsuit. (Ex. 2017). In that motion, Broadcom specifically stated that the damages verdict "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (*Id.* at p. 4) (emphasis added). This demonstrates not only the effect of the relationship, but also Broadcom's willingness to take action in support of the D-Link Defendants.

---

("the '568 Patent") (IPR2013-00602), 6,424,625 ("the '625 Patent") (IPR2013-00636, and 6,772, 215 ("the '215 Patent") (IPR2013-00601).

6

**A0192**

Case IPR2013-00601

Broadcom cannot deny the existence of indemnity agreements and other evidence bearing on its community of interests with the D-Link Defendants, but Ericsson was prevented from bringing these to the attention of the Board because they are subject to a Protective Order. (Ex. 2016). The contents and scope of these documents continues to remain secret, but their existence is not: in its public order denying Ericsson Inc.'s Emergency Motion for Relief from the Protective Order, the district court recited that "[d]uring the course of the litigation, Ericsson discovered (1) an indemnity agreement between Toshiba and non-party Broadcom Corporation ('Broadcom'), (2) an indemnity agreement between Dell and Broadcom, and (3) an email between Dell and Broadcom discussing indemnification[.]" (Ex. 2016). There is no question an indemnity relationship exists between Broadcom and at least two of the D-Link Defendants and there was communication regarding the relationship during the pendency of the D-Link lawsuit.

The Board denied Ericsson's request for discovery that would have established the existence of the indemnity relationships, the substance of the conversation between Dell and Broadcom pertaining to Broadcom's indemnity obligation, and likely produced additional evidence establishing Broadcom's privity relationship with the defendants. Paper No. 20. Ericsson filed a Request

7

**A0193**

Case IPR2013-00601

for Rehearing that the Board denied.  Paper No. 24.  The Board issued its Decision

for Institution of *Inter Partes* Review on March 10, 2014, Paper No. 25, and

Ericsson now submits its Patent Owner's Response.

## III.    The Petition is Barred by 35 U.S.C. §315(b)

The D-Link Defendants were formally served with a complaint more than

one year before the filing date of the Petition; Petitioner is subject to the 35 U.S.C.

§ 315(b)[3] bar as a privy to the D-Link Defendants, and because the D-Link

Defendants are real parties-in-interest to this action, despite Petitioner's failure to

designate them as such under 35 U.S.C. § 312(a)(2).

### A.    Broadcom is in Privity with the D-Link Defendants

Broadcom has an indemnity relationship with Dell and Toshiba, and has

initiated multiple legal actions on behalf of the community of interest.  These

actions specifically relate to the '215 Patent and Broadcom's BCM4313 and

BCM4321 chips, the property in question here.  The result of these legal actions

---

[3] Under 35 U.S.C. § 315(b), "[a]n inter partes review may not be instituted if

the petition requesting the proceeding is filed more than 1 year after the date on

which the petitioner, real party in interest, or privy of the petitioner is served with a

complaint alleging infringement of the patent."

8

**A0194**

Case IPR2013-00601

will directly impact both Broadcom and these D-Link Defendants, demonstrating that their relationship is sufficiently close that both should be bound by the trial outcome and related estoppels.

The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," Ex. 2019 (*Black's Law Dictionary*, 9th Ed. (2009)), "sufficiently close such that both should be bound by the trial outcome and related estoppels," Office Patent Trial Practice Guide, 77 Fed. Reg. at 48759. Both Congress and the PTO expanded the meaning of privity for use in the AIA and acknowledged that the PTO will give effect to judgments by extending the term "beyond the classical description." 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (citing *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal. App. 4th 1506 (Cal. App. 2008)); *see also* Trial Practice Guide, 77 Fed. Reg. at 48,759. The PTO further noted that "privity is an equitable rule that takes into account the 'practical situation,' and should extend to parties to transactions and other activities relating to the property in question." Trial Practice Guide, 77 Fed. Reg. at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)). Thus, both Congress and the PTO specifically expanded the traditional notions of privity to cater the doctrine to the unique context of IPR proceedings.

9

**A0195**

Case IPR2013-00601

The PTO acknowledged the aim of the AIA in the Trial Practice Guide and stated that there are *multiple* factors relevant to the "real party-in-interest" and "privity" analysis, and it specifically cited both *Taylor v. Sturgell*, 553 U.S. 880 (2008) and *Aoki*, 163 Cal. App. 4th 1506. *Taylor* listed six distinct bases on which a party in a later case could be bound by the judgment in an earlier case to which he was not a party. 553 U.S. at 894–95. Two relevant factors listed in *Taylor* are whether the parties maintain a pre-existing "substantive legal relationship," or whether the later party had the *opportunity* to control the original party's participation in a proceeding. *Id.* Each of these factors is applicable here.

When discussing "substantive legal relationships," *Taylor* specifically stated that these relationships "are sometimes collectively referred to as 'privity.'" *Id.* at 894 n.8. The Court then cited to the Restatement:

> [A] person standing in one of a variety of pre-existing legal relationships with a party may be bound by a judgment affecting that party. These relationships are often referred to as involving "privity." The circumstances under which such relationships result in preclusion are the subject of specific rules such as those governing . . . *indemnitor and indemnitee*[.]

2 Restatement of Judgments § 62, Comment a (emphasis added); *see also Speedtrack, Inc. v. Office Depot, Inc.*, No. C 07-3602 PJH, 2014 WL 1813292, at *5-6 (N.D. Cal. May 6, 2014) (an indemnification agreement between the defendants and their software supplier established that the parties were in privity

10

**A0196**

Case IPR2013-00601

despite a lack of control over the suit, barring the infringement claims as res judicata). The Supreme Court specifically relied on the Restatement, and explained that the term "privity" has "come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Taylor*, 553 U.S. at 894 n. 8 (citing 18A Wright & Miller § 4449, pp. 351-353, and n. 33). Thus, the Court not only relied on authority that prescribes an indemnity relationship as a pre-existing substantive legal relationship, but also confirmed the broader interpretation of the term "privity."

The substantive legal relationship between Broadcom and the D-Link Defendants, specifically Dell and Toshiba, relates to the property in question. Ericsson's patents are the property in question both here and in the previous litigation—and, as Broadcom admits, both proceedings are closely related: "Patent Owner's infringement allegations were based in part on Defendants' use of Petitioner's WiFi compliant products, such as the BCM4313 and BCM4321." Paper No. 3 at 1. Ericsson proved the existence of Broadcom's indemnity relationships that dictate its contractual relationship to the property, and also that Broadcom has an express policy of initiating litigation to control the property, and did take several actions relating to the property in question during the D-Link Lawsuit. (*See* Exs. 2005 at 53/65; 2009, 2015 at p. 3, 6, 2016, 2017). Thus, not

11

**A0197**

Case IPR2013-00601

only does Broadcom maintain substantive legal relationships with the D-Link Defendants, but it has carried out multiple legal actions to control the property in question, and could have exercised control the D-Link Lawsuit.  These substantive legal relationships and corresponding actions to control the '215 Patent prove that Broadcom is in privity with the Dell and Toshiba, among others, and therefore barred under Section 315(b).

### B.    The D-Link Defendants are Real Parties-in-Interest.

The D-Link Defendants' substantive legal relationships with Broadcom and the parties' coordinated activity demonstrate that the D-Link Defendants are real parties in interest to this IPR.  In IPR proceedings, "the 'real party-in-interest' is the party that desires review of the patent.  Thus, the 'real party-in-interest' may be the petitioner itself, and/or it may be the party or parties at whose behest the petition has been filed."  Trial Practice Guide, 77 Fed. Reg. at 48759.  The same factors for determining privity apply to real parties in interest.  *Id.*  In addition, the PTO also relies on *In re Guan Inter Partes Reexamination* Proceeding, Control No. 95/001,045, Decision Vacating Filing Date, at 8 (Aug. 25, 2008), which states that the petitioner must identify another entity as the real party in interest if it "[a]llow[s] another entity to direct or control the content (e.g., *provide the prior patents/printed publication on which the reexam is to be based*) of the request

12

**A0198**

Case IPR2013-00601

whether such is termed 'technical review' or some other phrase."    (emphasis

added).  Broadcom's substantive legal relationships with at least Dell and Toshiba,

Broadcom's use of the same prior art references as the D-Link Defendants, and the

timing of Broadcom's Petition for IPR confirm that both Broadcom and the D-Link

Defendants are real parties in interest.

On August 8, 2013, Ericsson obtained a judgment of infringement against

the D-Link Defendants for three patents.  (Ex. 2018).  Less than three months later,

Broadcom filed its Petition for IPR of the same claims infringed by the D-Link

Defendants' use of its chips, relying on the same reference the D-Link Defendants

used in their invalidity case.  For obvious reasons, Broadcom did not seek review

of the claims the district court found to *not* be infringed.  (*See* Ex. 2018).

Broadcom instead made the rote assertion that there were no other real

parties in interest.  However, Broadcom admitted that it supplied the property in

question, namely the "Wi-Fi compliant products, such as the BCM4313 and

BCM4321" to the D-Link Defendants.  Paper No. 3 at 1.  The only logical

inference is that Broadcom's duty to indemnify some or all the D-Link Defendants

triggered the successive attack on Ericsson's patents, and that the D-Link

Defendants desire review of the '215 Patent.

Case IPR2013-00601

In addition, Broadcom made it clear that both itself and the D-Link Defendants desire review of the patent in its "Motion of Amici Wi-Fi Chip Companies." Broadcom specifically stated that the damages verdict in the D-Link Lawsuit "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (Ex. 2017 at p. 4) (emphasis added). This demonstrates that Broadcom and the D-Link Defendants have common interests in the '215 Patent, and that Broadcom is willing to take action on behalf of the D-Link Defendants. Broadcom cannot hide behind its rote assertions when it is clear that the D-Link Defendants "desire[ ] review of the patent" and, therefore, are real parties in interest.

The coordination between Broadcom and the D-Link Defendants and their indemnity agreements clearly demonstrate that the D-Link Defendants are real parties in interest. Broadcom failed to properly designate them as such under 35 U.S.C. § 312(a)(2), and because the D-Link Defendants were served with a complaint alleging infringement of the '215 Patent more than one year before Broadcom filed its Petition, Broadcom is barred from review under Section 315(b).

14

**A0200**

Case IPR2013-00601

(Order at 10.)   Instead, the Board proposed that this term means "a field of a message that identifies the type of that message." (Order at 11.)

The Board's conclusion and proposed construction of this term is incorrect for several reasons.  First, the Board provided no case law for its proposition that introducing a dependency upon the preamble would cause the preamble to limit the invention. (Paper No. 29 at 10.)  Not only is this proposition unsupported by case law, it appears to be focused on the antecedent basis issue.   (Akl Dec. ¶ 36.) Second, Board's proposed construction of this term would cover a mere S-PDU as in the prior art.  But the specification distinguishes "the present invention" from the prior art S-PDU. ('215 Pat. At 4:38-40, 43-63).  Therefore, the Patent Owner agrees with Broadcom that the district court's construction for this phrase represents the broadest reasonable construction that is consistent with the specification, with a slight modification, namely "responsive to the receiving step, generating a message field including a field that identifies **a** message type of a feedback response message from a number of different message types." (Ex. 1005 at 9.) And should the Board prefer to construe only the phrase "type identifier field," then the reasonable broadest construction for this term is "a field of a message that identifies the type of a feedback message from a number of different message types." (Akl Dec. ¶ 36.)

26

**A0212**

Paper No. __

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BROADCOM CORPORATION

Petitioner

v.

WI-FI ONE, LLC

Patent Owner

Case IPR2013-00601
U.S. Patent No. 6,772,215

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE**

**UNDER 37 C.F.R § 42.120**

**A0231**

Petitioner's Reply to Patent Owner's Response (IPR2013-00601)

## I.    BROADCOM'S PETITION IS NOT BARRED BY 35 U.S.C. § 315(B)

Owner[1] asserts that Broadcom's Petition is barred because Broadcom is a "privy" of the D-Link Defendants, the alleged "real parties-in-interest to this Action." (Resp. at 8; Paper No. 40). Owner has raised this identical argument twice, and has failed each time. This Board previously denied Owner's Motion for Additional Discovery regarding privity and real party-in interest issues and the Federal Circuit subsequently denied Owner's Petition for a Writ of Mandamus seeking to overturn this Board's decision. This third attempt relies on *exactly the same arguments Owner made to this Board and the Federal Circuit* and should be rejected for the same reasons. Owner offers no new reason whatsoever for this Board to reverse its prior decision that Owner's proffered "evidence" and legal authorities fail to amount to anything more than "speculation" or "a mere possibility" that Broadcom is in privity with the D-Link Defendants or that the D-Link Defendants are real parties-in-interest.

### A.    Broadcom is Not in Privity with the D-Link Defendants

Owner again relies on unsubstantiated allegations of Broadcom's "substantive legal relationship" of indemnity with the D-Link Defendants, "multiple legal actions on behalf of the community of interest," and Broadcom's

---

[1]    After institution, Ericsson transferred the '215 patent to Wi-Fi One, LLC. This Reply refers to the current and prior owners as "Owner".

- 1 -

**A0234**

"attendance" at the Texas trial to support its claim of privity. *Id*. Owner's arguments, which rely on the same flawed and speculative "evidence" asserted previously, fail to establish Broadcom as a privy. As the Board correctly held, "indemnity payments and minor participation at trial are not sufficient to establish privity." (Discovery Decision at 7 (*citing Bros, Inc. v. W.E. Grace Mfg. Co*, 261 F.2d 428, 429 (5th Cir. 1958)); Paper No. 23). Instead, Owner must demonstrate that Broadcom actively controlled the Texas Litigation. (*Id*. at 7-8; Paper No. 23; *see also Goodman v. Super Mold Corp.*, 103 F.2d 474,482 (9th Cir. 1939) (no privity where there was no evidence manufacturer of accused infringing device "had the right to control the defense of the suit.")). Owner cannot, however satisfy this burden, because Broadcom did not control – actively or otherwise – the Texas Litigation. (December 20, 2013 Order Denying Ericsson's Emergency Motion for Relief from the Protective Order in *Ericsson Inc. v. D-Link Corp. et al.*, Civil Action No. 10-cv-473 (E.D. Tex.); Exhibit 1011).[2] Indeed, this Board has already

---

[2]    The Board should again reject Owner's argument that if Broadcom had the "opportunity to control" the Texas Litigation, this is sufficient to establish it as a privy. *First*, Owner offers no evidence that Broadcom had any "opportunity" to control the Texas Litigation. *Second*, mere "opportunity" to control litigation cannot create privity; a party must have *actual control* of the related litigation. *Id*.

- 2 -

**A0235**

Petitioner's Reply to Patent Owner's Response (IPR2013-00601)

found that "the totality of [the] evidence fails to amount to more than a 'mere possibility' that Broadcom controlled, or could have controlled, the Texas Litigation." (Discovery Decision at 11; Paper No. 23). Such a mere possibility, insufficient even to warrant further discovery, cannot possibly rise to the level sufficient to bar this Petition.

### B. Broadcom, Not the D-Link Defendants, is the Real Party-in-Interest

Owner's infringement allegations in the Texas Litigation (and its foreign litigation activities) accuse functionality found entirely within Broadcom's Wi-Fi products, not within other components of the end-user products sold by the D-Link Defendants. As the manufacturer of the accused functionality, Broadcom has a very real interest in demonstrating that Owner's patents are invalid. And, because Broadcom was not a party to – and did not control – the Texas Litigation, it has had no prior opportunity to raise the arguments in its Petition. That Broadcom's Petition uses "some of the same evidence, including known prior art" as in the Texas Litigation, does not demonstrate that Broadcom controlled the Texas litigation or that the D-Link Defendants controlled Broadcom's Petition. Again,

at 9 (citing *Dentsply Intern., Inc. v. Kerr Mfg. Co.*, 42 F.Supp.2d 385, 398 (D. Del. 1999) (no privity where party's role in a prior suit was "limited to observing the proceedings and filing amicus curiae briefs.")

- 3 -

**A0236**

Petitioner's Reply to Patent Owner's Response (IPR2013-00601)

this Board has already found that the evidence proffered by Owner "does not amount to more than speculation that any of Broadcom's activity constitutes evidence of collusion with the D-Link Defendants." (Discovery Decision at 13; Paper No. 23). Again, such speculation, insufficient even to warrant further discovery, cannot possibly bar this Petition.

## II.    CLAIM CONSTRUCTION

Owner disagrees with the Board's broadest reasonable interpretation of "type identifier field" and advances the construction previously proffered by Petitioner. (Resp. at 22-31, Paper No. 40). Petitioner, however, accepts as reasonable the Board's construction of type identifier field as a "field of a message that identifies the type of that message." (Decision at 11; Paper No. 29).

Owner concedes invalidity under the Board's construction based on the admitted prior art. (Resp. at 26 ("[the] Board's proposed construction of this term would cover a mere S-PDU in the prior art"); Paper No. 40). But invalidity of the claims in light of the prior art is not grounds for rejecting this Board's well-reasoned claim construction. Owner's further argument that its proposed construction is warranted because the '215 patent "describes" the use of variable-length messages "to reduce a waste of bandwidth resources" must be rejected, because no such variable length or reduction in bandwidth is ever *claimed*. (*See,*

- 4 -

**A0237**

Petitioner's Reply to Patent Owner's Response (IPR2013-00601)

*e.g.*, Resp. at 29, 35-37; Paper No. 40). Owner could have filed a motion to amend the claims to reflect these alleged benefits, but it chose not to do so.

## III.  SEO DISCLOSES A "TYPE IDENTIFIER FIELD" UNDER EITHER OWNER'S OR THE BOARD'S CONSTRUCTION

Seo's NAK_TYPE field is a "type identifier field" under either construction. Seo discloses (1) identifying a type of NAK from multiple different types of NAK messages (list or bitmap), as indicated by a NAK_TYPE field (Owner's construction); and (2) a NAK_TYPE field that is a field of a message that identifies the type of message (Board's construction).

### A.    Seo Discloses NAK_TYPE, a Type Identifier Field That Identifies Different Types of NAK Messages

Owner advances an incredibly strained argument that "NAK_TYPE" does not identify a "type of NAK" because NAK messages have a similar *format* when NAK_TYPE is "00" or NAK_TYPE is "01". (Resp. at 37-39; Paper No. 40). Owner's argument is illogical and factually wrong. And, in any event, NAK_TYPE is a "type identifier field" even under Owner's flawed argument.

Owner argues that "NAK_TYPE" is not a "type of NAK" because (1) Seo's Figure 4 allegedly shows a fixed-length NAK message with padding; and (2) therefore every NAK message in Seo must always include all of the fields shown in Figure 4; and (3) therefore there is only one message type. (*See* Resp. at 35-39; Paper No. 40). Owner is wrong on all counts.

- 5 -

**A0238**

Petitioner's Reply to Patent Owner's Response (IPR2013-00601)

The existence of padding does not mean messages have a fixed length. Messages could have variable length, but use padding to align the messages to an integer number of octets. Seo never limits the NAK message to a fixed length. Moreover, as Owner admits, Seo is based on the IS-707 communication standard, which has messages of multiple different lengths. (*See* Akl Tr. at 191:7-192:4 and 194:6-195:8, Ex. 1012; *see also* IS-707 at 4-3 (different number of "occurrences" of bitmaps); Ex. 1010; *see also* Bims Reply Decl. at ¶ 2; Ex. 1013).

Even if all the NAK messages in Seo had the same fixed length, it would not prove that the NAK messages all have the same fields. Owner offers no cogent argument for why the length of a message necessarily determines its type. Because it does not. For example, a message could use 32 bits to contain an alphanumeric string identifying a person's eye color, while a different message could use 32 bits to contain an integer representing the balance in a person's bank account. These two messages may be the same length, but they are unquestionably not the same type. (Bims Reply Decl. ¶3; Ex. 1013).

Seo's Figure 4 shows the fields that it uses to create the different types of NAKs, but Seo does not require that all the fields shown in Figure 4 be used with all types of NAKs. In fact, the disclosure of Seo directly contradicts Owner's argument. As stated in the Pet. at 34-37 and as recognized by this Board in its Decision at 18-19 (Paper No. 29), Seo describes how different fields "exist" in

- 6 -

**A0239**

different types of NAKs, as indicated by the value of NAK_TYPE. As this Board stated in its Decision, fields relating to NAK_MAP exist when the NAK message is a bitmap type (NAK_TYPE = 01), and different fields (e.g., FIRST, LAST) exist for the First/Last type of NAK message (NAK_TYPE = 00). (Seo claims 10-11; (Ex. 1002). When a field exists, it is present in the NAK message; when a field does not exist, it is not present. This is what "exist" means. It would make no sense to include unnecessary fields in a NAK message, such as FIRST and LAST fields in bitmap NAK_TYPE. (Bims Reply Decl. ¶¶ 4-6; Ex. 1013).

To obfuscate this plain disclosure, Owner presses a further strained argument that a field "exists" when it contains "data," and does "not exist" if the field contains all zeroes – although Owner fails to explain how a numerical value of zero is somehow not data. (Resp. at 39; Paper No. 40).

Following these incorrect assumptions, Owner then asserts that Seo discloses a "redundant" NAK control frame that always contains bitmap fields and first/last fields, regardless of the NAK_TYPE. (Resp. at 37-38; Paper No. 40). But Owner's cited "proof" for these assertions – Seo 5:28-30, Figure 4, and claim 10 (Ex. 1002) – say nothing of the sort. Owner baldly asserts that "the only change" between a first/last NAK message and a bitmap NAK message is that "certain fields contain non-zero values, depending on the value of the NAK_TYPE." (Resp. at 38-39; Paper No. 40). But Owner cites only to the

- 7 -

Petitioner's Reply to Patent Owner's Response (IPR2013-00601)

declaration of its expert, which does nothing more than repeat verbatim this same bald assertion. Seo, however, never once says that the only change between a first/last NAK message and a bitmap NAK message is having zero or non-zero data values in certain fields. To the contrary, Seo plainly states that these fields' *existence* – not their data values – depend upon the NAK_TYPE. (Seo claim 11 ("said (g), (h), (i) and (j) fields *exist* when a value of said (d) field is '00', said (k) field *exists* when the value of said (d) field is '01'") (emphasis added); Ex. 1002)).

A common sense understanding of what it means for a field to "exist," and the lack of any evidence that any of the NAK_TYPE-related fields are filled with zeroes, more than disprove Owner's argument. But if there were any doubt, the contemporaneous IS-707 standard from April 1999 (Ex. 1010) further confirms the common sense understanding of Seo. As Owner admits, Seo discloses an improvement on the IS-707 standard. (Resp. at 32; Paper No. 40). This improvement appears to have been adopted as part of the IS-707 standard as of April 1999. As shown at page 4-3 of Ex. 1010, when NAK_TYPE is "00", the FIRST and LAST fields follow the L_SEQ_HI field, exactly as shown in Seo Figure 4, and when NAK_TYPE is "01", the NAK_MAP_Count field follows the L_SEQ_HI field (and the FIRST and LAST fields do not exist), just as in Seo. Owner's expert, Dr. Akl, and Dr. Bims agree that IS-707 indicates that the type-specific fields are present or not present depending on the NAK_TYPE, thus

- 8 -

**A0241**

Petitioner's Reply to Patent Owner's Response (IPR2013-00601)

rebutting Owner's attempt to distinguish Seo. (Akl Tr. at 194:6-195:8; Ex. 1012; Bims Reply Decl. ¶7; Ex. 1013).[3] Because the type-specific fields only exist for their particular type of NAK message, Seo discloses a type identifier field that identifies different types of NAK messages, even under Patent Owner's unsupported claim construction.

Finally, even if the Board were to agree with Owner on all these dubious arguments leading to a conclusion that Seo always uses the same fields for different NAK_TYPEs, Seo would *still* disclose two types of NAK messages identified by the NAK_TYPE field, because there would be: (1) a first type that has all zeroes in the bitmap-related fields and non-zero data in the list-related fields; and (2) a second type that has all zeroes in the list-related fields and non-zero data in the bitmap-related fields.

Owner has not proposed, nor does the '215 patent support, any special construction of the term "type" that would preclude two messages from being two

---

[3]    Although the April 1999 IS-707 standard may not be prior art itself, in light of the '215 patent's April 9, 1999 provisional application, it is contemporaneous evidence of how a person of ordinary skill in the art would understand Seo's disclosure of the circumstances in which certain fields exist and those circumstances in which they do not exist.

- 9 -

**A0242**

Petitioner's Reply to Patent Owner's Response (IPR2013-00601)

different "types" where the messages are constrained by a consistently applied set of rules, such that some fields are always zeroes in some circumstances, and other fields are always zeroes in other circumstances.   (Bims Reply Decl. ¶ 8; Ex. 1013).

**B.**      **Owner's Attempt to Distinguish Seo Based on Whether Certain Fields are Within "Headers" or "Payloads" Has No Support in the '215 Patent's Specification or Claims**

Owner also argues that Seo does not anticipate the challenged claims of the '215 patent because the NAK_TYPE identifier is allegedly part of a "header" and not part of a "payload" of a "message." (Resp. at 39-40; Paper No. 40).  But neither the claims nor the specification of the '215 patent make a distinction between providing information in a "header" versus in a "payload" or in any other portion of a message.  Owner has not proposed any construction for the terms "message," "header," or "payload," perhaps because the term "message" is broad, and the terms "header" and "payload" are not even found in the '215 patent.

Owner repeatedly refers to a benefit of the '215 patent as having something to do with putting information in a payload versus a header, but the unclaimed, alleged benefit of the '215 patent is that one type of feedback response might use fewer bits in some cases, and another type of feedback response might use fewer bits in other cases.  For example, Table 1 of the '215 patent shows that a series of consecutive missing sequence numbers (example 1) is more efficiently identified as a list; while a non-consecutive set of sequence numbers (example 4) might be

- 10 -

**A0243**

Petitioner's Reply to Patent Owner's Response (IPR2013-00601)

any such length field.  Claim 15 requires a type identifier field and "at least one of" three optional fields.  More specifically, it reads:

> said message field including [1] a type identifier field and [2] *at least one of*, [a] a length field, [b] a plurality of erroneous sequence number-fields, and [c] a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

('215 patent at 10:65-11:5; Ex. 1001).  (Emphasis added)

Owner offers no construction of claim 15, but simply contends that "[a]ny prior art reference that does not teach or disclose a message field having a length field cannot anticipate claim 15."  (Resp. at 41; Paper No. 40).  Owner's argument gives no meaning to the phrase "at least one of," and contradicts the claim language to apparently require all of elements 2[a], 2[b], and 2[c] above.

Petitioner contends that the broadest reasonable interpretation of claim 15 requires only one of the following: (i) a length field, (ii) a plurality of erroneous sequence number fields, or (iii) a plurality of erroneous sequence number length fields.  This broadest reasonable interpretation gives meaning to "at least one of" and is consistent with the Board's apparent understanding that claim 15 would cover a type identifier field and a plurality of erroneous sequence number fields. (Decision at 21; Paper No. 29).

- 14 -

**A0247**

Paper No. <u>70</u>

Filed on behalf of: Wi-Fi One, LLC

## UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

BROADCOM CORPORATION,

Petitioner,

V.

WI-FI ONE, LLC,

Patent Owner.

———————————

CASE NO.: IPR2013-00601
PATENT NO. 6,772,215 B1

———————————

**PATENT OWNER'S REQUEST FOR REHEARING OF
FINAL WRITTEN DECISION (PAPER NO. 66)**

**A0252**

IPR2013-00601
Patent 6,772,215 B1

Pursuant to 37 CFR § 42.71(d)(2), Patent Owner submits this Request for Rehearing of the Board's Final Written Decision (Paper No. 66).

## I.    INTRODUCTION

In its Final Written Decision, the Board made certain fundamental errors with respect to its determination that this IPR Petition is not time-barred under 35 U.S.C. § 315(b). This case is a prime example of concerns expressed less than two weeks ago by USPTO Director Michelle Lee, who noted that Patent Owners frequently are not given sufficient discovery on the "real party in interest" issue, meaning that panels often decide this issue on an inadequate evidentiary record.[1] In light of Director Lee's comments, the Board should take a close look at this request for rehearing.

**First**, in this case the Board misapprehended the purpose and effect of the "real party in interest, or privy" language in § 315(b), as plainly set forth in the text of the statute, and as confirmed by the legislative history and the USPTO's public

---

[1] *See* http://www.uspto.gov/blog/director/entry/ptab_s_quick_fixes_for, USPTO Director Michelle K. Lee, "PTAB's Quick-Fixes for AIA Rules are to be Implemented Immediately," (March 27, 2015) (last visited April 6, 2015) ("[W]e understand that the existence of ample discovery to establish the real-party-in-interest (RPI) of the petitioner has been a concern. And we want to be sure that the availability of appropriate RPI evidence does not pose a problem for patent owners.")

REQUEST FOR REHEARING              1              IPR2013-00601

**A0253**

comments. As a result, the Board applied the wrong legal standard for assessing the § 315(b) issue, focusing too narrowly (and exclusively) on whether Petitioner has controlled the co-pending District Court Litigation, and ignoring other relevant facts, such as whether the District Court Defendants are controlling this IPR.[2]

**Second**, the Board overlooked the substantial evidence Patent Owner has presented showing that Broadcom and the District Court Defendants share a common economic and legal interest, and have been in cahoots in opposing the '215 Patent for many years. This evidence shows **both** that (1) Broadcom's District Court Defendant customers are real-parties in interest to this IPR proceeding, **and also** that (2) the District Court Defendant customers are in privity with Broadcom for purposes of this IPR and the District Court Litigation.

The Board's refusal to permit any discovery at all on this issue – even the introduction of Broadcom's known indemnity agreements – is a clear abdication of the Board's duty to consider a full and reasonable evidentiary record on matters related to its own jurisdiction, and inherently renders the Board's decision suspect.

**Third**, the Final Written Decision itself presents additional administrative law issues that Patent Owner raises in this request for rehearing. Because the Petition was

---

[2] The terms "District Court Litigation" and "District Court Defendants" refer to parallel infringement litigation and defendants as cited in the Board's Decision denying additional discovery.  Paper No. 23 at 2.

and is time-barred under § 315(b), the Board's Final Written Decision is an *ultra vires* action that exceeds the Board's delegated statutory authority. Moreover, the Board's Final Written Decision is contrary to several provisions of the Administrative Procedures Act ("APA"), as discussed more fully below.

It is undisputed that the Board would have no authority, under § 315(b), to consider this IPR Petition if it had been filed by the District Court Defendants themselves. It would have been time-barred. Section 315(b) does not permit Broadcom to assist its customers in circumventing the one-year time-bar. That is precisely what the "real party in interest, or privy" language was intended to prevent.

## II.    IDENTIFICATION OF BASIS FOR REHEARING REQUEST

As required by 37 C.F.R. § 42.71(d), Patent Owner hereby specifically identifies the matters Patent Owner contends the Board misapprehended or overlooked:

(1)    The Board misapprehended the purpose of the "real party in interest or privy" language in 35 U.S.C. § 315(b), and misapprehended the correct legal standard for determining whether a non-party is a "real party in interest or privy of petitioner" under § 315(b). *See, e.g.* Patent Owner's Request for Rehearing, Paper No. 27 at 3-7.

(2)    The Board misapprehended the entirety of the factual record and overlooked evidence supporting Patent Owner's contention that certain District Court Defendants are real parties in interest and/or privies of petitioner in this IPR. *See* Patent Owner's Response, Paper No. 40 at 3-15.

In addition, the Board's Final Written Decision itself raises certain administrative law issues that Patent Owner could not have previously raised. *See* Section III(D), *infra.*

## III.   ARGUMENT

### A.   The Board misapprehended the purpose of the "real party in interest, or privy" language in § 315(b).

#### 1.   The purpose of § 315(b), in general, is to prevent district court litigants from using IPR petitions as a delay tactic.

By its plain language, and as confirmed by the legislative history, § 315(b) was intended to impose a time-bar on the filing of IPR Petitions so that district court litigants could not use IPR Practice for purposes of delaying the district court litigation. The statute states:

> An inter partes review may not be instituted if the petition requesting the proceding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent. . . .

§ 315(b). The legislative purpose of this statute is to ensure IPR Petitions are *not used as a litigation tactic for purposes of delay*. *See*, *e.g.*, 157 Cong. Rec. S1326 (daily ed. March 7, 2011) (statement of Sen. Reid) ("The bill . . . imposes time limits on starting an inter partes or post-grant review when litigation is pending. . . . [T]hese reforms will help ensure that post-grant review operates fairly and *is not used for purposes of harassment or delay*." (emphasis added)); H. Judiciary Comm. Rep., H.

Rep. No. 112-98, at 47-48 (discussing that certain amendments, including the time-bar

of § 315(b), are intended to prevent harassment of Patent Owners and delay of

infringement litigation); 154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement by

Sen. Kyl) ("The real reforms in this bill that would protect patent owners from

abusive and duplicative proceedings are the various restrictions imposed in section

327" – which included a three-month time bar that was later amended to become the

one-year period as codified in § 315(b)). *See also Zoll Lifecor Corp. v. Philips Elec. N. Am.

Corp.*, IPR2013-00609, Paper No. 15 at 8-9 (discussing the legislative history of §

315(b)).

> **2.      The purpose of the "real party in interest, or privies" language is to ensure that litigation defendants do not subvert the statute by using their cohorts to file an IPR Petition when they themselves are time-barred.**

The plain text of the statute makes clear that the "real party in interest, or privy

of the petitioner" language in § 315(b) is intended to prevent litigation defendants

from subverting the statutory time-bar by having their agents or cohorts file an IPR

petition that they themselves are barred from filing. The statutory time-bar applies not

only to the petitioner, but also to (1) any real party in interest **and also** (2) any privy

of the petitioner. *See* 35 U.SC. § 315(b). The Patent Trial Guide confirms that this is

the purpose of the "real party in interest, or privy" language in § 315(b). *See* Trial

Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012) (One of the "core

functions" of the real-parties-in-interest or privies language is to "protect patent

owners from harassment via successive petitions *by the same or related parties* . . . .") Without this language in § 315(b), district court litigants could easily circumvent the time bar by simply having others file a time-barred petition on their behalf.

**B.    The Board misapprehended the legal test that should be applied to determine whether a non-party is a "real party in interest, or privy" for purposes of § 315(b).**

**1.    The legislative history and the USPTO's public comments indicate that "real party in interest, or privy" in § 315(b) is to be read broadly and flexibly.**

It goes without saying that the legal standard for determining whether a third party is a "real party in interest, or privy of petitioner" under § 315(b) should draw from and coincide with the legislative purpose behind the statute. The legal standard must be aimed at determining whether a given set of facts shows that an IPR petitioner is sufficiently related or connected to a time-barred third party, such that the petitioner should also be subject to the time-bar. To serve the statutory purpose, the legal standard must be sufficiently flexible to capture all the various ways that parties might collude or conspire to circumvent the § 315(b) time-bar. For example: (1) a time-barred third party employing the petitioner as its agent or shill, specifically for the purpose of circumventing the statute; (2) where parties are "in cahoots" to execute a coordinated divide-and-conquer strategy designed to subvert the § 315(b) time-bar in an effort to harass or delay a patent owner; or (3) a scenario where any one party controls both the litigation and IPR activity in a coordinated effort.

REQUEST FOR REHEARING          6          IPR2013-00601

**A0258**

The legislative history and official public comments of the USPTO demonstrate that the applicable legal standard is flexible and multi-faceted so that individual cases can be judged on their unique circumstances. *See* 154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (discussing the breadth of "privy" as explained by recent case law developments). This breadth and flexibility of "real party in interest, or privy" was also recognized by the USPTO in its official public comments in the Office Patent Trial Practice Guide. *See* Trial Practice Guide, 77 Fed. Reg. at 48759-60. As articulated by the USPTO and by Senator Kyl in the legislative history, this legal standard is purposefully broad and flexible so that the Board can determine, on a case-by-case basis and in light of all relevant facts, whether particular parties are attempting to circumvent the § 315(b) time-bar.

2.    **The Board erred as a matter of law in applying a legal standard imposing an inflexible standard requiring that Petitioner must have exercised control over the District Court Defendants in the District Court Litigation.**

In its decision on the § 315(b) issue, the Board did not apply a broad and flexible standard for "real party in interest or privy." Instead, the Board applied a narrow and rigid standard that is erroneous as a matter of law.

The standard applied by the Board requires – as an absolute and necessary condition – that Broadcom controlled or could have exercised control over one or more of the District Court Defendants in relation to the District Court Litigation. *See* Decision on Ericsson's Motion for Additional Discovery, Paper No. 23 at 7 ("To

**A0259**

show privity requires a showing that Broadcom would be bound by the outcome of the Texas litigation. To be bound, in normal situations, Broadcom *must have had control over the Texas Litigation*."); *id*. at 11 ("The totality of the evidence fails to amount to more than a 'mere possibility' that Broadcom *controlled, or could have controlled, the Texas litigation*."); *id*. at 12-13 ("[T]he IPR filings fail to show control over the Texas litigation. . . . The evidence does not amount to more than speculation that any of Broadcom's activity constitutes evidence of collusion with the Texas Defendants in the Texas litigation *in a manner that would bind Broadcom to the outcome thereof*."); *id*. at 15 ("The evidence and arguments fail to show that the sought-after discovery would have more than a mere possibility of producing useful privity information, i.e., *that Broadcom controlled or could have controlled the Texas Litigation*."); *see also* Final Written Decision, Paper No. 66 at 9.

The legal standard applied by the Board in this case is narrower and inconsistent with the legal standard applied by the Board in other cases. *See, e.g., Zoll,* IPR2013-00609, Paper No. 15 at 9-16 (considering "real party in interest" and "privy" separately; and also considering, *inter alia,* the non-party's control over the IPR).

The legal standard applied by the Board in this case does not reflect – and in fact undermines - the legislative purpose of § 315(b). Under the Board's standard, even if there were irrefutable evidence that the District Court Defendants had expressly hired Broadcom to file this IPR petition, and that the District Court Defendants were paying for and controlling every aspect of Broadcom's IPR activity,

the Board's standard **still** would not be satisfied - because the evidence would not show that Broadcom was controlling the District Court Litigation or that Broadcom would be bound by the result of that litigation. That would be an ***absurd result***, in direct contravention of the plain text of § 315(b) and its clear legislative purpose. This example conclusively demonstrates that the Board's legal standards for "real party in interest, or privy" under § 315(b) is fundamentally wrong because it is too rigid and narrow. It is not grounded in the text or purpose of the statute, and it does not capture all the ways that parties might conspire to subvert the statutory time-bar.

Under § 315(b), Broadcom's control of the District Court Litigation might be sufficient to establish that the District Court Defendants are real parties in interest or privies, but it should not be a necessary condition. A showing that petitioner controls the litigation should be one path to that result, but not the only path. An exclusive focus on whether Broadcom would be bound by a judgment in the District Court litigation is misplaced, because no one is seeking to bind Broadcom to the results of the District Court litigation by virtue of this IPR, or otherwise.

Instead, the issue under § 315(b) is whether the District Court Defendants have attempted to circumvent the one-year statutory time-bar, *i.e.* whether Broadcom and one or more of the District Court Defendants should be treated collectively for purposes of determining whether the petition is time-barred. Under the plain language of § 315(b), they should be treated as one if a **District Court Defendant is a "real party in interest or privy" of <u>Broadcom</u>**. The standard applied by the Board,

focusing exclusively on Broadcom's connection to the District Court litigation, turns the real issue on its head.

Patent Owner respectfully submits that the Board's misapprehension of the correct legal standard may stem from the fact that a separate statutory provision, § 315(e), also uses the phrase "real party in interest or privy" in the context of defining the scope of estoppel that results from a final written decision by the Board. Most of the discussion of "real party in interest or privy" in the Trial Practice Guide also relates to estoppel. *See* Trial Practice Guide, 77 Fed. Reg. at 78,759-60. In the context of § 315(e) estoppel, it might make sense to focus on the "control" factor, like common law estoppel cases do.

But § 315(b) is not an estoppel provision, and the "real party in interest, or privy" language in § 315(b) serves a much different purpose. The standard applied by the Board ignores the statutory language and purpose, and serves to undermine the statute altogether by not capturing most of the ways parties could purposefully circumvent the statutory time-bar.

**C.    The Board misapprehended the entirety of the evidentiary record on the § 315(b) issue, and overlooked evidence establishing that certain District Court Defendants are real parties in interest and/or privies of Broadcom.**

The evidentiary record before the Board strongly indicates that one or more of the District Court Defendants are real parties in interest, and/or that they are in privity with Petitioner for purposes of this IPR.

REQUEST FOR REHEARING          10          IPR2013-00601

**A0262**

IPR2013-00601
Patent 6,772,215 B1

Significantly, Petitioner had an opportunity to present evidence that the District Court Defendants are not coordinating or controlling aspects of this IPR – but they presented no evidence on this point at all. Tellingly, Petitioner's proof seems carefully worded to focus **<u>exclusively</u>** on Broadcom's ties to the District Court litigation and avoid any mention of the District Court Defendants' role in this IPR. *See* Petitioner's Opposition to Motion for Additional Discovery, Paper No. 19 at 2-5 (including cited exhibits). Petitioner, who had every opportunity to illuminate the District Court Defendants' role (or lack thereof) in this IPR, purposefully chose to offer no evidence as to whether the District Court Defendants are paying all or part of the costs of this IPR; whether Petitioner filed this IPR for the benefit of, or at the behest of, the District Court Defendants; or whether the District Court Defendants have coordinated or controlled any aspects of this IPR proceeding. *See Zoll*, IPR2013-00609, Paper No. 15 at 11-12 (placing weight on Petitioner's <u>failure</u> to provide evidence of the non-party's lack of participation in or control over the IPR).

Patent Owner, on the other hand, has made a strong circumstantial showing that Petitioner and at least some of their District Court Defendant customers are in cahoots in defending against the '215 Patent, both in the District Court Litigation and in this IPR. *See* Patent Owner's Response, Paper No. 40, at 3-15. It is not disputed in the evidence that there are indemnity agreements between Broadcom and certain District Court Defendants (as expressly stated in Judge Davis's order denying relief from the litigation protective order). *See* Ex. 1011.  Nor is it disputed that Broadcom

REQUEST FOR REHEARING            11            IPR2013-00601

**A0263**

and its District Court Defendant customers share a common economic and legal interest in opposing the '215 Patent. *See* Ex. 2008 (asserting a common interest privilege); Ex. 2009 at ¶ 101. It is not disputed that Broadcom has been coordinating with the District Court Defendants for many years in an effort to oppose the '215 Patent. *See* Patent Owner's Response, Paper No. 40 at 4-8. And it is not disputed that Petitioner has taken concrete steps, such as the filing of this IPR and otherwise, to oppose the '215 Patent on behalf of its customers. *See id.*

The Board should presume that the indemnity agreement contains some covenants related to the funding and control of efforts to oppose claims of patent infringement. Any indemnity agreement will expressly allocate the obligation to pay for defense of claims and also the rights to control the defense and settlement. Failing to do so would be drafting malpractice. For this reason, the Board erred when it decided the § 315(b) issue without reviewing the known indemnity agreements, which are likely the most crucial documents. These agreements could have been provided to the Board with no burden whatsoever to Broadcom.

Even without the agreements in evidence, the circumstantial evidence overwhelmingly shows that Petitioner has been in cahoots with its District Court Defendant customers since long before this IPR petition was filed. Petitioner's declaration is conclusory, carefully worded, and narrowly tailored to avoid addressing issues central to the § 315(b) issue. As such it obscures the true nature of the relationship between Broadcom and its District Court Defendant customers.

**A0264**

The only reasonable conclusion in light of this evidentiary record is that the Petition is time-barred under § 315(b) because Broadcom's District Court Defendant customers are a real party in interest in this IPR, and/or the District Court Defendants are privies of Petitioner in this case. In light of this record, it is unreasonable to conclude that Petitioner should not be bound by the statutory time-bar, just like the District Court Defendants are. At a minimum, the Board should reopen these proceedings for further fact-finding so the Board can make a determination on a full evidentiary record, including having the benefit of the indemnity agreements.

**D.    The Board's Final Written Decision violates fundamental principles of administrative law.**

**1.    The Final Written Decision is an *ultra vires* action that exceeds the Board's statutory authority as delegated by Congress.**

Section 315(b) is a jurisdictional limit on the power delegated to the Board by Congress. *See* 35 U.S.C. § 315(b); 37 C.F.R. § 42.3(b) ("**Jurisdiction** . . . A petition to institute a trial must be filed with the Board consistent with any time period required by statute."). The Board's Final Written Decision and other actions in this IPR are *ultra vires*, undertaken without statutory authority.

The Board's determination of the § 315(b) issue will be reviewed on appeal with little (if any) deference. *See City of Arlington, Texas v. FCC*, 133 S. Ct. 1863, 1874 (2013) (appellate courts must "tak[e] seriously, and appl[y] rigorously, in all cases, statutory limits on agencies' authority. Where Congress has established a clear line, the

REQUEST FOR REHEARING            13            IPR2013-00601

agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow.").

The USPTO Director has taken the position that the Board's determinations under § 315(b) are never reviewable. *See* Brief for Intervenor – Director of the USPTO at 14-16, *Achates Reference Publ'g, Inc. v. Apple, Inc.*, Appeal No. 2014-1767 (Fed. Cir. Feb. 24, 2015). This position is contrary to a wealth of United States Supreme Court authority directly on point. *See Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 672 n.3 (1986) (collecting authority). It is also contrary to the APA. *See* 5 U.S.C. § 706(2)(C). Patent Owner fully intends to present this *ultra vires* argument to the Federal Circuit on appeal.

**2.      The Board's Final Written Decision and other actions violate the Administrative Procedures Act.**

The Board's refusal to consider a reasonably full evidentiary record in connection with the § 315(b) issue; its denial of all discovery on the issue; and its refusal to consider the terms of the known indemnity agreement and other known facts all violate the Board's duties under the APA. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994); *Intel Corp. v. U.S. Int'l Trade* Commiss'n, 946 F.2d 821, 836-39 (Fed. Cir. 1991).

Moreover, the Board's actions in this proceeding are contrary to the USPTO's own official public statements made during the rulemaking process. *See* 77 Fed. Reg. 48,680, 48,694-95 (Aug. 14, 2012) ("Additional discovery may be authorized where a

**A0266**

patent owner raises sufficient concerns regarding the petitioner's certification."); 77

Fed. Reg. at 48760 (discussing the legal standard). The Board's actions are

inconsistent with these comments and, therefore violate the APA. *See* 5 U.S.C. §

552(a), § 706(2)(A),(C); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

The Board's Final Written Decision is also contrary to the Board's own

promulgated substantive rules – specifically, 37 C.F.R. § 42.3(b). The Board's failure

to follow its own rules is contrary to the APA. *See* 5 U.S.C. § 552(a), § 706(2)(C), (D);

*Align Tech., Inc. v. ITC*, 771 F.3d 1317, 1322 (Fed. Cir. 2014).

Finally, the Board's Final Written Decision does not set forth proper findings

of fact or conclusions of law establishing that the Board has jurisdiction to hear this

petition in light of 35 U.S.C. §315(b). This is contrary to the requirements of the APA,

5 U.S.C. § 557(c). *See Austin Road Co. v. Occupational Safety and Health Review Comm'n*,

683 F.2d 905, 908 (5th Cir. 1982).

## IV.    CONCLUSION

For the foregoing reasons, the Board should grant this request for rehearing,

vacate its Final Written Decision, and dismiss the Petition pursuant to 35 U.S.C.

§315(b). In the alternative, the Board should vacate the Final Written Decision and

reopen this proceeding so additional fact-finding can be done on the §315(b) issue.

IPR2013-00601
Patent 6,772,215 B1

Dated  April 6, 2015

Respectfully submitted,

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

Peter Ayers (Reg. No. 38,374)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0252
Fax: 512.605.0252
**Lead Counsel for Patent Owner**
Wi-Fi One, LLC

Sarah E. Spires (Reg. No. 61,501)
SKIERMONT PUCKETT LLP
2200 Ross Ave. Ste. 4800W
Dallas, TX 75201
P: 214-978-6600/F: 214-978-6601
**First Back-Up Counsel for Patent Owner**

J. Christopher Lynch (Reg. No. 34,216)
Lee & Hayes, PLLC
601 W. Riverside Ave., Suite 1400
Spokane, WA 99201
Telephone: 509.324.9256
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

John Shumaker (Reg. No. 52,223)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0260
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

**A0268**

IPR2013-00601
Patent 6,772,215 B1

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 6, 2015 the foregoing PATENT OWNER'S REQUEST FOR REHEARING OF FINAL WRITTEN DECISION was served via email on Lead and Back up Counsel for Broadcom Corporation identified in Broadcom's Mandatory Notices, whom consented to electronic service:

Dominic E. Massa, Lead Counsel
Zachary Piccolomini, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
Dominic.massa@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

Skiermont Puckett LLP

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

**A0269**

Trials@uspto.gov                                                            Paper 71
571-272-7822                                          Entered: June 1, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

_____

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)[1]

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

---

[1] We exercise our discretion to issue one Order to be filed in each case. The parties are not authorized to use this style heading for any subsequent papers.

A0270

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

## I.    SUMMARY

Patent Owner, Wi-Fi One, LLC,[2] requests rehearing of the Final Written Decisions (IPR2013-00601, Paper 66, "601 Dec."; IPR2013-00602, Paper 60, "602 Dec."; IPR2013-00636, Paper 60, "636 Dec.").  Paper 70 ("Req.").[3]  Patent Owner seeks rehearing on the grounds that:

1. The Board misapprehended the purpose of the "real party in interest or privy" language in 35 U.S.C. § 315(b), and misapprehended the correct legal standard for determining whether a non-party is a "real party in interest or privy of petitioner" under § 315(b); and

2. The Board misapprehended the entirety of the factual record and overlooked evidence supporting Patent Owner's contention that certain district court defendants are real parties in interest and/or privies of Petitioner in this proceeding.

Req. 2.  Patent Owner also argues that our Final Written Decisions raise administrative law issues.  *Id.* at 4, 13–15.

The Requests for Rehearing are *denied*.

---

[2] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice in IPR2013-00601 indicating that the patent-at-issue had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC are now the real parties-in-interest.  Paper 43.  The same paper was filed in IPR2013-00602 (Paper 40) and IPR2013-00636 (Paper 38).

[3] Patent Owner filed a Request for Rehearing in each of IPR2013-00601 (Paper 70), IPR2013-00602 (Paper 64), and IPR2013-00636 (Paper 64).  All three requests put forward substantively the same arguments and, thus, we address them together with reference to the Request in IPR2013-00601.  Citations are to IPR2013-00601, unless otherwise noted.

**A0271**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

## II.   DISCUSSION

The applicable standard for a request for rehearing is set forth in 37 C.F.R. § 42.71(d), which provides in relevant part:

> A party dissatisfied with a decision may file a request for rehearing, without prior authorization from the Board.  The burden of showing a decision should be modified lies with the party challenging the decision.  The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, opposition, or a reply.

### A.  35 U.S.C. § 315(b)

Patent Owner argues that the Board misapprehended the purpose of the "real party in interest, or privy" language of § 315(b).  Req. 4.  Specifically, Patent Owner argues that "the legislative purpose of [35 U.S.C. § 315(b)] is to ensure IPR Petitions are not used as a litigation tactic for purposes of delay" (*id*. at 4), and that "[t]he plain text of the statute makes clear that . . . § 315(b) is intended to prevent litigation defendants from subverting the statutory time-bar by having their agents or cohorts file an IPR petition that they themselves are barred from filing" (*id.* at 5).  Patent Owner also argues that the legal standard for determining whether a third party is a "real party in interest, or privy of petition" under § 315(b) "is purposefully broad and flexible so that the Board can determine, on a case-by-case basis and in light of all relevant facts, whether particular parties are attempting to circumvent the § 315(b) time-bar."  Req. 7.

Patent Owner has not argued in its Patent Owner Response the legislative purpose of § 315(b).  We could not have misapprehended or overlooked arguments not before us.  Moreover, Patent Owner identifies

3

**A0272**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

nothing in our Decision that it contends mischaracterizes the legislative purpose of § 315(b). We are not persuaded, therefore, that we have overlooked or misapprehended the legislative purpose of § 315(b).

Patent Owner also argues that we misapprehended the legal test that should be applied to determine whether a non-party is a "real party in interest, or privy" for purposes of § 315(b). Req. 6. Specifically, Patent Owner contends that "the Board applied a narrow and rigid standard that is erroneous as a matter of law" (*id.* at 7) because it "requires — as an absolute and necessary condition — that Broadcom controlled or could have exercised control over one or more of the District Court Defendants in relation to the District Court Litigation" (*id.*) without "also considering, *inter alia*, the non-party's control over the IPR" (*id.* at 8). According to Patent Owner, "the issue under § 315(b) is whether the District Court Defendants have attempted to circumvent the one-year statutory time-bar." Req. 9.

Although our Decision on Patent Owner's Motion for Additional Discovery (Paper 23) focuses primarily on Broadcom's ("Petitioner") exercise of control, or opportunity to exercise control over the prior District Court lawsuit (Req. 8), that is because that was the focus of Patent Owner's Motion for Additional Discovery. *See, e.g.,* Paper 14, 6 ("Here, evidence will prove that Broadcom has had the opportunity to control and maintains a substantive legal relationship with the D-Link Defendants sufficient to bind Broadcom to the District Court's judgment.").

That decision, however, did not characterize the legal standard, for all cases, as being limited strictly to a petitioner's control, or opportunity to control, a non-party in previous litigation. To the contrary, it addressed

4

**A0273**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

control, or opportunity to control, by a non-party generally as one of a number of factors:

> Whether parties are in privity, for instance, depends on whether the relationship between a party and its alleged privy is "sufficiently close such that both should be bound by the trial outcome and related estoppels." [*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012]. Depending on the circumstances, a number of factors may be relevant to the analysis, including whether the non-party "exercised or could have exercised control over a party's participation in a proceeding," and whether the non-party is responsible for funding and directing the proceeding. *Id*. at 48,759-60.

Paper 23, 7.

That decision also addresses Patent Owner's theory that the indemnity agreements imply that the District Court Defendants are real parties in interest in these *inter partes* reviews ("IPRs"). *See id*. at 12–13. Patent Owner relied on substantively the same arguments and evidence in its Patent Owner Response as in its Motion for Additional Discovery, and our Final Written Decision, thus, applied essentially the same analysis. 601 Dec. 8–9. Accordingly, we are not persuaded that we misapprehended the proper legal standard for establishing privity or real party in interest.

### B. District Court Defendants

Patent Owner argues that we misapprehended and overlooked evidence establishing that certain District Court defendants are real parties in interest and/or are in privity with Petitioner for purposes of this proceeding. Req. 10–13. Specifically, Patent Owner argues that it has made "a strong circumstantial showing that Petitioner and at least some of their District Court Defendant customers are in cahoots" because "there are indemnity

5

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

agreements," they "share a common economic and legal interest," and "[Petitioner] has been coordinating with the District Court Defendants for many years." *Id.* at 11–12. According to Patent Owner, "the Board erred when it decided the § 315(b) issue without reviewing the known indemnity agreements." *Id.* at 12.

Patent Owner's arguments are not persuasive. The evidence cited by Patent Owner were Paper 3, and Exhibits 2005 and 2015–2018. PO Resp. 8–14. Exhibit 2018 is a final judgment of infringement in the co-pending district court litigation that sheds no light on whether Broadcom controlled, or could have controlled, the district court defendants, or vice-versa. All of the other evidence was considered in our Decision on Patent Owner's Motion for Additional Discovery. For example, we considered, and rejected, Patent Owner's argument that an indemnity relationship is sufficient to establish privity:

> Contrary to Ericsson's assertion that "[t]he weight of authority strongly supports that an indemnity agreement . . . establish[es] privity," Mot. 6, *Bros. Inc, TRW, Dentspl[]y* and other cases noted *supra* illustrate that more is required. Control of the litigation, or some sort of representation, constitutes a "crucial" factor. *Dentsply*, 42 F.Supp.2d at 398.

Paper 23, 9. As we indicated in our Final Written Decision, Patent Owner's Response relied on substantively the same arguments and evidence as its Motion for Additional Discovery, and we were not persuaded for the same reasons as explained in our decision on that motion. 601 Dec. 8–9. Accordingly, we are not persuaded that we misapprehended or overlooked the evidence relied upon by Patent Owner. To the extent Patent Owner is arguing that we should have granted its Motion for Additional Discovery

6

**A0275**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

directed to the indemnity agreements, the argument is untimely because our decision denying that discovery was issued well over a year before our Final Written Decision, Patent Owner requested rehearing (Paper 27) and we denied that request (Paper 28). *See* 37 C.F.R. § 42.71(d)(1).

In these proceedings, Patent Owner does not set forth a persuasive argument, supported by evidence, that the District Court Defendants funded, controlled, or could have controlled these proceedings, or that Petitioner's indemnity agreements even mention IPRs, let alone would show funding, control, or ability to control IPRs, or would have obligated Broadcom to file specific, if any, IPRs. *See* Req. 12. Instead, Patent Owner generally asserts that "Broadcom's duty to indemnify triggered the successive attack on [it]s patents," without specifying, based on cited precedent supporting the theory, how even a generic trigger for some unspecified future action, even if it existed, elevates the District Court Defendants to real parties in interest in the IPRs. *See* PO Resp. 13.

Patent Owner also argues that Petitioner failed to provide evidence of the non-party's lack of participation in, or control over, this proceeding, and that the Declaration of David Djavaherian (Ex. 1007) submitted by Petitioner in its Opposition to Patent Owner's Motion for Additional Discovery is carefully worded to obscure the true nature of the relationship between Petitioner and the District Court defendants. Req. 11, 12. Patent Owner did not make these arguments in the Patent Owner Response. We, therefore, could not have misapprehended or overlooked them.

7

**A0276**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

### C. Administrative Law Issues

Patent Owner argues that "the Board's Final Written Decision and other actions in this IPR are *ultra vires*, undertaken without statutory authority." Req. 13. Specifically, Patent Owner argues the following:

> The Board's refusal to consider a reasonably full evidentiary record in connection with the § 315(b) issue; its denial of all discovery on the issue; and its refusal to consider the terms of the known indemnity agreement and other known facts all violate the Board's duties under the APA. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994); *Intel Corp. v. U.S. Int'l Trade* [*Comm'n*], 946 F.2d 821, 836-39 (Fed. Cir. 1991).

*Id.* at 14. Patent Owner also argues that (1) our actions are inconsistent with public statements made during the rulemaking process and, therefore, violate the Administrative Procedure Act ("APA"); (2) our Decision is contrary to 37 C.F.R. § 42.3(b) and our failure to follow our rules is contrary to the APA; and (3) our Decision does not establish that we have jurisdiction to hear this petition in light of 35 U.S.C. § 315(b), contrary to the APA. *Id.* at 15.

Patent Owner's arguments are predicated on its contention that we lack jurisdiction under § 315(b) because the defendants in the co-pending district court litigation are real parties-in-interest who were served with a complaint alleging infringement more than one year before the filing of the Petitions in these proceedings. As discussed above, we are not persuaded that we erred in determining that those defendants are not real parties in interest. As a result, we are not persuaded that the Petitions were time-barred under § 315(b), and we are, therefore, not persuaded that our Final Written Decisions are *ultra vires* actions that exceed our statutory authority.

8

**A0277**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

### III.   Conclusion

For the foregoing reasons, Patent Owner has not shown that our Final Written Decision in IPR2013-00601 should be modified.  For the same reasons, Patent Owner also has failed to show that our Final Written Decisions in IPR2013-00602 and IPR2013-00636 should be modified.

### ORDER

Accordingly, it is:

ORDERED that Patent Owner's Requests for Rehearing are *denied*.

9

**A0278**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
Dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Sarah Spires
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
Sarah.spires@skiermontpuckett.com

10

**A0279**

Paper No. <u>72</u>

Filed on behalf of: Wi-Fi One, LLC

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____


BROADCOM CORPORATION,

Petitioner,

V.

WI-FI ONE, LLC,

Patent Owner.


_____

CASE NO.: IPR2013-00601
PATENT NO. 6,772,215 B1
_____

**PATENT OWNER'S NOTICE OF APPEAL**

**A0280**

IPR2013-00601
Patent 6,772,215 B1

In accordance with 35 U.S.C. §§ 141-142, 319 and 37 CFR § 90.2(a), 90.3, Patent Owner Wi-Fi One, LLC ("Wi-Fi One") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board (the "Board") entered on March 6, 2015 (Paper No. 66) (the "Final Written Decision") and the Board's Decision on Patent Owner's Request for Rehearing entered on June 1, 2015 (Paper No. 71) (the "Rehearing Decision"), and from all underlying orders, decisions, rulings, opinions and/or findings, including without limitation the Board's Decision on Institution of *Inter Partes* Review entered on March 10, 2014 (Paper No. 29) regarding Wi-Fi One's U.S. Patent No. 6,722,215.

For the limited purposes of compliance with 37 C.F.R. § 90.2(a)(3)(ii), Wi-Fi One expects that the issues on appeal may include the following, along with any underlying findings, determinations, rulings, opinions, orders, decisions, or other related issues:

- The Board's determination of unpatentability of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of U.S. Patent 6,722,215 (the "'215 patent"), under 35 U.S.C. § 102(b), and any finding or determination (factual or legal) supporting that determination;

NOTICE OF APPEAL                    1                    IPR2013-00601

**A0281**

IPR2013-00601
Patent 6,772,215 B1

- The Board's determination that it had invalidation authority to render its Final Written Decision in this case;

- The Board's determination that this Petition is not barred by 35 U.S.C. § 315(b), and any other finding or determination (factual or legal) supporting or related to this determination;

- The Board's failure to terminate this Petition after institution under 35 U.S.C. § 315(b), and any other finding or determination (legal or factual) supporting or related to this failure; and

- The Board's decision to deny Wi-Fi One's motion for additional discovery related to the issue of real-party-in-interest or privity under 35 U.S.C. § 315(b), and any other finding or determination (legal or factual) supporting or related to this determination.

Wi-Fi One reserves the right to challenge any finding or determination supporting or related to the issues listed above and to challenge the other issues decided adversely to Wi-Fi One in the Board's Final Written Decision, the Board's Decision on Request for Rehearing regarding the Final Written Decision, and/or any orders, decisions, or rulings underlying the Board's Final Written Decision or Decision on Request for Rehearing regarding the same.

Copies of this Notice of Appeal are being filed simultaneously with the Director of the United States Patent and Trademark Office, the Patent Trial and

**A0282**

IPR2013-00601
Patent 6,772,215 B1

Appeal Board, the Court of Appeals for the Federal Circuit, and served on the

Petitioner.

**A0283**

IPR2013-00601
Patent 6,772,215 B1

Dated  July 13, 2015

Respectfully submitted,

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

Peter Ayers (Reg. No. 38,374)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0252
Fax: 512.605.0252
**Lead Counsel for Patent Owner**
Wi-Fi One, LLC

Sarah E. Spires (Reg. No. 61,501)
SKIERMONT PUCKETT LLP
2200 Ross Ave. Ste. 4800W
Dallas, TX 75201
P: 214-978-6600/F: 214-978-6601
**First Back-Up Counsel for Patent Owner**

J. Christopher Lynch (Reg. No. 34,216)
Lee & Hayes, PLLC
601 W. Riverside Ave., Suite 1400
Spokane, WA 99201
Telephone: 509.324.9256
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

John Shumaker (Reg. No. 52,223)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0260
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

NOTICE OF APPEAL              4              IPR2013-00601

**A0284**

IPR2013-00601
Patent 6,772,215 B1

## CERTIFICATE OF FILING

The undersigned certifies that on July 13, 2015, in addition to being filed electronically through the Patent Trial and Appeal Board's PRPS System, the foregoing PATENT OWNER'S NOTICE OF APPEAL was filed via Express Mail with the Director of the United States Patent and Trademark Office, at the following address (in accordance with 37 C.F.R. §§ 90.2(a), 104.2):

Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

## CERTIFICATE OF FILING

The undersigned certifies that on July 13, 2015, a true and correct copy of the foregoing PATENT OWNER'S NOTICE OF APPEAL was filed via Express Mail with the Clerk's Office of the United States Court of Appeals for the Federal Circuit at the following address:

Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place NW
Washington, DC 20005

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 13, 2015 the foregoing PATENT OWNER'S NOTICE OF APPEAL was served via email on Lead and Back up Counsel for Broadcom Corporation identified in Broadcom's Mandatory Notices, whom consented to electronic service:

Dominic E. Massa, Lead Counsel
Zachary Piccolomini, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
Dominic.massa@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

## A0285

IPR2013-00601
Patent 6,772,215 B1

Skiermont Puckett LLP

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**WI-FI ONE, LLC,**
**Owner/Appellant**

**v.**

**BROADCOM CORPORATION,**
**Petitioner/Appellee**

**Proceeding No: IPR2013-00601**

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely filed on July 13, 2015, in the United States Patent and Trademark Office in connection with the above identified *Inter Partes Review* proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being forwarded to the Federal Circuit.

Respectfully submitted,

By: _____
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

Date: August 24, 2015

A0295

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the

foregoing has been served on Appellant and Appellee this 24th day of August,

2015, as follows:

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
Dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Sarah Spires
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
Sarah.spires@skiermontpuckett.com

By: _____
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

**A0296**

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>**August 24, 2015**</u>

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**BROADCOM CORPORATION,**
**Petitioner,**
**v.**

**WI-FI ONE, LLC,**
**Patent Owner.**

**Case:  IPR2013-00601**
**Patent No. 6,772,215 B1**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Macia L. Fletcher*

*Certifying Officer*



**A0297**

Prosecution History IPR 2013-00601

| Date | Document |
|------|----------|
| 9/20/2013 | Petition for Inter Partes Review |
| 9/20/2013 | Petitioner's Power of Attorney |
| 9/20/2013 | Fee Authorization |
| 9/30/2013 | Notice of Filing Date Accorded to Petition |
| 10/21/2013 | Patent Owner's Power of Attorney |
| 10/21/2013 | Patent Owner's Mandatory Notices |
| 11/1/2013 | Patent Owner's Power of Attorney |
| 11/1/2013 | Patent Owner's Updated Mandatory Notice |
| 12/11/2013 | Order - Authorizing Motion for Additional Discovery |
| 12/11/2013 | Patent Owner's Motion to Seal (confidential) |
| 12/16/2013 | Patent Owner's Motion to Seal (public) |
| 12/16/2013 | Patent Owner's Motion for Additional Discovery |
| 12/20/2013 | Petitioner's Motion to Seal (Redacted) |
| 12/20/2013 | Petitioner's Motion to Seal (confidential) |
| 12/20/2013 | Petitioner's Opposition (Redacted) |
| 12/20/2013 | Petitioner's Opposition (confidential) |
| 12/20/2013 | Petitioner's Exhibit List |
| 12/30/2013 | Patent Owner's Election to Waive Its Preliminary Response |
| 1/24/2014 | Decision - Motion for Additional Discovery |
| 1/27/2014 | Petitioner's Motion to Seal |
| 2/7/2014 | Patent Owner's Request for Rehearing |
| 2/20/2014 | Decision - Request for Rehearing |
| 3/10/2014 | Decision - Institution of Inter Partes Review |
| 3/10/2014 | Scheduling Order |
| 3/28/2014 | Patent Owner's List of Proposed Motions |
| 4/1/2014 | Patent Owner's Notice of Related Matters |
| 4/2/2014 | Order - Conduct of the Proceeding |
| 5/15/2014 | Patent Owner's Power of Attorney |
| 5/15/2014 | Notice of Appearance - Shumaker |
| 6/11/2014 | Patent Owner's Motion to Seal (confidential) |
| 6/11/2014 | Patent Owner's Motion to Seal (Redacted) |
| 6/11/2014 | Patent Owner's Response |
| 6/11/2014 | Patent Owner's Response (Redacted) |
| 6/30/2014 | Decision - Motions to Seal |
| 7/11/2014 | Patent Owner's Updated Mandatory Notice |
| 7/11/2014 | Patent Owner's Updated Power of Attorney |
| 7/17/2014 | Petitioner's Standard Acknowledgement for Access to Protective Order Material - Massa |
| 7/17/2014 | Petitioner's Standard Acknowledgement for Access to Protective Order Material - Diener |
| 8/29/2014 | Notice of Stipulated Modification of Due Dates 2-3 |
| 9/17/2014 | Notice of Appearance - Piccolomini |

**A0298**

Prosecution History IPR2013-00601

| Date | Document |
| --- | --- |
| 10/1/2014 | Petitioner's Reply to Patent Owner's Response |
| 10/29/2014 | Notice of Stipulated Modification of Due Dates 4-5 |
| 11/12/2014 | Petitioner's Request for Oral Argument |
| 11/12/2014 | Patent Owner's Motion to Exclude |
| 11/12/2014 | Patent Owner's Request for Oral Argument |
| 11/12/2014 | Patent Owner's Updated Exhibit List |
| 11/12/2014 | Letter from Ayers to Vignone re service of New Exhibit |
| 11/17/2014 | Order - Trial Hearing |
| 11/19/2014 | Petitioner's Opposition to Motion to Exclude Evidence |
| 11/24/2014 | Patent Owner's Reply to Opposition to Motion to Exclude Evidence |
| 12/4/2014 | Petitioner's Demonstratives for Oral Argument |
| 12/4/2014 | Patent Owner's Updated Exhibit List |
| 12/7/2014 | Patent Owner's Notice of Related Matters |
| 12/7/2014 | Letter from Ayers to Vignone re service of New Exhibit |
| 12/19/2014 | Petitioner's Revised Mandatory Notice |
| 2/5/2015 | Oral Hearing Transcript |
| 3/6/2015 | Final Written Decision |
| 4/3/2015 | Patent Owner's Power of Attorney |
| 4/3/2015 | Patent Owner's Revised Mandatory Notice |
| 4/3/2015 | Patent Owner's Standard Acknowledgment for Access to Protective Order Material - Spires |
| 4/6/2015 | Patent Owner's Request for Rehearing |
| 6/1/2015 | Decision - Request for Rehearing |

## I.    MANDATORY NOTICES

### A.    Real Parties-in-Interest

Broadcom Corporation ("Petitioner") is the real party-in-interest and submits this *inter partes* review Petition ("Petition") for review of certain claims of U.S. Patent No. 6,772,215 ("the '215 patent") (Ex. 1001).

### B.    Related Matters

International Trade Commission

The '215 patent is currently the subject of an International Trade Commission hearing that started September 17, 2013 (Investigation No. 337-TA-862).  There has already been fact discovery and expert discovery with expert reports being exchanged.  Petitioner understands that the ITC Staff Attorney has recommended that the asserted claims of the '215 patent be found <u>invalid</u> under either Seo (Ex. 1002) or Gong (Ex. 1003), the two references cited in this Petition.

District Court

In September 2010, Ericsson Inc. *et al.* (the "Patent Owner") filed suit in the Eastern District of Texas against D-Link Systems, Inc., Netgear, Inc., Belkin International, Inc., Dell, Inc., Toshiba Corporation, Acer Inc., and Gateway Inc. (the "Defendants") alleging infringement of several U.S. patents, including the '215 patent.  (*See  Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No.

1

**A0303**

6:10-CV-473 (LED/KGF) ("Texas Litigation")).[1] The Patent Owner's infringement allegations were based in part on Defendants' use of Petitioner's Wi-Fi compliant products, such as the BCM4313 and BCM4321. The Patent Owner did not allege that Petitioner infringed any patent asserted in the Texas Litigation, and Petitioner was not a party to the Texas Litigation.

Following an eight-day trial, the jury found claim 1 of the '215 patent infringed. The Defendants, who were allowed only 15 hours to present their case for the five (5) patents[2], damages and certain equitable issues, did not address the invalidity of the '215 patent at trial.

## C.     Counsel

Lead Counsel:      Dominic E. Massa (Registration No. 44,905)

Backup Counsel:   Michael A. Diener (Registration No. 37,122)

---

[1]     On November 19, 2011, Intel Corporation filed a Motion to Intervene in the Texas Litigation, which the court granted on May 4, 2012.

[2]     Ericsson also asserted the following additional patents at trial in the Texas Litigation: U.S. Patent No. 6,330,435 (the "'435 patent"), U.S. Patent No. 6,519,223 (the "'223 patent"), U.S. Patent No. 6,424,625 (the "'625 patent"), and U.S. Patent No. 6,466,568 (the "'568 patent").

2

**A0304**

**D.    Service Information**

Email:  Michael A. Diener, michael.diener@wilmerhale.com

Post and Hand Delivery:  Wilmer Cutler Pickering Hale and Dorr, LLP, 60 State Street, Boston, MA 02109

Telephone:  617-526-6454          Facsimile:  617-526-5000

**E.    Certification of Grounds for Standing**

Petitioner certifies pursuant to Rule 42.104(a) that the patent for which review is sought is available for *inter partes* review and that Petitioner is not barred or estopped from requesting an *inter partes* review challenging the patent claims on the grounds identified in this Petition.

**II.    OVERVIEW OF CHALLENGE AND RELIEF REQUESTED**

Pursuant to Rules 42.22(a)(1) and 42.104(b)(1)-(2), Petitioner challenges Claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent (the "Challenged Claims") as anticipated under 35 U.S.C. § 102, in view of either of two references set out below.

**A.    Prior Art Patents and Printed Publications**

Petitioner relies upon the following patents and printed publications to show that the Challenged Claims are anticipated and therefore invalid:

1.    Seo, U.S. Patent No. 6,581,176 ("Seo") (Ex. 1002), which was filed on Dec. 31, 1998, and is prior art to the '215 patent under (pre-AIA) 35 U.S.C.

3

**A0305**

§ 102(e).

2. Fengmin Gong et al., "An Application-Oriented Error Control Scheme for High-Speed Networks," IEEE/ACM Transactions on Networking, Vol. 5, No. 5 (1996) ("Gong") (Ex. 1003), which was published on Oct. 5, 1996, and is prior art to the '215 patent under (pre-AIA) 35 U.S.C. § 102(b).

## B.    Grounds for Challenge

Petitioner requests cancellation of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 (the "Challenged Claims"), as unpatentable under 35 U.S.C. § 102.

**Ground 1**:  the Challenged Claims are anticipated under § 102 by Seo.

**Ground 2**:  the Challenged Claims are anticipated under § 102 by Gong.

This Petition, supported by the Declaration of Dr. Harry Bims ("Bims Declaration" or "Bims Decl.") (Ex. 1004) filed with this Petition, demonstrates that there is a reasonable likelihood that Petitioner will prevail with respect to at least one of the challenged claims and that each of the challenged claims is unpatentable for the reasons cited in this petition.  *See* 35 U.S.C. § 314(a).

## III.   Claim Construction

The claims in an *inter partes* review should be given their "broadest reasonable construction in light of the specification" as commonly understood by

substantive limitations.

The construction of Term [4] above identifies those specific portions of the specification that describe the minimum structure necessary for performing the recited function, and is consistent with the level of structure shown in the '215 patent. The only disclosed corresponding structure is the ARQ entity. (*See* Bims Decl. at ¶ 21, Ex. 1004)

## IV.    OVERVIEW OF THE '215 PATENT[5]

### A.    Automatic Repeat Request Protocols

The '215 patent relates to a communication system with an Automatic Repeat Request ("ARQ") protocol.  An ARQ protocol uses acknowledgements and/or timers to assist a transmitter in retransmitting protocol data units ("PDUs") that are not received or that are incorrectly received.[6]  In some types of systems, a transmitter transmits PDUs to a receiver, and the receiver provides the transmitter with positive acknowledgement feedback (known as "ACKs" or "PACKs") indicating that one or more PDUs were correctly received, and/or negative acknowledgement feedback (NAKs or NACKS) indicating one or more PDUs were

---

[5]    Dr. Bims confirms that this section accurately describes the '215 patent. (Bims Decl. at ¶ 16, Ex. 1004).

[6]    These PDUs could also be referred to as packets, frames, or cells. (*See, e.g.*, '215 Patent at 1:59-63; 10:2-5, Ex. 1001).

9

U.S. Patent 6,772,215
Petition for *Inter Partes* Review

not correctly received.  ('215 Patent, FIG. 1; 2:33-36, Ex. 1001).  The transmitter

and/or receiver may use a timer as an alternative to PACKs and NACKs, or in

addition to PACKs and NACKs, to determine whether a PDU appears to have been

lost.  The transmitter can use the feedback (or lack of receiving feedback) to

retransmit packets that are negatively acknowledged or that were not

acknowledged.  (*Id.* at 1:33-36, Ex. 1001).   The '215 patent identifies examples of

protocols that use ARQ, including GSM and GPRS cellular protocols.  (*Id.* at 1:63-

2:1, Ex. 1001).

Figure 1 of the '215 patent (below) shows two ARQ peer entities 10 and 12

communicating with each other.



'215 Patent, Figure 1 (Ex. 1001)

10

**A0312**

Case IPR2013-00601 Patent 6,772,215; Case IPR2013-00602
Patent 6,466,568; Case IPR2013-00636 Patent 6,424,625

packet then becomes the last sequence number of the received window. The received window then is adjusted so that the packet that's been received now is the sequence number of the last section of the received window as opposed to the first part of the received window as normal.

So what this means is that Vornefeld as opposed to releasing expectations of packets having prior sequence numbers actually creates expectations, and that's shown in the figure -- the wheel figure in the bottom, which has a 0, 1 and 2 in the gray section, and that gray section is the packets that the receiver is now expecting to receive rather than being released.

And I'll stop there, Your Honor, unless you have questions and I'll reserve the rest of my time for rebuttal.

JUDGE EASTHOM: Thank you, counsel. I don't have any questions. Any questions? Actually I had one bookkeeping question. Are you now Wi-Fi One or --

DR. SHUMAKER: Wi-Fi One owns the patents at suit now. Ericsson owns an interest in some of the patents in terms of the past damage issue, but Wi-Fi One owns the patents going forward.

JUDGE EASTHOM: So should we -- we should change the name to --

DR. SHUMAKER: To Wi-Fi One?

JUDGE EASTHOM: Right.

DR. SHUMAKER: Yes, Wi-Fi One, LLC.

JUDGE EASTHOM: Thank you.

75



US006581176B1

(12) **United States Patent**

Seo

(10) **Patent No.:**    **US 6,581,176 B1**

(45) **Date of Patent:**    **Jun. 17, 2003**

(54) **METHOD FOR TRANSMITTING CONTROL FRAMES AND USER DATA FRAMES IN MOBILE RADIO COMMUNICATION SYSTEM**

(75) Inventor: **Chang Keun Seo**, Inchon-kwangyoksi (KR)

(73) Assignee: **LG Information & Communications, Ltd.**, Seoul (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/223,755**

(22) Filed: **Dec. 31, 1998**

(30) **Foreign Application Priority Data**

Aug. 20, 1998    (KR) ............................................. 98/33816

(51) **Int. Cl.**$^7$ ................................................ **H04L 1/18**
(52) **U.S. Cl.** ........................ **714/749**; 370/320; 370/474
(58) **Field of Search** ................................. 370/538, 252, 370/230, 231, 310, 469, 389, 349, 521, 474, 209, 320, 342, 471, 216, 335, 332; 714/748–750, 776; 341/106; 375/372, 220, 231, 235, 240; 709/201, 209, 238; 455/442, 522, 67.1, 423

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,537,414 A | * | 7/1996 | Takiyasu et al. | ............ | 370/347 |
| 6,088,342 A | * | 7/2000 | Cheng et al. | ................ | 370/320 |
| 6,112,323 A | * | 8/2000 | Meizlik et al. | ............. | 714/748 |
| 6,118,834 A | * | 9/2000 | Rasanen | ...................... | 370/231 |
| 6,148,208 A | * | 11/2000 | Love | ............................ | 370/332 |
| 6,226,301 B1 | * | 5/2001 | Cheng et al. | ................ | 370/209 |

OTHER PUBLICATIONS

Nonnenmacher, J. et al. (Optimal multicast feedback; IEEE, Apr. 2, 1998).*
Lifan Gu et al. (New error recovery structures for reliable multicasting; IEEE, Sep. 25, 1997).*

Yamauchi Y (Reliable multicast over the mobile packet radio channel; IEEE, May 9, 1990).*

Leung C.H.C et al. (A new efficient ARQ scheme for satellite communications; IEEE, 1989).*

*Data Service Options for Wideband Spread Spectrum Systems: Radio Link Protocol*, TIA/EIA/IS–707–A.2 (PN–4145.2), V&V Version, (Jul. 1998).

TIA/EIA/IS–707–A.2 dated Jul. 1998 (pp. 4–3–3 4–5).

TIA/EIA/IS–707.2 dated Feb. 1998 (pp. 4–3–3 4–5).

* cited by examiner

*Primary Examiner*—Albert Decady
*Assistant Examiner*—Guy Lamarre
(74) *Attorney, Agent, or Firm*—Fleshner & Kim, LLP

(57) **ABSTRACT**

In a method for transmitting radio link protocol frames in a mobile radio communication system, if an error occurs on a radio section when user data frames of a radio link protocol (RLP) having respective different series numbers are transferred from a transmitting station to a receiving station, at least one missed user data frame is caused at the receiving station. At this time, the receiving station transmits, repeatedly by first times, a negative acknowledgement (NAK) control frame of the RLP for at least one missed user data frame, to the transmitting station. The transmitting station sends, by second times different from the first times, at least one missed user data frame in response to the received NAK control frame, to the receiving station. Particularly, series numbers of respective missed user data frames are sent through one NAK control frame to the transmitting station, at equal time when a timer for an NAK is expired, to accordingly result in reducing the number of the total NAK control frames and increasing a throughput per unit time.

**29 Claims, 5 Drawing Sheets**



TRANSMITTING STATION A

RECEIVING STATION B

m + 1NAK

m + 1 RETRANSMISSION

m + 1 RETRANSMISSION

BROADCOM 1002

A0494



## FIG. 1
## BACKGROUND ART

| FIELD | LENGTH (BITS) |
|-------|---------------|
| SEQ | 8 |
| CTL | 8 |
| FIRST | 8 |
| LAST | 8 |
| FCS | 16 |
| PADDING | VARIABLE |

## FIG. 2
## BACKGROUND ART



*FIG. 3*
*BACKGROUND ART*

| FIELD | LENGTH (BITS) |
|---|---|
| SEQ | 8 |
| CTL | 4 |
| RE_NUM | 2 |
| NAK_TYPE | 2 |
| NAK_SEQ | 4 |
| L_SEQ_HI | 4 |
| | |
| FIRST | 12 |
| LAST | 12 |
| FCS | 16 |
| PADDING | VARIABLE |
| | |
| NAK_Map_Count | 2 |
| NAK_Map | |
| NAK_Map_SEQ | 12 |
| NAK_Map | 8 |

*FIG. 4*

A0497



V(N)=NECESSARY
SERIES NUMBER

V(R)=RECEIVED
SERIES NUMBER

1  2  3  4  5  6  7  8  9  10  11  12  13  14

 FRAMES RECEIVED IN SEQUENCE

 FRAMES RECEIVED OUT OF SEQUENCE

 BUFFER SPACE FOR NEW OR MISSED DATA FRAMES

## FIG. 5

A0498



**FIG. 6**



**FIG. 7**

US 6,581,176 B1

# METHOD FOR TRANSMITTING CONTROL FRAMES AND USER DATA FRAMES IN MOBILE RADIO COMMUNICATION SYSTEM

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a method for transmitting control frames and user data frames in a mobile radio communication system.

### 2. Discussion of Related Art

In a CDMA (Code Division Multiple Access) mobile radio communication system, it is prescribed in a Radio Link Protocol (RLP) of IS-707.2 of February 1998 a relay layer corresponding to a radio section between a terminal device and a base station, for the sake of a circuit data service or a packet data service.

RLP frames can be classified into two types, control frames and user data frames. The user data frames transport user traffic data while the control frames are used to send control information required for RLP initialization and error recovering. The control frames contain important information in RLP operation. As a result, if reliability were not ensured for these control frames, it would negatively impact the performance of an overall system. According to the RLP retransmission procedure, the NAK (Negative Acknowledgement) RLP control frame for a particular user data frame can be transmitted more than once at the same time to ensure the reliability and the missing user data frame will be retransmitted whenever it receives the NAK frame.

Currently, the transmission methods of the NAK control frames in RLP type 1 and RLP type 2 will be described hereinafter.

When an entity receiving RLP frames or an RLP destination transmits NAK control frames for incorrect or lost user data frames, an entity sending RLP or an RLP source retransmits RLP user data frames whenever it receives the NAK control frames. For example, if the RLP source receives two NAK control frames containing the same missing sequence number, it retransmits the missing user data frames twice. In other words, the total number of the retransmission of RLP user data frames matches exactly the total number of NAK frames transmitted containing the sequence number of that user frame.

The above method has a drawback in terms of flexibility. For example, in case of simultaneous voice and packet data service such as the service option VPI, it may occur that the NAK control frames can not be transmitted over a forward channel (FCH) due to a voice packet transmission. In this case, the NAK control frames could be transmitted over a supplemental channel (SCH) with a low frame error rate (FER).

Referring to FIG. 2 showing a structure of the conventional RLP NAK control frame, it is constructed in the RLP NAK control frame by a data frame sequence number field SEQ with a length of 8 bits, a control field CTL with a length of 8 bits, a field FIRST with a length of 8 bits, a field LAST of a length of 8 bits, a frame check sequence field FCS with a length of 16 bits and a field, padding, with a variable length. The control field CTL is made up of a higher rank 4 bits and a lower rank 4 bits. If a value of the higher rank 4 bits is "1100", it represents that the RLP control frame is the NAK frame and it requests to retransmit data frames. At this time, the lower rank 4 bits of the control field CTL is "0000".

A value "11010000" of the field CTL indicates a non-encrypted mode synchronization, a value "11010011" represents an encrypted mode synchronization, a value "11100000" provides a non-encrypted mode acknowledgement, a value "11100011" means an encrypted mode acknowledgement, a value "11110000" indicates a non-encrypted mode synchronization/acknowledgement, and a value "11110011" represents an encrypted mode synchronization/acknowledgement.

The field FIRST represents the 8 bit sequence number of a first data frame for which a retransmission is required. The field FIRST is used only in case of an NAK and its value is "00" except such case. The field LAST indicates the 8 bit sequence number of a last data frame for which the retransmission is required. The field LAST is also used only in case of the NAK and its value becomes "00" except such case.

The field FCS is a frame check sequence, the contents will be generated by 16 bits FCS polynomial specified in 3.1 of RFC 1662. The field FCS shall cover the fields SEQ, CTL, FIRST and LAST. The field, padding, is padding bits and it is required to fill the remainder of the frame. These bits shall be set to "0".

In the conventional method for transmitting the RLP NAK control frames, in case that the number of sequence numbers of basically valid frames are more than the number of sequence numbers anticipated in the receiving station, NAK control frames for user data frames not received to the receiving station are required.

Referring to FIG. 3, when the receiving station receives user data frames with sequence numbers 1,2,3, a sequence number V(N) necessary by the receiving station and a sequence number V(E) estimated by the receiving station become "4". V(R) shown in FIG. 3 indicates received sequence numbers. If a frame error rate (FER) becomes high owing to various causes of a radio section, the receiving station may receive a user data frame of a sequence number 14 instead of the user data frame of the sequence number 4. The receiving station may actually receive user data frames having more sequence numbers than the sequence number 14 since there is much possibility for a burst occurrence of the FER on the radio section. Like this, in case the receiving station receives the user data frame having the sequence number 14, the receiving station sends NAK control frames requiring for user data frames of missed sequence numbers 4 to 13 to the transmitting station. That is, the receiving station requests the transmitting station to retransmit the missed user data frames thereto. At this time, the receiving station operates of each retransmission counter for an NAK about the user data frames having the sequence number 4 to 14. After that, the number of the retransmission counter increases whenever an effective idle frame or a new effective data frame is received.

In case the receiving station does not receive the missed user data frames even till the retransmission counter for the NAK reaches a given threshold, the receiving station requires the retransmission of the missed user data frames from the transmitting station. In other words, the receiving station transfers NAK control frames to the transmitting station A. If user data frames of sequences numbers 5,8,9, 11,13 are received before the timer of the NAK retransmission counter is expired, the NAK timer does not operate for the frames of the sequence numbers 5,8,9,11,13 any more. Then, the receiving station B retransmits NAK control frames only for user data frames not received even by the retransmission of the transmitting station A, to the transmitting station A.

**A0500**

US 6,581,176 B1

3

That is to say, an NAK control frame is sent for the user data frame of the sequence number **4** shown in FIG. **3**, and after 20 ms, the NAK control frame is resent for the user data frame of the sequence number **4**. Also, NAK control frames are sent for the user data frames of sequence numbers **6, 7**, and after 20 ms, the NAK control frames are resent for the user data frames of the sequence numbers **6, 7**. And then, after 20 ms, an NAK control frame is transmitted for a user data frame of a sequence number **10**, and after 20 ms, the NAK control frame is retransmitted for the user data frame of the sequence number **10**. Also after 20 ms, an NAK control frame is transferred for a user data frame of a sequence number **12**, and after 20 ms, the NAK control frame is retransferred for the user data frame of the sequence number **12** to the transmitting station A.

Supposing that, after the transmission of all the NAK control frames, the receiving station B receives only the user data frame of the sequence number **7** till the NAK timer is expired, the receiving station B again sends the NAK control frames for the respective user data frames having the missed sequence numbers **4,6,10,12** each three times to the transmitting station A. In response to such operation, the transmitting station A transmits the corresponding missed user data frames in the number same as the number of the received NAK control frames, to the receiving station B.

Such conventional method for transmitting NAK control frames has problems described in the following.

That is, despite that the value of the NAK timer is expired for the user data frames of the sequence numbers **4,6,7,10,12** at an equal time, the respective NAK control frames for the respective corresponding user data frames should be transmitted in the conventional method, to accordingly cause some delay. That is, when the NAK timer is expired, the NAK control frames for the respective user data frames not received till that are transferred several times. Then, the transmitting station A retransmits the user data frames by the number of the received NAK control frames. Accordingly, unnecessary delay is caused. For instance, in case the user data frame of the sequence number **4** is not received, the receiving station B transfers the NAK control frame for the sequence number **4** several times when the NAK timer is expired. Thus, a delay time in sending the NAK control frames increases to cause a fall of a throughput per unit time.

A sequential order for transmitting the frames on the traffic channel is as an NAK control frame, a missed user data frame and a new user data frame. Consequently, when one NAK control frame for one user data frame is sent every 20 ms on the traffic channel having many transmissions of the NAK control frames, a point of time in sending the new user data frame low in a prior transmission order is delayed much.

## SUMMARY OF THE INVENTION

Accordingly, the present invention is directed to a control frame and user data frame transmitting method that substantially obviate one or more of the limitations and disadvantages of the related art.

An object of the present invention is to provide a method for transmitting user data frames and control frames in a mobile radio communication system capable of ensuring a reliability of an NAK control frame transmission.

Another object of the present invention is to provide a method for transmitting user data frames and control frames in a mobile radio communication system capable of preventing a transmission delay of frames.

A further object of the present invention is to provide a method for transmitting user data frames and control frames

4

in a mobile radio communication system capable of heightening a throughput per unit time.

Additional features and advantages of the invention will be set forth in the description which follows, and in part will be apparent from the description, or may be learned by practice of the invention. The objectives and other advantages of the invention will be realized and attained by the structure as illustrated in the written description, as well as the appended drawings.

To achieve these and other advantages, and in accordance with the purpose of the present invention as embodied and broadly described, it is considered as follows.

It is desirable to send NAK control frames more than the total number of the retransmission of user data frames if the transmission link of the user data frame is more reliable. The opposite case may occur too, that is, there are some other cases where an asymmetric RLP retransmission is also desirable. For instance, we known that it is crucial that the NAK control frames are transmitted as early as possible. However, when it is tried to send many different control frames including the NAK control frames in a CDMA system in which many RLP entitles can exist in a mobile station, congestions may be caused in a mapping layer or an MUX/QoS sublayer. In this case, it is needed that the NAK control frames be transmitted over an SCH or the transmission number of the NAK control frames be reduced if a transmission link is in a good condition in terms of frame error rate.

In the inventive method, at equal time when a timer for an NAK is expired, series numbers of missed user data frames are loaded on one NAK control frame and this NAK control frame is transmitted to a transmitting station from a receiving station.

At this time, the retransmission number of the missed user data frames is variable according to a state of a corresponding traffic channel, and such retransmission number is indicated on the NAK control frame.

The transmission number of the same NAK control frames is also variable according to a state of a corresponding channel, and a series number of the NAK control frame, capable of identifying the transmission number is also represented on that NAK control frame.

In a structure of the NAK control frame in accordance with the present invention, there are provided a field NAK_SEQ indicating series numbers of NAK control frames, for checking a duplication, a control field CTL representing NAK control frames requiring a retransmission of missed user data, and a field RE_NUM providing the retransmission number of missed user data frames. Also, the transmission number of that NAK control frames is variable according to the number of user data frames requesting its retransmission.

It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory and are intended to provide further explanation of the invention as claimed.

## BRIEF DESCRIPTION OF THE ATTACHED DRAWINGS

The accompanying drawings, which are included to provide a further understanding of the invention and are incorporated in and constitute a part of this specification, illustrate embodiments of the invention and together with the description serve to explain the principles of the invention.

A0501

5

In the drawings:

FIG. **1** is a diagram showing a conventional method for transmitting RLP NAK control frames and RLP user data frames.

FIG. **2** represents a diagram providing a structure of a conventional RLP NAK control frame.

FIG. **3** depicts a diagram illustrating examples of frames received at a receiving station in a conventional method.

FIG. **4** illustrates a diagram showing a structure of an RLP NAK control frame in accordance with the present invention.

FIG. **5** provides a diagram for examples of frames received at a receiving station in the present invention.

FIG. **6** shows a diagram explaining a method for transmitting NAK control frames and user data frames in accordance with one embodiment of the present invention.

FIG. **7** sets forth a diagram explaining a method for transmitting NAK control frames and user data frames in accordance with another embodiment of the present invention.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENT

Reference will now be made in detail to the preferred embodiments of the present invention, examples of which are illustrated in the accompanying drawings.

In accordance with the present invention, the structure of an NAK control frame prescribed in the existed standard, IS-707, is here compensated. In other words, each NAK control frame corresponding to each missed user data frame is not transmitted in the invention, but only one NAK control frame for all missed user data frames is transmitted to a transmitting station to require a retransmission of the missed user data when a timer for an NAK is actually expired. The transmission number of the NAK control frames is variable according to a quality of a radio section between a receiving station and the transmitting station. The transmission number of the missed user data frames may be also variable according to a quality of the radio section.

FIG. **4** is a table showing the structure of a RLP NAK control frame in the present invention.

Referring to FIG. **4**, two new fields NAK_SEQ and RE_NUM are added to the existing RLP NAK control frame considered for a backward compatibility.

The field NAK_SEQ with a length of 4 bits is a sequence number of the NAK control frame for duplication check. A counterpart RLP entity performs a duplication processing when it receives an NAK control frame having the same field NAK_SEQ. A field RE_NUM with a length of 2 bits is a retransmission-number of a missed user data frame. The range of the field RE_NUM is "1" to "4". A field NAK_TYPE with a length of 2 bits indicates an NAK type. When a value of the field NAK_TYPE is "00", the receiving station requests a retransmission of missed user data frames numbered a field FIRST through a field LAST. A field SEQ with a length of 8 bits is a data frame sequence number. A field CTL is a control field and has a length of 4 bits. A value "1100" of the field CTL indicates an NAK control frame and also indicates to request the retransmission of missed user data frames. A field L_SEQ_HI with a length of 4 bits is the most significant 4 bits of L_V(S). A field FIRST with a length of 12 bits is the 12-bit sequence number of the first data frame for which a retransmission is required. A field LAST with a length of 12 bits is the 12-bit sequence number of the last data frame for which a retransmission is required.

6

A field FCS with a length of 16 bits is a frame check sequence. Its contents shall be generated by the 16-bit FCS polynomial. The field FCS shall cover the fields SEQ, CTL, FIRST, LAST. A field, padding, with a variable length is padding bits and is required to fill the remainder of frames. These bits shall be set to "0". A field NAK_MAP_Count with a length of 2 bits indicates a number less than the number of NAK maps in the NAK control frame. A field NAK_MAP_SEQ with a length of 12 bits is the 12-bit sequence number of the first data frame in this NAK Map for which a retransmission is requested. A field NAK_MAP with a length of 8 bits is a bit-map identifying the missing user data frames for which a retransmission is requested. The most significant bit corresponds to the user data frame identified by the field NAK_MAP_SEQ+1. Each less significant bit corresponds to the next sequential data frame. A bit set to "1" indicates that a corresponding user data frame is missing. If a value of the field NAK_TYPE is "00", the fields FIRST, LAST, FCS, padding, exist. If a value of the field NAK_TYPE is "01", the field NAK_MAP_COUNT exits. If a value of the field NAK_MAP_COUNT+1 exists, there exist the fields NAK_MAP_SEQ and NAK_MAP.

An inventive method for transmitting NAK control frames and user data frames in a mobile radio communication system is described as follows.

Referring to FIG. **5**, if the receiving station B receives user data frames having series numbers **1**, **2**, **3**, a necessary series number V(N) or an estimated series number V(E) of the receiving station B is "4". After that, by the way, if the receiving station B receives a user data frame with series number **14** instead of a user data frame with series number **4** due to various causes of a radio section, its necessary series number V(N) becomes "4" as it is, and its estimated series number V(E) becomes "15". Then, the receiving station B transmits an NAK control frame for user data frames of series numbers **4** to **13**. At this time, the existing NAK control frame is used as it is. After that, the receiving station B begins an operation of a timer for an NAK, about transmitted NAK control frames, in the existing time method. When the corresponding NAK timer is expired, the receiving station B transmits an NAK control frame only for missed user data frames not received. As shown in FIG. **5**, if user data frames of series numbers **5**, **8**, **9**, **11**, **13** are received till/before an expiry of the corresponding NAK timer, the receiving station B transfers only one NAK control frame for user data frames with series numbers **4**, **6**, **7**, **10**, **12** which are not yet received, though the conventional method is that respective corresponding NAK control frames are transmitted each two times.

In a radio section, frequency bands used on forward and backward traffic channels are different from each other, and radio wave paths thereon are also different. That is, a frame error rate (FER) on the forward traffic channel does not become high together, even though an FER on the backward traffic channel is high. Thus, in a transmission direction of an NAK control frame, a state of the radio section may be good, or not so good or very bad. Supposing that the radio section in such transmission direction is a good state, the receiving station B sends the same NAK control frame having corresponding information only one time to the transmitting station A so that the transmitting station A can transfer missed user data frames to the receiving station B several times, as shown in FIG. **6**.

Meantime, in case the frame error rate (FER) of the radio section from the receiving station B transmitting NAK control frames is higher than that from the transmitting station A receiving the NAK control frames, the receiving

US 6,581,176 B1

7

station B sends the same NAK control frames to the transmitting station A several times more than the number of retransmission of its corresponding user data frames, as shown in FIG. 7. For instance, even if the retransmission of two times for the missed user data is requested, the same NAK control frames may be transmitted four times. Namely, though the NAK control frame is repeatedly transferred four times, the missed user data may be transmitted only two times. Accordingly, when one NAK control frame for the missed user data frames having series numbers 4, 6, 7, 10, 12 shown in FIG. 5 is sent from the receiving station B to the transmitting station A and the retransmission of three times for the missed user data frames from the transmitting station A to the receiving station B is required, it is inserted "3" in the field CTL, wherein "3" is a value of the field CTL of the NAK control frame shown in FIG. 4.

While, in case the frame error rate on a channel belonging to a sending direction of an NAK control frame is higher, so in case it is requested to transfer the NAK control frame four times and transmit missed user data frames corresponding to the NAK control frame two times, the same fields NAK_SEQ having a value "4" are each inserted in the same NAK control frames and a value "2" of the field CTL for a retransmission of respective user data frames is inserted in the user data frame. At this time, the transmitting station A receiving the NAK control frames receives the NAK control frames four times instead of only one time, to thereby reduce further more a probability for not receiving the corresponding NAK control frame.

If the transmitting station A receiving the NAK control frames receives a first NAK control frame, a duplication for three rest NAK control frames can be checked by referring to the fields NAK_SEQ within the frames. After checking, three duplicated NAK control frames are disregarded, and the missed user data frames are re-transmitted to the receiving station B two times by checking a value "2" of the field CTL of the corresponding NAK control frame.

As afore-mentioned, an inventive method for transmitting RLP NAK control frames and user data frames between a terminal device and a base station in the mobile radio communication system such as CDMA has merits as follows.

First, the receiving station B sends one NAK control frame for respective user data frames finished at equal time when a timer for an NAK is expired, thereby resulting in reducing the total number of NAK control frames so enabling to reduce the delay time of user data frames transmitted after that time, namely frames received at a higher rank hierarchy, from a view of the receiving station B transmitting the NAK control frames. In addition, the maximum work processing amount can be attained since the number of data frames transmitted per unit time increases.

Secondly, in the inventive method the retransmission number of missed user data frames is decided, separately from the transmission number of the same NAK control frames, though in the conventional method the retransmission number of the missed user data frames depends upon the transmission number of the NAK control frames. Therefore, in case a quality of a radio traffic channel in an NAK control frame sending direction is not good, it is available to increase the transmission number of the same NAK control frames. Moreover, it is no need to surely make the retransmission number of missed user data and the transmission number of NAK control frames to be same. On the contrary, in case the quality of the radio traffic channel in the NAK control frame sending direction is good, it is

8

available that the transmission number of the NAK control frames become less than the retransmission number of missed user data.

Thirdly, the inventive method is more appropriate to and necessary for a circuit data services or a high-speed data service, since cases for a transmission of idle frames occur in the high-speed data service or file transmission and facsimile services comparatively less than that in the current low-speed data service. Accordingly, in case there is a frame broken in a radio traffic section whose state is not good, it has a high probability that the frame may be a user data frame.

It will be apparent to those skilled in the art that various modifications and variations can be made in the control frame and user data frame transmitting method of the present invention without deviating from the spirit or scope of the invention. Thus, it is intended that the present invention cover the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents.

What is claimed is:

1. A method for transmitting radio link protocol frames in a mobile radio communication system, comprising:

transferring user data frames of a radio link protocol (RLP) from a transmitting station to a receiving station, said user data frames having respective different series numbers;

transmitting a negative acknowledgment (NAK) control frame of the radio link protocol a first prescribed number of times from the receiving station to the transmitting station when an error occurs in transmitting said user data frames so at least one missed user data frame occurs, the NAK control frame including a NAK sequence number corresponding to the first prescribed number of times and a retransmission number indicating a number of retransmissions of the at least one missed user data frame, where the retransmission number is variably selected for each NAK control frame; and

sending at least one missed user data frame a second prescribed number of times in response to said NAK control frame from the transmitting station to the receiving station in accordance with at least one of a forward communication quality and a reverse communication quality, wherein the second prescribed number is equal to the number indicating a number of retransmissions.

2. The method of claim 1, wherein said first and second prescribed number of times are variably decided according to a quality of a radio section between the transmitting station and the receiving station in a direction that NAK control frame is transmitted.

3. The method of claim 2, wherein said first prescribed number of times is less than said second prescribed number of times when the quality of said radio section is good.

4. The method of claim 2, wherein said first prescribed number of times is more than said second prescribed number of times when the quality of said radio section is not good.

5. The method of claim 1, wherein said NAK control frame each has series numbers necessary for identifying said NAK control frames transmitted by said first prescribed number of times.

6. The method of claim 1, wherein series numbers of said missed user data frames are represented on one NAK control frame and the NAK control frame with the series numbers is transmitted from the receiving station to the transmitting station, at equal time when a timer for an NAK is expired.

US 6,581,176 B1

| 9 | 10 |

**7**. The method of claim **1**, wherein said second prescribed number of times is represented on said NAK control frame.

**8**. The method of claim **1**, wherein said NAK control frame comprises:

(a) a field with a length of 4 bits which is a sequence number of the NAK control frame for duplication check;

(b) a field with a length of 2 bits which is a retransmission-number of at least one missed user data frame; and

(c) a control field with a length of 4 bits, a value "1100" of said control field indicating the NAK control frame and also indicating to request a retransmission of said at least one missed user data frame.

**9**. The method of claim **8**, wherein a value of said (b) field is any one out of "1" through "4".

**10**. The method of claim **8**, wherein said NAK control frame further comprises:

(d) a field with a length of 2 bits which indicates an NAK type, a value "00" of said (d) field indicating to request the retransmission of said at least one missed user data frame numbered as a field FIRST through a field LAST;

(e) a field with a length of 8 bits which is a data frame sequence number;

(f) a field with a length of 4 bits which is the most significant 4 bits;

(g) a field FIRST with a length of 12 bits which is the 12-bit sequence number of a first user data frame for which the retransmission is required;

(h) a field LAST with a length of 12 bits which is the 12-bit sequence number of a last user data frame for which the retransmission is required;

(i) a field with a length of 16 bits which is a frame check sequence;

(j) a field with a variable length which is padding bits and is required to fill the remainder of the NAK control frame;

(k) a field with a length of 2 bits which indicates a number less than the number of NAK maps in the NAK control frame;

(l) a field with a length of 12 bits which is the 12-bit sequence number of said first user data frame in this NAK map for which the retransmission is requested; and

(m) a field with a length of 8 bits which is a bit-map identifying said at least one missed user data frame for which the retransmission is requested.

**11**. The method of claim **10**, wherein said (g), (h), (i) and (j) fields exist when a value of said (d) field is "00", said (k) field exists when the value of said (d) field is "01", and said (l) and (m) fields exist when the value of said (k) field+1 exists.

**12**. The method of claim **1**, wherein received NAK control frames are analyzed by the transmitting station to determine whether a corresponding missed user data frame has already been sent to the receiving station.

**13**. The method of claim **12**, wherein if it is determined that the corresponding missed user data frame has already been retransmitted to the receiving station then the missed user data frame is not again retransmitted.

**14**. The method of claim **12**, wherein the received NAK control frames include a sequence number of the NAK control frame and a retransmission number of a missed user data frame used to determine whether the corresponding missed user data frame has already been sent to the receiving station.

**15**. A method for transmitting RLP frames in a mobile radio communication system, comprising:

transmitting user data frames having series numbers from a transmitting station to a receiving station;

transferring at least one negative acknowledgement (NAK) control frame for user data frames having non-received series numbers from the receiving station to the transmitting station;

operating a timer for said NAK control frames transmitted, in the receiving station, said timer being for a NAK;

sending one NAK control frame a first prescribed number of times for a missed user data frame or missed user data frames, which is/are not received until said timer is expired, from the receiving station to the transmitting station, said NAK control frame comprising (A) a control field for requesting a retransmission of said missed user data frame or frames, (B) a field for indicating a second prescribed number of times which represents a number of retransmissions of the missed user data frame or frames such that the number of retransmissions of the missed user data frame can be dynamically changed between NAK control frames, and (C) a field for indicating a NAK control frame sequence number corresponding to said first prescribed number of times, for duplication check; and

transmitting the missed user data frame or frames the second prescribed number of times from the transmitting station to the receiving station, when said NAK control frame is received by the first prescribed number of times.

**16**. The method of claim **15**, wherein said NAK control frame includes series numbers of said missed user data frame or frames.

**17**. The method of claim **15**, further comprising:

detecting a duplication of the NAK control frames received continuously in the receiving station, by using said (C) fields of the NAK control frames, when the transmitting station receiving the NAK control frames receives a first NAK control frame; and

disregarding the followed NAK control frames when the duplication is detected and retransmitting the missed user data frame or frames by the second prescribed number of times from the transmitting station to the receiving station, said second prescribed number corresponding to a value of said (A) field of the received NAK control frame.

**18**. The method of claim **15**, wherein said (A) field has a length of 4 bits, said (B) field has a length of 2 bits and said (C) field has a length of 4 bits.

**19**. The method of claim **15**, wherein a value of said (B) field has a range of "1" through "4".

**20**. The method of claim **15**, wherein said first and second prescribed number of times are variably decided according to a quality of a radio section between the transmitting station and the receiving station in a direction that said NAK control frame is transmitted.

**21**. The method of claim **15**, wherein said first prescribed number of times is less than said second prescribed number of times when the quality of said radio section is good.

**22**. The method of claim **15**, wherein said first prescribed number of times is more than said second prescribed number of times when the quality of said radio section is not good.

**23**. The method of claim **15**, wherein said NAK control frame further comprises:

(D) a field with a length of 2 bits which indicates an NAK type, a value "00" of said (D) field indicating a request

US 6,581,176 B1

11

for retransmission of said at least one missed user data frame numbered as a field FIRST through a field LAST;

(E) a field with a length of 8 bits which is a data frame sequence number;

(F) a field with a length of 4 bits which is the most significant 4 bits;

(G) a field FIRST with a length of 12 bits which is the 12-bit sequence number of a first user data frame for which the retransmission is required;

(H) a field LAST with a length of 12 bits which is the 12-bit sequence number of a last user data frame for which the retransmission is required;

(I) a field with a length of 16 bits which is a frame check sequence;

(J) a field with a variable length which is padding bits and is required to fill the remainder of the NAK control frame;

(K) a field with a length of 2 bits which indicates a number less than the number of NAK maps in the NAK control frame;

(L) a field with a length of 12 bits which is the 12-bit sequence number of said first user data frame in this NAK map for which the retransmission is requested; and

(M) a field with a length of 8 bits which is a bit-map identifying said at least one missed user data frame for which the retransmission is requested.

24. The method of claim 23, wherein said (G), (H), (I) and (J) fields exist when a value of said (D) field is "00", said (K) field exists when the value of said (D) field is "01", and said (L) and (M) fields exist when the value of said (K) field+1 exists.

25. The method of claim 15, wherein received NAK control frames are analyzed by the transmitting station to determine whether a corresponding missed user data frame has already been sent to the receiving station.

12

26. The method of claim 25, wherein if it is determined that the corresponding missed user data frame has already been retransmitted to the receiving station then be missed user data frame is not again retransmitted.

27. A negative acknowledgment (NAK) control frame for a communication system configured to allow a number of retransmissions of RLP data frames to be dynamically modified as compared to a previous NAK control frame, comprising:

a sequence field to indicate a data frame sequence number;

a control field to indicate a request for retransmission of missed user data;

a first field to indicate a first frame of missed data to be retransmitted;

a last field to indicate a last frame of missed data to be retransmitted;

a negative acknowledgment sequence number field to determine if the missed data has already been retransmitted according to a previous NAK control frame; and

a retransmission number to indicate a number of retransmissions of the missed user data frame.

28. The control frame of claim 27, wherein a transmitting station transmits user data to a receiving station, the receiving station transmits the NAK control frame to the transmitting station when user data is not received, and wherein the transmitting station analyzes data in each of the fields of the NAK control frame to determine whether the missed user data should be retransmitted.

29. The control frame of claim 28, wherein missed user data is not retransmitted if the missed data was already retransmitted to the receiving station based on a previous NAK received by the transmitting station.

*    *    *    *    *

**A0505**

DOCKET NO: 0111168-0240

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

PATENT:        6,772,215

INVENTOR:     Bela Rathonyi, et. al.

FILED:            March 29, 2000
                                                            ISSUED:     August 3, 2004

TITLE:           METHOD OF MINIMIZING FEEDBACK RESPONSES
                      IN ARQ PROTOCOLS

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

**DECLARATION OF HARRY BIMS, PH.D.**

I, Harry Bims, declare as follows:

**General Background**

1.      My name is Harry Bims.  I have been asked to offer opinions regarding whether certain claims of U.S. Patent No. 6,772,215 (the '215 patent) are anticipated or would have been obvious in view of the prior art, and to review a Petition for *Inter Parties* Review of U.S. Patent No. 6,772,215, which I understand is being filed with this declaration.

2.      I received my B.S. in computer and systems engineering from Rensselaer Polytechnic Institute in 1985, my M.S. in electrical engineering from

BROADCOM 1004

**A0521**

Stanford University in 1988, and my Ph.D. in electrical engineering from Stanford University in 1993. Since receiving my doctorate, I have worked on a number of wireless and mobile technologies, including wireless pagers, wireless home LAN protocols, cellular products including 2.5G and 3G products, wireless network infrastructures based on the 802.11 wireless specification, and wireless networks in the 4G technology known as WiMAX, an implementation of 802.16.

3.     I have been actively involved in the development of the 802.16 standards, which is a series of wireless broadband standards written by the Institute of Electrical and Electronics Engineers (IEEE), including as a vice-chair of the 802.16 working group, and chair of two task groups. Previously, I was the vice-chair and secretary of the IEEE 802.16h License Exempt Task Group.

4.     I am currently working as both a technology consultant in the industry and an expert consultant for litigation matters.

5.     I began my technical career in 1992 just before completing my Ph.D. as one of the first employees at Glenayre Technologies, where I worked until 1998. While at Glenayre, I designed and built a 4-channel wireless pager demonstration based on the ReFLEX wireless protocol developed by Motorola, which led to an award for Narrowband Personal Communications Service (PCS) development. I invented, designed, and built a two-way pager test system for the ReFLEX protocol that was deployed around the country for testing pagers. Additionally, I

- 2 -

**A0522**

device that implements ARQ protocols and algorithms for sending and receiving digital data, this entity would have a processor that would be programmed to generate messages that could include the identified fields.

21.  For the "means for sending," while specific structure is not shown other than ARQ entities, it would be inherent that these ARQ entities would include a transmitter for sending data units to a receiver.

**Technical Basis Underlying the Grounds of Rejections Set Forth in the Petition for *Inter Partes* Review**

**The Challenged Claims are Anticipated by Seo**

22.  I have reviewed and understand Seo, U.S. Patent No. 6,581,176 ("Seo", Ex. 1002).  In my opinion, a person of ordinary skill in the art would find Seo to be an enabling disclosure of the subject matter it discusses.  A chart summarizing citations in Seo is at the end of this declaration, and may include more citations than are specifically provided below.

23.  Seo is a patent, assigned on its face to LG Information and Communication Ltd., relating to improving the reliability of NAK transmissions and preventing delay of frames.  Further, a goal is to improve throughput per unit time. (Ex. 1002, 3:58-4:2).  Seo describes these benefits in the context of a wireless CDMA cellular system.  (*Id.* at 1:14).

24.  Seo discloses two types of ARQ feedback responses:

- 6 -

**A0526**

- A first type that identifies a first and last sequence number (SN) of frames (packets or PDUs) to be retransmitted ("First/Last Approach") (*Id.* at 5:54-6:6); and

- A second type that includes one or more bitmaps ("Bitmap Approach") (*Id.* at 6:6-22).

25.     The receiver disclosed in Seo indicates to the transmitter which type of feedback is being used though a field called NAK_TYPE (i.e., a type of negative acknowledgement). (*Id.* at 5:53-54). The example provided in Figure 4 of Seo demonstrates how a receiver could go from one type of feedback to the other type of feedback, and from one response to the next. In this example, at first, there are consecutive missing frames 4 through 13. Thus, the receiver could use the First/Last Approach. Subsequently, with multiple non-consecutive missing frames, the receiver could use the Bitmap Approach. (*Id.* at 6:26-49). This example in Seo would indicate to a person of ordinary skill how Seo could use different types of feedback for efficiency.

26.     A NAK_TYPE value of "00" indicates the First/Last Approach, and can be used to indicate a series of missing data units. The fields include FIRST and LAST, each of which is a SN of a missing frame. The first and last SNs indicate a series of sequence numbers extending from the first to the last missing

**A0527**

frame. (*Id.* at 5:63-67). For example, if FIRST = 10 and LAST = 15, these fields indicate that the six data units with sequence numbers of 10, 11, 12, 13, 14, and 15 are all missing or erroneous, and are requested for retransmission. This is an alternative to specifying a first SN and a number (length) of subsequent frames; e.g., FIRST = 10 and LENGTH = 6 (or 5, depending on the protocol).

27.    A NAK_TYPE value of "01" indicates the Bitmap Approach. The fields for this approach include a NAK_Map_Count field to indicate a number of bitmaps, and a bitmap NAK_Map field that has 8 bits. The NAK_Map_Count indicates a number that is one less than the number of bitmaps. For example, a NAK_Map_Count binary value of "00" would indicate $0 + 1 = 1$ bitmap, while a binary value of "10" = 2 would indicate $2 + 1 = 3$ bitmaps. If there are multiple bitmaps, a starting sequence number (NAK_Map_SEQ) is provided for each bitmap. Figure 4 does not specifically show the number of bits the first time NAK_Map is shown, but viewing this in context and considering that the second instance of NAK_Map has 8 bits, a person of ordinary skill would understand that a single NAK_Map would have 8 bits. (*Id.* at 6:5-21).

28.    Seo provides an example in which one type of feedback (First/Last Approach) can be used where there is a series of missing frames, and how a different type of feedback (Bitmap Approach) where there is a group of non-

- 8 -

**A0528**

consecutive missing frames. (Seo, 6:22-49, Ex. 1002). One of ordinary skill in the art would understand that using different types of feedback as disclosed in Seo in an optimal way reduces the number of bits to be transmitted and is therefore more efficient. Where there are a series of consecutive missing packets (such as SN 4 through SN 13 in the example), the First/Last Approach is likely most efficient, whereas if there are individual non-consecutive packets missing, the Bitmap Approach is likely more efficient. (*Id.* at 6:25-49).

29. The NAK_TYPE field has two bits, and therefore could be used to indicate four values. Seo does not identify specific uses of binary values of "10" and "11". One of ordinary skill in the art would understand these values to be unused and/or reserved for future use. Reserving (or not using) certain values that a field can have is not unusual, and is quite common in protocols. One of ordinary skill would understand that Seo would allow for further types of feedback to be defined.

### Seo Anticipates Independent Claim 1

30. Claim 1 reads:

1. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

[a] sending a plurality of first data units over a communication link;

- 9 -

**A0529**

[b] receiving said plurality of first data units; and

[c] responsive to the receiving step, constructing a

message field for a second data unit, said message field

including

[i] a type identifier field and

[ii] at least one of a

sequence number field,

a length field, and

a content field.

31.    Seo discloses claim elements 1[a] and 1[b].  Seo describes a system in which a transmitter (Figures 6 and 7; Transmitting Station A) in a system, such as a cellular mobile radio system, sends a plurality of first data units (frames) to a receiver, and a receiver (Figures 6 and 7, Receiving Station B) receives the first plurality of data units (frames).  (Seo, 1:20-25; 2:30-3:24; 7:30-8:3, Ex. 1002).

32.    Seo discloses claim element 1[c].  In Seo, the receiver can use radio link protocol ("RLP") control frames, one of which is an RLP NAK frame for negative acknowledgements.  (*Id.* at 5:42-46; 1:14- 2:29).  This RLP NAK

- 10 -

**A0530**

feedback response has a "type identifier field" (NAK_TYPE), and has at least one

of a sequence number field, a length field, and a content field. Specifically, Seo

discloses a content field that can include a bitmap (NAK_Map). (*Id.* at Fig. 4;

5:47-6:22). Seo also discloses sequence number fields, such as FIRST, LAST, and

NAK_Map_Seq. (*Id.* at Fig. 4; 5:54-67; 6:7-14).

### Seo Anticipates Dependent Claims 2 and 6

33.     Claims 2 and 6 read as follows:

2. The method of claim 1, wherein said message field

comprises a bitmap message.

6. The method of claim 1, wherein said content field

comprises a bitmap.

34.     In Seo, the RLP NAK feedback response has a "type identifier field"

(NAK_TYPE), and a content field (which is part of the claimed "message field")

that can include a bitmap (NAK_Map). (*Id.* at Fig. 4; 5:47-6:22; 9:38-48, Ex.

1002).

### Seo Anticipates Dependent Claims 4 and 8

35.     Claims 4 and 8 read as follows:

4. The method of claim 1, wherein said sequence number

field includes any sequence number from said plurality of

first data units.

- 11 -

**A0531**

8. The method of claim 1, wherein said second data unit comprises information about missing or erroneous said first data units.

36.    In Seo, the RLP NAK feedback response includes sequence number fields with various sequence numbers from the received first data units (e.g., FIRST, LAST, or NAK_Map_SEQ) that identify missing or erroneously received first data units. (Seo, Fig. 4; 5:47-6:22; 7:9-16, Ex. 1002). A Bitmap Approach also identifies missing or erroneously received packets. (*Id.* at 6:6-22; 9:42-48) Seo thus discloses a response that comprises information about missing or erroneously received first data units with either the First/Last Approach or the Bitmap Approach.

### Seo Anticipates Independent Claim 15

37.    Claim 15 reads as follows:

15. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of: [a] sending a plurality of first data units over a communication link; [b] receiving said plurality of first data units; and

[c] responsive to the receiving step, constructing a message field for a second data unit, said message field including

- 12 -

[i] a type identifier field and

[ii] at least one of,

a length field,

a plurality of erroneous sequence number-fields, and

a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

38.    Seo discloses claim elements 15[a] and 15[b], which are the same as those in claim 1. Seo describes a system in which a transmitter (Figures 6 and 7; Transmitting Station A) in a system, such as a cellular mobile radio system, sends a plurality of first data units (frames) to a receiver, and a receiver (Figures 6 and 7, Receiving Station B) receives the first plurality of data units (frames). (Seo, 1:20-25; 2:30-3:24; 7:30-8:3, Ex. 1002).

39.    Claim element 15[c], is similar to claim 1 in requiring a type identifier field, but is different in that it requires one of several other types of fields

in addition to the type identifier field, including as one option "a plurality of erroneous sequence number fields" as shown above.

40.    Seo discloses a "type identifier field" (Seo, NAK_TYPE, e.g., Fig. 4) as discussed above, and also discloses a plurality of erroneous sequence number fields. These erroneous sequence number fields are either:

(1) the FIRST and LAST fields, each of which represents the sequence numbers of two non-received data units, and further indicates other sequence numbers between FIRST and LAST (*Id.* at Fig. 4; 5:54-57), or

(2) the one-bit fields within a bitmap that each identify the missing frames by sequence number (Fig. 4; 6:13-17). That is, a bitmap with a starting sequence number (SSN) and, for example, an 8-bit bitmap of 11001111 indicates that sequence numbers of SSN+3 and SSN + 4 are missing (assuming "0" indicates a SN not received or not received correctly).

### Seo Anticipates Dependent Claim 22

41.    Claim 22 reads: The method of claim 15, wherein said second data unit comprises information about missing or erroneous said first data units.

42.    The information in Seo for (1) FIRST and LAST fields or (2) bitmap is about missing or erroneously received data units as noted above. (Seo, 5:63-67, 6:11-15; 9:17-48, Ex. 1002).

- 14 -

**A0534**

**Seo Anticipates Independent Claim 25**

43.   Claim 25 reads:

25. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of: [a] sending a plurality of first data units over a communication link; [b] receiving said plurality of first data units; and [c] responsive to the receiving step, constructing between one to several message fields for a second data unit, said one to several message fields including

a type identifier field and

at least one of

a sequence number field,

a length field,

a content field,

a plurality of erroneous sequence number fields, and

a plurality of erroneous sequence number length fields,

each of said plurality of erroneous sequence number

- 15 -

**A0535**

fields associated with a respective one of said plurality of erroneous sequence number length fields.

44. Seo discloses claim elements 25[a] and 25[b] for the same reasons as claim elements 1[a] and 1[b] and 15[a] and 15[b]. Seo describes a system in which a transmitter (Figures 6 and 7; Transmitting Station A) in a system, such as a cellular mobile radio system, sends a plurality of first data units (frames) to a receiver, and a receiver (Figures 6 and 7, Receiving Station B) receives the first plurality of data units (frames). (Seo, 1:20-25; 2:30-3:24; 7:30-8:3, Ex. 1002).

45. Seo discloses claim element 25[c], which requires a type identifier field and one of a number of other fields, including a content field, a sequence number field, or a plurality of erroneous sequence numbers field. In Seo, a feedback response is constructed with message fields; in a specific example, the system uses radio link protocol (RLP) control frames, one of which is an RLP NAK frame for negative acknowledgements. (*Id.* at 5:42-46; 1:14- 2:29).

46. This RLP NAK feedback response has a "type identifier field" (NAK_TYPE) as discussed above for claim 1, and a number of the different "at least one of" fields. Specifically, Seo discloses (1) a content field that can include a bitmap (NAK_Map) (Seo, Fig. 4 and 5:47-6:22; see also discussion of claim 1); (2) sequence number fields (e.g., FIRST and LAST); and (3) a plurality of

- 16 -

**A0536**

erroneous sequence number fields (see discussion of claim 15 above). *See also* discussion of claim element 15[c] at ¶ 39 herein.

### Seo Anticipates Dependent Claims 29 and 32

47.    Claims 29 and 32 read as follows:

29. The method of claim 25, wherein said one to several message fields include a bitmap message.

32. The method of claim 25, wherein said content field comprises a bitmap.

48.    This RLP NAK feedback response has a "type identifier field" (NAK_TYPE), a content field that can include a bitmap (NAK_Map). (Seo, Fig. 4 and 5:47-6:22; 9:38-48, Ex. 1002).

### Seo Anticipates Dependent Claim 34

49.    Claim 34 reads:  The method of claim 25, wherein said second data unit comprises information about missing or erroneous said first data units.

50.    In Seo, the fields of the RLP NAK feedback response include various sequence number fields (e.g., FIRST, LAST, or NAK_Map_SEQ) of missing or erroneously received first data units.  (Seo, Fig. 4; 5:47-6:22; 9:18-22, Ex. 1002).

### Seo Anticipates Dependent Claim 26

51.    Claim 26 reads:  The method of claim 25, wherein said one to several message fields further comprise an acknowledgment message.

- 17 -

**A0537**

52.    In Seo, the RLP NAK feedback response has a "type identifier field" (NAK_TYPE), which is a content field that can include a bitmap (NAK_Map). (Seo, Fig. 4 and 5:47-6:22,Ex. 1002).  The bitmap includes an indication of PDUs that are expressly acknowledged.  (*Id.* at 6:13-17).  That is, a bitmap with a starting sequence number (SSN) and, for example, an 8-bit bitmap of 11001111 indicates that sequence numbers of SSN+1, +2, and +5 through +8 are acknowledged as correctly received.  Further, the FIRST field indicates a first field for which retransmission is requested.  This FIRST field thus acknowledges all SNs before FIRST.

**Seo Anticipates Independent Claim 45**
**and Dependent Claims 46, 49, 52, and 54**

53.    Claim 45 of the '215 patent contains means-plus-function limitations, which I understand are construed based on the structures disclosed in the '215 patent specifications and equivalents of those structures.  The '215 patent does not identify specific structure beyond peer ARQ entities that transmit and receive, and refers to devices that communicate over cellular networks.  It is well-known to those of ordinary skill in the art that such transmitting and receiving entities (in the '215 patent and also in the prior art) that implement RLP or ARQ protocols and algorithms would inherently include processors that are programmed to create messages that can include fields that are specified by the programming.  The level of detail in the '215 patent and Seo is substantially the same in that they each

- 18 -

**A0538**

disclose a box with a transmitting or receiving station and then describe how they form messages with fields.

54.    Claim 45 reads as follows:

45. A system for minimizing feedback responses in an ARQ protocol, comprising: [a] a first peer entity; [b] a second peer entity; and [c] a communication link coupled between said first peer entity and said second peer entity for communicating data therebetween;

[d] said first peer entity including means for sending a plurality of first data units over said communication link to said second peer entity;

[e] said second peer entity including

means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including

[i] a type identifier field and

[ii] at least one of

a sequence number field,

- 19 -

**A0539**

a length field,

a content field,

a plurality of erroneous sequence number fields, and

a plurality of erroneous sequence number length fields,

each of said plurality of erroneous sequence number

fields associated with a respective one of said plurality of

erroneous sequence number length fields.

55.    Claim 45 and dependent claims 46, 49, 52, and 54 generally relate to the same types of fields discussed above in conjunction with claim 22 (which essentially combined the options of claims 1 and 15).

56.    Seo discloses elements 45[a] through 45[d].  More specifically, Seo describes a system in which a first peer entity (Figures 6 and 7; Transmitting Station A) in a cellular mobile radio system sends a plurality of first data units, and a second peer entity (Receiving Station B) receives the first plurality of data units in a CDMA mobile radio communications system (Seo, Figures 6 and 7; 1:14-19). In Seo, the first peer entity (Transmitting Station A) has a transmitter as a means for sending the first data units. (Seo, Figures 6 and 7).  *See also* discussion of claim elements 1[a] and 1[b], 15[a] and 15[b], and 25[a] and 25[b].

- 20 -

**A0540**

57.    Seo discloses element 45[e]. In Seo, the system inherently has a processor that constructs radio link protocol (RLP) control frames, one of which is an RLP NAK frame for negative acknowledgements. (Seo, 5: 42-46; 1:14-2:29, Ex. 1002). This RLP NAK feedback response has a "type identifier field" (NAK_TYPE). Seo also discloses (1) a content field that can include a bitmap (NAK_Map). (Seo, Figure 4 and 5:47-6:22); (2) sequence number fields (e.g., FIRST, LAST and NAK_Map_SEQ), and (3) fields of erroneously received sequence numbers (FIRST, LAST), as discussed above in conjunction with claim 15. (Seo, Figure 4, 5:42-6:22, Ex. 1002)

58.    Dependent claims 46, 49, 52, and 54 are substantially the same as dependent claims 26, 29, 32, and 34, and are anticipated for the same reasons.

59.    Seo discloses dependent claim 46. This RLP NAK feedback response has a "type identifier field" (NAK_TYPE), a content field that can include a bitmap (NAK_Map). (Seo, Fig. 4; 5:47-6:22; 9:38-48, Ex. 1002). The bitmap includes an indication of PDUs that are expressly acknowledged. (*Id.* at 6:13-17; *see also* discussion of claim 26).

60.    Seo discloses dependent claims 49 and 52, which relate to use of a bitmap in a message field or content field. This RLP NAK feedback response has a "type identifier field" (NAK_TYPE), a content field that can include a bitmap

- 21 -

**A0541**

(NAK_Map). (Seo, Fig. 4 and 5:47-6:22; 9:38-48, Ex. 1002; *see also* discussion of claims 29 and 32).

61. Seo discloses dependent claim 54. The fields include various sequence number fields (e.g., FIRST, LAST, or NAK_Map_SEQ) of missing or erroneously received first PDUs. (Fig. 4 and 5:47-6:22; *see also* discussion of claim 34).

62. While I understand that the preamble – "for minimizing feedback responses in an ARQ protocol" -- should not be considered a substantive part of the claims, the discussion above with respect to the example of Seo in operation (at Seo, 6:26-59), indicates that Seo can select one of a plurality of types of NAK based on the nature of the missing frames, and allows selection a more efficient method for transmitting the feedback. Further, Seo discloses that a goal of his invention is to reduce the number of the total NAK control frames and increase throughout per unit of time. (Seo, Abstract; 3:66-4:2).

**Patent Owner's Prior Response to Seo**

63. I have reviewed an expert report that I understand the Patent Owner submitted ("Report", Ex. 1006) in a prior litigation to rebut the contention that Seo anticipates the claims.

64. The Report addressed only the common limitation of a "type identifier field." It did not distinguish any other element of the claims, did not distinguish

- 22 -

**A0542**

can be used to maximize the number of sequence numbers in an S-PDU with limited size, if it is not possible to fit all potential sequence numbers into a single S-PDU. '215 patent at 4:33-38. The inventors summarized the invention as "a method for minimizing feedback responses in an ARQ protocol ... whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. In particular, these different mechanisms can be combined in a single S-PDU. The S-PDUs are constructed so as to optimize system performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of [sequence numbers] in an S-PDU of limited size." '215 patent at 4:44-53.

## DISCUSSION

### I.   Disputed terms of the '215 patent.

The disputed terms and their proposed constructions are set forth below.

**a.   "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field" (claims 1, 15 and 25)**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types | responsive to the receiving step, generating a message field including a field identifying the type of feedback response that is selected from multiple available feedback responses in order to minimize the size of number of feedback responses |

Plaintiffs acknowledge that the proposed constructions are nearly identical, but argue that Defendants' proposed construction contains superfluous language and should be rejected. Plaintiffs' first objection to Defendants' proposed construction is that it requires the type of feedback response to be actively "selected from multiple available feedback responses", which, they argue, would import an entirely additional step (the step of selecting) into the claim, violating the canons of claim

**A0591**

construction.

Plaintiffs also object to Defendants' requirement that the unclaimed "selecting" further accomplish the goal of "minimiz[ing] the size or number of feedback responses." Plaintiffs argue that while minimizing the size of number of feedback responses may be the benefit of the invention, not every benefit flowing from an invention is a claim limitation, citing *i4i, Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010), *aff'd* __U.S.__, 131 S. Ct. 2238, 180 L. Ed. 2d 131. They contend Defendants' construction adds only two, and not all, of the advantages set forth in the patent. According to Plaintiffs, Defendants do not point to any lexicography, disclaimer, or disavowal that allow the limitations to be included in the claims and, further, the patentee apparently chose to put "minimization of feedback responses" in the preamble where it is not a limitation.[1] They further argue that the claims define the invention, and that those claims do not include Defendants' proposed extraneous limitations.

Defendants respond that their construction captures the actual inventive concept claimed to overcome the prior art problems identified in the specification. They further argue that the solution to the problem (the static use of a particular type of response) not addressed by the prior art is to "select" a feedback response to optimize system performance. '215 patent at 9:12-14. They contend that "selecting" or "minimizing" is already part of the claim as part of the element requiring the construction of a feedback response "in response to" incoming data units. Defendants argue that this is not merely some benefit of the invention, it *is* the invention and the claims should be construed

---

[1] Plaintiffs contend that Defendants have never before claimed in their briefing that the preamble is a limitation and are essentially trying to back-door it in as a limitation now. *See Transcript of Claim Construction Hearing* (doc. #255), p. 16.

to capture the scope of the actual invention,[2] citing *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296 (Fed Cir. 2011) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005)(en banc)).

This Court notes that there is currently a split among the judges on the Federal Circuit regarding the appropriate role of the specification in construing the claims of a patent. *See Retractable Technologies, Inc. v. Becton, Dickinson and Company*, 659 F.3d 1369 (Fed. Cir. 2011)(denial of re-hearing en banc). As stated above, Defendants urge that the claims should be construed in order to capture the actual scope of the invention. Judge Lourie is of the view that the claims are limited by the "invention" described in the specification. *Retractable*, 653 F.3d at 1305 ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of the claim to disclosed embodiments or allow claim language to become divorced from what the specification conveys is the invention."). However, Judge Moore along with Chief Judge Rader take the view that the claims define the metes and bounds of the patented invention and, although the specification may shed light on the plain and ordinary meaning of a claim term, it cannot be used to narrow the claim term unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope. *Retractable*, 659 F.3d at 1360-71.

This Court is inclined toward Judge Moore's and Chief Judge Radar's view in *Retractable*. Defendants' proposed construction seems to fall on the side of reading limitations into the claims

---

[2] Ericsson disagrees that the advantage of minimizing the feedback response is the crux of the invention. It contends that the invention is "the creation of a choice in the receiver of multiple different formats of messages to use and then also the creation of a type identifier field which allows the receiver to identify to the transmitter which it is choosing." Transcript, p. 13.

**A0593**

rather than reading the claims in light of the specification. In addition, this Court agrees with Plaintiffs that Defendants' construction adds only two, and not all, of the advantages set forth in the patent. "[T]he fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives." *Phillips*, 415 F.3d at 1327 (internal quotations omitted).

Therefore, this Court finds that the term "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field" means **"responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types."**

      b.    **"means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields" (claim 45)**

**A0594**

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

---

Case IPR2013-00601
U.S. Patent No. 6,772,215

---

**DECLARATION OF DAVID DJAVAHERIAN**

Broadcom v. Ericsson
IPR2013-00601
Broadcom 1007

ActiveUS 119704032v.1

**A0867**

**CONFIDENTIAL PAGES REMOVED**

**A0868-A0869**

TIA/EIA/IS-707-A

# TIA/EIA
# INTERIM STANDARD

## Data Service Options for Wideband Spread Spectrum Systems

## TIA/EIA/IS-707-A

(Revision of TIA/EIA/IS-707)

APRIL 1999

**TELECOMMUNICATIONS INDUSTRY ASSOCIATION**



Representing the telecommunications industry in
association with the Electronic Industries Alliance



Electronic Industries Alliance

Broadcom v. Ericsson
IPR2013-00601
Broadcom 1010



EXHIBIT
1010 - 215
9.16.14

**A0879**

| Field | Length (bits) |
|---|---|
| SEQ | 8 |
| CTL | 6 |
| NAK_TYPE | 2 |
| L_SEQ_HI | 4 |

If NAK_TYPE = '00', the following fields shall be:

| FIRST | 12 |
|---|---|
| LAST | 12 |

If NAK_TYPE = '01', the following fields shall be:

| NAK_Map_Count | 2 |
|---|---|

NAK_Map_Count + 1 occurrences of the following record:

| NAK_Map_SEQ | 12 |
|---|---|
| NAK_Map | 8 |

For any NAK_TYPE value, the following fields shall be:

| Padding_1 | Variable |
|---|---|
| FCS | 16 |
| Padding_2 | variable |

SEQ            - Data frame sequence number.

CTL            - '1100 00' - NAK.  Requests retransmission of data frames.

NAK_TYPE    - NAK type, as defined below:

'00' - Requests retransmission of data frames numbered FIRST through LAST, inclusive.
'01' - Requests retransmission of data frames as specified by the NAK Map(s).

L_SEQ_HI    - The most significant 4 bits of L_V(S).

FIRST        - The 12-bit sequence number of the first data frame for which retransmission is requested.

LAST         - The 12-bit sequence number of the last data frame for which retransmission is requested.

Padding_1   - Padding bits.  As required to octet align the FCS field.  These bits shall be set to '0'.

FCS          - Frame Check Sequence.  The contents shall be as generated by the 16-bit FCS polynomial specified in 3.1 of RFC 1662. The FCS shall cover all fields before the FCS field.

Padding_2   - Padding bits.  As required to fill the remainder of the frame. These bits shall be set to '0'.

4-3

**A0892**

Case: 15-1944   Document: 41   Page: 274   Filed: 03/10/2016

ROBERT AKL, D.SC.                                    September 16, 2014
BROADCOM vs. WI-FI ONE                                              191

Q.   Okay.  What would the purpose be to always include those fields regardless of the type of message?

MR. SHUMAKER:  Objection, form.

A.   From an implementation point of view, having a -- all the fields there with the padding to make the frame be a specific size would make the decoding easier.

Q.   (BY MR. PICCOLOMINI)  Paragraph 47 of your declaration, you opine that the Seo was proposing a change to the standard IS-707, correct?

A.   Yes.

Q.   Are you familiar with the IS-707 standard?

A.   I don't really recall, besides what was mentioned in Seo.

Q.   Did you arrive IS-707 when drafting your declaration?

A.   I think I might have pulled it up, because I think it was referenced in Seo.

Q.   Okay.  So it seems fair that IS-707 could shed light on some of the meaning of the terms in Seo, correct?

MR. SHUMAKER:  Objection, form.

A.   Probably or maybe.

(Exhibit 1010-215 was marked.)

Q.   (BY MR. PICCOLOMINI)  I'm handing you what's marked as Exhibit 1010 of the '215 patent.  This is a copy of IS-707, correct?



**A1096**

Q.    Please turn to page 4-3.

A.    Okay.

Q.    See the CTL field is different for a NAK which has value of 1100 00, correct?

A.    Yes.

Q.    Okay.  And looking at the -- do you see the figure on page 4-3?

A.    Yes.

Q.    And it states that if the NAK_TYPE equals 0, then the following fields shall be first and last, correct?

A.    Yes.

Q.    Is it fair to say that the following fields means the fields following L sequence high would be first and last?

MR. SHUMAKER:  Objection, form.

A.    That's a safe assumption.

Q.    (BY MR. PICCOLOMINI)  Okay.  And continuing to refer to the figure shown in page 4-3, it states that if NAK_TYPE equals 01, the following fields shall be.  Do you see that language?

A.    Yes.

Q.    And it indicates a NAK_Map_Count field, correct?

A.    Yes.

Q.    Is it fair to say that if the NAK_TYPE is 01, then the field shall after L_SEQ_HI is the NAK_Map_Count



**A1099**

ROBERT AKL, D.SC.
BROADCOM vs. WI-FI ONE

September 16, 2014
195

field?

A.    Yes.

Q.    So the IS-707 standard explains that if the NAK_TYPE equals 01, then the first and last fields would not be present, correct?

MR. SHUMAKER:  Objection, form.

A.    Looking at the figure on page 4-3, that is a reasonable assumption.

Q.    (BY MR. PICCOLOMINI)  Okay.  And it also -- so continuing to refer to figure 4-3 of IS-707, if the NAK_TYPE equals 01, then if the NAK_Map_Count plus one occurrences would have the following fields NAK_Map_SEQ and NAK_Map, correct?

A.    Yes.

MR. PICCOLOMINI:  Okay.  I have no more questions.  I can pass witness.

MR. SHUMAKER:  Take a quick break.

(Recess from 5:15 p.m. to 5:20 p.m.)

EXAMINATION

BY MR. SHUMAKER:

Q.    Good afternoon, Dr. Akl.

A.    Afternoon.

Q.    Just a quick couple questions.  Want you to look at Exhibit 1010 from case 205 and that's entitled TIA/EIA interim standard.  You see that?

**A1100**

## Seo Anticipates the Challenged Claims of the '215 Patent

1.      In my original Declaration I explained why Seo anticipates claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent. Below I provide an additional discussion of Seo in reply to Patent Owner's Response.

2.      The existence of padding in Seo does not mean messages have a fixed length. Messages could have one of a number of different possible lengths, but use padding to align frames so that they have an integer number of octets. For example, frames could have variable lengths of 8, 16, 32, or 64 octets, and yet bits of padding (e.g., 4 bits) could be used to align a message to one of these frame length boundaries. Although the different frame lengths are fixed, the messages within the frame (excluding the padding) are variable in length. Such a system would also not be considered fixed length. Seo does not indicate that the NAK message has a fixed length. The fact that Seo can include different numbers of bitmaps also indicates variable length.

3.      Even if all the NAK messages in Seo were the same fixed length, it would not mean that the NAK messages all have the same fields. For example, a message could use a number of bits to contain an alphanumeric string identifying a person's eye color, while a different message could use the same number of bits to

- 2 -

**A1109**

contain an integer representing the balance in a person's bank account. These two messages may be the same length, but they are unquestionably not the same type.

4.      Seo's Figure 4 shows a set of possible fields that can be used in creating a NAK message, but there is no requirement in Seo that all of the fields in the figure must be used in all types of NAK messages. In fact, Seo's Figure 4, columns 5-6, and claims 10-11 describe how different fields "exist" in different types of NAK messages, as indicated by the value of NAK_TYPE. Fields relating to NAK_MAP exist when the NAK message is a bitmap type (NAK_TYPE = 01), and different fields (e.g., FIRST, LAST) exist for the First/Last list type of NAK message (NAK_TYPE = 00). (Seo at claims 10-11; Ex. 1002).

5.      I read this to mean what is says. When a field exists, it is present in the NAK message; when a field does not exist, it is not present. This is a common sense reading of what "exist" means.

6.      I do not believe it would make sense to include unnecessary fields in a NAK message, such as FIRST and LAST fields in a NAK message of the bitmap NAK_TYPE, or bitmap fields in a First/Last type of NAK.

7.      I believe that the text of the IS-707 communication standard from April 1999 (Ex. 1010) provides further confirmation. A person reading the April 1999 IS-707 standard would understand that bitmap fields exist when the NAK is a bitmap type, and not when the NAK is a list type; and that FIRST and LAST fields

- 3 -

**A1110**

exist with the list type of NAK, and not with the bitmap type of NAK.    As shown at page 4-3 of Ex. 1010, when NAK_TYPE is "00", the FIRST and LAST fields follow the L_SEQ_HI field, exactly as shown in Seo Figure 4, and when NAK_TYPE is "01", the NAK_MAP_Count field follows the L_SEQ_HI field (and the FIRST and LAST fields do not exist), just as in Seo.  Because the type-specific fields only exist for their particular type of NAK message, Seo discloses a type identifier field, even under Patent Owner's unsupported claim construction.

8.     Even if the Board were to conclude (1) that padding means fixed length (even though I believe it does not), (2) that fixed length means that fields that "exist" and do "not exist" are both present (even though I do not believe this is logical), and (3) that Seo always uses the same fields even though there is no reason to (and which I do not believe is true), a person of ordinary skill would interpret Seo to disclose two types of NAK messages:

- a first type that has all zeroes in the bitmap-related fields and non-zero data in the list-related fields; and

- a second type that has all zeroes in the list-related fields and non-zero data in the bitmap-related fields.

The '215 patent does not support any special construction of the term "type."  Two messages would still be considered to be different "types" where the messages are constrained by a consistently applied set of rules, such that some fields are always

- 4 -

**A1111**

zeroes in some circumstances, and other fields are always zeroes in other circumstances.

9.    The alleged benefit of the '215 patent is that one type of feedback response might use fewer bits in some cases, and another type of feedback response might use fewer bits in other cases.  For example, Table 1 shows that a consecutive run of missing sequence numbers (example 1) is more efficient as a list; while a non-consecutive set of individual sequence numbers (example 4) would be more efficient as a bitmap.  ('215 Patent at 4:19-29; Ex. 1001).  I do not believe that the benefit of saving bits arises from any alleged distinction of whether information is in a payload or a header.

10.    The '215 patent refers to its Figures 4-7 as "messages" without differentiating parts of those messages, such as those fields that include control information (type) and those fields that contain data content.  I believe that the type field in Figures 4-7 of the '215 patent contain bits that tell a receiver how to process the substance of the data that follows, and therefore would be considered part of a header as opposed to a "payload."

### Availability for Cross-Examination

11.    In signing this declaration, I recognize that the declaration will be filed as evidence in a contested case before the Patent Trial and Appeal Board of the United States Patent and Trademark Office.  I also recognize that I may be

- 5 -

**A1112**

## STATEMENT OF RELATED CASES

Plaintiffs-Appellees Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively, "Ericsson") agree with Defendants' Statement of Related Cases in Defendants' Brief except that *Ericsson, Inc., et al. v. Samsung Electronics Co., et al.*, No. 12-cv-894; *Ericsson, Inc., et al. v. Samsung Electronics Co., et al.*, No. 12-cv-895; and *In the Matter of Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Media Players, and Television, and Components Thereof*, No. 337-TA-862 are no longer pending.

Based on this Court's order dated December 27, 2013 [Dkt. 90], Defendants filed an opening brief with approximately 17,000 words, and Dell filed a separate brief of twenty-two pages that included approximately 2,800 words regarding issues unique to Dell. To minimize the burden on the Court, Ericsson will address the issues in both Defendants' and Dell's Briefs in this single brief of approximately 17,000 words.[1]

## STATEMENT OF JURISDICTION

Ericsson agrees with Defendants' Statement of Jurisdiction.

---

[1] Due to the constraints of a single brief, Ericsson refers the Court to the district court's partial summary judgment and post-trial opinions and orders, Docket Nos. 524 and 615 [A42-103], for additional citations.

1

**A1125**

EXHIBIT 2001

A1210

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00601, -602, and -636
Patent Nos. 6,772,215, 6,466,568, and 6,424,625

_____

**Patent Owner's Requests For Production**

**A1211**

## PATENT OWNER'S REQUESTS FOR PRODUCTION

Pursuant to 37 C.F.R.§ 42.51(b), Patent Owner Ericsson Telefonaktiebolaget L.M. Ericsson ("Ericsson") hereby requests that Petitioner Broadcom, Inc. ("Broadcom") produce for inspection and copying the documents requested below, within 20 days of the Board's Order, service thereof at the offices of Lee & Hayes, 13809 Research Blvd., Suite 405, Austin, TX 78750. Due to the timing and scheduling order, Ericsson requests that Broadcom produce its responses on a rolling basis, with any contracts or agreements in Request Nos. 1-3 being produced as early as possible.

## INSTRUCTIONS

1.     If any of the following requests cannot be answered in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying your inability to answer the remainder and stating whatever information you have concerning the unanswered portions.

2.     You must produce all documents responsive to these requests which are in your actual or constructive possession, custody or control, including all documents within the actual or constructive possession, custody or control of any representative, agent, employee, attorney, accountant, investigator or any person acting for you or on your behalf.

3.     All documents are to be produced as they are kept in the usual course of business, in the files in which such documents have been maintained, and in the order within each file in which such documents have been maintained; or all documents shall be organized and labeled to correspond with the requests below.

4.     If you withhold any document(s) from production on the basis of a claim of attorney-client or any other privilege, or on the basis of the attorney work-product doctrine, you must set

## A1212

forth with specificity the privilege or work product claim and furnish a list identifying each document for which the privilege or work product doctrine is claimed and a description thereof.

5.    If, in responding to the requests, you claim that there is any ambiguity in either a particular request or in a definition or an instruction applicable to the request, that claim shall not be used by you as a basis for refusing to respond, but you shall set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding to the particular request.

6.    Electronic records and computerized information are to be produced in an intelligible format together with a description of the system from which it is derived sufficient to permit rendering the material intelligible.

7.    The requests are to be regarded as continuing, and you are requested to provide any additional information or documents by way of supplemental responses as specified in Federal Rule of Civil Procedure 26(e).

## DEFINITIONS

1.    The terms "you," "your," "Broadcom," and "Petition" refer to Broadcom Corporation and each of its directors, officers, employees, agents, representatives, affiliates, predecessors, successors, assigns, or licensees, privies, and any other person or entity acting or purporting to act on its behalf, and, unless privileged, its attorneys.

2.    The term "the D-Link Litigation" refers to *Ericsson Inc. et al. v. D-Link Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) in the United States District Court for the Eastern District of Texas.

3.    The term "the D-Link Defendants" refers to the Defendants in *Ericsson Inc. et al. v. D-Link Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF), collectively, including D-Link

**A1213**

Corporation, D-Link Systems, Inc., Netgear, Inc., Acer Inc., Acer America Corporation,

Gateway Inc., Dell, Inc., Toshiba Corporation, Toshiba America, Inc., Toshiba America

Information Systems, Inc., Toshiba America Consumer Products, LLC, Belkin International,

Inc., and Intel Corporation.

4.      The term "the '568 Patent" refers to U.S. Patent No. 6,466,568.

5.      The term "the '625 Patent" refers to U.S. Patent No. 6,424,625.

6.      The term "the '215 Patent" refers to U.S. Patent No. 6, 772,215.

### REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

**REQUEST FOR PRODUCTION NO. 1:**   All executed contracts or agreements between Broadcom and any of the D-Link Defendants relating to Wi-Fi compliant products, such as the BCM4313 and BCM4321, that are used in any of the D-Link Defendants' products accused of infringement in the D-Link Litigation.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:**   All executed contracts or agreements between Broadcom and any of the D-Link Defendants that include any indemnity or duty to defend provisions.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 3**:   All joint defense agreements, or other agreements addressing cooperation on the defense of the D-Link Litigation, between Broadcom and any of the D-Link Defendants relating to the D-Link Litigation.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 4:** All invoices provided to or received from any of the D-Link Defendants, or their counsel, seeking reimbursement for any fees or expenses incurred in the D-Link Litigation.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 5:** Records of any payments made by Broadcom to any of the D-Link Defendants, or their counsel, or to Ericsson, pursuant to any actual or alleged contractual duty to defend or indemnify any the D-Link Defendants for any fees or expenses incurred in the D-Link Litigation.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 6:** All emails and written correspondence between any of the D-Link Defendants, or their counsel, and Broadcom, or its counsel, relating to any claimed duty of Broadcom to defend or indemnify any of the D-Link Defendants in the D-Link Litigation from January 1, 2010 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** All emails and written correspondence between Broadcom, or its counsel, and any of the D-Link Defendants, or their counsel, from January 1, 2010 to the present relating to:

A. The filing of IPR2013-00601, IPR2013-00602, and IPR2013-00636;

**A1215**

B.  Intervention by Broadcom in the D-Link Litigation;

C.  The claim construction or interpretation of any of the patents at issue in the D-Link Litigation, including, but not limited to, the '568 Patent, the '625 Patent, or the '215 Patent; and

D.  The validity or alleged invalidity of any of the patents at issue in the D-Link Litigation, including, but not limit to, the '568 Patent, the '625 Patent, or the '215 Patent.

**RESPONSE:**

Dated: December 11, 2013.

_/Peter J. Ayers/_
PETER AYERS, Reg. No. 38,374
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefonaktiebolaget
    L.M. Ericsson

**A1216**

CERTIFICATE OF SERVICE

The undersigned certifies that on December 3, 2013 the foregoing PATENT

OWNER'S REQUESTS FOR PRODUCTION was served on Lead and Back-up

Counsel for Broadcom Corporation by sending the same via Federal Express to the

service address provided in Broadcom's Mandatory Notices:

> Dominic E. Massa, Lead Counsel
> Michael A. Diener, Back-up Counsel
> Wilmer Cutler Pickering Hale and Dorr, LLP
> 60 State Street
> Boston, MA 02109

_/Peter J. Ayers/_

Peter J. Ayers, Reg. No. 38,374

**A1217**

Table of Contents

Due to the nature of our compensation programs, most of our executive officers sell shares of our common stock each quarter or otherwise periodically, often pursuant to trading plans established under Rule 10b5-1 of the Securities Exchange Act of 1934, as amended, or the Exchange Act. As a result, sales of shares by our executive officers may not be indicative of their respective opinions of Broadcom's performance at the time of sale or of our potential future performance. Nonetheless, the market price of our stock may be affected by sales of shares by our executive officers.

**We may be required to defend against alleged infringement of intellectual property rights of others and/or may be unable to adequately protect or enforce our own intellectual property rights.**

Companies in the semiconductor industry and the wired and wireless communications markets aggressively protect and pursue their intellectual property rights. From time to time, we receive notices that claim we have infringed upon, misappropriated or misused other parties' proprietary rights. Additionally, we receive notices that challenge the validity of our patents. Some of these notices involve "non-practicing entities," or NPEs, asserting claims addressing certain of our products. Intellectual property litigation can be expensive, time consuming and distracting to management. An adverse determination in any of these types of disputes could prevent us from manufacturing or selling some of our products or could prevent us from enforcing our intellectual property rights. Further, settlements can involve royalty or other payments that could reduce our profit margins and adversely affect our financial results.

We may also be required to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights. We have received requests from certain customers and strategic partners to include increasingly broad indemnification provisions in our agreements with them. These indemnification provisions may, in some circumstances, extend our liability beyond the products we provide to include liability for combinations of components or system level designs and for consequential damages and/or lost profits. Even if claims or litigation against us are not valid or successfully asserted, these claims could result in significant costs and diversion of the attention of management and other key employees to defend.

Our products may contain technology provided to us by other parties such as contractors, suppliers or customers. We may have little or no ability to determine in advance whether such technology infringes the intellectual property rights of a third party. Our contractors, suppliers and licensors may not be required to indemnify us in the event that a claim of infringement is asserted against us, or they may be required to indemnify us only up to a maximum amount, above which we would be responsible for any further costs or damages. Any of these claims or litigation may materially and adversely affect our business, financial condition and results of operations.

Furthermore, our success and future revenue growth will depend, in part, on our ability to protect our intellectual property. It is possible that competitors or other unauthorized third parties may obtain, copy, use or disclose our technologies and processes, or confidential employee, customer or supplier data. Any of our existing or future patents may be challenged, invalidated or circumvented. We engage in litigation to enforce or defend our intellectual property rights, protect our trade secrets, or determine the validity and scope of the proprietary rights of others, including our customers. We also enter into confidentiality agreements with our employees, consultants and strategic partners and control access to and distribution of our technologies, documentation and other proprietary information. Despite these efforts, internal or external parties may attempt to copy, disclose, obtain or use our products, services or technology without our authorization. If we cannot adequately protect our technology, our competitors may be able to offer products similar to ours.

Our software may be derived from "open source" software, which is generally made available to the public by its authors and/or other third parties. Open source software is often made available under licenses, which impose certain obligations in the event we distribute derivative works of the open source software. These obligations may require us to make
source code for the derivative works available to the public, and/or license such derivative works on different terms than those customarily used to protect our intellectual property. With respect to our proprietary software, we generally license such software under terms that prohibit combining it with open source software. Despite these restrictions, parties may combine our proprietary software with open source software without our authorization, in which case we might nonetheless be required to release the source code of our proprietary software.

We cannot assure you that our efforts to prevent the misappropriation or infringement of our intellectual property or the intellectual property of our customers will succeed. Identifying unauthorized use of our products and technologies is difficult and time consuming. The initiation of litigation may adversely affect our relationships and agreements with certain customers that have a stake in the outcome of the litigation proceedings. Litigation is very expensive and may divert the attention of management and other key employees from the operation of the business, which could negatively impact our business and results of operations.

46

## Brad Caldwell

**Subject:** FW: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

**From:** Kate_Ci_Shang@acer.com.tw [mailto:Kate_Ci_Shang@acer.com.tw]
**Sent:** Friday, June 04, 2010 11:02 AM
**To:** ROGER TU
**Subject:** RE: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

Dear Roger, for Wilan patents, we've been gathering vendors' inputs, and would need to discuss further. Is it possible to arrange another meeting before meeting in Sweden?

**Main purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros. Orrick will lead the discussion so I don't mind if we meet in US with your counsels there.**

Kate

| ROGER TU <roger.tu@ericsson.com> | To | "Kate_Ci_Shang@acer.com.tw" <Kate_Ci_Shang@acer.com.tw> |
|---|---|---|
| | cc | |
| 2010/06/04 上午 10:54 | Subject | RE: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps |

Dear Kate,

We don't expect any technical discussion for the meeting in Sweden. Both parties should aim to conclude the commercial discussion then.

BR/Roger

**From:** Kate_Ci_Shang@acer.com.tw [mailto:Kate_Ci_Shang@acer.com.tw]
**Sent:** Friday, June 04, 2010 10:47 AM
**To:** ROGER TU
**Subject:** Re: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

Dear Roger, regarding the technical discussion about Wlan patents, do you expect that we do it the same day when we visit Sweden?

Kate

6/30/2010

**A1452**

**ROGER TU**
**<roger.tu@ericsson.com>**

2010/06/01 上午 11:29

To "lydiawu@acer.com.tw" <lydiawu@acer.com.tw>

cc Kasim Alfalahi <kasim.alfalahi@ericsson.com>, Andreas Iwerb跌k <andreas.iwerback@ericsson.com>, Martin Karlsson <martin.karlsson@ericsson.com>, "bj_lin@acer.com.tw" <bj_lin@acer.com.tw>, "Kate_Ci_Shang@acer.com.tw"

<Kate_Ci_Shang@acer.com.tw>

Subject (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

Dear Lydia,

Thanks for the meeting dated May 19th. Both parties have reached certain consensus regarding the issue of Ericsson patent license(PC/End-User-Terminal). I hereby summarize the action points for your reference:

**PC (WLAN/WiMAX patent license)**
Acer requested to have more technical discussion with the chipset suppliers. To facilitate the technical discussion, Ericsson agreed with that Acer can disclose the Chipworks documents(reverse-engineering, Acer PC vs. Ericsson WLAN patent) to Acer's suppliers. Since Ericsson has provided all the necessary technical information, we don't expect a long technical discussion in this case. Acer should make the decision and conclude the commercial discussion as soon as possible.

As both parties agreed, the next meeting will be held in Sweden. The tentative schedule is below:

Date: June 29th, 2010

Time: 09:30AM~12:00PM

Place: Ericsson office

Torshamnsgatan 21-23, Stockholm, Sweden

6/30/2010

**A1453**

I would need Acer's confirmation in order to arrange the meeting. If any questions, please don't hesitate to call me.

Best Regards

**ROGER TU**
**IPR Director, Licensing & Patent Development**

Ericsson (China) Communications Co. Ltd.
No.5 Lize East Street, Chaoyang District
Beijing, China
Phone +86-10-84769600
Fax +86-10-84767765
Mobile +86-13581626085
roger.tu@ericsson.com
www.ericsson.com



This Communication is Confidential. We only send and receive email on the basis of the terms set out at www.ericsson.com/email_disclaimer

**A1454**

6/30/2010

# EXHIBIT 2009

**CONFIDENTIAL PAGES REMOVED**

**A1463-A1498**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| **ERICSSON INC., et al.,** | § § § | |
| **Plaintiffs,** | § § § | |
| **vs.** | § § § | **CASE NO. 6:10-CV-473** |
| **D-LINK CORPORATION, et al.,** | § § § | |
| **Defendants.** | § § § | |

## ORDER

Before the Court are Plaintiff Ericsson Inc.'s Emergency Motion for Relief from the Protective Order (Docket No. 662) and Ericsson's Emergency Motion for Expedited Briefing (Docket No. 664). For the following motions, the motions are **DENIED**.

## BACKGROUND

On August 8, 2013, the Court entered final judgment against Defendants Toshiba Corporation and Toshiba America Information Systems, Inc., (collectively, "Toshiba") and Dell, Inc. ("Dell") in favor of Plaintiffs Ericsson Inc. and Telefonakiebolaget LM Ericsson (collectively, "Ericsson"). During the course of the litigation, Ericsson discovered (1) an indemnity agreement between Toshiba and non-party Broadcom Corporation ("Broadcom"), (2) an indemnity agreement between Dell and Broadcom, and (3) an email between Dell and Broadcom discussing indemnification (collectively "Indemnity Documents"). Dell and Toshiba disclosed the Indemnity Documents pursuant to the Court's Protective Order, originally issued on October 18, 2011. Docket No. 148.

**A1628**

In the Motion for Relief from the Protective Order, Ericsson requests to disclose the Indemnity Documents in an inter partes review proceeding ("IPR") at the Patent Trial and Appeal Board ("PTAB"), which was initiated by Broadcom on September 20, 2013.  According to Ericsson, the Indemnity Documents show Broadcom is in privity with Dell and Toshiba, or at least show additional discovery is warranted on the issue.  Docket No. 662 at 1.  If Broadcom is in privity with Dell or Toshiba, Broadcom would be ineligible to petition for an IPR pursuant to the one-year bar of 35 U.S.C. § 315(b) ("An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent.").  In opposition, Dell and Toshiba argue the potential benefit to Ericsson for modifying the Protective Order will be outweighed by the potential harm they will suffer.  Specifically, Dell and Toshiba argue indemnification agreements do not show privity under the PTAB's recent rulings, and that as non-parties to the IPR, they will no longer in control of their confidential materials.  Docket Nos. 668 at 5, 669 at 2–3.

In the Motion for Expedited Briefing, Ericsson requests the Court to order Toshiba and Dell to file redacted, non-confidential versions of their briefs in response to the Motion for Relief from the Protective Order.  Docket No. 664 at 2.  Ericsson intends to use these briefs to "update the PTAB on the status" of Ericsson's Motion for Relief from the Protective Order and to show the PTAB the Defendants' "stated basis for opposing the motion."  *Id.*  Dell has agreed to this request and Toshiba opposes.  Docket Nos. 666, 667.

2

**A1629**

## ANALYSIS

*Motion for Relief from Protective Order*

Compared to district courts, the PTAB has an intentionally narrower scope of discovery. *See* 35 U.S.C. § 316(a)(5)(B) (limiting discovery to what is "necessary for the interest of justice"). Additionally, the PTAB has a corresponding narrower protection for the confidentiality of discoverable materials. *See* "Office Patent Trial Practice Guide," 77 Fed. Reg. 48761 ("Confidential information that is subject to a protective order ordinarily would become public 45 days after denial of a petition to institute a trial or 45 days after final judgment in a trial."). Granting Ericsson's request for relief from the Protective Order would allow Ericsson to circumvent this balance between IPR discovery and confidentiality. In essence, Ericsson would be able to use the Court's broader Rule 26 "relevancy" standard for discovery, yet subject Dell and Toshiba to the PTAB's narrower protections of confidentiality. *Id.* Relatedly, Ericsson only is aware of the Indemnity Documents as a matter of coincidence because of its former litigation and the broad scope of discovery pursuant to Rule 26.

Moreover, granting Ericsson relief from the Protective Order in this case would undermine the negotiations which produced the Protective Order. Ericsson, as the plaintiff in the district court litigation and the patent owner in any potential IPR, was in the best position to negotiate whether it may disclose documents discovered during litigation in an IPR.[1] Accordingly, Ericsson's Emergency Motion for Relief from the Protective Order is **DENIED**.

---

[1] For example, the parties considered proceedings at the PTAB when they negotiated the protective order, and agreed that anyone who viewed confidential information "may not participate, directly or indirectly, in the drafting preparation, or amending of any patent claim [and] may not reveal the content of [confidential] materials to reexamination counsel or agents." Docket No. 148 at 10–11. Ericsson has failed to show why this protection should not apply to the IPR.

**A1630**

*Motion for Expedited Briefing*

      Ericsson requests an expedited briefing schedule and for Dell and Toshiba to provide redacted, non-confidential briefs in response to Ericsson's Motion for Relief from Protective Order.  The Court has ordered an expedited briefing schedule.  Docket No. 665.  Accordingly, Ericsson's requests concerning the briefing schedule are **DENIED AS MOOT**.  Additionally, Dell has agreed to provide a redacted response brief.  Docket No. 667.  Furthermore, the Court has denied Ericsson's underlying request for relief from the Protective Order.  Consequently, there is little, if any, benefit in ordering Toshiba to supply a redacted response brief.  Accordingly, Ericsson's request to require Toshiba to file a redacted brief is **DENIED**.

           **So ORDERED and SIGNED this 20th day of December, 2013.**

           **LEONARD DAVIS**
           **UNITED STATES DISTRICT JUDGE**

4

**A1631**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **ERICSSON. INC., ET AL.,** | § § § | |
| **Plaintiffs,** | § § | |
| **vs.** | § § | **CASE NO. 6:10-CV-473** |
| **D-LINK CORPORATION. ET AL.,** | § § § | |
| **Defendants.** | § § § | |

## FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

On September 14, 2010, Ericsson Inc. and Telefonaktiebolaget LM Ericsson ("Ericsson") filed this action against D-Link Corporation[1] and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer, Inc. and Acer America Corporation ("Acer") and Gateway, Inc. ("Gateway"). Ericsson filed an amended complaint on June 8, 2011. The amended complaint added the following defendants: Dell, Inc. ("Dell"); Toshiba Corporation, Toshiba America, Inc.,[2] Toshiba America Information Systems, Inc., and Toshiba America Consumer Products, LLC ("Toshiba"); and Belkin International, Inc. ("Belkin"). Intel Corporation ("Intel") intervened in this action on June 22, 2012, and Ericsson brought a counterclaim against Intel on July 3, 2012. The Court conducted an eight day trial beginning June 3, 2013. Final judgment is now appropriate because all issues between Ericsson and the Defendants have been finally resolved by either the jury or the Court's Memorandum Opinion and Order (Docket No. 615).

---

[1] The Court dismissed D-Link Corporation on January 31, 2011. Docket No. 54.

[2] The Court dismissed Toshiba America, Inc. and Toshiba America Consumer Products, LLC on August 16, 2011. Docket No. 120.

Broadcom v. Ericsson
IPR2013-00601
Ericsson Ex. 2018

**A1641**

Case IPR2013-00601

UNITED STATES PATENT AND TRADEMARK OFFICE

——————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

——————————————

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)
Patent Owner

——————————————

Case IPR2013-00601
Patent 6,772,215
Title: Method for Minimizing Feedback Responses in ARQ Protocols

——————————————

**DECLARATION OF ROBERT AKL, D.Sc.,
IN SUPPORT OF PATENT OWNER'S RESPONSE**

Broadcom v. Ericsson
IPR2013-00601
Ericsson Ex. 2020

1

**A1645**

Case IPR2013-00601

D. Declaration of Harry Bims, Ph.D. (Petitioner's Exhibit No. 1004) ("Bims Dec.") and exhibits cited to therein;

E. Memorandum Opinion and Order Construing Claim Terms of United States Patent Nos. 6,772,215 *et al.*, dated March 8, 2013 (Petitioner's Exhibit No. 1005);

F. Rebuttal Expert Report of Scott Nettles, Ph.D. Regarding Validity of U.S. Patent Nos., 6,424,625; 6,330,435; 6,519,223; 6,772,215; 6,466,568; and 6,987,019 (Petitioner's Exhibit No. 1006); and

G. Decision: Institution of Inter Partes Review—37 C.F.R. §42.108 (IPR2013 00601, Paper No. 29);

H. Amendment and Reply to Office Action for Application No. 09/537,146 (January 7, 2004) (Patent Owner's Exhibit No. 2020)

I. Notice of Allowability for Application No. 09,537,146 (February 24, 2004) (Patent Owner's Exhibit No. 2020)

## THE LEVEL OF ORDINARY SKILL IN THE ART

13.    It is my opinion, based upon a review of the file history of the '215 patent and the other evidence addressed herein, that a person of ordinary skill in the art as of the '215 patent would have had, as of April 1999, a bachelor's degree in computer science or a similar technical field and at least two years of experience in telecommunications and network protocols.

## OPINIONS

### A. Overview of the '215 Patent

14.    The '215 Patent describes different mechanisms for minimizing feedback responses when using an Automatic Repeat Request (ARQ) protocol to

7

**A1651**

Case IPR2013-00601

request retransmission of lost or erroneous Protocol Data Units (PDUs). (Ex. 1001, '215 Pat. at 1:27-37). A PDU is a unit of data conveyed between two peer entities in a telecommunication network. '215 Pat. at 1:29-30. A PDU comprises an information element that includes a header having control information and a payload. An ARQ protocol is a set of rules that provides efficient retransmission mechanisms between a sender and a receiver peer in a communication system. '215 Pat. at 1:42-48. These rules specify, for example, how and in what form the PDUs are to be constructed so that the receiving side can interpret the conveyed PDUs correctly and respond to them accordingly. *Id*.

15.    Three main types of PDUs can be transferred between ARQ peer entities:  user data, error recovery control data, and common control data. '215 Pat. at 1:49-51. A user data PDU may include user data and a sequence number. *Id*. An error recovery control data PDU may include various control information needed for error recovery and control functions such as positive and negative acknowledgments. *Id*. PDUs that include user data and at least a sequence number are referred to as Data-PDUs (D-PDUs), and PDUs that include control data used for error control/recovery are referred to as Status-PDUs (S-PDUs). *Id*.

16.    Prior art ARQ protocols included a format identifier or PDU type field in the header to distinguish a Data-PDU from a Status-PDU. *Id*. at 2:52-55. That field is labeled "PDU_format" in FIGS. 2 and 3 of the '215 Patent (below):

**A1652**

Case IPR2013-00601

numbers.

20.    Prior art ARQ protocols used inefficient, fixed length messages to request retransmission of lost or corrupted PDUs. *Id*. at 3:46-50. Due to the required fixed length of an S-PDU, prior art ARQ protocols for creating S-PDUs wasted bandwidth by unnecessarily transmitting a large amount of overhead information. *Id*. at 3:48-50 and Table 2. For example, a significant amount of unnecessary overhead is introduced when a large number of D-PDUs are transmitted between two ARQ peer entities as each D-PDU must be acknowledged or selectively requested for retransmission. *Id*. at 3:50-54.

21.    The '215 Patent provides for encoding of multiple messages in a single S-PDU. To do so, the '215 patent includes messages (BITMAP, LIST, ACK or NO MORE) in the payload to allow for more flexibility in creating S-PDUs. (*Id*. at Table 2.) For example, the receiving peer entity in the prior art could request only one type of ARQ message (BITMAP or LIST) because the format identifier of the message was required to be in the header. (*Id*. at FIGs. 2-3) The '215 Patent, on the other hand placed the ARQ message in the payload to create a flexible system allowing messages to vary in terms of length, location, and content. ('215 Pat. at FIGs. 4-8, 3:46-50)

22.    The '215 Patent was directed toward addressing the problem of "determin[ing] how to efficiently represent (encode) in a message the status of an

10

**A1654**

Case IPR2013-00601

arbitrary amount and distribution of n numbers from a set of m numbers," where n is the number of sequence numbers identified in the message and n is the total number of sequence numbers. '215 Pat. at 4:31-34. The claimed method "can be used to minimize the size of S-PDUs in an ARQ protocol," *id*. at 4:33-35, or "can be used to maximize the number of SNs in an S-PDU with limited size, if it is not possible to fit all potential SNs into a single S-PDU." *Id*. at 4:35-40.

23.    As part of the message, the '215 specification introduces a "type identifier field" in the payload that indicates the type of ARQ information being transmitted in the message.  For example, the type identifier field could indicate that the message is a "BITMAP," a "LIST," or an "ACK" (acknowledgement) message.  *Id*. at Table 2.  By including the type identifier field in the message the payload, as opposed to the header, the '215 Patent supported different "types" of feedback messages (e.g., "BITMAP'," and "LIST'," "ACK," and "NO MORE") in "arbitrary" combinations in a single S-PDU.  *Id*. at 7:61-65; see also FIGS. 9-13. This flexibility in constructing ARQ messages permits the '215 Patent to achieve significant bandwidth savings over the prior art ARQ messages that use a header field to indicate the type of payload.  '215 Pat. at 9:38-50 (TABLE 3).

24.    Figures 4-7 of the '215 patent (as shown below) depict message types that are constructed differently from the prior art ARQ messages according to a "first embodiment of the present invention."  '215 Pat. at 5:12-24.  The first

Case IPR2013-00601

embodiment includes only a single message in the payload.  Id. at 5:12 ("FIG. 4 is

a bitmap message….").



25.    FIG. 4 illustrates "a bitmap message" while FIG. 5 shows the "fields

and contents of the LIST" type message.  *Id*. at 5:12-16.  To distinguish among

these various types, the '215 Patent includes a "type identifier field" (*i.e.*, "Type"

in FIGs. 4-7) in the message itself.  Unlike the admitted prior art S-PDU, none of

the header fields such as "PDU_format" are included in the message.  Placing the

type identifier in the header reduces the flexibility of the system by creating an

ARQ protocol that is "static in construction (e.g., fixed length messages are used)"

and "leads to a waste of bandwidth resources, because a great deal of overhead

information is transmitted unnecessarily."  '215 Pat. at 3:46-50.

26.    The type identifier field is included in the message to provide a

roadmap for the receiver peer entity to interpret the received message.  This

"dynamic interpretation" of an S-PDU provides flexibility in creating S-PDUs by

removing the "one size fits all" S-PDU requirement of the prior art, while

12

**A1656**

Case IPR2013-00601

conserving bandwidth.  Thus, the '215 patent discloses that the payload of the S-PDU includes one or more messages.

27.     By placing the entire message in the payload, the '215 Patent permits multiple messages in a single PDU.  FIG. 8 illustrates an example of a single S-PDU that includes three separate message fields (with annotations added) in a single payload.



FIG. 8

28.     "As shown, the resulting S-PDU includes two BITMAP' messages and one LIST' message."  215 Pat. at 8:41-44.  Each of these messages includes a "Type" field that identifies a type of each message included in the payload along with the contents of each type of message.  As with the single message embodiment, none of the header fields (e.g., "PDU_format") are included in the message.

29.     During prosecution of the '215 Patent, the Examiner rejected the claims based on a number of prior art references that disclosed ARQ protocols with different feedback responses.  In response to this rejection, the claims of the '215

13

**A1657**

Case IPR2013-00601

Patent were amended by requiring that the "type identifier field" be included within the message field of the second data unit. ((Ex. 2021 (January 7, 2004 Amendment) at 11-12.). The Examiner agreed that this amendment distinguished over the prior art ARQ messages, including the admitted prior art that included a PDU_format field in the header. (EX. 2022 (Notice of Allowance) at 1.) Seo is cumulative of the references already considered and found deficient by the Examiner because, like the PDU_format field, the alleged type identifier field is located in the header and not in the message field, as required by all of the challenged claims.

## B. Broadest Reasonable Interpretation

30.    I understand that during inter partes review claims are given their broadest reasonable interpretation in view of the specification of which they are part. I further understand that a construction that is inconsistent with the specification is unreasonable and should be rejected.

31.    Broadcom petitions for review of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 32, 45, 46, 49, 52, and 54 of the '215 Patent. Pet. at 3. Claims 1, 15, 25, and 45 are independent claims. All of the independent claims are drawn to either a method or system "for minimizing feedback responses in an ARQ protocol." The primary difference between the claims is that certain claims recite "constructing" a single ARQ "message field including a type identifier field" (*i.e.*, claims 1 and 15),

14

**A1658**

Case IPR2013-00601

uses a one-to-one correlation between the number of NAK frames and the number

of retransmitted data frames, regardless of channel conditions, as shown in Seo's

FIG. 1 (shown below).  *Id*. at 1:44-47.  Seo proposes a protocol in which the

number of NAK frame transmissions and D-PDU retransmissions depend on the

channel conditions, as shown in Seo's FIG. 6 (shown below).



*Seo*, FIG. 1 and FIG. 6.

42.    FIG. 6 represents a case in which the channel conditions are good

from Receiving Station B to Transmitting Station A, and bad from Transmitting

Station A to Receiving Station B.  In my opinion, Seo teaches the transmission of

one NAK frame from B to A, and two D-PDU retransmissions from A to B.  Seo

never uses the word minimize nor does Seo teach or suggest how to minimize the

size or number of feedback response messages by selecting one type of NAK or

another.  All references to reducing the number of NAK control frames refer to the

benefit of sending only one frame when channel conditions are good.

19

**A1663**

Case IPR2013-00601

43.     The Seo protocol built on the then existing NAK control frame shown in FIG. 2 of the '215 patent below (annotations added):

| FIELD | LENGTH (BITS) |
|-------|---------------|
| SEQ | 8 |
| CTL | 8 |
| FIRST | 8 |
| LAST | 8 |
| FCS | 16 |
| PADDING | VARIABLE |

**FIG. 2**
**BACKGROUND ART**

44.     The frame is fixed in size and consists of two parts: the header (in red) and the payload (in blue).  The header includes "a sequence number field SEQ" and "a control field CTL," which are used to control how to process the message contents (*i.e.*, payload) and are common across different RLP control frames.  *Id.* at 1:56-59.  SEQ represents the "data frame sequence number field."  *Id.* at 1:56-59.  A specific value in the first four bits of the control field CTL (i.e., "1100") "represents that the RLP control frame is the NAK frame and it requests to retransmit data frames."  *Id.* at 1:65-66.  Different values in the control field represent different types of synchronization, including synchronization without or without encryption and/or acknowledgement.  *Id.* at 2:1-9.

45.     The remaining fields make up the NAK-specific message.  Included within that message is the "field FIRST," which "presents the 8 bit sequence of a first data frame for which retransmission is requested."  *Id.* at 2:10-11.  Seo makes

20

**A1664**

Case IPR2013-00601

clear that this field is "used only in case of an NAK." *Id*. at 2:12-13. The same is

true of the "field LAST," which "indicates the 8 bit sequence number of a last data

frame for which retransmission is requested." *Id*. at 2:12-16 ("used only in case of

an NAK"). The "field FCS is a frame check sequence" is essentially a checksum

to ensure that the contents of the message were transmitted correctly. *Id*. at 2:17-

19. Because the S-PDU has a fixed-length, the remainder of the message is filled

with "padding bits and is required to fill the remainder of the frame." *Id*. at 2:20-

22.

46.   Seo's S-PDU format is shown in FIG. 4:

Case IPR2013-00601

| FIELD | LENGTH (BITS) |
|---|---|
| SEQ | 8 |
| CTL | 4 |
| RE_NUM | 2 |
| NAK_TYPE | 2 |
| NAK_SEQ | 4 |
| L_SEQ_HI | 4 |
| | |
| FIRST | 12 |
| LAST | 12 |
| FCS | 16 |
| PADDING | VARIABLE |
| | |
| NAK_Map_Count | 2 |
| NAK_Map | |
| NAK_Map_SEQ | 12 |
| NAK_Map | 8 |

## FIG. 4

Seo, Fig. 4 (annotations added).

47.    The PDU shown in Fig. 4 includes a fixed length header (shown in red) and a fixed length message field (shown in blue above).  The header includes the standard IS-707 fields such as, "SEQ" and "CTL," which are used for routing and processing of the S-PDU, much like an address on an envelope.  *Id.* at 1:56-67-2:1-9 and FIG. 2.  In addition, Seo adds a number of different fields, including RE_NUM, NAK_TYPE, NAK_SEQ, and L_SEQ_HI to the standard IS-707 header.  *Id.* at 5:44-46 and FIG. 4.  The fixed-length message in the payload spans from the FIRST field to the NAK_MAP field.  *Id.*  The blank row between the

22

**A1666**

Case IPR2013-00601

L_SEQ_HI field and the FIRST field delineates between the header and the payload, which includes the message. *Id.*

48.    Broadcom contends Seo anticipates the challenged claims. Specifically, Broadcom contends that the NAK_TYPE field anticipates the claimed "type identifier field." Pet. at 2. I disagree. First, unlike the broadest reasonable construction of this term, the NAK_TYPE field in Seo does not "identif[y] the message type of a feedback response message from a number of different message types" because Seo merely discloses a single message type. Second, the NAK_TYPE field is not included in the "message field" as required by all of the challenged claims.

### 1. The Seo NAK_TYPE field does not "identif[y] the message type of the feedback response from a number of different message types"

49.    The Seo NAK_TYPE field does not "identif[y] the message type of the feedback response message from a number of different message types," as required by the proper broadest reasonable construction of the term "type identifier field." Seo discloses only one message type, namely a redundant NAK control frame that contains both bitmaps and lists. *Id.* at 5:28-30. Seo's NAK frame has a constant size and format, containing both a bitmap and a list, regardless of the NAK_TYPE. *Id.* at 5:28-30, FIG. 4, claim 10. The NAK frame disclosed by Seo always contains the same fields whose content varies with the contents of the NAK_TYPE field. *Id.*

23

**A1667**

Appl. No. 09/537,146
Amdt. Dated January 7, 2004
Reply to Office action of October 7, 2003
Attorney Docket No. P11898-US2
EUS/J/P/04-3004

This listing of claims will replace all prior versions, and listings, of claims in the application:

Listing of Claims:

1.    (Currently Amended)    A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a type identifier field, a sequence number field, a length field, and a content field.

2.    (Original)    The method of Claim 1, wherein said message field comprises a bitmap message.

3.    (Original)    The method of Claim 1, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

4.    (Original)    The method of Claim 1, wherein said sequence number field includes any sequence number from said plurality of first data units.

5.    (Original)    The method of Claim 1, wherein said length field comprises a length value for said content field.

6.    (Original)    The method of Claim 1, wherein said content field comprises a bitmap.

7.    (Original)    The method of Claim 1, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

A1698

Appl. No. 09/537,146
Amdt. Dated January 7, 2004
Reply to Office action of October 7, 2003
Attorney Docket No. P11898-US2
EUS/J/P/04-3004

8.    (Original)    The method of Claim 1, wherein said second data unit comprises information about missing or erroneous said first data units.

9.    (Original)    The method of Claim 1, wherein the size of said length field is zero and a predefined bitmap size is used.

10.    (Original)    The method of Claim 1, wherein said length field indicates a final sequence number in a bitmap.

11.    (Original)    The method of Claim 1, wherein said length field comprises a value of zero.

12.    (Original)    The method of Claim 1, wherein a size of said sequence number field equals zero.

13.    (Original)    The method of Claim 1, wherein at least one of said plurality of first data units is used to piggy-back said message field.

14.    (Original)    The method of Claim 1, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

15.    (Currently Amended)    A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of ~~a type identifier field~~, a length field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous

A1699



Appl. No. 09/537,146
Amdt. Dated January 7, 2004
Reply to Office action of October 7, 2003
Attorney Docket No. P11898-US2
EUS/J/P/04-3004

sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

16.    (Original)    The method of Claim 15, wherein said message field comprises a list message.

17.    (Original)    The method of Claim 15, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

18.    (Original)    The method of Claim 15, wherein said length field comprises a value of zero.

19.    (Original)    The method of Claim 15, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

20.    (Original)    The method of Claim 15, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

21.    (Original)    The method of Claim 15, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

22.    (Original)    The method of Claim 15, wherein said second data unit comprises information about missing or erroneous said first data units.

23.    (Original)    The method of Claim 15, wherein at least one of said plurality of first data units is used to piggy-back said message field.

24.    (Original)    The method of Claim 15, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

Page 4 of 14

Appl. No. 09/537,146
Amdt. Dated January 7, 2004
Reply to Office action of October 7, 2003
Attorney Docket No. P11898-US2
EUS/J/P/04-3004

25.    (Currently Amended)    A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing between one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of ~~a type identifier field,~~ a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.



26.    (Original)    The method of Claim 25, wherein said one to several message fields further comprise an acknowledgment message.

27.    (Original)    The method of Claim 25, wherein the last of said one to several message fields includes an acknowledgment of all SNs not indicated erroneous by all other of said one to several message fields in said second data unit.

28.    (Original)    The method of Claim 25, wherein said one to several message fields further comprise a no more message.

29.    (Original)    The method of Claim 25, wherein said one to several message fields include a bitmap message.

30.    (Original)    The method of Claim 25, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

40

**A1701**

Appl. No. 09/537,146
Amdt. Dated January 7, 2004
Reply to Office action of October 7, 2003
Attorney Docket No. P11898-US2
EUS/J/P/04-3004

31.    (Original)    The method of Claim 25, wherein said length field comprises a length value for said content field.

32.    (Original)    The method of Claim 25, wherein said content field comprises a bitmap.

33.    (Original)    The method of Claim 25, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

34.    (Original)    The method of Claim 25, wherein said second data unit comprises information about missing or erroneous said first data units.

35.    (Original)    The method of Claim 25, wherein the size of said length field is zero and a predefined bitmap size is used.

36.    (Original)    The method of Claim 25, wherein said length field indicates a final sequence number in a bitmap.

37.    (Original)    The method of Claim 25, wherein said length field comprises a value of zero.

38.    (Original)    The method of Claim 25, wherein a size of said sequence number field equals zero.

39.    (Original)    The method of Claim 25, wherein said one to several message fields include a list message.

40.    (Original)    The method of Claim 25, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

41

Appl. No. 09/537,146
Amdt. Dated January 7, 2004
Reply to Office action of October 7, 2003
Attorney Docket No. P11898-US2
EUS/J/P/04-3004

41.    (Original)    The method of Claim 25, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

42.    (Original)    The method of Claim 25, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

43.    (Original)    The method of Claim 25, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

44.    (Original)    The method of Claim 25, wherein at least one of said plurality of first data units is used to piggy-back said one to several message fields.

45.    (Currently Amended)    A system for minimizing feedback responses in an ARQ protocol, comprising:

a first peer entity;

a second peer entity; and

a communication link coupled between said first peer entity and said second peer entity for communicating data therebetween;

said first peer entity including means for sending a plurality of first data units over said communication link to said second peer entity;

said second peer entity including means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a type identifier field, a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

46.    (Original)    The system of Claim 45, wherein said one to several message fields further comprise an acknowledgment message.

42

**A1703**

Appl. No. 09/537,148
Amdt. Dated January 7, 2004
Reply to Office action of October 7, 2003
Attorney Docket No. P11898-US2
EUS/J/P/04-3004

## REMARKS/ARGUMENTS

### Amendments

The Applicants have amended Claims 1, 15, 25 and 45. Claims 1-64 are pending in the application. Favorable reconsideration of the application is respectfully requested in view of the foregoing amendments and the following remarks.

### Claim Rejections – 35 U.S.C. § 102(b)

The Examiner rejected Claims 1-8, 13-16, 19-34, 39, 41-54, 59, and 61-64 under 35 U.S.C. 102(b) as being anticipated by Cam *et al.* IEEE vol. 45, No 1, January 1997 (hereinafter, Cam). The Applicant respectfully traverses this rejection and submits that Cam does not disclose at least the emphasized feature present in amended independent Claim 1 below.

> 1.    (Currently Amended)    A    method    for    minimizing feedback responses in an ARQ protocol, comprising the steps of:
>
>> sending a plurality of first data units over a communication link;
>> receiving said plurality of first data units; and
>
> responsive to the receiving step, constructing a message field for a second data unit, said message field including <u>a type identifier field and</u> at least one of a sequence number field, a length field, and a content field. (emphasis added)

Cam appears to disclose the effect of feedback errors on the throughput of ARQ protocols in a point-to-point channel under feedback assumptions. The Cam reference shows that feedback errors on the throughputs of continuous ARQ protocols can be reduced by modifying the retransmission by sending the complete state of the receiver back with each acknowledgment. As noted in the Detailed Action, a correspondence is drawn between the sequence number field, length field and content field. In independent Claim 1 and the description of a complete feedback scheme found on page 36 col. 2 line 34 to page 37, col. 1, line 19 of the Cam reference. In this passage, Cam is discussing the state of the receiver and discloses that the "complete receiver state

Page 11 of 14

**A1707**

Appl. No. 09/537,146
Amdt. Dated January 7, 2004
Reply to Office action of October 7, 2003
Attorney Docket No. P11898-US2
EUS/J/P/04-3004

information" consists of the sequence number of the first outstanding packet and the contents of the re-sequencing buffer (page 36, col. 2, lines 27-32). The sequence number field is discussed, but the Applicants are unable to determine any of the other fields claimed in the original version of Claim 1. The Applicants respectfully submit that amended Claim 1 provides the <u>type identifier field</u> and at least one of a sequence number field, a length field, and a content field. The only field that is disclosed in Cam is the sequence number field. The other fields don't seem to be present or suggested in the Cam reference. Therefore, Claim 1 is not anticipated by the Cam reference. This being the case, Claims 2-8 and 13-14 depend from Claim 1 and are not anticipated by Cam.

As between Claim 1 and the Cam reference, the Applicants submit that amended independent Claims 15, 25 and 45 contain limitations analogous to those found in Claim 1. For the above given reasons the Applicants respectfully submit that Claim 15, 26 and 45 are patentable over the Cam reference. This being the case, Claims 16 and 19-24, which depend from Claim 15 are not anticipated by Cam. Claims 26-34, 39 and 41-44, which depend from Claim 25 are also not anticipated by Cam. Also, Claims 54, 59, and 61-64, which depend from Claim 45 are not anticipated by the Cam reference.

## Claim Rejections – 35 U.S.C. § 103 (a)

The Examiner rejected claims 9-12, 17-18, 35-38, 40, 55-58 and 60 under 35. U.S.C § 103(a) as being unpatentable over Cam *et al.* IEEE vol 45, No 1, January 1997 in view of Knisely *et al.* (US 6,317,430) (Knisely).

The Knisely reference is cited for providing a size of length field that is zero and a predetermined bitmap size that is used, a final sequence number in a bitmap, a length field value of zero and a sequence number field equal to zero (fig. 4-7; col 2, lines 30-51; col 5-col 7). Knisely discloses a size of length field, a sequence number field but not seem to disclose a content field or a type identifier field. Therefore, the present invention is patentable over Cam in view of Knisely

The Applicants' respectfully submit that the present invention is patentable over the art of record for at least the reasons provided above with respect to Claim 1. In

Appl. No. 09/537,146
Amdt. Dated January 7, 2004
Reply to Office action of October 7, 2003
Attorney Docket No. P11898-US2
EUS/J/P/04-3004

addition, Applicant respectfully submits that there is no suggestion or motivation in either Cam or Knisely to combine the references to teach the claimed invention. Even if there were motivation to combine, neither reference includes disclosure of a content field and a type identifier field. Therefore, Claims 9-12 which depend from Claim 1 and contain the type identifier field and content field limitations are also patentable over the prior art. Claims 17-18 depend from independent Claim 15, Claims 35-38 and 40 depend from Claim 25 and Claims 55-58 and 60 depend from Claim 45 and contain the novel type identifier field and content field are also patentable over the Cam and Knisely references.

| | Application No. | Applicant(s) |
|---|---|---|
| ***Notice of Allowability*** | 09/537,146 | RATHONYI ET AL. |
| | Examiner | Art Unit | |
| | Frantz B. Jean | 2151 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *to the amendment filed on 1/7/2004*.

2. ☒ The allowed claim(s) is/are *1-64*.

3. ☐ The drawings filed on _____ are accepted by the Examiner.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some*   c) ☐ None  of the:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☒ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☒ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

      1) ☐ hereto or 2) ☒ to Paper No./Mail Date *6*.

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

**Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftperson's Patent Drawing Review (PTO-948)

3. ☐ Information Disclosure Statements (PTO-1449 or PTO/SB/08), Paper No./Mail Date _____

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

7. ☐ Examiner's Amendment/Comment

8. ☐ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____ .

**FRANTZ B. JEAN
PRIMARY EXAMINER**

U.S. Patent and Trademark Office
PTOL-37 (Rev. 1-04)

Notice of Allowability

Part of Paper No./Mail Date

Broadcom v. Ericsson
IPR2013-00601
Ericsson Ex. 2022

**A1712**

# United States Court of Appeals
# for the Federal Circuit

*WiFi One, LLC v. Broadcom Corporation*, No. 2015-1944

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by NELSON BUMGARDNER PC, attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **March 10, 2016** counsel has authorized me to electronically file the foregoing **JOINT APPENDIX (confidential and non-confidential versions)**, with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

DOMINIC E. MASSA, ESQ.
KEVIN GOLDMAN, ESQ.
ZACHARY PICCOLOMINI, ESQ.
KATIE SAXTON, ESQ.
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
617-526-6000
dominic.massa@wilmerhale.com
kevin.goldman@wilmerhale.com
zachary.piccolomini@wilmerhale.com
kate.saxton@wilmerhale.com
*Attorneys for Appellee*

Additionally on this date, the confidential version will be emailed to the above counsel and paper confidential copies will also be mailed to the above principal counsel.

Upon acceptance by the Court of the e-filed document, six confidential paper copies will be filed with the Court within the time provided in the Court's rules.

March 10, 2016                                    /s/ Robyn Cocho
                                                       Counsel Press